## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## CHAMPAIGN/URBANA DIVISION

| | | |
|---|---|---|
| KIM NOLTE, SHERRY LEWIS, and THERESA MITCHELL as representatives of a class of similarly situated persons, and on behalf of the CIGNA 401(k) Plan, | ) ) ) ) ) ) | Cause No: |
| | ) | |
| Plaintiffs; | ) ) | |
| v. | ) ) | |
| CIGNA CORPORATION, JOHN ARKO, THE CORPORATE BENEFIT PLAN COMMITTEE OF CIGNA, and CIGNA HEALTHCARE OF ILLINOIS, INC., | ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED ON ALL COUNTS AND ISSUES SO TRIABLE** |
| Defendants. | ) ) | |

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1.      Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement.  An increasing number of companies recently have terminated traditional pensions and left their employees with only defined contribution 401(k) plans.

2.      In 401(k) plans, the return on employees' investments is critical.  Even seemingly small reductions in a participant's return, like those caused by excess plan fees and expenses in any year, will substantially impair his or her accumulated savings at retirement.

1

3.      But 401(k) plan participants' lack of awareness of such fees, and their implications, is widespread.  In its November 2006 report, *PRIVATE PENSIONS Changes Needed to Provide 401(k) Plan Participants and the Department of Labor Better Information on Fees* (the "GAO Report," available at http://www.gao.gov/docsearch/abstract.php?rptno=GAO-07-21 ), the Government Accountability Office ("the GAO") concluded:

> Participants may not be aware of the different fees that they pay, yet are responsible for directing their investments within the plan. According to industry professionals, participants can be unaware that they pay any fees for their 401(k) investments and are particularly unaware of investment fees that are typically not quantified on account statements. In a nationwide survey, more than 80 percent of 401(k) participants report not knowing how much they pay in fees.

GAO Report, p. 17.

4.      The information that 401(k) plan participants are *not* receiving, in a useful form, is crucial to their financial well-being in retirement.  The most certain means of increasing the return on a plan participant's 401(k) savings is to reduce the plan's fees and expenses.  The GAO Report emphasizes the substantial and material impact of seemingly minor variations in 401(k) fees and expenses:

> Over the course of the employee's career, fees may significantly decrease retirement savings.  For example, a 1-percentage point difference in fees can significantly reduce the amount of money saved for retirement. Assume an employee of 45 years of age with 20 years until retirement changes employers and leaves $20,000 in a 401(k) account until retirement. If the average annual net

return is 6.5 percent—a 7 percent investment return minus a 0.5 percent charge

for fees—the $20,000 will grow to about $70,500 at retirement. However, if fees

are instead 1.5 percent annually, the average net return is reduced to 5.5 percent,

and the $20,000 will grow to only about $58,400.  The additional 1 percent annual

charge for fees would reduce the account balance at retirement by about 17

percent.

GAO Report, p.7.

　　　　5.　　　Unlike generalized market fluctuations, employers can control these fees

and expenses.  Federal law requires them to do so.  The Employee Retirement Income

Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"), prohibits the charging of

excess fees and expenses to 401(k) plans and requires that employers, and those they

appoint to run their 401(k) plans, must ensure that 401(k) plan fees and expenses are

reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

　　　　6.　　　Service providers in the retirement industry have developed a variety of

fee structures for the services they sell to 401(k) plans.  At best, these fee structures are

complicated and confusing when disclosed to Plan participants.  At worst, they are

excessive, undisclosed, and illegal.

　　　　7.　　　The GAO concludes that even the *retirement plan specialists in the*

*Department of Labor* cannot assess the propriety and legality of 401(k) plan fees and

expenses based upon information in Plan disclosures:

Without information on all fees, Labor's oversight is limited because it is unable

to identify fees that may be questionable. In addition, Labor and plan sponsors

may not have information on arrangements among service providers that,

according to officials at Labor, could steer plan sponsors toward offering

investment options that benefit service providers but may not be in the best

interest of participants. For example, a service provider that assists a plan sponsor

in selecting investment options for the plan may also be receiving compensation

from mutual fund companies for recommending their funds. The service provider

may not disclose this business arrangement to the plan sponsor, and as a result,

participants may have more limited investment options and pay higher fees for

these options than they otherwise would.

GAO Report, p. 4.

8.     In this action,  pursuant to ERISA § 502(a),  29 U.S.C. § 1132(a),

Plaintiffs and Class Representatives Kim Nolte, Sherry Lewis and Theresa Mitchell, on

behalf of the CIGNA 401(k) Plan (the "Plan") and similarly situated participants and

beneficiaries in the Plan, seek to recover the losses suffered by the Plan and to obtain

injunctive and other equitable relief for the Plan from CIGNA Corporation ("CIGNA"),

the Plan Sponsor; the Corporate Benefit Plan Committee, the Named Fiduciary (the

"Committee"); John Arko, the Plan Administrator; and CIGNA HealthCare of Illinois,

Inc. ("CIGNA-IL") (collectively "Defendants").

9.     As set forth in detail below, the fees and expenses paid by the Plan, and

thus borne by Plan participants, were and are unreasonable and excessive; not incurred

solely for the benefit of the Plan and its participants; and undisclosed to participants.

Further, in administering the Plan, Defendants engaged in a campaign of self-dealing and

prohibited transactions so as to reap profits for CIGNA at the Plan's expense.  By

subjecting the Plan and its participants to these excessive fees and expenses, and by other

conduct set forth below, Defendants violated their fiduciary obligations under ERISA and caused damages to the Plan.

**PARTIES, JURISIDCTION AND VENUE**

**Plaintiffs:**

10.     Plaintiff and Class Representative Kim Nolte is a resident of Momence, Illinois, and of this District.

11.     Plaintiff and Class Representative Sherry Lewis is a resident of Kankakee, Illinois, and of this District.

12.     Plaintiff and Class Representative Theresa Mitchell is a resident of Chebanse, Illinois, and of this District.

13.     Each Plaintiff and Class Representative is a participant in the Plan.

**Defendants:**

14.     Defendant CIGNA Corporation is headquartered in Philadelphia, PA and has employees in at least 47 states, in addition to locations around the world.

15.     In the 2005 Annual Report, CIGNA Corporation describes itself as a business that "provide[s] health care and related benefits offered through the workplace. Key product lines include medical coverages [sic] and related specialty health care products, and services such as pharmacy, behavioral, health, dental benefits, and disease management as well as group disability, life and accident insurance and disability and workers' compensation case management and related services.  In addition, CIGNA has an international operation that offers products (that are generally similar to those offered domestically) to businesses and individuals in selected markets. . .."

16.     CIGNA is the Sponsor of the Plan pursuant to ERISA § 3(16)(B).

17.     Defendant John Arko is the Plan Administrator.

18.     Defendant Corporate Benefit Plan Committee (the "Committee") is the named fiduciary of the Plan.  CIGNA Corporation appoints the Committee.  The Committee is comprised of CIGNA officers and employees.

19.     CIGNA markets and sells employee-benefits insurance products and, until April of 2004, sold employee retirement investment products, in all fifty states.  It has an extensive sales force throughout the United States and internationally.

20.     However, according to its filing with the SEC, CIGNA itself is not an insurance company.  It is a holding company that conducts business solely through the activities of various "segments" and subsidiaries.

21.     Defendant CIGNA HealthCare of Illinois, Inc. ("CIGNA-IL") is a CIGNA subsidiary located in Bourbonnais, Kankakee County, Illinois.  It maintains a facility, and employs approximately 200 people, at 1 CIGNA Drive, Bourbonnais, Illinois.  CIGNA and CIGNA-IL jointly provide the Plan to employees and Plan participants.

22.     Moreover, as set forth in detail below, before April, 2004, CIGNA was the primary investment manager and service provider of the Plan, and thus sold its services, for a profit, to CIGNA-IL employees and Plan participants in the Bourbonnais, Illinois area.

23.     As the Plan's sponsor, administrator, record-keeper, investment manager and service provider, CIGNA engaged in numerous transactions and undertook substantial conduct in, directed at, or arising out of the Bourbonnais, Illinois area, including transactions and the dissemination of information via mail, the Plan's internet website, and the Plan's customer service call center.

### Jurisdiction and Venue:

24.     **JURISDICTION:**  Plaintiffs bring this action pursuant to ERISA §§502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3), which provides that participants may pursue civil actions on behalf of the Plan for damages to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109,  and/or to obtain other appropriate equitable relief.  This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

25.     All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(2).

26.     Venue is proper in this Court pursuant to 29 U.S.C. § 1132 (e)(2) because the breaches of fiduciary duty giving rise to this action occurred in this district and the Defendants may be found in this district.

27.     **INTRADISTRICT ASSIGNMENT:**  Venue is proper in this Division of this Court pursuant to CDIL-LR 40.1(D) in that this case arises out of Kankakee County, Illinois; involves employment benefits provided to CIGNA-IL employees in Kankakee County, Illinois; and a substantial part of Defendants' actions and omissions out of which this action arises occurred Kankakee County, Illinois and/or were directed at, and had an effect upon, employees and Plan participants in this District and within this Division.

### Rule 23 Requires Class Certification:

28.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated Plan participants and beneficiaries.  They seek to represent the following (the "Class"):

> All persons, *excluding the Defendants, and/or other individuals who are or may be liable for the conduct described in this*

*Complaint,* who were or are participants or beneficiaries of the Plan and who were, are or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

29.    Certification of this Class is proper under Rule 23(a) in that:

A. **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the Plan's public documents state that, at the end of the 2005 Plan year, there were 44,322 participants with account balances in the Plan.

B. **Commonality.** Common issues of fact and law predominate over any issues unique to individual Class members.  Issues that are common to all Class Members include, but are not limited to, whether the Defendants:

i. Charged fees and expenses to the Plan that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

ii. Caused the Plan to enter into agreements with third-parties that caused or allowed the Plan to pay fees and expenses that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

iii. Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused or allowed the Plan to pay fees and expenses that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

iv.   Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

v.   Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

vi.   Failed properly to inform, or disclose to, Plan participants the fees and expenses that are, or have been, paid by the Plan;

vii.   Failed to inform, or disclose to, Plan participants in proper detail and clarity the transaction fees and expenses that effect participants' account balances in connection with the purchase or sale of interests in investment alternatives;

viii.   Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against Plan assets, and by failing to stop such hidden excessive fees;

ix.    In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plan, failed to exercise the care, skill, prudence, and diligence that a prudent

person would when acting in like capacity and familiar with such matters;

x. Caused or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

xi. By the conduct above or by other conduct set forth in this Complaint, revealed in discovery or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xii. Are liable to the Plan and the Class for losses suffered as a result of the breaches of their breached their fiduciary and other ERISA-imposed obligations; and

xiii. Are responsible to account for the assets and transactions of the Plan and should be charged/surcharged for any transactions and payments for which they cannot account or which were not proper uses of Plan assets.

C. **Typicality.** The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

i. The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and beneficiary, and each member of the Class;

    ii.    The Defendants' breach of those obligations constitutes a breach to each participant and beneficiary, and each member of the Class;

    iii.    To the extent that there are any differences in Class members' damages, such differences would be a product of simple mathematics based upon account balances in the Plan. Such minimal and formulaic differences are no impediment to class certification.

D. **Adequacy of Representation.** The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class' claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

30.    Class certification is also appropriate under Rule 23(b) and each subpart in that:

A. Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B. Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

C.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

**Defendants' Fiduciary Duties To The Plan Under ERISA**

31.  ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that: [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the **exclusive purposes of providing benefits** to participants in the plan and their beneficiaries **and defraying reasonable expenses of administering the plan.**

(Emphasis added).

32.  ERISA §§ 404(a)(1)(A)&(B), 29 U.S.C. § 1104(a)(1)(A) & (B), require that Plan fiduciaries, including Defendants, "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and:

A.  [F]or the exclusive purpose of:

i.  providing benefits to participants and their beneficiaries; and

ii.  defraying reasonable expenses of administering the plan;" and

B.  [W]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

33.  ERISA § 405, 29 U.S.C. § 1105, provides that a plan fiduciary may be liable for breaches of fiduciary duty by other fiduciaries, or by delegates and designees, in certain circumstances.

34.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the

Plan and "parties in interest."  Unless subject to an exemption set forth in ERISA § 408,

29 U.S.C. § 1108, a fiduciary

> shall not cause the plan to engage in a transaction …if he knows or should
>
> know that such a transaction constitutes a direct or indirect – sale or
>
> exchange, or leasing, of any property between the plan and a party in
>
> interest …furnishing of goods, services or facilities between the plan and a
>
> party in interest …transfer to, or use by or for the benefit of, a party in
>
> interest, of any assets of the plan.
>
> *See* 29.S.C. § 1106(a)(1).

35.     For purposes of section 406, a "party in interest" is any plan fiduciary,

including the plan administrator, trustee, officer or custodian, any plan services provider,

the employer, a relative of any of the above, and certain persons with ownership or

leadership roles in any of the above.  ERISA § 3(14), 29 U.S.C. § 1002(14).

36.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his

own interest or for his own account"; (2) shall not "act in any transaction involving the –

plan on behalf of a party (or represent a party) whose interests are adverse to the interest

of the plan" or its participants and beneficiaries; and (3) shall not "receive any

consideration for his own personal account from any party dealing with such plan in

connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

37.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan

Administrator periodically provide to Plan participants and beneficiaries a summary plan

description (a "SPD").

38.     ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan

Administrator at least annually provide to Plan participants and beneficiaries copies of

statements and schedules from the Plan's annual report for the previous year, and such

additional information "as is necessary to fairly summarize the latest annual report."

39.     The schedules and statements that the Plan Administrator annually must

provide to Plan participants and beneficiaries specifically include:

> A. [A] statement of the assets and liabilities of the plan aggregated by
>
> categories and valued at their current value, and the same data
>
> displayed in comparative form for the end of the previous fiscal year
>
> of the plan; and
>
> B. [A] statement of receipts and disbursements during the preceding
>
> twelve-month period aggregated by general sources and applications.
>
> *See* ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

40.     ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and

beneficiaries to receive more detailed information from the Plan Administrator on request:

> The administrator shall, upon written request of any participant or
>
> beneficiary, furnish a copy of the latest updated summary, plan description,
>
> and the latest annual report, any terminal report, the bargaining agreement,
>
> trust agreement, contract, or other instruments under which the plan is
>
> established or operated.

41.     ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among

other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report":

a statement of [the Plan's] assets and liabilities, and a statement of
changes in net assets available for plan benefits which shall include details
of revenues and expenses and other changes aggregated by general source
and application.

### ERISA § 404(c)'s "Safe Harbor" Defense

42.     In many 401(k) plans, including the Plan, plan fiduciaries seek to qualify,
under ERISA§ 404(c), 29 U.S.C. § 1104(c), for protection from liability for investment
losses that might result from participants' investments in a 401(k) plan.

43.     This protection from liability, dubbed a "safe harbor" for plan fiduciaries,
shifts responsibility for 401(k) investment losses from plan fiduciaries to plan
participants to the extent that participants exercise "independent control in fact" over the
assets in their account.  ERISA§ 404(c), 29 U.S.C. § 1104(c); 29 C.F.R. §2550.404c-
1(d)(2)(i).

44.     ERISA and ERISA Regulations impose a number of preconditions that
must be fulfilled before plan fiduciaries can qualify for this safe harbor protection.  To be
eligible for the safe harbor, Plan fiduciaries must, among other things, provide:

>       A.      "an opportunity for a participant or beneficiary to exercise control
>       over assets in his individual account," and

>       B.      "a participant or beneficiary with an opportunity to choose, from a
>       broad range of investment alternatives, the manner in which some or all
>       of the assets in his account are invested."

29 C.F.R. §2550.404c-1(b)(1).

45.     For a participant or beneficiary to have "an opportunity to exercise control over assets in his individual account" – Plan fiduciaries must provide him or her with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the Plan."  29 C.F.R. §2550.404c-1(b)(2)(B).

46.     The "sufficient investment information" Plan fiduciaries must provide includes:

> A.      "A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees)."  29 C.F.R. §2550.404c-1(b)(2)(i)(B)(1)(v); and

> B.      At least upon request, "[a] description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative." 29 C.F.R. §2550.404c-1(b)(2)(i)(B)(2)(i).

47.     ERISA's §404(c) Regulations make clear than *only plans which charge reasonable fees*, and fully disclose them, can bestow safe harbor protection upon plan fiduciaries:

> A plan does not fail to provide an opportunity for a participant or beneficiary to exercise control over his individual account merely because it--

(A) Imposes charges for reasonable expenses.  A plan may charge participants' and beneficiaries' accounts for the *reasonable expenses* of carrying out investment instructions, *provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

48.     ERISA § 404(c) Regulations also make clear that non-disclosure of material information regarding plan investments will render § 404(c)'s safe harbor unavailable to plan fiduciaries:

(2)  Independent control. Whether a participant or beneficiary has exercised independent control in fact with respect to a transaction depends on the facts and circumstances of the particular case.  *However, a participant's or beneficiary's exercise of control is not independent in fact if:*

* * *

(ii) *A plan fiduciary has concealed material non-public facts regarding the investment from the participant or beneficiary,* unless the disclosure of such information by the plan fiduciary to the participant or beneficiary would violate any provision of federal law or any provision of state law which is not preempted by the Act.

29 C.F.R. §2550.404c-1(c)(2)(ii)(emphasis added).

## FACTS

### The Plan And Defendants' Campaign of Self-Dealing

49.     As part of their compensation and benefits, CIGNA offers certain of its employees the opportunity to participate in the Plan.  The Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contains or is part of an "eligible individual account plan" under ERISA § 407(d)(3)(A), 29 U.S.C. §1107(d+)(3)(A).  It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

50.     CIGNA benefits by providing the Plan to eligible employees in that the opportunity to participate enhances CIGNA's ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles CIGNA to tax advantages under the Internal Revenue Code.

51.     Participants may contribute up to 25% of their eligible earnings in the Plan, and may choose among 22 investment options, all of which are organized as CIGNA "separate accounts."  The two largest options, the Fixed Income Fund and the CIGNA Company Stock Fund, have comprised approximately 65% of Plan assets in recent years. The Plan's default investment option is the Fixed Income Fund.

52.     For most employee-participants, CIGNA contributes a "regular match" of 50% of participants' contributions up to 6%.  GIGNA requires that half of this matching contribution be invested in the Plan's Cigna Stock Fund.

53.     Until March, 2005, CIGNA prohibited participants from transferring these matching contributions, and any earnings from them, out of the CIGNA Stock Fund until either: (A) the participants' employment with CIGNA was terminated, or (B) the participant reached age 55.

54. Defendants retained CIGNA's "Retirement Business" or "Retirement Segment," comprised of CIGNA subsidiaries and affiliates including GLIC (Connecticut General Life Insurance Co.) and Times Square Capital Management (investment management subsidiary of CIGNA), as the investment manager of most, if not all, of the Plan's assets; as record-keeper; and as providers of other, undisclosed services for which the Plan pays fees.

55. Thus, CIGNA's Retirement Business, or its subsidiaries and affiliates, charged the Plan fees in connection with all of the Plan's 22 investment options. While this was greatly beneficial for CIGNA, it was not for the Plan and its participants.

56. In CIGNA's annual filings with the United States Securities Exchange Commission (the "SEC"), CIGNA states (emphasis added):

> Assets under management consist of invested and separate account assets, as well as third-party investment advisory account assets of the Retirement segment. **Assets under management are a key driver of earnings for this segment because a significant portion of this segment's revenues is based on asset values.**

57. In recent years, the Plan has held assets in excess of $2 billion. Most, if not all of these assets, were under the management of CIGNA's Retirement Business. They were, in short, part of the "asset under management" value that was a "key driver" of the Retirement Benefits Business' earnings.

58. As set forth below, GIGNA sold its Retirement Business to Prudential Retirement Insurance and Annuity Company ("PRIAC") on April 1, 2004. Before that time, the Plan's default investment option, the Fixed Income Fund, was a "fixed group

annuity contract with GLIC" and thus, the 100 percent invested in the general account of CIGNA **[CIGNA or GLIC???].**

59.     At the end of 2003, the Fixed Income Fund contained over $1.1 billion. The Plan's next largest fund, the CIGNA Stock Fund, held $307 million.  Thus, not only did CIGNA reap the benefit of Defendants having placed more than $2 billion of CIGNA employees' retirement savings under the management of CIGNA's Retirement Business, but CIGNA also benefited directly by being the recipient of its employees' 401(k) contributions.

60.     Through the combination of the Plan's Fixed Income Fund and the CIGNA Stock Fund, Defendants caused in excess of $2.4 billion, approximately 65% of the Plan's assets, to be invested in CIGNA, the Plan's Sponsor.

61.      Without more, this is a serious breach of fiduciary duty.  It subjected the Plan and its participants to the unreasonable and imprudent dangers of undiversified investing.  In the 401(k) context, this lack of diversification is even more perilous.

62.     The typical 401(k) participant – before placing any retirement savings in his or her employer's stock or business – relies on the stability and financial viability of the employer as the basis of his or her standard of living: the participant's present salary, healthcare and other benefits, as well as his or her pension (if any) and retirement health insurance depend upon the employer's continued solvency and viability.

63.     Thus, the same risk that could impair the participant's investment in his or her employer's stock or business – the failure or insolvency of the employer – would also cause the loss of current income and benefits, and future non-401(k) retirement benefits.

The risks are correlated and, if realized, would financially devastate most employees and 401(k) plan participants.

64.     By causing approximately of 65% of the Plan's assets to be invested in CIGNA, Defendants not only forced the Plan and its participants to bear imprudent levels of risk, *but also subjected them to the conflicts of interest inherent in having the Plan's investment management, recordkeeping and other services performed by CIGNA's for-profit Retirement Business.*

65.     As a result, the Plan and its participants *both* bore this unreasonable risk *and* paid unreasonable and excessive fees to CIGNA's Retirement Business in doing so.

66.     On April 1, 2004, CIGNA sold its Retirement Business to Prudential Retirement Insurance and Annuity Company ("PRIAC").  Through this sale, PRIAC became the Plan's primary investment manager, recordkeeper and service provider.

67.     As part of this sale, CIGNA's Retirement Business transferred approximately $18 billion of assets under management to PRIAC, including the Plan's assets of more than $2.1 billion.

68.     CIGNA reaped an *after tax gain of $809 million* from this sale, as well as other financial benefits including the release or reduction of various contract or guarantee obligations.

69.     Although the Plan's assets exceeded 10% of the assets under management transferred to PRIAC in this sale, Defendants did not ensure that that Plan's contribution to this profitable transaction was acknowledged and compensated.

70.     To the contrary, in its filings with the SEC, CIGNA stated:

CIGNA expects to use the proceeds from the sale of its retirement business to support the growth of its health care and related benefits businesses, maintain or improve subsidiary and parent company ratings, ensure financial flexibility of the parent

company, and return capital to investors by repurchasing outstanding stock. The company reinitiated its share repurchase program in 2004. The sale of the retirement business further strengthens CIGNA's overall financial position and flexibility.

71.     CIGNA enjoyed these benefits while ignoring the Plan's contribution to them.  In fact, although in 2004 CIGNA used a portion of its profit from the sale of its' Retirement Business to repurchase CIGNA stock, it did not allow Plan participants who held CIGNA stock as a result of CIGNA's matching contributions to participate in the CIGNA share repurchase program.

72.     In its filings with the SEC, CIGNA stated:

CIGNA has had a repurchase program for many years, and has had varying levels of repurchase authority and activity under this program. The program has no expiration date. CIGNA suspends activity under this program from time to time, generally without public announcement. Remaining authorization under the program was approximately $381 million as of December 31, 2004.

73.     Under this repurchase program, CIGNA purchased 3.5 million CIGNA shares for $343 million ($98/share) in 2002, and 10 million CIGNA shares for $690 million ($69/share) in 2004.  Defendants did not lift the restrictions on Plan participants' CIGNA stock matching shares until March 2005, when CIGNA authorized a third repurchase amount.

74.     Without even considering the excessive and unreasonable fees to which Defendants have subjected the Plan, the foregoing conduct constitutes a serious breach of Defendants' fiduciary duties and flagrant self-dealing.  In addition, Defendants' conduct has caused the Plan to engage in multiple prohibited transactions in violation of ERISA. *See* 29 U.S.C. § 1106(a)(1).

**Fees and Expenses Assessed Against The Plan And Paid To CIGNA**

75.     Various entities are involved in providing services and operating the Plan. As the GAO Report describes:

> Fees are charged by the various outside companies that the plan sponsor—often the employer offering the 401(k) plan—hires to provide a number of services necessary to operate the plan. Services can include investment management (i.e., selecting and managing the securities included in a mutual fund); consulting and providing financial advice (i.e., selecting vendors for investment options or other services); record keeping (i.e., tracking individual account contributions); custodial or trustee services for plan assets (i.e., holding the plan assets in a bank); and telephone or Web-based customer services for participants.

GAO Report, p. 7.

76.     Here, Defendants have caused the Plan to purchase – primarily from CIGNA – record-keeping, administration, investment advisory, investment management, brokerage, insurance, trustee, consulting, accounting, legal, printing, mailing, and other services.

77.     The services for which Defendants retained CIGNA are the most substantial of these: "Investment fees and plan record-keeping fees comprise the vast majority of total plan fees." GAO Report, p. 10.

78.     Investment management fees are charged by plan investment options, such as mutual funds, for the costs of operating that particular fund.  Record-keeping fees

> cover individual account maintenance for plan participants, generally constitute the second-largest portion of plan fees.  *Unlike investment fees, plan record-keeping fees apply to the entire 401(k) plan rather than the individual investment*

> *options*.  *…*  These fees cover a variety of activities such as enrolling plan
>
> participants, processing participant fund selections, preparing and mailing account
>
> statements, and other related administration activities.

GAO Report, p. 11-12 (emphasis added).

79.    Investment management services generally fall into two broad categories:

A.    "Active management" is an investing strategy that seeks returns in

excess of a specified benchmark.  If a Fund is "actively managed," the

investment manager will independently select, purchase, and sell

securities for the Fund in an effort to outperform the Fund's benchmark;

to "beat the market."

B.    "Passive management" is an investing strategy that mirrors the

performance of an index, instead of attempting to "beat the market."  It

does not involve or require the independent selection of securities for the

Fund.  Passive fund managers select securities of the same type and in the

same proportion as the holdings of the Fund's benchmark, which is the

index against which the Fund measures its performance.

80.    Actively-managed funds charge higher fees against Plan participants'
investments than do passively-managed funds.

81.    Here, Defendants caused the Plan to pay recordkeeping and investment
management fees to CIGNA's Retirement Business that were far in excess of those
reasonably borne by plans – like the Plan – that contain billions of dollars of assets.

82.    Despite ERISA and the regulations promulgated thereunder, Defendants
have not informed, and do not inform, Plan participants of the actual dollar amount of

investment management fees deducted from their 401(k) accounts. Instead, investment management fees are subtracted from Plan participants' account before the returns of participants' investment option/Funds are reported, so that the fees do not appear on participants' statements.

83.     Moreover, in statements or otherwise, the Plan fiduciaries have not and do not disclose to participants the "*actual expenses incurred with respect to their respective individual account.*" *See*, 29 C.F.R. §2550.4c-1(b)(2)(ii)(A).

84.     Although ensuring that Plan participants are unaware that they are doing so, Defendants have caused or allowed these services providers to receive payment from the Plan in a combination of two ways:

    A.  By direct disbursement from the plan to the entity providing the service ("Hard Dollar" payments); and/or

    B.  Through hidden "Revenue Sharing" payments, which are derived from the expense ratios assessed against Plan participants' accounts in various investment options/mutual funds and distributed between and/or among various service providers. Because these Revenue Sharing payments derive directly from Plan participant accounts, they are Plan assets.

### **"Hard Dollar" Payments to Plan Service Providers**

85.     "Hard Dollar" payments are direct disbursements from a 401(k) plan to service providers. 401(k) plans disclose such payments in filings with the Department of Labor.

86.     Here, since at least 1999, the Plan has disclosed no Hard Dollar payments.

87.     Nonetheless, the Plan has incurred substantial record-keeping, administrative and other costs.  Defendants have caused such costs to be charged against Plan participants accounts though hidden "Revenue Sharing" payments.

### Revenue Sharing Payments to Plan Service Providers

88.     Revenue Sharing is the transfer of asset-based fees that *Plan participants pay to brokers or investment managers* (including mutual funds, common collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) *from* those brokers or managers *to* administrative service providers (such as record-keepers, administrators, or even back to fund managers).

89.     Revenue Sharing occurs between and among brokerage firms, investment managers, fund families and other service providers.

90.     For example, a plan fiduciary or its agent (an administrator, third-party administrator, consultant, or similar fiduciary) seeking to invest plan assets in an investment vehicle (a mutual fund, common and collective trust, guaranteed investment contract, etc. (collectively a "Fund")) can negotiate an agreement that sets the costs assessed against each dollar invested by specifying the Fund's expense ratio (an asset-based fee) and available revenue sharing.

91.     In Revenue Sharing arrangements, the Plan fiduciary and the Fund agree upon an asset-based fee/expense ratio that is not the true price for which the Fund will provide its service to the Plan.

92.     Instead, the Fund's agreed asset-based fee/ expense ratio includes ***both*** the actual price for which the Fund will provide its service ***and*** additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

93.     The additional portion of the agreed-upon asset-based fee / expense ratio is "shared" with plan service providers or others who do business with the plan or the Fund.

94.     As a result of Revenue Sharing arrangements, plan service providers or others who do business with the plan or the Fund may receive *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

95.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation:  the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of  Revenue Sharing and inclination to expend effort monitoring revenue sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan sponsor, plan fiduciary and the Fund as they negotiate.

96.     Although Revenue Sharing may not lead to the imposition of excess and unreasonable fees and expenses against 401(k) participants' accounts in all circumstances, the practice hides from participants and government regulators how much Plan service providers are paid, for what, whether such payments are proper under applicable law, and whether they involve conflicts of interest, prohibited transactions, or other impropriety.

97.     Plan fiduciaries, such as Defendants here, have a fiduciary obligation to ensure that the fees and expenses that the Plan incurs are reasonable for the services provided and incurred for the sole benefit of Plan participants and beneficiaries.  This obligation includes understanding, monitoring, and controlling Revenue Sharing to

ensure that *all payments to Plan service providers*, whether direct and disclosed or indirect and hidden, comply with these standards.

98.     Thus, when 401(k) plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

99.     Ascertaining whether the Plan fiduciaries, like Defendants here, have fulfilled their fiduciary obligation to ensure that the fees and expenses assessed against the 401(k) plan are reasonable and incurred solely in the interest of plan participants requires consideration whether the *total of both* the Hard Dollar *and* Revenue Sharing payments paid for any category of services complies with this standard.

100.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the Plan, Plan assets, and Plan service providers, Revenue Sharing is not always captured and used for the benefit of the Plan and its participants.

101.     When Revenue Sharing is foregone, the Plan will not only pay additional Hard Dollar fees to the Plan service providers (since no Revenue Sharing payments are available to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep (because the Fund's expense ratio includes both the actual price of the Fund's services and Revenue Sharing amounts).

102.     Consequently, in determining whether the Plan administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants, foregone Revenue Sharing must also be taken into account.

103.     Here, Defendants have caused the Plan to pay service providers only through hidden Revenue Sharing transfers and, before April 2004, caused the vast majority of that hidden Revenue Sharing to be paid to the CIGNA Retirement Business. The investment managers, including the CIGNA Retirement Business, of the Plan's funds charged fees to the Plan that included money with which to make Revenue Sharing payments.  The CIGNA Retirement Business kept those fees for itself in respect of the Funds for which it served as investment manager, and received Revenue Sharing transfers from other investment managers in respect of other Plan Funds.

104.     After CIGNA sold its Retirement Business to PRIAC in April 2004, Defendants allowed such hidden Revenue Sharing transfers to continue, with such payments being directed to, and received by, PRIAC.

105.     In violation of ERISA and Defendants' clear fiduciary duties, the Plan's payments for administration and recordkeeping were excessive and unreasonable in light of the services provided and were not incurred for the sole benefit of Plan participants and beneficiaries.

106.     In addition, these Revenue Sharing payments are further and flagrant self-dealing and constitute prohibited transactions under ERISA, in that they involve the transfer of Plan assets to, or the use of Plan assets by, or for the benefit of, parties in interest.  29 U.S.C. § 1106(a)(1).

107.    By causing Plan service providers to be paid through such Revenue Sharing arrangements, Defendants have made it impossible for Plan participants and government regulators to determine what fees are assessed against Plan participants' accounts; to whom such fees are paid; for what services are they paid; whether the fees are reasonable for the services provided; and whether such payments involve conflicts of interest or prohibited transactions.

108.    Without regard to Defendants' nondisclosure and concealment of these Revenue Sharing transfers, Defendants have breached their fiduciary obligations by causing or allowing the Plan to pay excess fees and expenses.

### CIGNA Received Prohibited Profit From The Plan

109.    The fees that CIGNA has assessed against Plan participants' accounts were excessive and unreasonable.

110.    ERISA prohibits CIGNA from providing services for a profit to the Plan. However, CIGNA did exactly that by charging excessively high expense ratios that included investment management expenses, risk charges, and administrative charges. Since all of these payments went to CIGNA or one of its subsidiaries, it received profit from the Plan that is prohibited by ERISA.

111.    As set forth above, CIGNA's asset-based fees assessed against Plan participants' accounts were unreasonable and excessive, especially in light of the more than $1.5 billion that the Plan invested with CIGNA-managed Funds.  For example, the Fixed Income Fund holds more than $ 1.1 billion, and has since before CIGNA sold its Retirement Business to PRIAC.  Since the April 2004, however, PRIAC has charged the Plan's Fixed Income Fund *lower* investment management, risk, and administrative

service fees while guaranteeing a *higher* return than did GIGNA's Retirement Business – even though CIGNA was managing its own employee's retirement savings.

112.    While the fees that both CIGNA and PRIAC have charged or are charging Plan for a more than *$1.1 billion* Fixed Income Fund are excessive, Defendants caused or allowed CIGNA's Retirement Business to charge the Plan an more severely unreasonable fee than would an unrelated third party.

Despite ERISA's strict and unambiguous prohibitions, CIGNA, directly or though its wholly-owned subsidiaries, reaped profits from these unreasonable and excessive fees assessed against the Plan.

### Revenue Sharing Arrangements Are Not Disclosed to Plan Participants

113.    Revenue Sharing, dubbed "hidden fees" by many in the retirement industry, is not disclosed to plan participants and government regulators, even though it may account for a greater portion of certain categories of service provider payments than do Hard Dollar disbursements.  The GAO Report explains:

> [S]pecific fees that are considered to be "hidden" may mask the existence of a conflict of interest. Hidden fees are usually related to business arrangements where one service provider to a 401(k) plan pays a third-party provider for services, such as record keeping, but does not disclose this compensation to the plan sponsor. For example, a mutual fund normally provides record-keeping services for its retail investors, i.e., those who invest outside of a 401(k) plan. The same mutual fund, when associated with a plan, might compensate the plan's record keeper for performing the services that it would otherwise perform, such as

maintaining individual participants' account records and consolidating their

requests to buy or sell shares.

GAO Report, p. 25-26.

114.    Without regard to whether such fees are hidden from Plan *participants*,

Plan fiduciaries, such as Defendants here, must understand them, and take them into

account, in determining whether such fees are reasonable and incurred for the sole benefit

of plan participants and beneficiaries:

> [The Department of] Labor's position is that plan sponsors must know about these
>
> fees in order to fulfill their fiduciary responsibilities. However, if the plan
>
> sponsors do not know that a third party is receiving these fees, they cannot
>
> monitor them, evaluate the worthiness of the compensation in view of services
>
> rendered, and take action as needed.

GAO Report, p.26.

115.    By entering into or allowing these hidden Revenue Sharing arrangements,

and by failing to disclose or concealing them, Plan participants about them, Defendants

have deprived Plan participants of material information regarding:

> A.   The actual expenses incurred with respect to their respective individual
>
>      account;
>
> B.    The actual amount of administrative fees that is assessed against
>
>      participants' accounts in the Plan;
>
> C.   The actual expense ratio of plan investment options/Funds if such
>
>      expense ratios *did not include* monies to be used for Revenue Sharing
>
>      payments to other Plan service providers;

D.  Who is receiving Plan assets, derived from participants' accounts, through Revenue Sharing;

E.  How much each service provider is paid with Plan assets, derived from participants' accounts, when *both* Hard Dollar Fees *and* Revenue Sharing are considered;

F.  Whether the total amount paid to services providers (*i.e.* disclosed, hard dollar fees *combined with* Revenue Sharing payments) is reasonable and incurred solely for participants' and beneficiaries' benefit;

G.  Whether hidden payments of Plan assets, derived from participants' accounts, are masking prohibited transactions and/or conflicts of interests between or among Plan fiduciaries and service providers; and

H.  Whether plan fiduciaries have forgone Revenue Sharing available in connection with Plan investment options, and thereby unnecessarily increased the expenses that Plan participants bear directly.

116.    In addition, Defendants' ongoing nondisclosure and concealment of this information indicates that Defendants breached their fiduciary duties under ERISA by failing to undertake proper review and analysis of the fees assessed against Plan participants' accounts; to whom such fees are paid; for what services are they paid; whether the fees are reasonable for the services provided; and whether such payments involve conflicts of interest or prohibited transactions.

**Defendants' Campaign of Nondisclosure, Concealment, and Misrepresentation Breached Their Fiduciary Duty and Defeats §404(c)'s Safe Harbor Defense**

117.    As set forth in detail above, Defendants have extensive, affirmative fiduciary obligations under ERISA, including ensuring: (a) that any fees and expenses charged against the Plan and its participants and beneficiaries are reasonable for the services provided and incurred of the sole benefit of participants and beneficiaries; and (b) that Plan assets are used for the exclusive benefit of participants and beneficiaries and never inure to the benefit of the employer.

118.    Defendants cannot evade or circumvent these core fiduciary obligations by formulaic disclosures.  ERISA requires that employee benefit plans, like the Plan here, will be administered by disinterested and competent fiduciaries.  It does not contemplate that plan administrators are free to ignore or violate their fiduciary duties so long as they comply with minimal disclosure requirements.  Accordingly, the liability protection of ERISA § 404(c), 29 U.S.C. §1104(c), is not available to Defendants in light of their breaches of core fiduciary duties.

119.    Nonetheless, Defendants' campaign of nondisclosure, concealment, and misrepresentation would disqualify them from §404(c)'s protections if the statute did apply.

120.    As set forth above, Defendants have directly and affirmatively misled Participants by failing to disclose the administrative costs of the Plan through hidden Revenue Sharing arrangements.

121.    As set forth above, Defendants have not disclosed, have affirmatively concealed, or have misled Plan participants regarding a litany of material information including:

A.  In violation of ERISA §103(b)(3), 29 U.S.C. §1023(b)(3), the Plan's actual receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications;

B.   In violation of ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3), the Plan's assets and liabilities, and the changes in net assets available for Plan benefits, including details of revenues and expenses and other changes aggregated by general source and application;

C.   That Plan service providers were or are engaging in Revenue Sharing;

D.  That Revenue Sharing was available for the benefit of the Plan and its participants;

E.  The amount of Revenue Sharing payments made by or to Plan service providers;

F.  That the expense ratios charged in Plan investment options include revenue sharing amounts *not* used for the investment management and operation of the investment option/Fund, *but rather paid to other Plan service providers* for recordkeeping and administrative functions;

G.  That the expense ratios of Plan investment options/Funds include monies to be used for Revenue Sharing payment to other Plan service providers so that the *stated expense ratio is not the true and accurate cost of investing* in the investment option/Fund;

H.  Who is receiving Plan assets, derived from participants' accounts, through Revenue Sharing;

I.  How much each service provider is paid with Plan assets, derived from participants' accounts, when *both* Hard Dollar fees *and* Revenue Sharing are considered;

J.  Whether the total amount paid to services providers (*i.e.* disclosed, Hard Dollar fees *combined with* Revenue Sharing payments) is reasonable in light of the services provided and incurred solely for participants' benefit;

K.  Whether plan fiduciaries have forgone Revenue Sharing available in connection with Plan investment options, and thereby unnecessarily increased the expenses which Plan participants bear directly;

L.  The true and accurate amount of recordkeeping and administrative fees that is assessed against participants' accounts in the Plan;

M.  The true and accurate price of Plan investment options/Funds, in that the stated expense ratios of Plan investment options/Funds are overstated so as to include extra, hidden monies to be used for Revenue Sharing payments to other Plan service providers;

N.  The true and accurate amount of fees paid to investment managers *for actual investment management services* in any Plan investment option/Fund; in that the investment management prices represented in the expense ratios of plan investment options/Funds are overstated so as to include extra monies to be used for Revenue Sharing payments to other Plan service providers;

O.  In actively-managed investment options/Funds, the actual amount of active management services that Plan participants are purchasing, in that the inclusion of undisclosed Revenue Sharing amounts in the expense ratios of actively-managed investment options/Funds renders participants incapable of knowing whether the higher fees charged by actively-managed funds actually are used for active investment management rather than Revenue Sharing payments to other Plan service providers; and

P.  Whether hidden payments of Plan assets, derived from participants' accounts, are masking prohibited transactions and/or conflicts of interests between or among Plan fiduciaries and service providers.

122.    ERISA § 404(c) Regulations make clear that Plan participants cannot exercise "independent control in fact" so as to bestow ERISA § 404(c)'s safe harbor protections upon plan fiduciaries where, as here, Plan fiduciaries have hidden material information from participants:

(2)  Independent control.  Whether a participant or beneficiary has exercised independent control in fact with respect to a transaction depends on the facts and circumstances of the particular case. *However, a participant's or beneficiary's exercise of control is not independent in fact if:*

* * *

(ii) *A plan fiduciary has concealed material non-public facts regarding the investment from the participant or beneficiary*, unless the disclosure of such information by the plan fiduciary to the participant or beneficiary

would violate any provision of federal law or any provision of state law

which is not preempted by the Act.

29 C.F.R. §2550.404c-1(c)(2)(ii)(emphasis added).

123.    As set forth in detail, Defendants do not qualify for, and cannot avail

themselves of, § 404(c)'s safe harbor because the fees charged against participants'

accounts were unreasonable and excessive.

124.    ERISA's § 404(c) Regulations make clear than *only plans which charge*

*reasonable fees*, and fully disclose them, provide the opportunity for a participant or

beneficiary to exercise "independent control in fact" so as to bestow §404(c)'s safe

harbor protection upon plan fiduciaries:

A plan does not fail to provide an opportunity for a participant or beneficiary to

exercise control over his individual account merely because it--

(A) Imposes charges for reasonable expenses.  A plan may charge

participants' and beneficiaries' accounts for the *reasonable expenses* of

carrying out investment instructions, *provided that procedures are*

*established under the plan to periodically inform such participants and*

*beneficiaries of actual expenses incurred with respect to their respective*

*individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

125.    Defendants have not periodically informed participants and beneficiaries

of the *"actual expenses incurred with respect to their respective individual accounts."*

126.    As a result of the Defendants' campaign of misrepresentation,

nondisclosure, and concealment, Plan participants have not been provided with "the

opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan." 29 C.F.R. §2550.404c-1(b)(2)(B).

127.     Because the Defendants failed and refused to provide them with this information, and concealed this information from them, Plan participants have lacked the information necessary to understand and protect their interests in the Plan, and/or to have knowledge of the Defendants' breaches of fiduciary duty.

128.     In fact, in their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

129.     ERISA fiduciaries, such as Defendants here, have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

130.     A fiduciary's silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

131.     Despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to the litany of information set forth above.

132.     Based upon all of the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404 (c).

## Defendants' Conduct Concealed Their Fiduciary Breach and Prevented Its Discovery

133.     Defendants engaged in a course of conduct designed to conceal from Plan participants and government regulators their ongoing breaches of fiduciary duty.  In

addition to the foregoing, and although they are subject to extensive fiduciary duties of affirmative disclosure:

A.  On an ongoing and continuous basis, Defendants distributed participant account statements designed to conceal that participants were paying certain fees from their 401(k) account balances; thereby rendering participants unable to know of and inquire about the fees assessed against their retirement savings;

B.  On an ongoing and continuous basis, Defendants concealed from Plan participants the actual fees, as a dollar figure, that participants paid from their retirement savings for any given month, quarter or year; thereby rendering participants unable to compare and analyze such fees and compare them with those charged by other investment vehicles or options;

C.  On an ongoing and continuous basis, Defendants have concealed and failed to disclose the method by which Plan participants could calculate for themselves the actual fees, as a dollar figure, that participants paid from their retirement savings for any given month, quarter or year; thereby blocking the ability of Plan participants to analyze such fees and consider whether they were excessive;

D.  While continuously emphasizing early participation, diversification, and historical fund performance as key factors in 401(k) investment decisions, Defendants wholly failed to explain the effect of fees and expenses on 401(k) savings over time.  By this conduct, Defendants

diverted participants' attention away from the fact that -- by properly controlling plan fees and expenses, as they are obligated to do – Defendants could increase participants' investment returns while subjecting them to no additional risk;

E.   In participant education materials, Defendants failed to disclose and explain that certain fees would be removed from participants' accounts and that fees would be taken before returns were reported so that the fees would be hidden from, and totally invisible to, Plan participants;

F.   In participant education materials, Defendants failed provide any explanation of Defendants' fiduciary duties to ensure that fees and expenses charged to participants' accounts are reasonable and incurred solely for the benefit of the participants;

G.   On an ongoing and continuous basis, Defendants hid Plan-wide administrative and record-keeping charges in the expense ratios of various investment options/ Funds, so as to make it impossible for Plan participants to know to whom they were paying fees, for what services, whether such charges were reasonable for the services provided and incurred solely for Plan participants' benefit, and whether such payments involved prohibited transactions or conflicts of interest; and

H.   To the extent Defendants made any disclosure of fees, Defendants did so in a manner that made it virtually impossible for Plan participants to know and understand the amount of fees they were paying, in that Plan

administrative and recordkeeping fees were summarized, if at all, in different documents provided at different times than investment option management fees – and even these documents never disclosed to Plan participants the actual dollar amount that any given participant paid in these fee categories.

134. Plaintiffs had neither actual or constructive notice, and could not have gained actual or constructive notice despite their exercise of diligence, that Defendants had breached their fiduciary duties, in that:

A. As set forth above, Plaintiffs are beneficiaries of extensive fiduciary duties owed to them by Defendants, and, as such were entitled to expect that Defendants' express statements about the payment of Plan administrative costs were true, accurate, and complete.  Plaintiffs and Plan participants had no duty to, and had no reason to surmise they needed to, investigate Defendants' express representations with an eye toward disproving them;

B. As set forth above, Defendants engaged in an ongoing and continuous course of conduct to conceal from Plan participants the truth regarding the fees removed from Participants' 401(k) accounts;

C. As set forth above, Plan participants never received an explanation or disclosure of the actual amount of fees that they were paying from their 401(k) accounts, for what services those fees were being paid, to whom, whether those fees were reasonable for the services provided, whether they were incurred solely for participants' benefit, and

whether such payments involved prohibited transactions or conflicts of interest;

D.   As set forth in detail above, Defendants' communications with Plan participants were designed to deflect participants' attention away from the fees that would be assessed against their retirement savings and away from the Defendants' obligation to properly control and monitor those fees;

E.   As beneficiaries of extensive fiduciary duties, Plan participants were entitled to rely upon Defendants to fulfill their fiduciary obligation to ensure that the fees assessed against participants' accounts were reasonable for the services provided, incurred solely for participants' benefit, free of conflicts of interest, and otherwise legal and proper; Plan participants have no obligation to police Plan fiduciaries for the purpose of confirming that they are fulfilling these clear obligations; and

F.   As set forth above, Defendants hid Plan record-keeping and administrative fees within the expense ratios of various Plan investment option, thereby rendering it impossible for participant to have notice of, or an  understanding of, the fees and expenses they were paying and the Defendants' breaches of fiduciary duty in connection with those fees and expenses.

135.   By this conduct, Defendants actively concealed their breaches of fiduciary duty so as to prevent Plan participants' discovery of them.

136.    Further, as a result of this ongoing practice of concealment and non-disclosure set forth above, Plan participants have been, and continue to be, deprived of information necessary for them:

A.  To understand and protect their rights and interests in the Plan;

B.  To make informed investment decisions considering all appropriate factors for long-term retirement saving;

C.  To exercise "independent control in fact" over their 401(k) accounts;

D.  To be aware of, and question Plan fiduciaries regarding, the amount of fees and expenses charged to their accounts, the services for which they are charged, whether such charges were reasonable for the services provided and incurred solely for Plan participants' benefit; and whether such payments involved conflicts of interest;

E.  To be aware of, and seek independent advice and/or counsel regarding, the fees and expenses charged to their retirement savings and whether they were legal and proper; and

F.  To be aware of, and pressure Plan fiduciaries to properly control and monitor, the fees and expenses assessed against their 401(k) accounts.

137.    As a result of all of the foregoing, including Defendants' campaign of non-disclosure, concealment, and misrepresentation, Plaintiffs and all Plan participants and beneficiaries have been forced to pay excessive fees and expenses from their 401(k) accounts and have suffered financial losses and damages.

138.     As a result of all of the foregoing, including Defendants' campaign of non-disclosure, concealment, and misrepresentation, Plaintiffs and all Plan participants and beneficiaries have been deprived of:

A.   The advantages of proper fiduciary oversight and administration of their 401(k) Plan for which they have paid and to which they are entitled under ERISA;

B.   The information, which ERISA requires they be provided, necessary for them to understand their interests and to prudently invest their retirement savings in the Plan; and

C.    The services of Plan fiduciaries focused solely on advancing Plan participants' and beneficiaries' interests, rather than on attempting to secure hidden and excessive profits and compensation.

139.     As a result, Plaintiffs and all Plan participants and beneficiaries are entitled to, and request the Court to order and declare that Defendants shall provide, proper fiduciary oversight and administration of the Plan focused solely upon advancing Plan participants' and beneficiaries' interests; true, accurate, and complete disclosure of material information regarding the Plan, and the benefits and advantages to which ERISA entitles them in connection with the Plan.

### COUNT I:
### [Breach of Fiduciary Duty – ERISA §502(a)(2)]

140.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 139 as though fully set forth here.

141.     As set forth in detail above, Defendants owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

A.  To conduct itself as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

B.  To perform its duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

C.  To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

D.  To ensure, at all times, that the Plan avoid prohibited transactions;

E.  To know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

F.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

G.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any

employer and shall be held for the exclusive purposes of providing

benefits to participants in the Plan and their beneficiaries and

defraying reasonable expenses of administering the Plan;"

H.  To ensure that the fees and expenses incurred by the Plan are

reasonable and incurred for the sole and exclusive benefit of Plan

participants and beneficiaries;

I.  In entering into agreements with service providers to the Plan, to

ensure that the payments from the Plan – whether they are direct or

indirect – are reasonable for the services provided and made for the

sole and exclusive benefit of Plan participants and beneficiaries;

J.  In operating and administering the Plan, to establish, implement, and

follow procedures to properly and prudently determine whether the

fees and expenses paid by the Plan were reasonable and incurred

solely for the benefit of Plan participants;

K.  In operating and administering the Plan,  on an ongoing basis to

monitor that the payments made by the Plan to service providers –

whether they are direct or indirect – are and remain reasonable for the

services provided and made for the sole and exclusive benefit of Plan

participants and beneficiaries;

L.  To inform itself of, and understand, the various methods by which

vendors in the 401(k) industry collect payments and other revenues

from 401(k) plans;

M.  To inform itself of trends, developments, practices, and policies in the
retirement, financial investment and securities industry which affect
the Plan; and to remain aware and knowledgeable of such trends,
practices and policies on an ongoing basis;

N.  To communicate with Plan participants and beneficiaries regarding the
Plan honestly, clearly and accurately;

O.  To affirmatively and without request provide Plan participants and
beneficiaries with honest, accurate and complete information they
need to understand their investments in the Plan; the management, risk,
potential returns of such investments; and the fees and expenses
incurred in connection with those investments;

P.  Upon request, to provide further and information to Plan participants
and beneficiaries regarding the operation and administration of the
Plan and the expenses incurred in doing so; and

Q.  To provide honest, accurate, and complete information to Plan
participants and beneficiaries regarding the costs associated with their
various investment choices and directions.

142.     As set forth in detail above, Defendants breached their fiduciary
obligations to the Plan, Plan participants and beneficiaries and the Class by, among other
conduct to be proven at trial:

A.  Engaging in self-interested transactions;

B.   Profiting from the management of Plan assets and the administration of the Plan at the expense of, and to the detriment of, the Plan and its participants and beneficiaries;

C.   Profiting from the sale and/or transfer of the Plan's assets, as CIGNA assets under management, to PRIAC;

D.   Causing or allowing the Plan to enter into agreements with service providers under which the Plan pays and continues to pay – directly or indirectly -- fees and expenses that were, and continue to be, unreasonable or not incurred solely for the benefit of Plan participants and beneficiaries;

E.   Allowing the Plan to pay – directly on indirectly -- -- fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

F.   Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

G.   By engaging in, and causing the Plan to engage in, prohibited transactions;

H.   By failing to know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

I.   Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry which

affect the Plan; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

J.   Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

K.   Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

L.   Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

M.   Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

N.   Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

O.   Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plan;

P.   By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

143.    As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plan, and the Plan's participants and beneficiaries have suffered financial losses and damages.

144.    Further, as set forth in detail above, Defendants failed to provide participants and beneficiaries with sufficient investment information so as to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. 1104(c).  Accordingly, Plaintiffs seek a declaration that the § 404(c) defense in not available to Defendants, and that Defendants are liable for participants and beneficiaries' investment losses.

145.    Pursuant to ERISA § 413, 29 U.S.C. § 1113, as set forth in detail above, by a campaign of nondisclosure, concealment, affirmative misrepresentation and deceit, Defendants prevented Plaintiffs from discovering Defendants breaches of fiduciary duty and thus delayed the running of the statute of limitations Plaintiffs claims until Plaintiffs discovered them.

146.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are personally liable to make good to the Plan for the losses it experienced as a result of Defendants' breaches of fiduciary duty and for all profits Defendants realized from the prohibited and/or self-interested transactions set forth above.

147.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
### [Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]

148.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 147 as though fully set forth here.

149.     In addition to, and as an alternative to, the causes of action stated in Count I, Plaintiffs seek further relief pursuant to  ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

150.     Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

151.     Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

152.     Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

153.     By accepting possession and control over a Plan participants' assets, Defendants necessarily must have also accepted the obligation to explain and account for every transaction, expenditure, application, and distribution of such assets.

154.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

155.     Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

156.     As set forth in detail above, Defendants have caused and/or allowed the plan to pay – directly or indirectly – excess fees and expenses to Plan service providers.  Litigating and resolving these issues will involve identifying and reconciling multiple transfers, payments, and flows of Plan assets that occurred while such Plan assets were within Defendants possession and control.

157.     Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed.

158.     An accounting is a particularly appropriate equitable remedy in circumstances where the underlying action involves a fiduciary's control of and accounts that are so complicated that a normal action for a fixed sum may not be practical.

159.     In such an accounting, in light of their possession and control of Plan assets and information about how Plan assets have been applied and distributed, Defendants must bear the burden of proving all Plan transactions and their propriety.

160.     Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements, and dispositions occurring in, in connection with, and/or in respect of, the Plan and its assets.

161.     Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding: (A) all profits Defendants realized from, or in connection with, the Plan and its assets; and (B) all fees and expenses incurred by the Plan and/or paid to third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

162.     Plaintiffs respectfully request that the Court charge / surcharge against the Defendants and in favor of the Plan all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA.

163.     Further, as set forth in detail above, Defendants have reaped profits from the Plan in violation of their fiduciary duties and ERISA.  Plaintiffs respectfully request that the Court disgorge all such profits from Defendants.

164.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease in order for the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future and to remove Defendants from their fiduciary roles in connection with the Plan.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and  declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and/or cause the Defendants to disgorge such monies and return them to the Plan;

- disgorge from Defendants any profits that have reaped from, or in connection with, the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- award actual damages to the Plan in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

**<ins>JURY TRIAL DEMANDED</ins>**

Pursuant to Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs

hereby demand a trial by jury.


Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON


By:   <ins>     s/ Heather Lea     </ins>
    Jerome J. Schlichter
    Daniel V. Conlisk
    Heather Lea
    100 S. 4th St., Suite 900
    St. Louis, Missouri 63102
    (314) 621-6115
    (314) 621-7151 (Fax)
    dconlisk@uselaws.com
    hlea@uselaws.com

    ATTORNEYS FOR PLAINTIFFS/
    CLASS REPRESENTATIVES
    KIM NOLTE, SHERRY LEWIS,
    THERESA MITCHELL.

⊕JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II.  BASIS OF JURISDICTION       (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT       (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 893  Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | 26 USC 7609 | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V.  ORIGIN       (Place an "X" in One Box Only)

☐ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
another district
(specify)

☐ 6   Multidistrict
Litigation

☐ 7   Appeal to District
Judge from
Magistrate
Judgment

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing  (**Do not cite jurisdictional statutes unless diversity**):

Brief description of cause:

## VII.  REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☐ Yes    ☐ No

## VIII.  RELATED CASE(S)
IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**.    Example:    U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.