**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| KIM NOLTE, SHERRY LEWIS, and THERESA MITCHELL as representatives of a class of similarly situated persons, and on behalf of the CIGNA 401(k) Plan, | ) ) ) ) ) ) | |
| Plaintiffs; | ) ) ) | |
| v. | ) ) | Cause No:    2:07-CV-2046-HAB-DGB |
| CIGNA CORPORATION, JOHN ARKO, and THE CORPORATE BENEFIT PLAN COMMITTEE OF CIGNA, | ) ) ) ) ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY**

1.      In this action,  Plaintiffs and Class Representatives Kim Nolte, Sherry Lewis, and Theresa Mitchell, on behalf of the CIGNA 401(k) Plan (the "Plan") and similarly situated participants and beneficiaries in the Plan, seek to recover the financial losses suffered by the Plan and to obtain injunctive and other equitable relief for the Plan from CIGNA Corporation ("CIGNA" the Plan Sponsor), the Corporate Benefit Plan Committee of CIGNA (the "Committee", the Plan Administrator), and other defendants identified below (collectively "Defendants"), based upon breaches of their fiduciary duties.

2.      As set forth in detail below, Defendants:  (1) undertook a long campaign of self-interested and prohibited transactions by retaining CIGNA affiliates, for profit, to serve as the Plan's investment manager and primary service provider; (2) caused the Plan to include

investment options with fees and expenses – paid by the Plan, and thus borne by Plan participants – that were and are unreasonable and excessive, not incurred solely for the benefit of the Plan and its participants and undisclosed to participants; and (3) ultimately used Plan assets to drive the profitable sale of CIGNA's retirement business.  Further, as set forth below, Defendants' selection of investment options for the Plan was imprudent and improper in light of the Plan's size and enormous negotiating leverage in the investing marketplace.  By subjecting the Plan and its participants to these self-interested transactions, imprudent investment options, and the accompanying excessive fees and expenses, and by other conduct set forth below, Defendants violated their fiduciary obligations under ERISA and caused damages to the Plan.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs:

3.      Plaintiff and Class Representative Kim Nolte is a resident of Momence, Illinois, and of this District.

4.      Plaintiff and Class Representative Sherry Lewis is a resident of Kankakee, Illinois, and of this District.

5.      Plaintiff and Class Representative Theresa Mitchell is a resident of Chebanse, Illinois, and of this District.

### Defendants:

6.      Defendant CIGNA Corporation is based in Philadelphia, Pennsylvania.   Pursuant to ERISA § 3(16)(B), CIGNA serves as sponsor of the Plan either directly or through its co-defendants, agents or employees.

7.      Defendant John Arko is the Plan Administrator.

8.      Defendant Corporate Benefit Plan Committee (the "Committee") is the named fiduciary of the Plan.  CIGNA Corporation appoints the Committee.  The Committee is comprised of CIGNA officers and employees.

9.      CIGNA markets and sells employee-benefits insurance products and, until April of 2004, sold employee retirement investment products in all fifty states.  It has an extensive sales force throughout the United States and internationally.

10.     Moreover, as set forth in detail below, before April 2004, CIGNA was the primary investment manager and service provider of the Plan, and thus sold its services, for a profit, to CIGNA employees and Plan participants, including those living and working for CIGNA in the Bourbonnais, Illinois area.

11.     As the Plan's sponsor, administrator, record-keeper, investment manager and service provider, CIGNA engaged in numerous transactions and undertook substantial conduct in, directed at, or arising out of the Bourbonnais, Illinois area, including the dissemination of information via mail, the Plan's internet website, and the Plan's customer service call center.

### Jurisdiction and Venue:

12.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3), which provide that participants may pursue civil actions on behalf of the Plan for damages to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109, and/or to obtain other appropriate equitable relief.

13.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

14.     All Defendants are subject to nationwide service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(2).

15.    Venue is proper in this Court pursuant to 29 U.S.C. § 1132 (e)(2) because the breaches of fiduciary duty giving rise to this action occurred in this district and the Defendants may be found in this district.

16.    **INTRADISTRICT ASSIGNMENT:**  Venue is proper in this Division of this Court pursuant to CDIL-LR 40.1(D) in that this case arises out of Kankakee County, Illinois; involves employment benefits provided to CIGNA employees in Kankakee County, Illinois; and a substantial part of Defendants' actions and omissions out of which this action arises occurred in Kankakee County, Illinois and/or were directed at, and had an effect upon, employees and Plan participants in this District and within this Division.

### Rule 23 Requires Class Certification:

17.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Plan, themselves and all similarly situated Plan participants and beneficiaries.  The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant or beneficiary, has an interest.  Plaintiffs seek to represent the following (the "Class"):

> All persons, *excluding the Defendants, and/or other individuals who are or may be liable for the conduct described in this Complaint,* who were or are participants or beneficiaries of the Plan and who were, are or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

18.    Certification of this Class is proper under Rule 23(a) in that:

A. **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the Plan's public documents

4

state that, at the end of the 2005 Plan year, there were 17,395 participants with account balances in the Plan.

B.  **Commonality.** Common issues of fact and law predominate over any issues unique to individual Class members.  Issues that are common to all Class Members include, but are not limited to, whether the Defendants:

    i.    Engaged in prohibited and self-interested transactions by retaining CIGNA, for-profit, to be the Plan's primary investment manager and service provider;

    ii.    Included investment options in the Plan which were imprudent and improper in light of the Plan's size and negotiating leverage;

    iii.    Reaping prohibited profits in respect of  Plan assets in the sale of CIGNA's retirement business to Prudential Retirement Insurance and Annuity Company;

    iv.    Included investment options that caused participants' long-term retirement savings to consistently under-perform the market;

    v.    Failed to consider investment options with low costs and which are available to large plans;

    vi.    Failed to capture revenues and profits available to the Plan, because of its size, from the proceeds from securities lending,  "float" (interest earned on temporary cash holdings in the Plan), and similar activities;

vii.      Subjected the Plan to fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

viii.      Caused the Plan to enter into agreements with third-parties through which the Plan paid fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

ix.      Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

x.      Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

xi.      Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

xii.      Failed properly to inform Plan participants of the fees and expenses that are, or have been, paid by the Plan;

xiii.      Manipulated, misrepresented and/or disguised the nature of fees and expenses incurred by the Plan;

xiv.     Breached their fiduciary duties by failing to disclose that hidden

and excessive fees were and are being assessed against Plan

assets and paid to CIGNA, and by failing to stop such hidden

excessive fees;

xv.      In charging, causing to be charged or paid, and failing to monitor

the fees and expenses of the Plan, failed to exercise the care, skill,

prudence, and diligence that a prudent person would when acting

in like capacity and familiar with such matters;

xvi.     Caused fees and expenses to be paid by the Plan for purposes

other than those allowed by ERISA;

xvii.    By the conduct above and/or by other conduct set forth in this

Complaint, revealed in discovery and/or proven at trial, breached

their fiduciary and other ERISA-imposed obligations to the Plan,

Plan participants, and members of the Class;

xviii.   Are liable to the Plan and the Class for losses suffered as a result

of the breaches of their fiduciary duties and other ERISA-

imposed obligations; and

xix.     Are responsible to account for the assets and transactions of the

Plan and should be charged/surcharged for any transactions and

payments for which they cannot account or which were not

proper uses of Plan assets.

C. **Typicality.** The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant, has an interest.  The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

    i.    The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and beneficiary, and each member of the Class;

    ii.    The Defendants' breach of those obligations constitutes a breach to each participant and beneficiary, and each member of the Class;

    iii.    To the extent that there are any differences in Class members' damages, such differences would not arise until after an award of damages to the Plan and could easily be resolved with simple mathematics based upon account balances in the Plan.  Such minimal and formulaic differences are no impediment to class certification.

D. **Adequacy of Representation.**  The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation.  The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class' claims.  Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

19.    Class certification is also appropriate under Rule 23(b) and each subpart in that:

A.  Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B.  Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

C.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS

### The Plan

20.     The Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contains or is part of an "eligible individual account plan" under ERISA § 407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A).  It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

21.     Before the sale of CIGNA'S "Retirement Business" or "Retirement Segment" (the "Retirement Business") in April 2004, upon enrollment in the Plan, participants could direct their contributions into investment options which were all managed and/or operated, for profit, by CIGNA's Retirement Business as discussed below.

22.     Since CIGNA sold its Retirement Business, Plan participants have been able to direct their contributions in one or more of the following investment fund options: Fixed income, CIGNA Stock Fund, Dryden S&P 500 Index Fund, State Street Global Adv. EAFE, International Blend / Boston Co., Small-Cap Growth / Timessquare, Small-Cap Value/PWM, Large-Cap Growth/Goldman Sachs, Mid-Cap Blend/Amsterdam, Large-Cap Growth/Wellington, large Cap Value/AJO, Large-Cap Value/Wellington Mgmt., Mid-Cap Growth/Artisan Partners, Mid-Cap

Value/Wellington Mgmt., International Growth/Artisan, High Yield Bond/Caywood-Scholl, and Extended Equity Market Fund F/Barclays Global Investors, N.A.

### Defendants' Fiduciary Duties

23.     Defendants are bound by ERISA's imposition of a fiduciary duty that has been characterized as "the highest known to law."  Defendants' fiduciary obligations require that, at all times, they conduct themselves with the utmost good faith, loyalty and fidelity; act with the sole purpose of advancing the interests of the Plan, its participants and beneficiaries; scrupulously avoid all self-interest, duplicity and deceit; and fully disclose to, and inform participants and beneficiaries of, all material information.

24.     Defendants' fiduciary obligations under ERISA require that they exercise the care, skill, diligence, and caution which a prudent expert would in the operation of a Plan with like character and aims.

25.     Defendants' fiduciary obligations under ERISA require that they discharge their duties with the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying the reasonable cost of administering the Plan.

26.     Defendants' fiduciary obligations under ERISA require that ensure, at all times, that Plan assets are *never* used for the benefit of the employer; here, the CIGNA Defendants.

27.     Defendants' fiduciary obligations under ERISA require them to scrupulously avoid any transaction in which Plan assets would by used by, or inure to the benefit of, a party in interest in connection with the Plan.

### DEFENDANTS' MULTIPLE BREACHES OF FIDUCIARY DUTY

**CIGNA's Self-Dealing, Prohibited Transactions and Imprudence
In The Selection of Investment Options and Service Providers**

28.      Plan participants were allowed to contribute up to 25% of their eligible earnings in the Plan, and could choose from 22 investment options/"Funds".  All of the Plan's investment options are organized as CIGNA "separate accounts."  The two largest options, the Fixed Income Fund and the CIGNA Company Stock Fund, comprised approximately 65% of Plan assets in recent years.  The Plan's default investment option was the Fixed Income Fund.

29.      For most employee-participants, CIGNA matches 50% of participants' contributions up to 6%.  CIGNA requires that half of this matching contribution be invested in the Cigna Stock Fund.

30.      Until March, 2005, CIGNA prohibited participants from transferring these matching contributions, and any earnings from them, out of the CIGNA Stock Fund until either: (A) the participants' employment with CIGNA was terminated, or (B) the participant reached age 55.

31.      Defendants retained CIGNA's Retirement Business, comprised of CIGNA subsidiaries and affiliates including  GLIC (Connecticut General Life Insurance Co.) and Times Square Capital Management (investment management subsidiary of CIGNA), as the investment manager of  the Plan's assets; as record-keeper; and as providers of other, undisclosed services for which the Plan pays fees.

32.      Thus, CIGNA's for-profit Retirement Business, or its subsidiaries and affiliates, charged the Plan fees in connection with all of the Plan's 22 investment options.  While this was greatly beneficial for CIGNA, it was not for the Plan and its participants.

33.      In CIGNA's annual filings with the United States Securities Exchange Commission (the "SEC"), CIGNA states (emphasis added):

11

Assets under management consist of invested and separate account assets, as well as third-party investment advisory account assets of the Retirement segment. **Assets under management are a key driver of earnings for this segment because a significant portion of this segment's revenue is based on asset values.**

34.     In recent years, the Plan has held assets in excess of $2 billion. The Plan's assets are thus a substantial part of the "asset under management" value that was a "key driver" of the Retirement Benefits Business' earnings.

35.     As set forth below, CIGNA sold its Retirement Business to Prudential Retirement Insurance and Annuity Company ("PRIAC") on April 1, 2004. Before that time, the Plan's default investment option, the Fixed Income Fund, was a "fixed group annuity contract with GLIC" and thus, the 100 percent invested in the general account of GLIC.

36.     At the end of 2003, the Fixed Income Fund contained over $1.1 billion. The Plan's next largest fund, the CIGNA Stock Fund, held $307 million. Thus, not only did CIGNA reap the benefit of having placed more than $2 billion of CIGNA employees' retirement savings under the management of CIGNA's Retirement Business, but CIGNA also benefited directly by being the recipient of its employees' 401(k) contributions as equity contributions or loans.

37.     Through the combination of the Plan's Fixed Income Fund and the CIGNA Stock Fund, Defendants caused in excess of $2.4 billion, approximately 65% of the Plan's assets, to be invested in CIGNA, the Plan's Sponsor.

38.     Without more, this is a serious breach of fiduciary duty. It subjected participants' retirement savings to undiversified risk *and* to the same risk as their current income and benefits – the failure or insolvency of CIGNA.

39.     But by causing approximately of 65% of the Plan's assets to be invested in CIGNA, Defendants not only forced the Plan and its participants to bear imprudent levels of risk, *it also subjected them to the conflicts of interest inherent in having the Plan's investment management, recordkeeping and other services performed by CIGNA's for-profit Retirement Business.*  Thus, the same entities that were *supposed* to protect the Plan's interest in paying only reasonable fees stood to profit substantially by charging excessive fees to the Plan.  They did so.

40.     As a result, the Plan and its participants *both* bore this unreasonable risk *and* paid unreasonable and excessive fees to CIGNA's Retirement Business while doing so.

41.      On April 1, 2004, CIGNA sold its Retirement Business to Prudential Retirement Insurance and Annuity Company ("PRIAC").  Through this sale, PRIAC became the Plan's primary investment manager, record-keeper and service provider.

42.     As part of this sale, CIGNA's Retirement Business transferred approximately $18 billion of assets under management to PRIAC, including the Plan's assets of more than $2.1 billion.

43.     CIGNA reaped an *after tax gain of $809 million* from this sale, as well as other financial benefits including the release or reduction of various contract or guarantee obligations.

44.     Although the Plan's assets exceeded 10% of the assets under management transferred to PRIAC in this sale, Defendants did not ensure that that Plan's contribution to this profitable transaction was acknowledged and compensated.

45.     To the contrary, in its filings with the SEC, CIGNA stated:

CIGNA expects to use the proceeds from the sale of its retirement business to support the growth of its health care and related benefits businesses, maintain or improve subsidiary and parent company ratings, ensure financial flexibility of the parent company, and return capital to investors by repurchasing outstanding stock. The company reinitiated its share repurchase program in 2004. The sale of the retirement business further strengthens CIGNA's overall financial position and flexibility.

46.     CIGNA enjoyed these benefits while ignoring the Plan's contribution to them.

47.     Without even considering the excessive and unreasonable fees to which
Defendants have subjected the Plan, the foregoing conduct constitutes a serious breach of
Defendants' fiduciary duties and flagrant self-dealing.  In addition, Defendants' conduct has
caused the Plan to engage in multiple prohibited transactions in violation of ERISA.

### Unreasonable and Excessive Plan Fees and Expenses

48.     Defendants have breached their fiduciary obligations by causing the Plan, and
thus its participants and beneficiaries, to pay excess and unreasonable fees and expenses to Plan
service providers – primarily CIGNA.

49.     These excess payments took the form of hidden Revenue Sharing transfers.

50.     In Revenue Sharing arrangements, Plan fiduciaries, like the Defendants here,
select Funds which assess asset-based charges ("expense ratios") against Plan participants'
retirement savings for the ostensible purposes of operating the Fund and managing Fund
investments.  But in truth, such fees are collected for both these ostensible purposes *and* for the
purpose of providing "soft dollars" to support the Fund's Revenue Sharing program.

51.     Based upon the ostensible reasons for which Fund expense ratios are imposed,
Plan participants investing in the Fund are led to expect and believe that the fees collected from
their savings will benefit them by paying proper costs of operating the Fund and managing its
investments.

52.     This, however, is false.  The Funds transfer the soft dollars collected via Revenue
Sharing arrangements to other Plan service providers – primarily CIGNA entities – and/or others.

53.     Defendants have caused the Plan to pay service providers with *only* soft dollars
collected via hidden Revenue Sharing allotments and, before April 2004, caused the vast

majority of such soft dollars to be paid to the CIGNA Retirement Business.  The CIGNA

Retirement Business kept those fees for itself in respect of the Funds for which it served as

investment manager, and received Revenue Sharing transfers from other non-CIGNA investment

managers in respect of any non-CIGNA Funds included as Plan investment options.

54.     Further, because the CIGNA entities kept the soft dollars generated by CIGNA

Funds' Revenue Sharing programs within the CIGNA organization, the total amount that

CIGNA realized for itself was in excess of the fees that CIGNA would have retained if the Plan

included service providers that were not affiliated with CIGNA.

55.     After CIGNA sold its Retirement Business to PRIAC in April 2004, Defendants

allowed such hidden Revenue Sharing programs to continue, with such payments being directed

to PRIAC.

56.     The soft collars collected to support Revenue Sharing programs – consisting of

millions of dollars – were *both* far in excess of reasonable fees for the administrative or

investment services provided to the Plan by CIGNA *and* far in excess of those that a plan of this

size should pay for similar services.

57.     The resulting fees and expenses borne by the Plan were unreasonable and

excessive.   By subjecting the Plan to such excessive fees and expenses, and by selecting

investment options that assessed excessive fees against participants' accounts so as to provide

soft dollars for undisclosed Revenue Sharing programs, Defendants breached their fiduciary

duties.

### CIGNA Received Prohibited Profit by Charging Excessive Fees to the Plan

58.     CIGNA entities managing Plan assets charged the Plan excessively high expense

ratios that included investment management expenses, risk charges, and administrative charges.

All of these fee assessments were paid to CIGNA or CIGNA-related entities.  CIGNA received substantial profits from them, in direct violation of ERISA's prohibitions of self-interested transactions and admonitions that Plan assets must be managed for the exclusive benefit of the Plan and its participants and beneficiaries.

59.     CIGNA's charges were well in excess of those that an unrelated, arms-length entity would have assessed, especially in light of the more than $1.5 *billion* that the Plan invested in CIGNA-managed Funds.  For example, the Fixed Income Fund holds more than $1.1 billion, and has since before CIGNA sold its Retirement Business to PRIAC.  Since the April 2004, however, PRIAC has charged the Plan's Fixed Income Fund *lower* investment management, risk, and administrative service fees while guaranteeing a *higher* return than did CIGNA's Retirement Business.

60.     While the fees that both CIGNA and PRIAC charged, or charge, are excessive in light of the Fixed Income Fund's  *$1.1 billion* asset value, Defendants caused CIGNA's Retirement Business to charge the Plan an even more severely unreasonable fee than would an unrelated third party.

**Failure to Capture Additional Compensation Streams For the Benefit of the Plan**

61.     Beyond collecting excessive fees from the Plan through Revenue Sharing programs, CIGNA and other Plan service providers received additional, undisclosed compensation from their dealings with the Plan and Plan assets ("Additional Compensation Streams").  For example:

- consultants receive finders' fees from investment managers for the consultants' placement of Plan assets with a certain investment manager or mutual fund company;

- trustees or custodial banks perform cash sweeps of Plan accounts to capture cash before it is transferred to investment options, and earn interest on those cash holdings;

- investment managers, custodial banks, prime bankers, and/or mutual funds receive payments for lending securities, owned by the Plan, to third parties; and

- in connection with foreign investments, investment managers and mutual funds reap additional compensation from profiting on foreign currency exchange.

62.     In a multi-billion dollar plan, like the Plan here, such Additional Compensation Streams can result in millions of dollars of funds available to the Plan.

63.     Accordingly, Plan fiduciaries must also understand and consider these Additional Compensation Streams in fulfilling their fiduciary obligations to ensure that the proceeds of Plan assets are captured to defray Plan expenses and are applied solely for the benefit of the Plan and its participants and beneficiaries.

64.     Here, Defendants have failed to do so.

**Defendants' Payments for Active Investment Management**

65.     Eighteen (18) of the Plan's Funds are actively–managed, and approximately that number have been actively-managed in recent years.  In actively-managed funds, the investment manager seeks to outperform the Fund's benchmark.  This is more expensive than passive management, in which Fund managers conform their holdings to those of a particular benchmark.

66.     The inclusion of such actively-managed funds in a plan of this size is detrimental to the interests of the Plan and its participants and beneficiaries.  It repeatedly had been established that actively-managed funds rarely outperform such indexes on a risk-adjusted basis when held as long-term investments, and the Funds here, after fees, did not do so.

67.     Defendants' inclusion in the Plan of actively-managed funds provides no added value to participants while forcing them to bear substantial and unnecessary fees.  Over time and on a risk-adjusted basis, the Plan's actively-managed Funds have under-performed, and are known to under-perform, market returns by at least the level of such fees.

68.     Including actively-managed funds as investment options in the Plan virtually guaranteed that participants and beneficiaries would receive less than a market return on their long-term retirement savings, when they could have received market returns.  In doing so, Defendants breached their core fiduciary duties to the Plan.

**Defendants' Campaign of Misrepresentation And Non-Disclosure**

69.     As set forth in detail above, Defendants have manipulated, misrepresented, or disguised the nature of fees and expenses incurred by the Plan, and thus borne by Plan participants and beneficiaries.

70.     As set forth above, Defendants have not disclosed, and/or have affirmatively concealed, a litany of material information including:

A.     That Defendants had engaged in a long campaign of self-interested transactions designed to reap prohibited profits from the Plan and its assets for CIGNA and/or related entities;

B.     That the Plan's size and asset value enabled Defendants to provide lower-priced investment options;

C.     That the fees charged and funneled to CIGNA, including fees for active investment management, were depriving participants of the opportunity to receive market returns;

D.      That the excessive fees and expenses assessed against their accounts, and paid to CIGNA, substantially would undermine the value of participants' retirement savings over time;

E.      That Plan service providers – primarily CIGNA – were and/or are collecting "soft dollars" from participants' accounts to be used in undisclosed Revenue Sharing programs and the amount of such soft dollars taken via these hidden Revenue Sharing Programs;

F.      That Revenue Sharing monies were, and are, available for the benefit of the Plan and its participants;

G.      That Plan service providers – primarily CIGNA – were and/or are receiving excess payments via Additional Compensation Streams, and that such monies were available for the benefit of the Plan but not captured;

H.      That the expense ratios charged in Plan investment options were and are inflated to collect soft dollars to support Revenue Sharing programs and are *not* used for the investment management and operation of the investment option/Fund, *(i.e.* the ostensible purpose for the imposition of such fees);

I.      That the expense ratios of Plan investment options/Funds are inflated to collect soft dollars for the purpose of supporting Revenue Sharing programs so that the *stated expense ratio is not the true and accurate cost of investing* in the investment option/Fund;

J.      Who is receiving Plan assets, derived from participants' accounts, through undisclosed Revenue Sharing programs and/or Additional Compensation Streams;

K.      How much each service provider is paid with Plan assets, derived from participants' accounts, when Revenue Sharing transfers *and* Additional Compensation Streams are considered;

L.      Whether the total amount paid to services providers (*i.e.* Revenue Sharing payments *and* Additional Compensation Streams) is reasonable in light of the services provided and incurred solely for participants' benefit;

M.      Whether plan fiduciaries have forgone Revenue Sharing and/or Additional Compensation Streams available in connection with Plan investment options, and thereby unnecessarily increased the expenses which Plan participants otherwise must bear;

N.      The true and accurate amount of recordkeeping and administrative fees that is assessed against participants' accounts in the Plan; in that Plan record-keepers and administrators receive are paid only in soft dollars collected via undisclosed Revenue Sharing programs;

O.      The true and accurate price of Plan investment options/Funds, in that the stated expense ratios of Plan investment options/Funds are overstated so as to enable Funds to collect soft dollars to support undisclosed Revenue Sharing programs;

P.      The true and accurate amount of fees paid to investment managers *for actual investment management services* (*i.e.* the actual amount of investment management being purchased) in any Plan investment option/Fund; in that the investment management prices represented in the expense ratios of Plan

investment options/Funds are overstated so as to include soft dollars to support

Revenue Sharing programs;

Q.      In actively-managed investment options/Funds, the actual amount of

active management services that Plan participants are purchasing, in that the

inclusion of undisclosed soft dollar assessments in actively-managed investment

options/Funds renders participants incapable of knowing whether the higher fees

charged are actually used for active investment management rather than to

support Revenue Sharing programs; and

R.      Whether hidden soft dollar payments of Plan assets, derived from

participants' accounts, are masking prohibited transactions and/or conflicts of

interests between or among Plan fiduciaries and service provider.

71.      Because the Defendants failed and refused to provide them with this information,

and concealed this information from them, Plan participants have lacked the information

necessary for them: (a) to understand and protect their interests in the Plan; (b) to have

knowledge regarding the Defendants' breaches of fiduciary duty; and (3) to have reason to

believe they should make inquiry about those breaches and the facts underlying them.

72.      Defendants know that Plan participants lack such information and knowledge.

73.      In their fiduciary roles, Defendants are the parties with the information necessary

to know and understand whether the participants' rights and protections under ERISA are being,

or have been, violated.  As ERISA fiduciaries, Defendants have an affirmative obligation to

provide full and accurate information to the Plan participants regarding the administration of the

Plan.

74.     As a result of all of the foregoing, including Defendants' campaign of non-disclosure, concealment and misrepresentation, Plaintiffs and all Plan participants and beneficiaries have been forced to pay excessive fees and expenses from their 401(k) accounts, have suffered financial losses and damages, and have been deprived of the opportunity to receive market returns.

## COUNT I:

### [Breach of Fiduciary Duty – ERISA §502(a)(2)]

75.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 74 as though fully set forth here.

76.     As set forth in detail above, Defendants owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

    A.  To conduct itself as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

    B.  To perform its duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

    C.  To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan";

    D.  To, at all times, avoid self-interested transactions;

E.   To properly and prudently select investment alternatives for the Plan;

F.   To ensure, at all times, that the Plan avoid prohibited transactions;

G.   To know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

H.   To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

I.   To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

J.   To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

K.   In entering into agreements with service providers to the Plan, to ensure that the payments from the Plan – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

L.   In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

M.  In operating and administering the Plan, on an ongoing basis to monitor that the payments made by the Plan to service providers – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

N.  To inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

O.  To inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

P.  To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

Q.  To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plan; the management, risk, potential returns of such investments; and the fees and expenses incurred in connection with those investments;

R.  To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions; and

77.     As set forth in detail above, Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

A.   Reaping prohibited profits from the Plan and Plan assets in *both* the form of excessive fee charges *and* the proceeds from the sale of CIGNA's Retirement Business based upon Plan "assets under management";

B.   Squandering the Plan's enormous bargaining power to obtain low-cost investments, and instead subjecting the Plan and its participants and beneficiaries to high-priced investment vehicles that assessed unreasonable fees and paid them to CIGNA;

C.   Failing to employ the Plan's enormous bargaining power to obtain separate accounts and/or other low-cost investment options appropriate for a multi-billion dollar 401(k) plan;

D.   Failing to use the Plan's enormous bargaining power to obtain low-cost funds which provide a market return;

E.   Failing to properly and prudently select plan investment options, making selections for self-interested reasons, and/or abdicating their responsibilities in this regard;

F.   Causing the Plan to pay – directly on indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

G.   Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

25

H.  By engaging in, and causing the Plan to engage in, self-interested and prohibited transactions;

I.  Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

J.  Failing to inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

K.  Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

L.  Manipulating, misrepresenting and/or disguising the nature of the Plan's fees and expenses;

M.  Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, and accurately;

N.  Causing numerous high priced investment vehicles to be included as Plan investment options, and thereby breaching their fiduciary duty to select reasonable and prudent investment choices for the Plan and diluting the Plan's bargaining power, based upon its asset size, to secure lower cost investment options;

O.  Allowing Plan service providers, at the Plan's expense, to receive soft dollars from Plan assets to support Revenue Sharing programs, and failing to capture these soft dollars for the benefit of the Plan and its participants;

P.  Allowing Plan service providers, at the Plan's expense, to receive Additional Compensation Streams; and failing to capture Additional Compensation Streams for the benefit of the Plan and its participants;

Q.  Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

R.  Failing to discover, disclose, and stop the charging of  hidden and excessive fees to the Plan;

S.  Failing to disclose to Plan participants and beneficiaries that the Plan's investment options subjected their retirement savings to excessive and unreasonable fees in light of the Plan's size and bargaining power in the investment marketplace;

T.  Failing to disclose to Plan participants and beneficiaries that defendants had chosen plan investment options without considering appropriate information and in light of the Plan' size and asset value;

U.  By the foregoing conduct, failing to exercise the loyalty, care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters.

78.      As set forth in detail above, as a result of these breaches, the Plan, Plaintiffs, the Class, and the Plan's participants and beneficiaries have suffered financial losses and damages.

79.     Pursuant to ERISA §§409 and 502(a), Defendants are personally liable to make good to the Plan for the losses it experienced as a result of Defendants' breaches of fiduciary duty.

80.     Pursuant to ERISA §§409 and 502(a), Defendants are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
### [Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]

81.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 80 as though fully set forth here.

82.     In addition to, and as an alternative to, the causes of action stated in Count I, Plaintiffs seek further relief pursuant to  ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

83.     Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

84.     Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

85.     Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

86.     By accepting possession and control over Plan participants' assets, Defendants necessarily have also accepted the obligation to explain and account for every transaction, expenditure, application, and distribution of such assets.

87.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

88.     Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

89.     As set forth in detail above, Defendants have caused and/or allowed the Plan to pay – directly and via hidden Revenue Sharing transfers and hidden Additional Compensation Streams – excess fees and expenses to Plan service providers – primarily Cigna.   Further, Defendants reaped prohibited profits in the sale of CIGNA's retirement business based upon substantial Plan assets under management.

90.     Litigating and resolving these issues will involve identifying and reconciling multiple transfers, payments, and flows of Plan assets that occurred while such Plan assets were within Defendants' possession and control.

91.     Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

92.     An accounting is a particularly appropriate equitable remedy in circumstances where, as here, the underlying action and accounts are so complicated that a normal action for a fixed sum may not be practical.

93.     In such an accounting, in light of their possession and control of Plan assets and information about how Plan assets have been applied and distributed, Defendants must bear the burden of proving all Plan transactions and their propriety.

94.     Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of the Plan and its assets.

95.     Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to CIGNA and/or third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

96.     Plaintiffs respectfully request that the Court charge/surcharge against the Defendants and in favor of the Plan all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA.

97.     Plaintiffs respectfully request that the Court order Defendants to disgorge from CIGNA all profits it received in respect of the Plan and all amounts credited to CIGNA for administrative costs which CIGNA was obligated to pay and which Defendants assured Plan participants CIGNA did pay.

98.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease so that the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and  declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- award actual monetary losses to the Plan;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies, including monies from the sale of their retirement business, and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the
  Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS AND ISSUES SO TRIABLE.**

Respectfully submitted:

By: ___/s Daniel Conlisk_____
Jerome J. Schlichter
Daniel Conlisk
Heather Lea
Mark Boyko
SCHLICHTER, BOGARD & DENTON
100 South Fourth Street
Suite 900
St. Louis, MO 63102
Tel:    314-621-6115
Fax:    314-621-7151
Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2007, I electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Sari M. Alamuddin
James E. Bayles, Jr.
James E. Bayles, Jr.
MORGAN LEWIS & BOCKIUS, LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL  60601

s/ Daniel Conlisk
