**E-FILED**
Monday, 10 September, 2007  02:24:35 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

KIM NOLTE, SHERRY LEWIS, and
THERESA MITCHELL as representatives of a
class of similarly situated persons, and on
behalf of the CIGNA 401(k) plan,

     Plaintiffs,

v.

CIGNA CORPORATION, JOHN ARKO, and
THE CORPORATE BENEFIT PLAN
COMMITTEE OF CIGNA,

     Defendants.

No. 2:07-cv-02046-HAB-DGB

Judge Harold A. Baker

Magistrate Judge David G. Bernthal

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sari M. Alamuddin (ARDC # 06215689)
James E. Bayles, Jr. (ARDC # 06206547)
Attorneys for Defendants
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois  60601
Telephone: (312) 324-1000
Fax:  (312) 324-1001
E-mail:  salamuddin@morganlewis.com
    jbayles@morganlewis.com

Joseph J. Costello (admitted *pro hac vice*)
Attorney for Defendants
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania  19103
Telephone: (215) 963-5000
Fax:  (215) 963-5001
E-mail:  jcostello@morganlewis.co

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................. iv

I.     INTRODUCTION ...................................................................................1

II.    UNDISPUTED MATERIAL FACTS ......................................................3

    A.     The CIGNA 401(k) Plan .............................................................3

    B.     Parties............................................................................................4

        1.     Plaintiffs ...........................................................................4

        2.     Defendants .......................................................................5

            a.     CIGNA Corporation – Plan Sponsor ..................5

            b.     John Arko – Plan Administrator ........................5

            c.     Corporate Benefit Plan Committee Of Cigna
               Named Fiduciary....................................................5

    C.     Non-Party Plan Service Providers ..............................................6

        1.     Prudential Bank – Plan Trustee........................................6

        2.     Global Portfolio Strategies, Inc. – Investment
            Selection And Monitoring.................................................6

        3.     PRIAC – Plan Administrative And Record Keeping Services ...................7

        4.     Previous Plan Service Providers And The Sale Of
            CIGNA's "Retirement Business" To Prudential Financial........................8

    D.     The Plan's Compliance With ERISA Section 404(c) And
        29 C.F.R. § 2550.404c-1 .............................................................10

        1.     Participants Exercise Control Over Assets In Their
            Individual Accounts – 29 C.F.R. § 2550.404c-1(b)(2) ...........10

            a.     Participants Have A Reasonable Opportunity
               To Give Investment Instructions – Subsection (i)(A)...................10

b.     Participants Are Afforded The Opportunity To Obtain Sufficient Information About Plan Investment Alternatives – Subsection (i)(B)..................................12

(1)     Investment-Related Information Provided Under Subsection (i)(B)(1)(i)-(ix) .....................................12

(2)     Investment-Related Information Provided Or Made Available Upon Request Under Subsection (i)(B)(2)(i)-(v) .................................................16

2.     The Plan Offers A Broad Range Of Investment Alternatives – 29 C.F.R. § 2550.404c-1(b)(3) ...........................................19

III.     ARGUMENT .......................................................................................................22

A.     Applicable Legal Standards .........................................................................22

B.     Defendants Are Entitled To Summary Judgment On Plaintiffs' Breach Of Fiduciary Duty Claims ..................................................23

1.     ERISA Section 404(c) Immunizes Defendants Against Plaintiffs' Excessive Fee Claims ....................................................23

a.     The Plan Meets The DOL's Three Regulatory Criteria To Qualify As A Section 404(c) Plan............................24

(1)     The Plan Is An Individual Account Plan ..........................25

(2)     The Plan Provides Participants An Opportunity To Exercise Control Over The Assets in Their Individual Accounts..........................25

(a)     The Fee Disclosures Contained In Plan Documents Comply With Section 404(c)'s Implementing Regulations .............................................................27

(b)     The Disclosure Provisions Of Section 404(c)'s Implementing Regulations Are Not Subject To Judicial Expansion .................................................28

(3)     The Plan Provides Participants An Opportunity To Choose From A Broad Range Of Investment Alternatives ....................................................31

b.    The Department Of Labor's Comment On The Scope Of Section 404(c) Is Misguided And Not Entitled To Deference ............................................................. 33

2.    Plaintiffs' Prohibited Transactions Allegations Fail To State A Claim As A Matter Of Law .................................................... 40

a.    The Sale Of CIGNA's Subsidiary "Retirement Business" Is Not A Fiduciary Act Under ERISA ......................... 40

b.    Plaintiffs' Diversification Claims Fail Because ERISA Authorizes Sponsor Investments, Plan Participants Could Diversify Their Holdings And Plaintiffs Allege No Damages ....................................... 41

c.    ERISA Allows Financial Services Companies To Use Their Own Services To Administer Plans ............................. 42

IV.    CONCLUSION .................................................................................... 44

CERTIFICATE OF COMPLIANCE

INDEX OF EXHIBITS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ........................................................22

*Ames v. Am. Nat'l Can Co.*, 170 F.3d 751 (7th Cir. 1999) .....................................29, 40

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................22

*Beck v. Pace Int'l Union*, ____ U.S. ____, 127 S. Ct. 2310 (2007) ...............................38

*Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139 (2d Cir. 1997) ...........................................................................29

*Coleman v. General Electric Co.*, 643 F. Supp. 1229 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987) ...........................................................................40

*Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995) ......................................29

*DiFelice v. US Airways, Inc.*, No. 06-1892, ____ F.3d ____, 2007 WL 2192896 (4th Cir. Aug. 1, 2007) .............................................................34, 37

*Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337, 2007 WL 2263892 (S.D. Fla. Aug. 10, 2007) ...........................................................41, 43

*Ehlmann v. Kaiser Foundation Health Plan of Texas*, 198 F.3d 552 (5th Cir. 2000) .............................................................................29

*Faircloth v. Lundy Packing Co.*, 91 F.3d 648 (4th Cir. 1996) .......................................29

*Fleischfresser v. Directors of School Dist. 200*, 15 F.3d 680 (7th Cir. 1994) .................1

*Hecker v. Deere & Co.*, 496 F. Supp. 2d. 967, 2007 WL 1874367 (W.D. Wis. Jun. 21, 2007) ......................................................................... *passim*

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208(RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ...........................30

*In re Unisys Sav. Plan Litig.*, 74 F.3d 420 (3d Cir. 1996) .....................................34, 36

*Jenkins v. Yager*, 444 F.3d 916 (7th Cir. 2006) .....................................................24, 42

*Jensen v. SIPCO, Inc.*, 38 F.3d 945 (8th Cir. 1994) ....................................................30

*Jones v. Johnson*, 26 F.3d 727 (7th Cir. 1994) ...........................................................................22

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007) ..................................... *passim*

*Lively v. Dynegy, Inc.*, No. 05-DV-00063-MJR, 2007 WL 685861
(S.D. Ill. Mar. 2, 2007)...............................................................................................................36

*M&R Inv. Co. v. Fitzsimmons*, 685 F.2d 283 (9th Cir. 1982)........................................................42

*Nat'l Cable & Tel. Assoc. v. Brand X Internet Servs.*,
545 U.S. 967 (2005)....................................................................................................................39

*Schroeder v. Barth, Inc.*, 969 F.2d 421 (7th Cir. 1992) ...............................................................22

*Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA,
2007 WL 760750 (N.D. Cal. Mar. 9, 2007)................................................................................31

*Smith v. Jefferson Pilot Life Ins. Co.*, 14 F.3d 562 (11th Cir. 1994) .............................................41

*Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) .................................................29

*Stewart v. Hunkins*, No. 05-4033, 2007 WL 1832035 (C.D. Ill. Jun. 25 2007) ............................22

*Tolle v. Carroll Touch, Inc.*, 23 F.3d 174 (7th Cir. 1994) ............................................................22

**Statutes and Regulations**

29 U.S.C. § 1001, *et seq.*................................................................................................................1

29 U.S.C. § 1002(3)(16)(A) ............................................................................................................5

29 U.S.C. § 1002(3)(16)(B) ............................................................................................................5

29 U.S.C. § 1002(14)(G).................................................................................................................42

29 U.S.C. § 1002(34) ................................................................................................................24, 25

29 U.S.C. § 1102(a) .........................................................................................................................5

29 U.S.C. § 1102(c)(3).....................................................................................................................7

29 U.S.C. § 1104(a)(2).....................................................................................................................41

29 U.S.C. § 1104(c) ................................................................................................................. *passim*

29 U.S.C. § 1108(b)(5) ....................................................................................................................41

29 U.S.C. § 1108(b)(8) ..................................................................................................43

29 U.S.C. § 1132(a)(2)....................................................................................................1

29 U.S.C. § 1132(a)(3)....................................................................................................1

29 U.S.C. § 1341(b)(3)(A) ............................................................................................38

29 C.F.R. § 2550.404c-1 ......................................................................................... *passim*

57 Fed. Reg. 46,906, 46,924 n.27 ................................................................................34

Fed. R. Civ. P. 12(b)(6)...................................................................................................1

Fed. R. Civ. P. 56(c) .................................................................................................1, 22

**Other**

Investment Company Institute, The U.S. Retirement Market, Appendix:
Additional Data on the U.S. Retirement Market 7, 14 (July 2006) ...............................33

## I.      __INTRODUCTION__

Plaintiffs, Kim Nolte, Sherry Lewis, and Theresa Mitchell, are participants in the CIGNA 401(k) Plan (the "Plan") – a defined contribution individual account plan regulated by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA").  Plaintiffs assert that Defendants, CIGNA Corporation (the Plan sponsor), the Corporate Benefit Plan Committee of CIGNA (the named fiduciary) and John Arko (the Plan Administrator), breached their fiduciary duties to the Plan under ERISA.  To remedy these alleged fiduciary duty breaches, Plaintiffs have filed a two-count Amended Complaint against Defendants, seeking to recover alleged losses to the Plan under ERISA Sections 502(a)(2) (Count I) and (a)(3) (Count II), 29 U.S.C. §§ 1132(a)(2), (a)(3).

Plaintiffs assert primarily two breach of fiduciary duty claims against Defendants in their Amended Complaint: (1) that Defendants allowed the Plan to incur excessive administrative fees; and (2) that Defendants engaged in prohibited transactions prior to April 1, 2004 when Plan administrative functions were delegated to certain CIGNA subsidiaries, allegedly for a substantial profit.  Because no genuine issue of material fact exists as to any of these claims, Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56(c).[1]

---

[1] Ordinarily, Defendants would have moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim instead of a motion for summary judgment under Rule 56(c).  However, in response to Defendants' motion to dismiss the original complaint, Plaintiffs filed an Amended Complaint that painstakingly deleted all references to Plan documents as well as all references to a key affirmative defense (ERISA Section 404(c)) which showed that Plaintiffs' claims have no legal merit.  Thus, Defendants are now forced essentially to refile their motion to dismiss as a motion for summary judgment so that the Court could consider dispositive Plan documents that Plaintiffs, through artful pleading, hoped the Court would not be able to review early in the litigation.  Motions for summary judgment that are essentially motions to dismiss based on documents not part of the complaint are permissible.  *See Fleischfresser v. Directors of School Dist. 200*, 15 F.3d 680, 684-85 (7th Cir. 1994) (affirming conversion of motion to dismiss into one for summary judgment where district court considered material extraneous to the pleadings).

Plaintiffs' claim that the fees borne by Plan participants were excessive fails because Defendants' alleged fiduciary breaches in this regard are not actionable under the safe harbor provided by ERISA Section 404(c), 29 U.S.C. § 1104(c).  There is no genuine dispute that the Plan meets the criteria to qualify as a "Section 404(c) Plan" because it is an "individual account plan," gives Plan participants complete control over their investment decisions, and offers a broad range of investment alternatives (with varying fee levels) in which participants may invest their contributions.  *See* 29 C.F.R. § 2550.404c-1(b).  Thus, allegedly excessive fees can occur only as the product of *two* discrete acts: (1) Defendants' decision to include investment alternatives in the Plan that allegedly carry excessive fees; and (2) participants' decisions to invest in them.  Although Defendants may control the former, they do not control the latter, and where loss in a participant directed-plan is attributable at least in part to a participant's decision to invest, ERISA Section 404(c) unambiguously allocates liability for the loss to the participant.

Plaintiffs' prohibited transaction allegations do not even state a claim under ERISA, much less one requiring a factual record to resolve, and appear to serve no function other than to color their core allegations of excessive and inadequately disclosed administrative fees.  Plaintiffs assert that Defendants engaged in various forms of fiduciary self-dealing, such as by directing Plan business to CIGNA subsidiaries and then selling these businesses without allowing the Plan to share in the profits.  However, the alleged self-dealing transactions Plaintiffs identify in the Amended Complaint constitute either non-fiduciary settlor activity or transactions specifically authorized by ERISA.

Thus, no genuine issue of material fact exists as to any of Plaintiffs' breach of fiduciary duty claims.  Defendants' motion for summary judgment should therefore be granted.

## II.  UNDISPUTED MATERIAL FACTS

### A.  The CIGNA 401(k) Plan

1.  The CIGNA 401(K) Plan (the "Plan") is a defined contribution plan that provides for an individual account for each participant (Am. Compl. ¶¶ 17, 20; 401(k) Plan § 7.1(a); SPD pp. 6, 54-55).[2]

2.  Active employee participants may contribute to their accounts up to 25% of their eligible earnings, subject to certain limits imposed by the Plan and federal law (Am. Compl. ¶ 28; SPD pp. 6, 8, 14; 12/31/06 Update p. 3; 401(k) Plan § 4.1(a)).

3.  CIGNA Corporation makes a 50% regular matching contribution up to a maximum 6% of the employee participant's eligible earnings; CIGNA may also make an additional variable matching contribution in its discretion based on its judgment about CIGNA's business performance for the year (Am. Compl. ¶ 29; SPD pp. 6, 8, 16-18; 401(k) Plan §§ 4.3, 4.10).

4.  As of December 31, 2006, the Plan offered 22 investment funds in which participants could invest their individual and company matching contributions, including two

---

[2] References to "Am. Compl. ¶ __" are to the Amended Complaint for Breach of Fiduciary Duty filed on July 19, 2007 as Document No. 16.  References to "401(k) Plan § __" are to the CIGNA 401(k) Plan, As Amended and Restated Effective January 1, 1997.  References to "SPD p. __" are to the December 31, 2002 CIGNA Summary Plan Description and Prospectus.  References to "[date] IC p. __" are to Investment Choices, a supplement to the SPD.  References to "[date] SPD Update p. __" are to the CIGNA 401(k) Plan Summary Plan Description and Prospectus Update.  References to "Trust Agreement § __" are to the January 1, 2005 Trust Agreement Establishing the CIGNA 401(k) Plan Trust.  References to "12/31/06 [Plaintiff] Stmt. p. __" are to Plaintiffs' Account Summaries for the quarter ended December 31, 2006.  References to "Q2 Performance Update – Goldman Sachs" are to the Second Quarter 2007 Fund Fact Sheet (a/k/a "Performance Update") for the Large Cap Growth/Goldman Sachs Fund. All Plan documents are attached to, and authenticated by, the Declaration of John Arko, Plan Administrator, which is attached hereto as Exhibit A, and cited as "Arko Dec. ¶ __."  A complete index of exhibits follows the Certificate of Compliance.

fixed income funds, five pre-mixed fixed income/equity funds, 11 domestic equity funds, three foreign equity funds, and an employer stock fund (the CIGNA Stock Fund) (*infra* ¶¶ 85-96).

5.      Plan benefits are based solely on the amounts contributed to a participant's account and any income, gains and losses that may be allocated to such participant's account as a result of her investments (SPD p. 7; 401(k) Plan § 10.1(b)).

6.      The Plan is a profit sharing plan under Section 401(a) of the Internal Revenue Code and contains a cash or deferral arrangement under Section 401(k) of the Code (Am. Compl. ¶ 20; SPD p. 55; 401(k) Plan p. 2 & §§ 1.61, 4.8, 6.1).

7.      The Plan is set forth in a Plan Document, which is periodically amended and restated (401(k) Plan, *passim*).  The most recent restatement became effective January 1, 1997 (401(k) Plan p. 1).

8.      As of December 31, 2005, the Plan had total assets of $2.4 billion (12/31/06 SPD Update p. 14).

**B.      Parties**

**1.      Plaintiffs**

9.      Plaintiffs, Kim Nolte, Sherry Lewis, and Theresa Mitchell are participants in the Plan (Am. Compl. ¶ 1).

10.      As Plan participants, each Plaintiff holds an individual account in the Plan and receives quarterly statements that summarize, among other information, her account balance, quarterly activity, investments, overall account performance and the performance of all Plan investment options, both those in her individual portfolio and those offered by the Plan in which she is not invested (12/31/06 Nolte Stmt.; 12/31/06 Lewis Stmt.; 12/31/06 Mitchell Stmt.) (redacted).

2.  **Defendants**

    a.  **CIGNA Corporation – Plan Sponsor**

11.  Defendant CIGNA Corporation ("CIGNA") is the Plan's Sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(3)(16)(B) (Am. Compl. ¶ 6; 12/31/06 SPD Update p. 8).

12.  CIGNA markets and sells employee-benefits insurance products (and prior to April 2004, also sold employee retirement benefit insurance and investment products through its subsidiary Retirement Business) in all 50 states (Am. Compl. ¶¶ 9, 21).

    b.  **John Arko – Plan Administrator**

13.  Defendant John Arko is the Plan Administrator as defined by ERISA § 3(16)(A), 29 U.S.C. § 1002(3)(16)(A) and a "named fiduciary" as described in ERISA Section 402(a), 29 U.S.C. § 1102(a) (Am. Compl. ¶ 7; 12/31/06 SPD Update p. 8; 401(k) Plan § 17.1).

14.  As the title implies, the Plan Administrator's primary responsibility is to administer the Plan on behalf of CIGNA for the benefit of participants and their beneficiaries (401(k) Plan § 17.2).

    c.  **Corporate Benefit Plan Committee Of CIGNA – Named Fiduciary**

15.  Defendant Corporate Benefit Plan Committee of CIGNA (the "Committee") is a Plan "named fiduciary" (Am. Compl. ¶ 8; 12/31/06 SPD Update p. 8; 401(k) Plan § 16.1).

16.  The Committee, appointed by CIGNA and comprised of several CIGNA employees in the corporate finance, operations and employee benefits units, performs a variety of functions relating to the management, operation and administration of the Plan, including the establishment of a funding policy and the selection of investment funds for the Plan (Am. Compl. ¶ 8; 401(k) Plan §§ 7.1(b), 16.2).

C.      **Non-Party Plan Service Providers**

      1.      **Prudential Bank – Plan Trustee**

17.     Plan assets are held in a trust fund for the benefit of Plan participants (10/15/05 IC p. 48; 401(k) Plan § 15.1).

18.     Prudential Bank & Trust, F.S.B., a non-CIGNA entity, is the Plan Trustee under a Trust Agreement effective January 1, 2005 (12/31/06 SPD Update p. 8; 10/15/05 IC p. 48; Trust Agreement § 1(a)).

19.     The Trustee holds a group fixed annuity contract under which all Plan assets (except those invested in the CIGNA Stock Fund) are accumulated and managed (10/15/05 IC p. 48; Trust Agreement § 1(b) & Exhibit A).

20.     The Trustee also holds legal title to shares of CIGNA Corporation common stock and buys and sells shares on the open market, as needed, for the CIGNA Stock Fund, one of the Plan's 22 investment options (10/15/05 IC pp. 43, 48; Trust Agreement § 1(b) & Exhibit A).

21.     CIGNA pays the Trustee's fees directly out of its corporate assets, including the fees relating to the Trustee's administration of the CIGNA Stock Fund (10/15/05 IC pp. 43, 48).

22.     Prior to January 1, 2005, Mellon Bank (East), N.A., also a non-CIGNA entity, was the Plan's Trustee and performed essentially the same trustee services for the Plan that Prudential Bank now provides (10/23/02 IC pp. 44-45, 49; 12/22/04 Update p. 3).

      2.      **Global Portfolio Strategies, Inc. – Investment Selection And Monitoring**

23.     CIGNA retains Global Portfolio Strategies, Inc., a Prudential Financial company ("Global"), to provide advice and assistance to CIGNA and the Committee in selecting and monitoring Plan investment funds (10/15/05 IC p. 48).

24.    Like the Trustee's fees, CIGNA also pays Global's fees directly out of its general corporate assets (10/15/05 IC p. 48).

### 3.    PRIAC – Plan Administrative And Record Keeping Services

25.    Prudential Retirement Insurance and Annuity Company ("PRIAC") is the issuer of the group fixed annuity contract held by the Trustee under which all Plan assets (except those invested in the CIGNA Stock Fund) are accumulated and managed (10/15/05 IC p. 48; 12/31/06 SPD Update p. 8).

26.    In accordance with this contract, all Plan assets (except those invested in the CIGNA Stock Fund) are invested in either PRIAC's general account (via participant investment in the Fixed Income Fund) or one of 20 PRIAC-owned separate accounts (10/15/05 IC pp. 14-42, 48).[3]

27.    PRIAC is the "investment manager" of the Plan's 20 separate accounts within the meaning of ERISA Section 402(c)(3), 29 U.S.C. § 1102(c)(3), although it contracts with other entities to provide fund-level investment advice and management services (10/15/05 IC p. 48).

28.    Under the group fixed annuity contract, PRIAC also provides administrative and account record keeping services directly to the Plan (10/15/05 IC p. 48).

29.    PRIAC does not charge a separate fee for the Plan-level administrative and record keeping services it provides; it is compensated in part through arrangements with the fund

---

[3] Plan documents explain that a "separate account" is "a pool of money, similar to a mutual fund, that an insurance company invests according to stated investment objectives and guidelines. Money in a separate account is used only for participants in employee benefit plans that offer an option to invest in that separate account. Plan participants, and not the insurance company, earn the investment gains (and suffer the investment losses) in a separate account" (10/15/05 IC p. 52). Technically, only 15 of the Plan's investment options are true "separate accounts." The five CIGNA Custom Funds are not "separate accounts;" they are a pre-set mix of the Fixed Income Fund and nine of the Plans' equity funds/separate accounts (*infra* ¶¶ 93-94). However, for convenience, the Motion will refer collectively to the 20 PRIAC-owned investment funds (excluding the Fixed Income Fund and the CIGNA Stock Fund) as "separate accounts."

managers of the 20 Plan separate accounts to "share" some of the revenue it generates from fund-level asset-based fees and charges (*see* Am. Compl.¶¶ 49-55).[4]

30.     The existence of these revenue sharing arrangements is disclosed to Plan participants in a document entitled "Investment Choices," a part of the SPD which contains fund descriptions that discuss in detail Plan investment options (10/15/05 IC pp. 16-46; 12/31/06 SPD Update pp. 15-16).

31.     For example, the fund description contained in Investment Choices for the Large Cap Growth/Goldman Sachs Fund informs Plan participants that PRIAC retains Goldman Sachs Asset Management, LP to serve as Fund manager and that, as of December 31, 2006, PRIAC charges an annual fee of 0.55% of Fund assets "to cover its administrative expenses as well as the fees it pays to the Fund manager" (10/15/05 IC p. 23; 12/31/06 Update p. 10).

32.     Currently, none of the Fund managers is affiliated with CIGNA (10/15/05 IC pp. 14-46; 12/31/06 Update pp. 15-16).

### 4.     Previous Plan Service Providers And The Sale Of CIGNA's "Retirement Business" To Prudential Financial

33.     Prior to April 1, 2004, the Connecticut General Life Insurance Company ("CG Life") and Global were subsidiaries of CIGNA and part of CIGNA's Retirement and Investment Services (referred to informally in the Amended Complaint as the "Retirement Business") (*see* Am. Compl. ¶¶ 31, 41; 9/23/02 IC pp. 49-50).

---

[4] No revenue sharing occurs with respect to the remaining two Plan investment funds – the CIGNA Stock Fund and the Fixed Income Fund.  The CIGNA Stock Fund is administered by the Trustee, not PRIAC, has no separate fund manager, and does not carry asset-based fees (10/15/05 IC p. 43).  The Fixed Income Fund also has no fund manager; thus PRIAC retains all of the asset-based fees it charges under the fixed group annuity contract (10/15/05 IC p. 16).

34.      While CIGNA subsidiaries, CG Life and Global performed essentially the same services to the Plan that PRIAC and Global currently provide and both were compensated in the same manner (9/23/02 IC pp. 49-50).

35.      CG Life issued the group fixed annuity contract held by the Trustee under which all Plan assets (except those in the CIGNA Stock Fund) were accumulated and managed, served as the "investment manager" of the Plan's 20 separate accounts, and provided Plan-level administrative and account record keeping services (9/23/02 IC p. 49).

36.      Like PRIAC, CG Life was also compensated for the Plan-level administrative and record keeping services it provided to the Plan through revenue sharing arrangements with the separate account fund managers.  For example, the fact sheet for the Large Cap Growth/Goldman Sachs Fund included in the version of Investment Choices distributed to Plan participants during the period CG Life administered the Plan informed Plan participants that CG Life retained Goldman Sachs Asset Management, LP to serve as fund manager, and that as of November 1, 2002, CG Life charged an annual fee of 0.70% of Fund assets "to cover its administrative expenses as well as the fees it pays to the Fund manager" (9/23/02 IC pp. 5, 24-26).

37.      Similarly, as now, Global provided advice and assistance to CIGNA and the Committee in selecting and monitoring Plan investment funds and CIGNA paid Global's fees directly out of its corporate assets (9/23/02 IC p. 50).

38.      Prior to April 1, 2004, CIGNA also retained one of its Retirement Business subsidiaries – TimesSquare Capital Management, Inc. ("TimesSquare") – to provide fund management services for three of the Plan's investment funds:  the Fixed Income Fund, the S&P 500 Index Fund and the Small Cap Growth/TimesSquare Fund (Am. Compl. ¶ 31; 9/23/02 IC pp. 18, 31, 37).

39.     All of these compensation arrangements, as well as the fact that CG Life, Global and TimeSquare were CIGNA subsidiaries, were disclosed to Plan participants (*see, e.g.*, 9/23/02 IC pp. 18, 20, 24, 26, 31, 37, 50).

40.     On April 1, 2004, CIGNA sold its Retirement Business, including CG Life and Global, to Prudential Financial, Inc., and PRIAC was created (5/21/04 Update pp. 1, 3).[5]

41.     PRIAC is the primary operating company of Prudential Retirement – Prudential Financial's "retirement business" (Arko Dec. ¶ 15).

42.     Immediately after the sale, PRIAC began providing the Plan with the record keeping and administrative services that CG Life had previously provided (5/21/04 SPD Update p. 1), although CG Life remained the issuer of the group fixed annuity contract under which the Plan's assets were accumulated and managed until January 1, 2005 (12/22/04 SPD Update p. 6).

**D.      The Plan's Compliance With ERISA Section 404(c) And 29 C.F.R. § 2550.404c-1.**

**1.      Participants Exercise Control Over Assets In Their Individual Accounts – 29 C.F.R. § 2550.404c-1(b)(2).**

**a.      Participants Have A Reasonable Opportunity To Give Investment Instructions – Subsection (i)(A).**

43.     Participants may direct PRIAC to invest their individual contributions as well as CIGNA's regular and variable matching contributions in any one or more of the Plan's 22 investment funds in such proportions as they see fit (SPD pp. 6, 9; 10/15/05 IC p. 6; 401(k) Plan § 7.2).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(A).

---

[5] TimesSquare was not part of this transaction.  TimesSquare sold its equity investment management business in a separate transaction on November 19, 2004 (10/15/05 IC p. 35).

44.     Half of CIGNA's regular matching contributions and all of its variable matching contributions are initially invested automatically in the CIGNA Stock Fund (401(k) Plan §§ 4.10(d), 7.2(e); SPD p. 6).

45.     Participants may change the allocation of their future contributions as well as transfer balances among investment funds, including balances in the CIGNA Stock Fund,[6] at any time by telephoning Prudential Retirement's toll-free interactive voice response service or by logging onto Prudential Retirement's on-line Retirement Center at www.prudential.com/online/retirement (SPD p. 9; 10/15/05 IC pp. 7-8; 12/31/06 Update p. 11; 401(k) Plan § 7.3).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(A).

46.     Only three exceptions exist to the unrestricted transfer and reallocation of balances among investment funds.  First, PRIAC considers the High Yield Bond/Caywood-Scholl Fund and the Fixed Income Fund to be "competitors" and reserves (but has never exercised) the right to prohibit transfers from the latter to the former Fund under certain economic scenarios, such as rapidly rising interest rates, to protect the Fixed Income Fund from disintermediation (10/15/IC p. 18).

47.     Second, certain employees – generally CIGNA senior officers and other CIGNA employees who have material, non-public information – may not engage in any Plan transactions involving the CIGNA Stock Fund except during specified window periods (10/15/05 IC pp. 44-45).

48.     Third, Prudential Retirement reserves the right to monitor participants' investment activities for excessive trading and/or market timing (*e.g.*, one or more round trip trades in excess

---

[6] Restrictions on the transfer of matching contributions out of the CIGNA Stock Fund (*see* 401(k) Plan §§ 4.10(d), 7.3(a)) were removed in March 2005 (Am. Compl.¶ 30; 401(k) Plan, Amendment No. 3 p. 1).

of $25,000 within a 30-day period) and may restrict the investment transfers of participants engaging in these activities after an initial warning (10/15/05 IC pp. 8-9; 401(k) Plan, Amendment No. 4 p. 5 (adding § 7.3(f)).

> **b.      Participants Are Afforded The Opportunity To Obtain Sufficient Information About Plan Investment Alternatives – Subsection (i)(B).**
>
> **(1)      Investment-Related Information Provided Under Subsection (i)(B)(1)(i)-(ix).**

49.      CIGNA provides to all employees information about key aspects of the Plan primarily in three documents which together comprise the Summary Plan Description and Prospectus: (i) the Summary Plan Description ("SPD"); (ii) Investment Choices ("IC"); and (iii) periodic Summary Plan Description and Prospectus Updates ("SPD Update") (*e.g.*, 12/31/02 SPD; 10/15/05 IC; 12/31/06 SPD Update).

50.      The version of the Summary Plan Description and Prospectus in effect as of December 31, 2006 consists of the December 31, 2002 SPD, the October 15, 2005 version of Investment Choices, and the December 31, 2006 SPD Update (12/31/06 SPD Update p. 1).

51.      These summary materials are available to all CIGNA employees for download at any time on CIGNA's intranet (CIGNA Central) (Arko Dec. ¶ 12).  CIGNA also distributes copies of the SPD Updates to employees by e-mail, and by regular mail to employees without computer access (Arko Dec. ¶ 13).

52.      Plan participants may also request printed copies of these documents from Prudential Retirement by dialing its toll-free telephone number and speaking to a customer services representative (Arko Dec. ¶ 14).

53.      In accordance with the DOL's regulations, Investment Choices informs participants that the Plan is intended to qualify as an ERISA Section 404(c) Plan, that

participants are entitled to make their own investment decisions, and that Plan fiduciaries are not liable for any losses that directly result from these investment decisions (10/15/05 IC p. 48). *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(i).

54.     Specifically, Investment Choices states:

> CIGNA intends that the CIGNA 401(k) Plan qualify as a "404(c) plan" under section 404(c) of *ERISA* and section 2550.404c-1 of the regulations issued by the U.S. Department of Labor.  The persons responsible for administering a plan or managing its assets – the plan fiduciaries – may not be liable for any losses that directly result from investment decisions made by 404(c) plan participants or beneficiaries.  Therefore, Plan fiduciaries may be protected by *ERISA* section 404(c) against any *ERISA* liability claims you make because of investment losses in your Plan account that are the result of your investment elections.

(10/15/05 IC p. 48) (emphasis in original).

55.     Investment Choices also includes fund descriptions for of all of the Plan's investment alternatives (10/15/IC pp. 5, 14-46; 12/31/06 SPD Update pp. 15-16). *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(ii).

56.     These fund descriptions include a description of each investment alternative's objectives and risk and return characteristics as well as information relating to the type and diversification of assets comprising the investment's portfolio (10/15/IC pp. 5, 14-46; 12/31/06 SPD Update pp. 15-16). *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(ii).

57.     These fund descriptions also identify the investment fund managers for each Plan investment option, with the exception of the Fixed Income Fund and the CIGNA Stock Fund, which have no separate fund managers (10/15/05 pp. 14-46; 12/31/06 SPD Update p. 16). *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(iii).

58.     The SPD, Investment Choices and the SPD Updates inform participants as to how and when they may change their investment fund decisions and describe the restrictions on

transfers among investment options, specifically: (i) the possible restrictions on transfers between the High Yield Bond/Caywood-Scholl Fund and the Fixed Income Fund; (ii) the restrictions on key employee transactions in the CIGNA Stock Fund; and (iii) Prudential Financial's restrictions on excessive trading and market timing activities (*supra* ¶¶ 43-48).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(iv).

59.     The CIGNA Stock Fund description contained in Investment Choices informs Plan participants that investors in the CIGNA Stock Fund have "pass through" voting rights and that they may direct the Trustee to vote the shares that represent their interest in the Fund however they want (10/15/05 IC p. 44).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(iv).

60.     The CIGNA Stock Fund description also informs Plan participants that stockbrokers who buy and sell shares of the CIGNA Stock Fund are paid commissions (generally less than five cents a share) that are charged to the accounts of Plan participants who: (i) make investment changes, distributions or withdrawals that require the Trustee to buy or sell shares of CIGNA stock; (ii) make rollover or payroll contributions to the Fund; or (iii) have company matching contributions invested in the Fund (10/15/05 IC p. 43).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(v).

61.     Investment Choices, as amended by the SPD Updates, provides the names, addresses and phone numbers of the entities responsible for providing Plan participants with additional information about the Plan and the investment funds upon request and a summary of the information that may be obtained (10/15/05 IC p. 47; 12/31/06 SPD Update pp. 2, 8).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(vi).

62.     According to Investment Choices, participants may obtain directly from CIGNA all documents filed with the SEC and incorporated by reference in the CIGNA Stock Fund

prospectus, all documents that are part of the Plan prospectus, and CIGNA's annual report, proxy statements, and other shareholder reports and communications (10/15/05 IC p. 47).

63.     Participants may obtain from Prudential Retirement: (i) the Plan document and additional information about the Plan, the Plan Administrator, and the administration of the Plan; (ii) the most recently available list of stocks or other investments held in the Plan investment funds; and (iii) copies of any annual reports, quarterly reports or other information issued by PRIAC for any Plan investment fund (10/15/05 IC p. 47).

64.     Participants may also obtain from Prudential Retirement's website at www.prudential.com/online/retirement up-to-date performance information about the Plan's investment funds and links to Prudential Retirement's quarterly fund Performance Updates (10/15/05 IC p. 47; 12/31/06 SPD Update p. 2; Arko Dec. ¶ 20).

65.     The CIGNA Stock Fund description contained in Investment Choices explains to participants that CIGNA will treat as confidential any information about a participant's investments in the Fund, including transfers into or out of the Fund and their exercise of pass-through voting rights (10/15/05 IC p. 45).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(vii).

66.     The CIGNA Stock Fund description further states that the Plan Administrator (Defendant John Arko), whose address and phone number are provided in the SPD Updates, has adopted procedures to implement these confidentiality protections and is responsible for ensuring that the procedures are followed (10/15/05 IC p. 45; 12/31/06 SPD Update p. 8).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(vii).

67.     The CIGNA Stock Fund description summarizes the confidentiality procedures the Plan Administrator has implemented and explains that: (i) CIGNA employees responsible for processing Plan transactions or who otherwise have access to Plan account records will not

disclose information about investments in the CIGNA Stock Fund to anyone not responsible for administering the Plan; and (ii) the Trustee will vote CIGNA shares in its own name to protect the anonymity of plan participants who return (or do not return) proxy cards (10/15/05 IC p. 45). *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(vii).

68.     The covers of the SPD, Investment Choices, and the SPD Updates inform participants that these documents are "part of a prospectus covering securities that have been registered under the Securities Act of 1933" (SPD p. 1; 10/15/05 IC p. 1; 12/31/06 Update p. 1). *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(viii).

69.     With respect to the exercise of "pass-through" voting rights appurtenant to investment in the CIGNA Stock Fund, the Fund description informs Plan participants that they will receive before each shareholders meeting a proxy statement describing the matters to be considered and a proxy card to tell the Trustee how they want their interests voted (10/15/05 IC p. 44).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(ix).

70.     The CIGNA Stock Fund description further informs Plan participants that the Trustee will vote as participants direct if they return their proxy cards in time; otherwise the Trustee will vote as CIGNA management directs (10/15/05 IC p. 44).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(ix).

> **(2)     Investment-Related Information Provided Or Made Available Upon Request Under Subsection (i)(B)(2)(i)-(v).**

71.     Investment Choices and the periodic SPD Updates include fund descriptions for all Plan investment options (10/15/05 IC pp. 14-46; 12/31/06 SPD Update pp. 15-16).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(ii).

72.     The information contained in the fund descriptions (excluding the information contained in the CIGNA Stock Fund description) is based on information Prudential Retirement provides to the Plan (10/15/05 IC p. 14).

73.     The fund descriptions contain a description of the annual operating expenses of each investment fund which reduce the rate of return to participants and beneficiaries, and state the aggregate amount of such expenses expressed as a percentage of average net assets (*i.e.*, the "expense ratios") (10/05/15 IC pp. 14-46; 12/31/06 SPD Update pp. pp. 15-16).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(i).

74.     For example, the fund description for the Small Cap Value/MEA fund states that, as of December 31, 2006, "PRIAC charges an annual fee of 0.90% of Fund assets to cover its administrative expenses as well as the fees it pays to the Fund manager" (12/31/06 SPD Update p. 16).

75.     Investment Choices and the SPD Updates also list the expense ratios of the Plan's 22 investment funds in chart form to facilitate cost comparisons (10/05/15 IC p. 5; 12/31/06 SPD Update p. 10).[7]

76.     The fund descriptions for each of the 20 separate accounts contains a list of each investment fund's top ten holdings (10/15/05 IC pp. 16-42; 12/31/06 SPD Update pp. 15-16). The proportion of fund assets invested in each fund's top five holdings is also available in Prudential Retirement's quarterly Performance Updates, which participants may access on Prudential Retirement's website (Arko Dec. ¶ 20).[8]  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(iii).

---

[7] This data is provided by Prudential Retirement (*supra* ¶ 72).

[8] Performance updates are not available for the CIGNA Custom Funds because they are not true "separate accounts" (*supra* ¶ 26 n.3).

77.     For example, the fund description for the Large Cap Growth/Goldman Sachs Fund states that the Fund's top ten holdings are in the stocks of Microsoft Corp., Freddie Mac, First Data Corporation, QUALCOMM, Inc., Wal-Mart Stores, Inc., PepsiCo, Inc., McGraw-Hill Cos., Dell, Inc., Cendant Corp. and Cicso Systems, Inc. (10/15/05 IC p. 22).   Prudential Retirement's Performance Update for the quarter ended June 30, 2007 expands and updates this information with the proportions of the Fund's top five holdings:  Baker Hughes, Inc (4.14%); Suncor Energy, Inc. (3.91%); Google, Inc. (3.78%); Freddie Mac (3.26%); and McGraw-Hill Companies (3.06%) (Q2 Performance Update – Goldman Sachs).

78.     The fund description for the Fixed Income Fund, as amended by the SPD Updates, identifies PRIAC as the issuer of the Fund's only investment – the group fixed annuity contract issued by PRIAC – and provides the contract's interest rate/rate of return and the period in which the rate is in effect (10/15/05 IC pp. 14-15; 12/31/05 SPD Update p. 15).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(iii).

79.     Investment Choices, as amended by the SPD Updates, provides annual total returns and cumulative investment values for each Plan investment fund for 1-, 2-, 3-, 5- and 10-year periods, net of the applicable fees and charges described in each fund's fact sheet (10/15/05 IC pp. 10-12; 12/31/06 SPD Update pp. 11-13).   *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(iv).

80.     Participants also receive by mail from Prudential Retirement quarterly account statements which provide updated average annual returns for each of the Plan's investment funds for the period since January 1, as well as for the 1-, 2-, 3-, 5- and 10-year periods covered in Investment Choices and the SPD Updates (*e.g.*, 12/31/06 Nolte Account Stmt. pp. 4-5) (redacted). *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(iv).

81.     The updated unit value of each Plan investment option is available on Prudential Retirement's website (Arko Dec. ¶ 21).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(iv).

82.     The quarterly account statements participants receive from Prudential Retirement provide, for each investment fund in which a participant invests, the number of units held by the participant, the price of each unit, and the total value of the investment (*e.g.*, 12/31/06 Nolte Stmt. pp. 2-3) (redacted).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(v).

83.     The quarterly account statements inform participants that they may access up-to-date information about their accounts at any time by logging onto Prudential Retirement's website at www.prudential.com/online/retirement (*see, e.g.*, 12/31/06 Nolte Stmt. p. 1) (redacted).

**2.      The Plan Offers A Broad Range Of Investment Alternatives – 29 C.F.R. § 2550.404c-1(b)(3).**

84.     As of December 31, 2006, CIGNA designated 22 investment funds as Plan investment options (12/31/06 SPD Update p. 10).

85.     The 22 Plan investment funds offer a broad range of investment options in seven different asset classes: fixed income, mixed fixed income/equities, large, mid and small capitalization domestic equities, foreign equities, and employer stock (12/31/06 SPD Update p. 10).

86.     Summary charts included in Investment Choices and the SPD Updates list these investment options by asset class (12/31/06 SPD Update p. 10; 10/15/05 IC p. 5).

87.     The Fixed Income Fund represents the most conservative Plan investment option (risk level "low"), with a Fund portfolio consisting solely of a group fixed annuity contract issued by PRIAC which carries a guarantee against investment loss backed by PRIAC's general assets (10/15/05 IC pp. 14-16; 12/31/06 SPD Update p. 10).

88.     Moving up in risk, the Plan offers a second fixed income fund – the High Yield Bond/Caywood-Scholl Fund (risk level "moderate") – that invests primarily in U.S. corporate bonds that have high yields but are considered below investment grade (10/15/05 IC pp. 14-16; 12/31/06 SPD Update p. 10).

89.     For those investors with higher levels of risk tolerance, the Plan offers 14 equity funds  (risk levels "moderate" to "high") as of December 31, 2006 with differing investment goals:  Large Cap Growth/Goldman Sachs, Large Cap Growth (Wellington Management), Large Cap Blend/AJO, Large Cap Value (Wellington Management), Dryden S&P 500 Index, Mid Cap Growth/Artisan Partners, Mid Cap Value (Wellington Management), Mid Cap Blend/New Amsterdam Partners, Barclays Equity Market Index, Small Cap Growth/TimesSquare, Small Cap Value/MEA, International Blend/The Boston Company, International Growth/Artisan Partners and State Street Global Advisors EAFE Index (10/15/05 IC pp. 24-42; 12/31/06 SPD Update pp. 10, 15-16).

90.     Three of these equity funds are passively-managed index funds (the Dryden S&P 500 Index, the Barclays Equity Market Index, and the State Street Global Advisors EAFE Index) that carry the lowest expense ratios of all Plan investment options (.10%, .25% and .30%, respectively, as of December 31, 2006); the remaining 11 equity funds are actively managed (10/15/05 IC pp. 28-29, 37-38, 41-42; 12/31/06 SPD Update p. 10).

91.     The Plan's three index funds occupy different asset classes:  the Dryden Fund invests in large capitalization equities and attempts to track the S&P 500; the Barclays Fund invests in mid to small capitalization equities; and the State Street Fund invests in foreign equities (10/15/05 IC pp. 5, 28, 37, 41-42; 12/31/06 SPD Update p. 10).

92.     Three equity funds invest primarily in foreign equities (the International Blend/The Boston Company, the International Growth/Artisan Partners and the State Street Global Advisors EAFE Index Funds), two of which carry the highest expense ratios of all Plan investment options (.97% and .94% for the International Blend/The Boston Company Fund and the International Growth/Artisan Partners Fund, respectively, as of December 31, 2006) (10/15/05 IC pp. 38-41; 12/31/06 SPD Update p. 10).

93.     For those participants who do not wish to create their own investment portfolios, the Plan also offers five funds (the CIGNA Custom 20, 30, 40, 50 and 60 Funds) that consist of a pre-set mix of the Fixed Income Fund and nine of the Plan's equity funds and span a range of risk levels (10/15/05 IC pp. 18-20).

94.     The number in each Fund's name (20, 30, etc.) corresponds roughly to the age of the typical investor for whom the fund is generally considered appropriate (assuming a retirement age of 65) and relates to the level of risk associated with the Fund (10/15/05 IC pp. 19-20).  Thus, the CIGNA Custom 60 Fund is the least risky of the Custom Funds with nearly 2/3 of its assets invested in the Fixed Income Fund and the remainder in equities, whereas the Custom 20 Fund is the most risky, with only 20% of its assets invested in the Fixed Income Fund (10/15/05 IC pp. 19-20).

95.     The last fund (the CIGNA Stock Fund, risk level "high") is an undiversified stock fund that invests primarily in CIGNA Corporation common stock (and some temporary cash or cash equivalents until the Fund accumulates enough cash to buy more shares) and represents the Plan investment alternative with the greatest risk (10/15/05 IC pp. 42-46; 12/31/06 SPD Update p. 10).

## III.    ARGUMENT

### A.    Applicable Legal Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Stewart v. Hunkins*, No. 05-4033, 2007 WL 1832035, at *1 (C.D. Ill. Jun. 25, 2007) (Baker, J.).  A "material fact" is one that "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Stewart*, 2007 WL 1832035, at *1.  A dispute is "genuine" only if a reasonable factfinder could find for the nonmoving party.  *See Anderson*, 477 U.S. at 248; *Stewart*, 2007 WL 1832035, at *1.

A party moving for summary judgment initially has the burden of showing the absence of any genuine dispute of material fact based on the evidence.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *Schroeder v. Barth, Inc.*, 969 F.2d 421, 423 (7th Cir. 1992); *Stewart*, 2007 WL 1832035, at *1.  A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position.  *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994); *Stewart*, 2007 WL 1832035, at *1.  The evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255; *Stewart*, 2007 WL 1832035, at *1.  Nonetheless, "[s]ummary judgment is not a discretionary remedy.  If the plaintiff lacks enough evidence, summary judgment must be granted."  *Jones v. Johnson*, 26 F.3d 727, 728 (7th Cir. 1994); *Stewart*, 2007 WL 1832035, at *1.

### B. Defendants Are Entitled To Summary Judgment On Plaintiffs' Breach Of Fiduciary Duty Claims.

In their Amended Complaint, Plaintiffs assert primarily two breach of fiduciary duty claims against Defendants under ERISA Sections 502(a)(2) and (a)(3): (1) that Defendants allowed the Plan to incur excessive administrative fees, because most of the Plan's investment options allegedly were expensive, actively-managed funds and Defendants allegedly failed to capture revenue streams (*e.g.*, certain fees paid by investment managers to consultants) that could have reduced these fund-level investment costs (Am. Compl. ¶¶ 2, 48-57, 61-63, 65-74); and (2) that Defendants allegedly engaged in prohibited transactions prior to April 1, 2004 when Plan administrative functions were delegated to CIGNA subsidiaries, which not only allowed CIGNA to profit from the provision of services to the Plan, but also allowed these subsidiaries to build value which CIGNA was able to capture when these subsidiaries were sold (Am. Compl. ¶¶ 2, 31-47, 58-60). None of these allegations states a claim for breach of fiduciary duty as a matter of law. Therefore, under the foregoing standards, summary judgment should be granted.

### 1. ERISA Section 404(c) Immunizes Defendants Against Plaintiffs' Excessive Fee Claims.

To the extent Plaintiffs assert that the Plan incurred excessive administrative fees and seek to hold Defendants responsible for them, Defendants are entitled to summary judgment under ERISA Section 404(c). ERISA Section 404(c) provides, in relevant part:

> In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary) –
>
> * * *
>
> (B) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control.

29 U.S.C. § 1104(c)(1)(B).

Thus, under ERISA Section 404(c), "no fiduciary shall be liable for any loss which results from a plan participant or beneficiary's exercise of control in participant-directed plans." *Jenkins v. Yager*, 444 F.3d 916, 923 (7th Cir. 2006); *see also* 29 C.F.R. § 2550.404c-1(d)(2)(i) (immunizing fiduciaries from any loss "that is the necessary and direct result of that participant's or beneficiary's exercise of control").   Because there is no genuine dispute that participants exercise control over their accounts within the meaning of Section 404(c), Defendants are not responsible for any losses the Plan incurred as a result of their decisions to invest in what Plaintiffs now claim to be fee-heavy investments.

### a.    The Plan Meets The DOL's Three Regulatory Criteria To Qualify As A Section 404(c) Plan.

Entitlement to the fiduciary immunity depends on whether a plan qualifies as an "ERISA Section 404(c) Plan" under the DOL's implementing regulations.  *See* 29 C.F.R. § 2550.404c-1. Those regulations require plans to satisfy primarily three criteria.  First, the plan must be an "individual account plan" described in ERISA Section 3(34), 29 U.S.C. § 1002(34).  29 C.F.R. § 2550.404c-1(b)(1).  Second, the plan must provide "an opportunity for a participant to exercise control over assets in his individual account. . . ."  29 C.F.R. § 2550.404c-1(b)(1)(i).  Third, the plan must provide "a participant or beneficiary an opportunity to choose from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested."  29 C.F.R. § 2550.404c-1(b)(1)(ii); *see also*, *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 309 (5th Cir. 2007) ("[T]he Department implemented the Congressional purpose to qualify plans for this defense only if, *inter alia*, they offer a diversified array of investments; provide adequate information concerning the investments to participants; and authorize flexible

and autonomous control by the participants.").   No genuine issue of fact exists that the Plan satisfies all three of the regulatory criteria.

### (1)      The Plan Is An Individual Account Plan.

ERISA Section 3(34) defines the term "individual account plan" and the synonymous term "defined contribution plan" as:

> a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34).  The Plan indisputably qualifies as an "individual account plan" within the meaning of Section 3(34).  Plaintiffs' Amended Complaint alleges, and the Plan documents confirm, that the Plan: (1) is a qualified profit sharing plan; (2) provides for individual accounts; and (3) bases benefits to participants solely on contributions, gains and losses allocated to participants' individual accounts (Facts ¶¶ 1, 5-6).  Plaintiffs, themselves, had individual Plan accounts, as their account statements plainly show (Facts ¶¶ 10, 82-83).  Accordingly, the Plan satisfies the first of the three regulatory criteria to qualify as a Section 404(c) Plan.

### (2)      The Plan Provides Participants An Opportunity To Exercise Control Over The Assets In Their Individual Accounts.

There is also no genuine dispute that the Plan satisfies the second criteria to qualify as a Section 404(c) Plan – the opportunity for participants to exercise "control" over the assets in their individual accounts.  *See* 29 C.F.R. § 2550.404c-1(b)(2).  Under the DOL's implementing regulations, an ERISA Section 404(c) Plan is deemed to provide a participant with an opportunity to exercise control if the participant: (1) "has a reasonable opportunity to give investment instructions . . . to an identified plan fiduciary who is obligated to comply;" and (2) "is provided or has the opportunity to obtain sufficient information to make informed investment

decisions. . . ." 29 C.F.R. § 2550.404c-1(b)(2)(i)(A) & (B).   The Plan satisfies both control criteria.

First, participants may direct PRIAC to invest their contributions in any one or more of the 22 investment funds in such proportions as they see fit (Facts ¶ 43).  In addition, participants may change the allocations of their future contributions as well as transfer balances among investment funds, subject to certain immaterial restrictions, at any time by telephoning Prudential Retirement's automated voice response system or by or logging onto Prudential Retirement's website (Facts ¶¶ 44-48).  Accordingly, the Plan satisfies the DOL's first "control" criteria.  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(A).

Second, participants are provided a wealth of information to enable them to make informed investment decisions (Facts ¶¶ 49-83).  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B).  To start with, participants are cautioned that the Plan is intended to qualify as a Section 404(c) Plan, and that they are responsible for their own investment choices as a result (Facts ¶¶ 54-55).  In addition, participants are provided detailed information about Plan investment options in Investment Choices and the SPD Updates (Facts ¶¶ 55-56).  These materials cover a broad range of subjects, including Fund investment objectives, risk, and performance history (Facts ¶¶ 56, 71, 79), fund-level expenses (Facts ¶¶ 60, 73-75), voting rights (Facts ¶¶ 59, 66-67, 69-70), account access and management (Facts ¶¶ 45, 83), and where and from whom participants may obtain additional information about the Plan and the investment options (Facts ¶¶ 61-64).  Finally, all participants receive quarterly account statements that not only detail their individual investment holdings, but also track the performance of all investment funds in the Plan (Facts ¶¶ 82-83).

> **(a)** **The Fee Disclosures Contained In Plan Documents Comply With Section 404(c)'s Implementing Regulations.**

Plaintiffs have not challenged Defendants' compliance with any of the DOL's "control" regulations, except one: the obligation to provide participants with information about fund-level fees (Am. Compl. ¶¶ 47-56, 68-73).  However, Defendants indisputably complied with ERISA's fee-disclosure requirements with respect to all 22 investment funds.  Insofar as they relate to fees, the DOL's regulations to Section 404(c) require plans to disclose to participants only the following investment-specific information:

> (1)(v)  A description of any *transaction fees and expenses* which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (*e.g.*, commissions, sales load, deferred sales charges, redemption or exchange fees); [and] . . .

> (2)(i)  A description of the *annual operating expenses* of each designated investment alternative (*e.g.*, investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative.

29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(v) & (2)(i) (emphasis added); *see Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 2007 WL 1874367, at *6-7 (W.D. Wis. Jun. 21, 2007).

With respect to *transaction fees and expenses* that must be disclosed under Section 2550.404c-1(b)(2)(i)(B)(1)(v), the CIGNA Stock Fund description clearly informs Plan participants of the amount of, and circumstances under which, they will incur stockbroker fees and commissions (Facts ¶ 60).  With respect to *annual operating expenses* that must be disclosed under 29 C.F.R. § 2550.404c-1(b)(2)(B)(2)(i), which are required to be "expressed as a percentage of average net assets of the designated investment alternative," the fund descriptions included in Investment Choices and the SPD Updates identify the expense ratio of each

investment fund (Facts ¶¶ 73-74).  Investment Choices and the SPD Updates also consolidate this information in chart form to facilitate cost comparisons among investment funds (Facts ¶ 75).

> **(b)** **The Disclosure Provisions Of Section 404(c)'s Implementing Regulations Are Not Subject To Judicial Expansion.**

Despite Defendants' indisputable compliance with ERISA's express fee-disclosure provisions, Plaintiffs nevertheless assert that Defendants breached their fiduciary duties to Plan participants because they did not disclose exactly how these fund-level fees were used, including how they were divided up among fund and Plan service providers through revenue sharing arrangements (Am. Compl. ¶¶ 48-57, 69-74).  Irrespective of whether or not the disclosure of each fund's aggregate expense ratio is sufficient in Plaintiffs' estimation these disclosures – and no others – are what ERISA requires and the Court should decline Plaintiffs' implicit invitation to supplement them under the Court's general authority to define fiduciary obligation.  As the district court recently explained in *Deere*, when it rejected the same request made by another group of plaintiffs represented by the same attorneys that represent Plaintiffs here:

> There is no merit to plaintiffs' contention that disclosure not required by the statutory disclosure requirements is separately required by the general ERISA fiduciary obligations.  Disclosure requirements are generally limited to those expressly prescribed by the statutory language of ERISA.  *Ames v. American Nat. Can Co.*, 170 F.3d 751, 759 (7th Cir. 1999). . . .  Where as here Congress has by statute and related regulation, created detailed rules governing disclosure requirements, it would be inappropriate to ignore and augment them using the general power to define fiduciary obligations.

*Deere*, 2007 WL 1874367, at *5.[9]  *Deere* is well-reasoned and consistent with the overwhelming weight of Supreme and Circuit Court authority.   *See, e.g.*, *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 84 (1995) (ERISA's reporting and disclosure scheme "may not be a foolproof informational scheme, although it is quite thorough.  Either way, it is the scheme that Congress devised.  And we do not think Congress intended it to be supplemented by a far away provision in another part of [ERISA.]"); *Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 759 (7th Cir. 1999) ("[T]he affirmative obligation to disclose materials under ERISA, punishable by penalties, extends only to a defined set of documents"); *Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 146-47 (2d Cir. 1997) ("[W]e think it inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure"); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 657 (4th Cir. 1996) ("We likewise decline to use § 404(a)(1)(A) to expand the duties imposed under § 104(b)(4), the ERISA section that specifically governs the situation here – a request for documents related to the ESOP"); *Ehlmann v. Kaiser Foundation Health Plan of Texas*, 198 F.3d 552, 555 (5th Cir. 2000) ("Today we heed the Supreme Court's warning that where ERISA provides a section specifically dealing with a particular information scheme, courts should not supplement that scheme by reference to a far away provision in another part of the statute").   This overwhelming judicial reluctance to expand ERISA's specific statutory disclosure provisions extends to the DOL's implementing regulations as well.   *See, e.g., Sprague v. General Motors Corp.*, 133 F.3d 388, 405 n.15 (6th Cir. 1998) ("[W]hen Congress and the Department of Labor have carefully prescribed a detailed

---

[9] In *Deere*, the district court also concluded that, although the DOL is considering proposals to amend its regulations to require the disclosure of additional information, such as revenue sharing arrangements, "[w]hether, as a policy matter, additional reporting of revenue sharing arrangements should be required, it is not presently required and failure to include such information does not violate existing ERISA standards for disclosure."  *Deere*, 2007 WL 1874367, at *5.

list of matters that must be disclosed to plan participants and beneficiaries, it ill-behooves federal judges to add to that list"); *Jensen v. SIPCO, Inc.* 38 F.3d 945, 952 (8th Cir. 1994) (noting that the Department of Labor's regulations represent a "thorough approach to questions of disclosure" and that its failure to require certain disclosures "cannot be an inadvertent omission").

Moreover, Plaintiffs cannot show that information breaking down and itemizing Plan fees would even be material to the typical participant-investor. Although *total* fees certainly would be material, ERISA's regulations already require such disclosures and Defendants have complied with them.[10] To go further than the total cost of each investment fund would serve no purpose, as the district court in *Deere* recently observed:

> [T]here is nothing to suggest that receiving this additional non-prescribed information would effectively enhance investment decisions. In assessing the likely return on an investment the fees netted against the return are certainly relevant, but knowing the subsequent distribution of those fees has no impact on the investment's value. *See In re Merrill Lynch Investment Management Funds Securities Litigation*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006) (holding that such information is not material under securities law). In the context of the disclosure of information on investment options the additional information suggested by plaintiffs including revenue sharing is neither required by the regulations nor material to participant investors assessing the investment opportunity.

*Deere*, 2007 WL 1874367, at *7; *see also In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208(RO), 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006) ("All fees charged to the shareholder were disclosed in the offering prospectuses, which are incorporated

---

[10] Indeed, Defendants have gone further and provided a helpful chart that compares the fees of each fund, which facilitates participant control over their costs because they can simply look down the list and select funds with lower fees, if that is their investment strategy (Facts ¶ 75).

by reference into the consolidated amended complaint.  The allocation of the fees is immaterial, because it could have no effect on share price").[11]

Accordingly, because Defendants satisfied their investment-specific fee disclosure obligations in exactly the manner Section 2550.404c-1(b)(2)(i)(B) specifies, Plaintiffs' allegations that these disclosures are inadequate to qualify Defendants for ERISA's Section 404(c) fiduciary immunity should be rejected.

>        (3)    **The Plan Provides Participants An Opportunity To Choose From A Broad Range Of Investment Alternatives.**

Finally, there is no genuine dispute that the Plan satisfies the third criteria to qualify as a Section 404(c) Plan as well – providing participants the opportunity to choose from a broad range of investment alternatives.  *See* 29 C.F.R. § 2550.404c-1(b)(3).   Under the DOL's implementing regulations, an ERISA Section 404(c) Plan's investment alternatives are sufficiently broad if participants have a reasonable opportunity to: (1) affect the potential risks and returns on amounts in their individual accounts; (2) choose from at least three diversified investment alternatives; and (3) diversify their accounts.  29 C.F.R. § 2550.404c-1(b)(3)(i).  No reasonable fact finder could dispute that the 22 investment funds the Plan offers qualify as a "broad range" and thus meets the DOL's "choice" criteria.  The Plan's investment options span

---

[11] Although the district court in *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 760750 (N.D. Cal. Mar. 9, 2007) reached a contrary conclusion, *Siemers*' reasoning makes no sense.   In *Siemers*, the district court concluded that the disclosure of revenue sharing arrangements, for example, must necessarily be material because otherwise investors would not know that fees were being used to provide them services rather than for other purposes.  *Id.* at *13-14.  That reasoning is not sound.  Investors know the returns and the services they receive as well as the price of the investment.  If the price is too high in light of the services and returns provided, investors will turn to other investments.  Put another way, a customer who buys a "Happy Meal" at McDonald's does not care how much of the $4.00 purchase price is allocated to the drink, or if McDonald's earns a profit on sales.  The customer cares only that the drink, the fries and the burger are worth $4.00 to him/her.  How McDonald's uses that $4.00 internally is unimportant and totally irrelevant.

both the risk/return spectrum (Facts ¶¶ 85-89, 95) and the expense spectrum (Facts ¶¶ 90, 92), and participants may allocate their account balances among these investment funds in any way they see fit to achieve the precise risk and return characteristics they want for their portfolios (Facts ¶¶ 43-45).

Nevertheless, Plaintiffs suggest that the Plan does not satisfy the regulatory "choice" requirement to offer a broad range of investment alternatives because 18[12] of the Plan's offerings allegedly are actively managed funds that are more expensive than, and tend to be outperformed by, their passively managed counterparts once fees are taken into account (Am. Compl. ¶¶ 65-68). Thus, Plaintiffs appear to suggest, the Plan's offerings are not broad enough to allow participants to pursue prudent investment strategies *and* pay only reasonable fees because they necessarily have to invest in fee-heavy actively managed funds. Plaintiffs' allegations are meritless. Putting aside the fact that actively-managed funds are a staple of 401(k) plans,[13] the Plan offers three passively-managed index funds which also happen to constitute the Plan's three least expensive investment alternatives – the Dryden S&P 500 Index Fund (0.10%); the Barclays Equity Market Index Fund (0.25%); and the State Street Global Advisors EAFE Index Fund (0.30%) (Facts ¶ 90). These three low-cost index funds are also substantially different from one another in terms of risk, with each investment occupying a different asset class: the Dryden fund invests in large capitalization equities and attempts to track the S&P 500; the Barclays fund invests in mid to small capitalization equities; and the State Street fund invests in foreign equities

---

[12] Plaintiffs' allegation that the Plan offers 18 actively-managed funds (Am. Compl. ¶ 65) is factually incorrect. The Plan offers the Fixed Income Fund, the CIGNA Stock Fund, and three index funds, none of which is actively managed (Facts ¶¶ 87, 90, 95). Accordingly, the Plan offers only 17 funds which are actively managed.

[13] A 2005 study by the Investment Company Institute estimates that less than 10% of all mutual fund assets held in employer-sponsored defined contribution plans are held in passively-managed index funds. *See* Investment Company Institute, The U.S. Retirement Market, Appendix: Additional Data on the U.S. Retirement Market 7, 14 (July 2006).

(Facts ¶ 91).   The DOL's regulations make clear that an ERISA Plan satisfies the "choice" criteria if it offers a minimum of *three* diversified investment options.   *See* 29 C.F.R. § 2550.404c-1(b)(3)(i).   The Plan fully complies with this criteria on the basis of its three index fund offerings alone.   Moreover, although the Plan offers 19 more investment alternatives, most of them actively-managed and carrying higher fees, Plaintiffs are not required to invest in any of them.   That is their choice, alone.   Therefore, Plaintiffs' assertion that the Plan offers participants no reasonable opportunity to create a well-diversified portfolio, and keep costs down in the process, is meritless.

In short, because the Plan meets all three regulatory criteria to qualify as a Section 404(c) Plan, Defendants are not responsible for the allegedly excessive fees the Plan incurs as a result of participants' investment choices. *See Deere*, 2007 WL 1874367, at *8 ("The only possible conclusion is that to the extent participants incurred excessive expenses, those losses were the result of participants exercising control over their investments within the meaning of the safe harbor.").   Therefore, Defendants' motion for summary judgment should be granted.

### b.      The Department Of Labor's Comment On The Scope Of Section 404(c) Is Misguided And Not Entitled To Deference.

In their opposition to Defendants' motion to dismiss, Plaintiffs argued that, even if the Plan's structure otherwise qualified it for treatment as a Section 404(c) Plan under the DOL's implementing regulations, the fiduciary immunity Section 404(c) provides is inapplicable in this case because the defense does not apply as a matter of law to a fiduciary's designation of investment alternatives (Opposition pp. 8-13).   Defendants anticipate that Plaintiffs will reiterate this argument in opposition to Defendants' motion for summary judgment and, therefore, address it now.   The argument is without merit.

Plaintiffs' legal argument against applicability of the Section 404(c) safe harbor has its origins in one footnote to the preamble to the final regulations the DOL promulgated under ERISA Section 404(c) (Opposition p. 10) (citing 57 Fed. Reg. 46,906, 46,924 n.27).   As Plaintiffs previously noted, the DOL's regulations provide that fiduciaries are relieved of responsibility only for losses that are the "direct and necessary result" of a participant's exercise of control (Opposition p. 10) (quoting 29 C.F.R. § 2550.404c-1(d)(2)(i)).   Commenting on that provision in its preamble footnote, the DOL suggests that the "act of limiting or designating investment options . . . is not a direct or necessary result of any participant's direction of such plan."  57 Fed. Reg. 46,906, 46,924 n.27.  Based on this footnote, Plaintiffs contend that Section 404(c)'s fiduciary immunity does not extend to Defendants' selection of Plan investment options that allegedly carry high investment fees as a matter of law (Opposition pp. 8-13).

The DOL's opinion that Section 404(c) does not apply to the designation of Plan investment alternatives is misguided and should be accorded no deference.  Indeed, the weight of circuit court authority to have considered Section 404(c)'s applicability to these types of activities has held, contrary to the DOL, that the immunity applies.  *See Langbecker*, 476 F.3d at 309; *In re Unisys Sav. Plan Litig.*, 74 F.3d 420 (3d Cir. 1996); *but see DiFelice v. US Airways, Inc.*, No. 06-1892, ___ F.3d ___, 2007 WL 2192896, at *5 n.3, 10 (4th Cir. Aug. 1, 2007).  This Court should follow the majority view.

In *Langbecker*, the Fifth Circuit made the sensible observation that investment losses in a Section 404(c) Plan can occur only as the product of two separate acts: "[1] the fiduciary's inclusion of 'bad' stocks into the pot, and [2] the participants' choices to invest in those 'bad' stocks. . . ." *Langbecker*, 476 F.3d at 310.  Because a loss from a "bad" investment option could

not occur without a participant decision to invest, the Fifth Circuit rejected the DOL's position

that the plan fiduciary is always to blame:

> A plan fiduciary may have violated the duties of selection and monitoring of a plan investment, but § 404(c) recognizes that participants are not helpless victims of every error. Participants have access to information about the Plan's investments, pursuant to DOL regulations, and they are furnished with risk-diversified investment options. . . . [T]he plan sponsor cannot be a guarantor of outcomes for participants.

*Langbecker*, 476 F.3d at 312.

The Fifth Circuit's observation applies with full force here. Plaintiffs allege that

Defendants were responsible for selecting the Plan's 22 investment alternatives, and that many of

them, particularly the Plan's actively managed funds, carried unreasonable fees (Am. Compl.

¶¶ 65-68). But, as mentioned above, Plaintiffs have complete access to the fees charged by all of

the Plan's investment alternatives and the freedom to invest in, or avoid, the allegedly "bad"

funds (*supra* pp. 27-28). Therefore, placing the burden squarely on Defendants for these alleged

investment losses is no more appropriate in this case than it was in *Langbecker*. Although

Defendants may have retained the power to designate, Plaintiffs retained the power to invest, and

the losses could not have occurred without both. Moreover, where both fiduciaries and

participants are responsible, Section 404(c) unambiguously allocates the liability to the latter.

Any other construction "would render the § 404(c) defense applicable only where plan managers

breached no fiduciary duty, and thus only where it is unnecessary." *Langbecker*, 476 F.3d at

311.

The Third Circuit in *Unisys* reached the same conclusion about Section 404(c)'s

allocation of responsibility for investment losses as did the Fifth Circuit in *Langbecker*. In

*Unisys*, plan participants similarly argued that Section 404(c) does not absolve plan fiduciaries of

responsibility for selecting imprudent investment options. The Third Circuit disagreed:

> [T]he first question we must answer regarding section [404(c)] is whether the statute allows a fiduciary, *who is shown to have committed a breach of duty in making an investment decision*, to argue that despite the breach, it may not be held liable because the alleged loss resulted from a participant's exercise of control.  In light of section [404(c)'s] plain language, we believe that it does.  There is nothing in section [404(c)] which suggests that a breach on the part of a fiduciary bars it from asserting section [404(c)'s] application.

*Unisys*, 74 F.3d at 445 (emphasis added).  As the above quote makes clear, the Third Circuit, like the Fifth Circuit, recognizes that, in participant-directed plans, plan losses have two causes and that the plan fiduciary's imprudent selection of investment options is only one of them. Nevertheless, the Third Circuit concluded that, where a participant's decision to invest "was *a* cause-in-fact, as well as a substantial contributing factor in bringing about the loss incurred," Section 404(c) shifts the burden of loss to the participant.  *Id.* (emphasis added)*.*

As the majority of circuit courts to have addressed the applicability of Section 404(c) to a plan fiduciary's selection of plan investment options go against the DOL's interpretation, Plaintiffs will likely devote considerable effort to attacking *Langbecker* and *Unisys*, as they did in their earlier opposition to Defendants' motion to dismiss (Opposition pp. 11-13).  Moreover, they will no doubt contend that the Fourth Circuit's recent decision in *DiFelice* and district court cases, such as *Lively v. Dynegy, Inc.*, No. 05-DV-00063-MJR, 2007 WL 685861 (S.D. Ill. Mar. 2, 2007),[14] that credit the DOL's position and express skepticism as to Section 404(c)'s applicability in the investment-designation context, are better reasoned and should be followed here.

---

[14]  *Lively*'s continued viability is uncertain.  On April 25, 2007, the Seventh Circuit granted defendants' petition for permission to appeal the district court's class certification order that rejected defendants' Section 404(c) defense.  The interlocutory appeal was docketed on May 8, 2007 as Case No. 07-2073 and remains pending.

*DiFelice* and its philosophical brethren, however, are not well-reasoned and should not be followed.  First, *DiFelice's* discussion of the Section 404(c) defense is *dicta*.  Following a six-day bench trial, the district court entered judgment in US Airways' favor on the merits, concluding that US Airways' decision to continue to offer its own stock as a plan investment option was prudent under the circumstances.  *See DiFelice*, 2007 WL 2192896, at *6.  Thus, the Fourth Circuit's discussion of the DOL's commentary on the scope of the Section 404(c) defense was unnecessary to its decision.

Second, the Fourth Circuit's discussion in *DiFelice*, most of which is relegated to a footnote, lacks any analysis.  The Fourth Circuit simply, and uncritically, adopts the DOL's footnote commentary without discussing why its reasoning is sound and entitled to deference. *See DiFelice,* 2007 WL 2192896, at *5 n.3.  The Fifth Circuit in *Langbecker* was far more thorough.   Unlike the Fourth Circuit in *DiFelice*, the Fifth Circuit actually confronted the statutory text directly, which states, in relevant part, that "no person who is otherwise a fiduciary shall be liable for any loss, *or by reason of any breach*, which results from such participant's or beneficiary's exercise of control."  *See* 29 U.S.C. § 1104(c)(1)(B) (emphasis added).  Thus, as the Fifth Circuit explained:

> [T]he [DOL's] footnote does not reasonably interpret § 404(c) itself, because it contradicts the governing statutory language in cases where an individual account plan fully complies with the regulations' disclosure, diversification and participant control provisions, and loss is caused, *notwithstanding some other fiduciary duty breach*, by the participants' investment decisions. The DOL footnote would render the § 404(c) defense applicable only where plan managers breached no fiduciary duty, and thus only where it is unnecessary.

*Langbecker*, 476 F.3d at 311 (emphasis added).  By contrast, the Fourth Circuit in *DiFelice*, following the DOL's lead, simply decrees by quasi-legislative fiat that fiduciaries are strictly liable for "assembling an imprudent menu in the first instance," *DiFelice*, 2007 WL 2192896, at

*5 n.3 – a position utterly inconsistent with the Congressionally-approved, unambiguous text of a statute that *presumes* fiduciary imprudence at the outset and then operates to excuse that imprudence.

To bolster its analysis further, the Fifth Circuit in *Langbecker* explained in detail why the DOL is not entitled to the kind of uncritical deference the Fourth Circuit in *DiFelice* appears to have accorded it.  The Fifth Circuit recognized that the DOL's footnote commentary never made it into the Code of Federal Regulations – it is only a footnote to the preamble to the final regulations.  *Langbecker*, 476 F.3d at 311.  Thus, it constitutes "at best a comment on the regulations and is not itself a regulation" to which deference is owed.  *Id.*  The Fifth Circuit also rejected the argument that the DOL's footnote qualifies as an "interpretation," to which it was required to give deference.  *Id.*  Agency commentary qualifies as binding "interpretation" only when it construes an ambiguous regulation.  *Id.*  However no party, including the DOL, has contended that its regulations are ambiguous.  Therefore, the rule requiring deference to agency interpretation does not apply.  *Id.*[15]  Accordingly, *Langbecker* is substantially better-reasoned than *DiFelice* and should be followed here.

The Third Circuit's decision in *Unisys* also rests on a substantially more solid foundation than *DiFelice* because, as discussed above, it also confronts the statutory text directly.  It had to – the DOL's commentary did not exist at the time the transactions at issue in *Unisys* occurred.  Plaintiffs, in their earlier opposition to Defendants' motion to dismiss the original complaint,

---

[15] For this reason, Plaintiffs' earlier reliance on *Beck v. Pace Int'l Union*, __ U.S. __, 127 S. Ct. 2310 (2007) in their opposition to Defendants' motion to dismiss the original complaint for their prediction that the Supreme Court would automatically give the DOL's preamble footnote deference is misplaced (Opposition p. 11).  Although the Court in *Beck* reaffirmed its general practice of deferring to the PBGC when interpreting ERISA, *see id.* at 2317, it did so in the context of the PBGC appearing as an amicus to give its opinion on the proper construction of 29 U.S.C. § 1341(b)(3)(A) – an ambiguous statutory provision.  Section 404(c) was not at issue, is not asserted to be ambiguous, and is not in need of interpretation.

view the unavailability of the DOL's commentary as a reason for criticizing the Third Circuit's decision (Opposition p. 12). However, just the opposite is true – the Third Circuit's decision eviscerates the DOL's subsequent discussion. The Supreme Court has recently held that a court's decision categorically forecloses subsequent agency interpretation of a statute where the court determines that its reading of the statute is the *only permissible* reading. *Nat'l Cable & Tel. Assoc. v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."). In *Unisys*, the Third Circuit's holding was based entirely on the statute's unambiguous language, rendering subsequent DOL interpretation immaterial. *See Langbecker*, 476 F.3d at 311 (noting that *Unisys* found Section 404(c)'s meaning "tolerably plain"). Accordingly, *Unisys* remains good law, the DOL's subsequent footnote commentary notwithstanding. *Id.* ("*Unisys* predated the DOL regulations but embodies a common sense interpretation of the statute").

Therefore, Plaintiffs can proffer no compelling argument against the applicability of Section 404(c)'s safe harbor. Because it is dispositive, Plaintiffs' excessive fee claims fail as a matter of law and Defendants' motion for summary judgment should be granted. *See Deere*, 2007 WL 1874367, at *8 ("Assuming for purposes of the present motion that defendants failed to satisfy their fiduciary obligation to consider expenses when selecting mutual fund investment options, they are nevertheless insulated from liability by the safe harbor provision because of the nature and breadth of funds made available to participants under the plans.").

2.      **Plaintiffs' Prohibited Transactions Allegations Fail To State A Claim As A Matter Of Law.**

Scattered throughout Plaintiffs' Amended Complaint are allegations that Defendants engaged in various transactions which they characterize as fiduciary "self-dealing" in violation of ERISA (*e.g.*, Am. Compl. ¶¶ 9, 22, 54-74).  Plaintiffs, however, fail to identify a single transaction that properly qualifies as fiduciary self-dealing.  Therefore, Defendants are entitled to summary judgment on these allegations as well.

a.      **The Sale Of CIGNA's Subsidiary "Retirement Business" Is Not A Fiduciary Act Under ERISA.**

Plaintiffs allege that CIGNA sold its Retirement Business to PRIAC in April 2004 and assert that Defendants breached their fiduciary duty to the Plan because Plan participants did not adequately share in the sale proceeds (Am. Compl. ¶¶ 35, 41-46).  Plaintiffs fail to state a claim for breach of fiduciary duty under ERISA.  A sale of a business is strictly a corporate function, not an ERISA-regulated fiduciary act.  *See Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 757 (7th Cir. 1999) ("[W]hen company representatives are negotiating the sale of a division, they are not acting in their capacity as a plan fiduciary, and thus they do not bear the legal obligations that go along with fiduciary status"); *Coleman v. General Electric Co.*, 643 F. Supp. 1229, 1238-39 (E.D. Tenn. 1986) ("[T]he fact that an employer serves in a dual capacity as both employer and fiduciary does not prevent an employer from engaging in normal business activity, such as the sale of a division"), *aff'd*, 822 F.2d 59 (6th Cir. 1987).  Accordingly, summary judgment in Defendants' favor should be granted, to the extent Plaintiffs assert that Defendants owed the Plan a fiduciary responsibility in connection with the sale of CIGNA's Retirement Business.

     **b.**     **Plaintiffs' Diversification Claims Fail Because ERISA Authorizes Sponsor Investments, Plan Participants Could Diversify Their Holdings And Plaintiffs Allege No Damages.**

Plaintiffs next accuse Defendants of fiduciary wrongdoing because, prior to the sale of the Retirement Business in April 2004, 65% of Plan assets allegedly were invested in two CIGNA-related investment vehicles:  the Company Stock Fund and the Fixed Income Fund, the latter a group fixed annuity contract previously issued by CIGNA subsidiary CG Life (Am. Compl. ¶¶ 35-40).  Plaintiffs allege that the risks attendant to these investments "subjected the Plan and its participants to the unreasonable and imprudent dangers of undiversified investing" because the performance of CIGNA investment products were subject to the same risk factor as their jobs – CIGNA's continued success (Am. Compl. ¶ 38).  Plaintiffs' allegations fail for three reasons.  First, the investments products about which Plaintiffs complain – employer stock and group annuity contracts issued by insurance companies – are expressly authorized by ERISA. *See, e.g.*, 29 U.S.C. § 1104(a)(2) (exempting qualifying employer securities from the prudence and diversification requirements); 29 U.S.C. § 1108(b)(5) (exempting contracts for "life insurance, health insurance, or annuities" from prohibited transaction provisions).[16]

Second, Plaintiffs have failed to allege actual losses stemming from Defendants' alleged failure to diversify Plan assets, such as a downturn in CIGNA's business that resulted in layoffs

---

[16]  An insurance contract remains an appropriate investment vehicle even if it is the Plan sponsor's or an affiliate's own product.  As the district court in *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337, 2007 WL 2263892 (S.D. Fla. Aug. 10, 2007) recently observed, "Congress enacted ERISA § 408(b)(5) because it recognized that 'it would be contrary to normal business practice to require the plan of an insurance company to purchase its insurance from another insurance company.'" *Id.* at *40 (quoting H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974)); *accord Smith v. Jefferson Pilot Life Ins. Co.*, 14 F.3d  562, 568 n.4 (11th Cir. 1994) ("ERISA expressly permits insurer-employers to use their own insurance policies to fund ERISA governed benefits by exempting such transactions from the statute's prohibited transaction provisions."). Accordingly, there was nothing wrong in Defendants selling CIGNA-related insurance products to the Plan.

and a correlative drop in the value of CIGNA investment products.  Thus, Plaintiffs' allegations are nothing more than *un*realized fears of future loss and are not actionable.  *See Jenkins*, 444 F.3d at 924 (to state a claim for breach, plaintiff must establish "that the breach caused harm to the plaintiff").

Third, even if Plaintiffs had alleged that they suffered losses as a result of inadequate diversification, Plaintiffs are responsible for these investment losses under ERISA Section 404(c).  As discussed above, the Plan offered 22 investment options, and participants were free to structure their investment portfolios however they wished.  They did not have to invest in CIGNA-related products, such as the Fixed Income Fund and the CIGNA Stock Fund, if they feared tying both their jobs and their investments to CIGNA's fortunes.

### c.    ERISA Allows Financial Services Companies To Use Their Own Services To Administer Plans.

Finally, Plaintiffs allege that Defendants engaged in prohibited self-dealing when it directed certain Plan-related functions, such as investment management and recordkeeping, to CIGNA's "Retirement Business" prior to its sale to Prudential in April 2004 (Am. Compl. ¶¶ 31-34, 58-60; Facts ¶¶ 33-39).  These allegations of fiduciary misconduct also fail.

First, the record shows, and Plaintiffs themselves recognize, that CIGNA's "Retirement Business" was comprised of *subsidiary* entities legally separate from Defendants – CG Life and TimesSquare Capital Management, in particular (Am. Compl. ¶¶ 54-55; Facts ¶¶ 33, 38).  Under ERISA, although transactions between a parent and a subsidiary are properly described as transactions between parties-in-interest, *see* Section 3(14)(G), 29 U.S.C. § 1002(14)(G) (50% ownership establishes party-in-interest relationship), such transactions are not examples of fiduciary *self*-dealing because the entities are legally separate.  *See M&R Inv. Co. v.*

*Fitzsimmons*, 685 F.2d 283, 285 (9th Cir. 1982) (subsidiaries of common parent that sponsored fund considered parties in interest).

Second, ERISA authorizes financial services companies to use their own services to administer the plans they sponsor. Specifically, ERISA Section 408(b)(8) exempts "[a]ny transaction" between a plan and "a pooled investment fund of an insurance company" if the insurance company receives no more than reasonable compensation for the sale or purchase of an interest in the fund. 29 U.S.C. § 1108(b)(8); *Dupree*, 2007 WL 2263892, at *41. Section 408(b)(8) was enacted "to allow 'banks, trust companies and insurance companies' to continue their 'common practice' of investing their plans' assets in their own pooled investment funds." *Dupree*, 2007 WL 2263892, at *41 (quoting H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974)). The DOL has interpreted the exemption as extending to the fees charged for managing investments in pooled separate accounts and collective trusts as well. *See Dupree*, 2007 WL 2263892, at *41 (citing DOL Adv. Op. 82-022A, 1982 ERISA LEXIS 47 (May 12, 1982)). As the DOL has recognized, "it would be 'contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor.'" *Dupree*, 2007 WL 2263892, at *41 (quoting Notice of Proposed Rulemaking, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724, 10730 (Mar. 13, 1991)). Thus, even though Defendants allegedly directed Plan business to entities that were CIGNA-owned prior to April 2004, there was nothing inappropriate about it.

Therefore, CIGNA's subsidiary "Retirement Business" was no different from any other service provider or vendor insofar as ERISA's prohibited transactions restrictions are concerned and Plaintiffs' repeated insinuations to the contrary (*e.g.*, Am. Compl. ¶ 32) are without merit.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' self-dealing allegations as well.

## IV.    CONCLUSION

For the foregoing reasons, Defendants, CIGNA Corporation, John Arko, and the Corporate Benefit Plan Committee of CIGNA, respectfully request the Court to grant summary judgment in Defendants' favor and dismiss the Complaint with prejudice.

Respectfully submitted,

CIGNA CORPORATION, JOHN ARKO, and THE CORPORATE BENEFIT PLAN COMMITTEE OF CIGNA

By:    s/ James E. Bayles, Jr.

Sari M. Alamuddin (ARDC # 06215689)
James E. Bayles, Jr. (ARDC # 06206547)
Attorneys for Defendants
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois  60601
Telephone: (312) 324-1000
Fax:  (312) 324-1001
E-mail:   salamuddin@morganlewis.com
          jbayles@morganlewis.com

Joseph J. Costello (PA Bar No. 44327)
Attorney for Defendants
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania  19103
Telephone: (215) 963-5000
Fax:  (215) 963-5001
E-mail:   jcostello@morganlewis.com

## CERTIFICATE OF COMPLIANCE

In accordance with CDIL-LR 7.1(B)(4)(c), I hereby certify that Section III ("Argument") of the foregoing Defendants' Motion For Summary Judgment complies with the type-volume limitation of Rules 7.1(B)(4)(b)(1) and 7.1(D)(5).  Section III contains 6,993 words and was prepared in a proportionally spaced typeface (12-point Times New Roman) using Microsoft Word 2003.

s/ James E. Bayles, Jr.

Sari M. Alamuddin (ARDC # 06215689)
James E. Bayles, Jr. (ARDC # 06206547)
Attorneys for Defendants
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois  60601
Telephone: (312) 324-1000
Fax:  (312) 324-1001
E-mail:   salamuddin@morganlewis.com
           jbayles@morganlewis.com

Joseph J. Costello (PA Bar No. 44327)
Attorney for Defendants
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania  19103
Telephone: (215) 963-5000
Fax:  (215) 963-5001
E-mail:   jcostello@morganlewis.com

**INDEX OF EXHIBITS TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

| **Exhibit** | **Title** |
|---|---|
| A | Declaration of John Arko, including Exhibits 1-15 |
| A.1 | CIGNA 401(k) Plan, As Amended and Restated Effective January 1, 1997 |
| A.2 | Trust Agreement Establishing the CIGNA 401(k) Plan Trust, Effective January 1, 2005 |
| A.3 | CIGNA 401(k) Plan Summary Plan Description and Prospectus – December 31, 2002 |
| A.4 | CIGNA 401(k) Plan Summary Plan Description and Prospectus, Investment Choices – October 15, 2005 |
| A.5 | CIGNA 401(k) Plan Summary Plan Description and Prospectus, Update – December 31, 2006 |
| A.6 | CIGNA 401(k) Plan Summary Plan Description and Prospectus, Investment Choices – September 23, 2002 |
| A.7 | CIGNA 401(k) Plan Summary Plan Description and Prospectus, Update – July 11, 2003 |
| A.8 | CIGNA 401(k) Plan Summary Plan Description and Prospectus, Update – October 10, 2003 |
| A.9 | CIGNA 401(k) Plan Summary Plan Description and Prospectus, Update – December 17, 2003 |
| A.10 | CIGNA 401(k) Plan Summary Plan Description and Prospectus, Update – May 21, 2004 |
| A.11 | CIGNA 401(k) Plan Summary Plan Description and Prospectus, Update – December 22, 2004 |
| A.12 | Account Summary for Kim A. Nolte – Quarter Ended December 31, 2006 (redacted) |
| A.13 | Account Summary for Sherry D. Lewis – Quarter Ended December 31, 2006 (redacted) |

A.14                    Account Summary for Theresa C. Mitchell – Quarter Ended December 31, 2006 (redacted)

A.15                    Second Quarter 2007 Fund Fact Sheet (a/k/a "Performance Update") for the Large Cap Growth/Goldman Sachs Fund

## CERTIFICATE OF SERVICE

I hereby certify that, on September 10, 2007, I electronically filed the foregoing Defendants' Motion For Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Jerome J. Schlichter
> Daniel V. Conlisk
> Heather Lea
> Mark Boyko
> SCHLICHTER, BOGARD & DENTON
> 100 South 4th Street, Suite 900
> St. Louis, Missouri  63102
> jschlichter@uselaws.com
> dconlisk@uselaws.com
> hlea@uselaws.com
> mboyko@uselaws.com

> s/ James E. Bayles, Jr.

> Sari M. Alamuddin (ARDC # 06215689)
> James E. Bayles, Jr. (ARDC # 06206547)
> Attorneys for Defendants
> MORGAN, LEWIS & BOCKIUS LLP
> 77 West Wacker Drive, Fifth Floor
> Chicago, Illinois  60601
> Telephone: (312) 324-1000
> Fax:  (312) 324-1001
> E-mail:   salamuddin@morganlewis.com
>               jbayles@morganlewis.com

> Joseph J. Costello (admitted *pro hac vice*)
> Attorney for Defendants
> MORGAN, LEWIS & BOCKIUS LLP
> 1701 Market Street
> Philadelphia, Pennsylvania  19103
> Telephone: (215) 963-5000
> Fax:  (215) 963-5001
> E-mail:   jcostello@morganlewis.com