# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| KIM NOLTE, SHERRY LEWIS, | ) | |
| and THERESA MITCHELL, | ) | |
| individually and as representatives | ) | |
| of a class of similarly situated | ) | |
| persons, and on behalf of the | ) | |
| CIGNA 401(k) Plan, | ) | |
| | ) | |
| Plaintiffs; | ) | |
| | ) | |
| v. | ) | Cause No:       2:07-CV-02046-HAB-DGB |
| | ) | |
| CIGNA CORPORATION, JOHN | ) | |
| ARKO, THE CORPORATE | ) | JURY TRIAL DEMANDED ON |
| BENEFIT PLAN COMMITTEE | ) | |
| OF CIGNA, CONNECTICUT | ) | ALL COUNTS AND ISSUES SO TRIABLE |
| GENERAL LIFE INSURANCE | ) | |
| COMPANY, AND | ) | |
| TIMESSQUARE CAPITAL | ) | |
| MANAGEMENT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY

1.     In this action,  Plaintiffs and Class Representatives Kim Nolte, Sherry Lewis, and

Theresa Mitchell, on behalf of the CIGNA 401(k) Plan (the "Plan") and similarly situated

participants and beneficiaries in the Plan, seek to recover the financial losses suffered by the Plan

and to obtain injunctive and other equitable relief for the Plan from CIGNA Corporation

("CIGNA" the Plan Sponsor), John Arko, the Corporate Benefit Plan Committee of CIGNA (the

"Committee", the Plan Administrator), Connecticut General Life Insurance Company, and

TimesSquare Capital Management, Inc. ("TimesSquare") (collectively "Defendants"), based

upon breaches of their fiduciary duties.

2.      As set forth in detail below, Defendants, among other things:  (1) undertook a long campaign of self-interested and prohibited transactions by, among other things, retaining CIGNA subsidiaries ("CG Life" and "TimesSquare," indentified below), to serve as the Plan's investment manager and primary service provider, and thereby generating revenues and profits for the benefit of CIGNA; (2) caused the Plan to include investment options with fees and expenses – paid by the Plan, and thus borne by Plan participants – that were and are unreasonable and excessive, and not incurred solely for the benefit of the Plan and its participants, but rather to serve CIGNA's financial interests; (3) imprudently selected and retained CG Life's  separate accounts and the CG Life Fixed Income Fund as Plan investment options, so as to serve CIGNA's financial and profit interests; (4) invested more than $1 billion of Plan assets directly into CG Life's General Account, even though that investment imposed excessive and undiversified risk upon the Plan; and (5) used Plan assets in CG Life's (and thus CIGNA's) business by placing more than $2.4 billion with CG Life as assets under management so as to increase the ongoing revenues and profits, and the eventual sale price, of CIGNA's Retirement Business while not accounting to the Plan for such use.

3.      Further, as set forth below, Defendants' selection of investment options for the Plan was imprudent and improper because equivalent investment products providing comparable services for dramatically lower fees were available to the Plan, and investment options were unsound and imprudent for this reason and other reasons discussed below.  For the fees imposed, the same as those available to small investors in the retail marketplace, Defendants did not secure for the Plan, and its participants, additional investment advice or other extra services.

4.      By subjecting the Plan and its participants to these self-interested transactions, imprudent investment options, and the accompanying excessive fees and expenses, and by other

conduct set forth below, Defendants violated their fiduciary obligations under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 et. seq., and caused damages to

the Plan, including losses from the payment of excessive fees, underperformance net of fees, and

lost opportunities to recover for the benefit of the Plan for the Plan's contribution to the success

of CIGNA subsidiaries and lost opportunities to capture additional compensation streams.

## Jurisdiction and Venue:

5.      Plaintiffs bring this action pursuant to ERISA §§502(a)(2) & (3), 29 U.S.C.

§1132(a)(2) & (3), which provide that participants may pursue civil actions on behalf of the Plan

for damages to remedy breaches of fiduciary duty as set forth in ERISA §409, 29 U.S.C. §1109,

and/or to obtain other appropriate equitable relief.

6.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C.

§1331 and 29 U.S.C. §1132(e)(1)(F).

7.      All Defendants are subject to nationwide service of process issued from this Court

pursuant to 29 U.S.C. §1132(e)(2).

8.      Venue is proper in this Court pursuant to 29 U.S.C. §1132(e)(2) because the

breaches of fiduciary duty giving rise to this action occurred in this district and the Defendants

may be found in this district.

9.      **INTRADISTRICT ASSIGNMENT:**  Venue is proper in this Division of this

Court pursuant to CDIL-LR 40.1(D) in that this case arises out of Kankakee County, Illinois;

involves employment benefits provided to CIGNA employees in Kankakee County, Illinois; and

a substantial part of Defendants' actions and omissions out of which this action arises occurred

in Kankakee County, Illinois and/or were directed at, and had an effect upon, employees and

Plan participants in this District and within this Division.

## PARTIES

**Plaintiffs:**

10.     Plaintiff and Class Representative Kim Nolte is a resident of Momence, Illinois, and of this District.

11.     Plaintiff and Class Representative Sherry Lewis is a resident of Kankakee, Illinois, and of this District.

12.     Plaintiff and Class Representative Theresa Mitchell is a resident of Chebanse, Illinois, and of this District.

13.     Each Plaintiffs and Class Representative is a participant in the Plan.

**Defendants:**

14.     Defendant CIGNA Corporation is based in Philadelphia, Pennsylvania.  Pursuant to ERISA §3(16)(B), CIGNA serves as Plan sponsor either directly or through its co-defendants, agents or employees.

15.     CIGNA markets and sells employee-benefits insurance products and, until April of 2004, sold employee retirement investment products in all fifty states.  It maintains an extensive sales force throughout the United States and internationally.

16.     CIGNA is primarily a holding company.  Its operations and business consists of nothing more than its subsidiaries' activities, including those of CG Life and TimesSquare, identified in more detail below.

17.     In its December 31, 2004 Form 10-K ("2004 Form 10-K"), CIGNA states that "CIGNA Corporation" is "a holding company and is not an insurance company.  Its subsidiaries conduct various businesses . . ."

18.     According to its 2004 Form 10-K, CIGNA considers the segments a single operation: "CIGNA Corporation and its subsidiaries constitute one of the largest investor-owned employee benefits organizations in the United States."

19.     Simply stated, CIGNA and its subsidiaries are a single, integrated organization. CIGNA's business is owning subsidiaries and collecting revenues and profits from them.

20.     Defendant John Arko is the Plan Administrator and a named fiduciary.

21.     Defendant Corporate Benefit Plan Committee of CIGNA (the "Committee") is the named fiduciary of the Plan.  CIGNA Corporation appoints the Committee.  The Committee is comprised of CIGNA officers and employees.

22.     Until April 2004, Defendant Connecticut General Life Insurance Company ("CG Life") was a subsidiary of CIGNA. In 2004, CIGNA sold CG Life to Prudential, Inc and Prudential Financial Insurance and Annuity Company ("PRIAC").

23.     Until April 2004, CG Life, for a profit that inured to the benefit of CIGNA, served as the Plan's investment manager, recordkeeper and primary administrative service provider.

24.     Until April 2004, Defendant TimesSquare was a subsidiary of CIGNA. TimesSquare was wholly owned by CIGNA and its employees participated in the Plan.

25.     In 2004, CIGNA sold TimesSquare to certain of its officers and employees who, Plaintiffs are informed and believe, were CIGNA insiders and affiliated managers.

26.      Before 2004, TimesSquare, for profit which inured to the benefit of CIGNA, was the investment manager of the Plan's Fixed Income Fund, S&P 500 Index Fund, Small Cap Growth/TimesSquare Fund, and High Yield Bond Fund.  This placed more than two-thirds of the Plans' assets under the management of TimesSquare.

27.     CG Life, TimesSquare and another subsidiary, Global Portfolio Strategies, Inc. ("Global") comprised CIGNA's "Retirement Business."

28.      ERISA §2(21)(A) , 29 U.S.C. §102(21)(A), provides, in part, that "a person is a fiduciary with respect to a plan to the extent

(i)     he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii)     he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

* * *

29.     Pursuant to 29 C.F.R. §2510.3-101(H)(1)(iii), the Plan's assets include an undivided interest in the underlying assets of CG Life's separate accounts.

30.     CG Life is a Plan fiduciary in that it was the investment manager of the Plan and of CG Life's separate accounts, the underlying assets of which are Plan assets.  It thus exercises discretionary control respecting the Plan's assets and the disposition of those assets.

31.     TimesSquare is a Plan fiduciary in that it was the investment manager/advisor to the Plan's Fixed Income Fund, the S&P 500 Index Fund, High Yield Bond Fund and the Small Cap Growth/TimesSquare Fund, each of which are CG Life separate accounts.  The underlying assets of these separate accounts are Plan assets.  TimesSquare manages and invests those assets and thus exercises discretionary control respecting the Plan's assets and the disposition of those assets.

### Rule 23 Requires Class Certification:

32.     Pursuant to ERISA §502(a), actions for violations of the obligations defined in §409(a) may be brought my the Secretary of Labor, plan participants, beneficiaries, or fiduciaries, but must be brought on behalf of the Plan.

33.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, on behalf of the Plan, themselves and all similarly situated Plan participants and

beneficiaries.  The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each

Plan participant or beneficiary, has an interest.  Plaintiffs seek to represent the following (the

"Class"):

> All persons, *excluding the Defendants, and/or other individuals who are*
> *or may be liable for the conduct described in this Complaint,* who were or
> are participants or beneficiaries of the Plan and who were, are or may have
> been affected by the conduct set forth in this Complaint, as well as those
> who will become participants or beneficiaries of the Plan in the future.

34.     Certification of this Class is proper under Rule 23(a) in that:

A.     **Numerosity.**  The members of the Class are so numerous that joinder of

all members is impracticable.  Although the Plaintiffs do not know the

exact number of Class members as of the date of filing, the Plan's public

documents state that, at the end of the 2007 Plan year, there were 40,825

participants with account balances in the Plan.

B.     **Commonality.** Common issues of fact and law predominate over any

issues unique to individual Class members.  As set forth in detail below,

issues that are common to all Class Members include, but are not limited

to, that Defendants:

i.     Failed to discharge their duties solely in the interest of the Plan and

its participants;

ii.    Failed to exercise the care, skill, prudence and diligence under the

circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

iii.   Used Plan assets in their own interest and not for the exclusive purpose of providing benefits to participants and beneficiaries and defraying the reasonable expenses of administering the Plan;

iv.   Failed to conduct themselves with the utmost good faith, loyalty and fidelity;

v.   Failed to prudently monitor recordkeeping fees for reasonableness;

vi.   Fraudulently concealed excessive recordkeeping and administrative fees in their communication with Plan participants;

vii.   Selected and retained investment options that imposed excessive and unreasonable fees, including fees for the benefit of CIGNA;

viii.   Subjected the Plan to such unreasonably expensive options when the Plan's enormous size and bargaining power enable Defendants to secure the same investments at a fraction of the cost;

ix.   Imposed excessive and unreasonable additional fees, *in addition to* these unreasonable management and extra fees, for the benefit of CIGNA;

x.   Failed to secure, for the excessive fees imposed upon the Plan, additional investment advice or other services for Plan participants;

xi.   Selected and retained investment options for reasons other than furthering the economic interests of the Plan;

xii.    Failed to properly prescreen investment options; selected and retained investment options that a responsible fiduciary would exclude; and imposed on participants the unreasonable burden of having to screen investment options when they lack the resources and expertise to do so;

xiii.   Selected and retained CIGNA's subsidiary TimesSquare as investment manager of three investment options so as to funnel additional and excessive fees to CIGNA in addition to CIGNA's wrap fee;

xiv.    Selected and retained CG Life's Fixed Income Fund so as to provide financial and other benefits to CIGNA and its subsidiaries while subjecting the Plan and its participants to excessive, undiversified and avoidable risk;

xv.     Subjected the Plan to the control and discretion of fiduciaries laboring under conflicts of interest.

xvi.    Selected and retained investment options operated by officers and employees of TimesSquare who were also officers and employees of CIGNA, and thus who had a direct financial interest in managing Plan assets for the benefit of CIGNA;

xvii.   Used their authority, discretion and control in connection with the Plan to advance their own interest;

xviii.  Subjected the Plan assets to control and discretion of investment managers with conflicting loyalties;

xix.   Failed to compensate the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in their  business and/or for their benefit;

xx.    Failed to account to the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

xxi.   Failed, even in the absence of a breach of fiduciary duty, to account for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

xxii.  For the benefit of CIGNA and to the detriment of the Plan, included the CG Life Fixed Income Fund as the Plan's largest investment option, and thereby caused well in excess of a billion dollars of Plan assets to be used as working capital in CG Life's General Account so as to support and fund CG Life's (and the Retirement Business') business and operations;

xxiii. For the benefit of CIGNA and to the detriment of the Plan, included CG Life's Fixed Income Fund as the Plan's largest investment option and, by doing so, effectively extended a loan of Plan assets to CG Life and the Retirement Business to support and funds their business and operations;

xxiv.  For the benefit of CIGNA and to the detriment of the Plan, included virtually exclusively CG Life separate accounts and the

CG Life Fixed Income Fund as Plan investment options, and thereby provided more than $2.4 billion in assets under management to CG Life and the Retirement Business;

xxv. For the benefit of CIGNA and to the detriment of the Plan, included virtually exclusively CG Life separate accounts and the CG Life Fixed Income Fund as investment options, and thereby caused Plan assets to be used as CG Life assets under management which were the "key driver" of the Retirement Business' earnings;

xxvi. For the benefit of CIGNA and to the detriment of the Plan, included virtually exclusively CG Life separate accounts and the CG Life Fixed Income Fund as investment options, and thereby used Plan assets to enhance the value of, and increase the sale price of, the Retirement Business;

xxvii. Through the Fixed Income Fund and thus CG Life's General Account, effectively provided a loan in excess of $1 billion to the Retirement Business and CG Life to support and fund their general operations;

xxviii. Through the use of Plan assets, enhanced the value and increased the sale price of the Retirement Business as a going concern;

xxix. Received revenues and profits from the use of Plan assets in their business;

xxx. Failed to account to the Plan for the revenues and profits CIGNA received in connection with such uses of Plan assets;

xxxi.    Failed to compensate the Plan for such use of Plan assets;

xxxii.   Caused or allowed service providers to receive excess and
         unreasonable compensation by retaining Additional Compensation
         Streams in addition to other compensation;

xxxiii.  Deprived the Plan of the benefit of earnings, proceeds and other
         income generated from, or in respect of, Plan assets; and caused or
         allowed CG Life and TimesSquare to receive additional and excess
         compensation for the benefit of CIGNA;

xxxiv.   Failed to properly monitor the fees and expenses paid by the Plan;

xxxv.    Manipulated, misrepresented and/or disguised the nature of fees
         and expenses incurred by the Plan and that they were imposed for
         CIGNA's benefit to the detriment of the Plan;

xxxvi.   Failed to disclose that hidden and excessive fees were and are
         being assessed against Plan assets and paid to CIGNA, and by
         failing to stop such fees;

xxxvii.  In charging, causing to be charged or paid, and failing to monitor
         the fees and expenses of the Plan, failed to exercise the care, skill,
         prudence, and diligence that a prudent person would when acting
         in like capacity and familiar with such matters;

xxxviii.  Imprudently invested in separately managed accounts which in
         turn invested in mutual funds and other investment products, thus
         imposing an additional layer of management fees without
         providing any additional services of value;

xxxix. Engaged in prohibited transactions that they knew, or should have known, constituted direct, or indirect, furnishing of services between the Plan and CG Life and TimesSquare;

xl. Engaged in prohibited transactions that they knew, or should have known, constituted direct, or indirect, transfer to, or use by, or for the benefit of CG Life and TimesSquare, assets of the Plan;

xli. Engaged in prohibited transactions when they dealt with the assets of the Plan in their own interest and for their own accounts;

xlii. Engaged in prohibited transactions when in their individual and corporate capacities as officers, directors, employees and/or agents of CIGNA, acted in transactions involving the Plan on behalf of CIGNA, CG Life and TimesSquare (or represented CIGNA, CG Life and TimesSquare) whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries;

xliii. Engaged in prohibited transactions when they received consideration for their own personal account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan;

xliv. By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xlv.     Are liable to the Plan and the Class for losses suffered as a result of
the breaches of their fiduciary duties and other ERISA-imposed
obligations;

xlvi.    Must disgorge all fees and other revenues paid to them by, or
derived from, the Plan; and

xlvii.   Are responsible to account for the assets and transactions of the
Plan and should be charged/surcharged for any transactions and
payments for which they cannot account or which were not proper
uses of Plan assets.

C.    **Typicality.** The Plan is comprised of a unitary trust corpus in which each
Plaintiff, and each Plan participant, has an interest.  The claims brought by
the Plaintiffs are typical of those of the absent Class members, in that:

i.      The Defendants owed the exact same fiduciary and other ERISA-
based obligations to each Plan participant and beneficiary, and
each member of the Class;

ii.     The Defendants' breach of those obligations constitutes a breach
to each participant and beneficiary, and each member of the
Class; and

iii.    Any recovery or other remedy secured in this action will inure to
the benefit of the Plan.

D.    **Adequacy of Representation.**  The Plaintiffs are adequate representatives
of the absent Class members and will protect such absent Class members'
interests in this litigation.  The Plaintiffs do not have any interests

antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class' claims.  Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

35.     Class certification is also appropriate under Rule 23(b) and each subpart in that:

A.     Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B.     Pursuant to Rule 23(b)(1)(B), in the absence of certification, there is a risk that adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications;

C.     Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

D.     Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS APPLICABLE TO ALL COUNTS

### The Plan

36.     The Plan is a "defined contribution plan," as defined in ERISA §3(34), 29 U.S.C. §1002(34), and contains or is part of an "eligible individual account plan" under ERISA §407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A).  It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

**The Plan's Investment Options Assessed Fees Which Were and Are Unnecessary, Excessive and Directly Benefit Defendants, including CIGNA.**

37.     CG Life was the Plan's investment manager.

38.     CG Life charged fees to each investment option in addition to the management fees charged by the managers (the "sub-advisors") of the underlying investments.

39.     CG Life did not actually provide necessary or valuable investment management services.  Instead, the sub-advisors provided investment management services and received a portion of the fund's expense ratio, the balance of which was paid to CG Life.

40.     As a result, the Plan and its participants were forced to pay both: (1) excessive and imprudent fees to the underlying managers (as discussed below); *and* (2) an additional fee CG Life imposed for the benefit of its parent, CIGNA (a "wrap fee" discussed below).

41.     Contrary to the duty of plan fiduciaries to operate the Plan for the exclusive benefit of plan participants, these additional fees directly benefitted CIGNA.

42.     These fees were unnecessary and imprudent in that the Plan could have invested with the sub-advisor's mutual fund directly and, in doing so, received the same or superior services while avoiding CG Life's additional fees.

43.     The only reason for structuring the investments was to allow CG Life to charge additional, needless fees so as to provide revenue and profit to CIGNA.

44.     The fees received by the sub-advisors were also imprudent and excessive in that Defendants could have, and should have, secured lower fees by investing in the sub-advisor's institutional investment products or similar institutional investment products with equivalent services and dramatically lower fees.

45.     Until approximately December 2000, Plan participants could contribute up to 25% of their eligible earnings to the Plan and invest in eleven investment options that

Defendants selected for inclusion in the Plan. Of these, nine were CG Life "separate accounts" that CG Life operated, for a profit, to benefit CIGNA rather than for the exclusive benefit of plan participants. The other two investment options were the CG Life Fixed Income Fund, which invested directly in CG Life's General Account, and the CIGNA Stock Fund.

46.     From 2001 and thereafter, upon enrollment Plan participants could contribute 25% of their eligible earnings to the Plan and invest in twenty-two investment options that Defendants had selected for inclusion in the Plan. Of these, twenty were CG Life separate accounts. The other two were the CG Life Fixed Income Fund, which invested directly in CG Life's General Account, and the CIGNA Stock Fund.

47.     Defendants retained Global, CIGNA's subsidiary, to advise them in the selection of investment options.

48.     Global "advised" Defendants that the Plan should invest – with the exception of the CIGNA Stock Fund – only in investment options for which CIGNA and its subsidiaries received revenues and profits.

49.     Each investment option in the Plan imposed excessive fees for the investment management services provided and, in addition, paid fees on top of these investment management fees, directly or indirectly, to CIGNA.

50.     Each expense ratio was excessive and included extra assessments, collected for the benefit of CIGNA, which were wholly unnecessary and bore no relation to the services provided.

51.     As set forth in more detail below, Defendants installed TimesSquare as the sub-advisor/investment manager of the Fixed Income Fund, the S&P 500 Index Fund, the Small Cap Growth/TimesSquare Fund, and the High Yield Bond Fund.

52.     As a result, through its subsidiary TimesSquare, CIGNA received both the revenues and profits CG Life received from its role as the investment manager of the Plan *and* revenues and profits TimesSquare generated as sub-advisor for the Fixed Income Fund, the S&P 500 Index Fund, the Small Cap Growth/TimesSquare Fund, and the High Yield Bond Fund.

## CIGNA Sells Its Plan-Funded Subsidiaries for a Profit

53.     As set forth below, in April 2004, after having placed Plan participants in its own products using their retirement assets as seed capital, CIGNA sold its Retirement Business to PRIAC.

54.     As a result of that sale, PRIAC replaced CG Life, and provided the same services to the Plan as CG Life had provided before the sale. Similarly, Global became a Prudential Financial subsidiary and provided the same services to the Plan as it had before the sale.

55.     As a result of this sale, the Plan's investment options nominally changed. They remained in the same funds with the same investment managers, with very few exceptions. After the sale, they were renamed PRIAC separate accounts.

56.     Since CIGNA sold its Retirement Business, the Plan's investment options have had lower fees because CIGNA's self-interest in adding excessive fees has been reduced:

| Name of Fund | Cigna Expense Ratio | PRIAC Expense Ratio | Excess reduced |
|---|---|---|---|
| Dryden S&P 500 Index Fund | 20 bps | 17 bps | 3 bps |
| Small Cap Value / Perkins, Wolf, McDonnell Fund | 95 bps | 90 bps | 5 bps |
| Large Cap Growth / Goldman Sachs Fund | 70 bps | 61 bps | 9 bps |
| Small Cap Growth / TimesSquare Fund | 95 bps | 91 bps | 4 bps |
| Barclays Equity Market Index Fund | 35 bps | 25 bps | 10 bps |

| Name of Fund | Cigna Expense Ratio | PRIAC Expense Ratio | Excess reduced |
|---|---|---|---|
| Mid Cap Value / Wellington Mgmt Fund | 90 bps | 80 bps | 10 bps |
| Mid Cap Blend / New Amsterdam Partners Fund | 90 bps | 80 bps | 10 bps |
| State Street Global Advisors EAFE Index Fund | 35 bps | 30 bps | 5 bps |
| Large Cap Value / Wellington Mgmt Fund | 70 bps | 60 bps | 10 bps |
| Mid Cap Growth / Artisan Partners Fund | 90 bps | 80 bps | 10 bps |
| High Yield Bond / Caywood-Scholl Fund | 95 bps | 57 bps | 38 bps |
| International Blend / Boston Co. Fund | 100 bps | 96 bps | 4 bps |
| Large Cap Value / John A. Levin & Co. Fund | 70 bps | 60 bps | 10 bps |
| CIGNA Custom 40 Fund | 91 bps | 76 bps | 15 bps |
| International Growth / Artisan Partners Fund | 100 bps | 95 bps | 5 bps |
| CIGNA Custom 50 Fund | 92 bps | 76 bps | 16 bps |
| CIGNA Custom 30 Fund | 90 bps | 76 bps | 14 bps |
| Large Cap Growth / RCM Fund | 70 bps | 60 bps | 10 bps |
| CIGNA Custom 20 Fund | 89 bps | 76 bps | 13 bps |
| CIGNA Custom 60 Fund | 95 bps | 75 bps | 20 bps |

57.    Although PRIAC, an unaffiliated third party, charged substantially lower fees than those CIGNA charged to its own employees, PRIAC's expense ratios were still unreasonably excessive as set forth below, causing millions of dollars of excessive fees.

**Defendants' Fiduciary Duties**

58.     Defendants are bound by ERISA's imposition of a fiduciary duty that has been characterized as "the highest known to law."  Defendants' fiduciary obligations require that, at all times, they must:

A.      conduct themselves with the utmost good faith, loyalty and fidelity;

B.      act with the sole purpose of advancing the interests of the Plan, its participants and beneficiaries;

C.      without request, fully disclose to, and inform participants of, all material information and all information participants need to know to understand and protect their interests in the Plan;

D.      discharge their duties with the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying the reasonable cost of administering the Plan;

E.      ensure, at all times, that Plan assets are never used for the benefit of the plan sponsor or other fiduciaries;

F.      scrupulously avoid conflicts of interests, self-dealing and prohibited transactions;

G.      never use their authority, discretion and control in connection with the Plan to advance their own interest;

H.      account to the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

I.      compensate the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

J.      disgorge any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

K.      even in the absence of a breach of fiduciary duty, account for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

L.      consider only the economic interests of the Plan in selecting Plan investment options;

M.      exercise the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

N.      diversify the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so;

O.      properly prescreen investment options so as not to include investment options that a responsible fiduciary would exclude;

P.      properly prescreen investment options and avoid placing on participants the unreasonable burden of having to screen investment options when they lack the resources and expertise to do so; and

Q.    use the enormous bargaining and purchasing power of a multi-billion

dollar 401(k) plan to secure investment options in the wholesale,

institutional investment marketplace and/or to secure additional

investment advice or other extra services for participants so as to lower

participants' cost of participation to wholesale levels if non-institutional

investment vehicles are included.

59.    Defendants have not disclosed, and/or have affirmatively concealed, a litany of

material information including:

A.    That Defendants had engaged in a long campaign of self-interested

transactions designed to reap prohibited profits from the Plan and its assets

for CIGNA and/or related entities;

B.    That the Plan's size and asset value enabled Defendants to provide lower-

priced investment options;

C.    That the fees charged and funneled to CIGNA were depriving participants

of the opportunity to receive market returns;

D.    That the excessive fees and expenses assessed against their accounts, and

paid to CIGNA, substantially would undermine the value of participants'

retirement savings over time;

E.    That Plan service providers – primarily CIGNA subsidiary CG Life –

collected "soft dollars" from participants' accounts which included asset-

based charged for recordkeeping services which became increasingly

excessive as assets in the Plan grew;

F.      That wrap fees were, and are, being assessed against the Plan but not being used to benefit the Plan, but rather to benefit CIGNA;

G.      That Plan service providers – primarily CIGNA – were and/or are receiving excess payments via Additional Compensation Streams, and that such monies were available for the benefit of the Plan but not captured;

H.      That the expense ratios charged in Plan investment options were and are inflated to collect soft dollars and wrap fees and are *not* used for the investment management and operation of the investment option/Fund, *(i.e.* the ostensible purpose for the imposition of such fees);

I.       That the expense ratios of Plan investment options/Funds were and are inflated to collect soft dollars for the purpose of providing wrap fees so that the *stated expense ratio is not the true and accurate cost of investing* in the investment option/Fund;

J.       How much each service provider is paid with Plan assets, derived from participants' accounts, when wrap fees *and* Additional Compensation Streams are considered;

K.      That the total amount paid to services providers is not reasonable in light of the services provided and incurred solely for participants' benefit;

L.      That plan fiduciaries have forgone Additional Compensation Streams available in connection with Plan investment options, and thereby unnecessarily increased the expenses which Plan participants otherwise must bear;

M.    The true and accurate amount of recordkeeping and administrative fees that are assessed against participants' accounts in the Plan; in that Plan record-keepers and administrators receive are paid only in soft dollars collected;

N.    The true and accurate price of Plan investment options/Funds;

O.    The true and accurate amount of fees paid to investment managers *for actual investment management services* (*i.e.* the actual amount of investment management being purchased) in any Plan investment option/Fund;

P.    In actively-managed investment options/Funds, the actual amount of active management services that Plan participants are purchasing, in that the inclusion of undisclosed soft dollar assessments in actively-managed investment options/Funds renders participants incapable of knowing whether the higher fees charged are actually used for active investment management rather than to funnel additional revenue to CIGNA;

Q.    The fact that soft dollar payments of Plan assets, derived from participants' accounts, are masking prohibited transactions and/or conflicts of interests between or among Plan fiduciaries and service provider; and

R.    That Defendants based investment decisions on factors other than the economic interest of the Plan.

60.    Because the Defendants failed and refused to provide them with this information, and concealed this information from them, Plan participants have lacked the information necessary for them: (a) to understand and protect their interests in the Plan; (b) to have

knowledge regarding the Defendants' breaches of fiduciary duty; and (c) to have reason to believe they should make inquiry about those breaches and the facts underlying them.

61.     Defendants know that Plan participants lack such information and knowledge.

62.     In their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.  As ERISA fiduciaries, Defendants have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

## COUNT I:

### Imposition of Unreasonable Record Keeping and Administrative Fees
### for The Benefit of CIGNA
(Breach of Duty of Prudence and Loyalty – 29 U.S.C. §1104(a))

63.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 62 as though fully set forth here.

64.     The Plan's recordkeeper, CG Life, was an affiliate of CIGNA.

65.     CG Life's compensation for recordkeeping was "wrapped" into a variable group annuity contract.

66.     In these variable annuity contracts, Defendants selected investment vehicles and/or managers – either retail mutual funds or investments that mirror retail mutual funds in their features and services – and imposed an additional fee on top of the funds' expense ratio. This process is known as "wrapping" the mutual fund.  The extra fees imposed are called "wrap fees."

67.     As investments, therefore, annuities are inherently inferior to straight investment in the underlying investment vehicles, because they are more expensive.

68. The fees for these contracts in the Plan were asset based and, accordingly, increased as the amount of assets grew over time.

69. Defendants failed to prudently monitor these fees for reasonableness.

70. In 2002, CG Life was paid $14 million for providing these services.

71. Of that amount, $10 million came from fees on the fixed income fund alone.

72. CG Life's compensation was excessive for the services the Plan received from CG Life.

73. CG Life's asset-based compensation for recordkeeping services was excessive. The costs of recordkeeping services do not increase commensurately with the amount of assets in the Plan. Ongoing increases in Plan assets caused recordkeeping fees to be excessive, and to consistently become more so.

74. Defendants fraudulently concealed these excessive recordkeeping and administrative fees in their communications with plan participants.

75. By way of example, Defendants informed participants only of the total expense ratio of the Plan's investment options, which concealed the amount of fees paid to CG Life and other CIGNA affiliates for recordkeeping and administrative services. See, e.g., Ct.Doc. 19-7, p. 5).

76. Defendants further concealed the excessive recordkeeping compensation in quarterly account statements to participants, which were completely silent as to fees paid by the participants in any respect. See, e.g., Doc. 19-16.

## COUNT II:

### Selection of Excessively-Priced and Imprudent Investment Options
### For The Benefit of CIGNA and at The Expense of the Plan
(Breach of Duty of Prudence and Loyalty – 29 U.S.C. §1104(a))

77.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 76 as though fully set forth here.

### Selection and Retention of Investment Options Imposing Excessive Fees

78.     As set forth above, Defendants caused the Plan's investment options to include – with the exception of the CIGNA Stock Fund – exclusively CG Life separate accounts and the CG Life Fixed Income Fund (which invested directly in CG Life's General Account).

79.     As set forth above, each such separate account was comprised of a mutual fund or similar investment product "wrapped" in CG Life's additional layer of fees.

80.     As set forth above, these additional fees were excessive and a prudent fiduciary could have easily avoided them by purchasing equivalent investment management directly from the sub-advisor.

81.     For each investment option, the sub-advisor who actually managed the Plan's investment option offered equivalent investment management services for less than was ultimately paid by the Plan.

82.     As set forth above, for each investment option, the difference between the reasonable investment management rates available from the sub-advisor and the fees actually assessed against the Plan represent revenue and self-dealing profits to CIGNA and its subsidiaries, including CG Life and TimesSquare.

83.     Even when compared to mutual funds and similar investment products, the fees CIGNA charged in the Plan's separate accounts, and the Fixed Income Fund, were excessive in every category.

84.     The fees available in the mutual fund marketplace to an investor *with only $3,000 to invest* were, and are, substantially lower than those Defendants imposed on the Plan in every investment category.

85.     Defendants did not even consider these sorts of alternatives, or any alternatives that did not allow CG Life or other CIGNA affiliates to profit.

86.     Further evidencing the unreasonable and excessive fees that Defendants imposed on the Plan is the fact the fees assessed against each investment option fell by millions of dollars when, in 2004, CIGNA sold its Retirement Business to PRIAC.

87.     Simply stated, when CIGNA and its Retirement Business were eliminated from the Plan, and CIGNA's profit motive no longer affected the Plan's fees, the expense ratios of the Plan's investment options fell in every category.  Defendants for years had imposed on CIGNA's own employees higher fees than would, and did, PRIAC – an unaffiliated third party.

88.     Despite the fact that PRIAC imposed lower fees than did CG Life, after CIGNA's sale of the retirement business to PRIAC in 2004, the Plan's fees remained unreasonable and excessive.

89.     At all times relevant to this action, the Plan contained assets ranging from more than $1.3 billion in 1995 to more than $2.6 billion in 2007.

90.     The size and purchasing power of multi-billion dollar 401(k) plans, like the Plan here, enables plan fiduciaries to contract directly with investment managers and secure investment management services at a fraction of the fees – potentially 25% – charged to smaller

plans and individual investors in the retail marketplace.  More than a decade ago, the Department of Labor emphasized this to 401(k) plan fiduciaries.

91.     Moreover, while paying a fraction of retail fees, by selecting such institutional investment vehicles, plan fiduciaries can establish and control the funds' investment objectives, control and reduce trading costs, and escape the conflicts of interest and scandals that have plagued the retail investment/mutual fund industry for years.

92.     Simply stated, the investment marketplace available to multi-billion dollar 401(k) plans, like the Plan here, allowed Defendants the opportunity to invest Plan assets prudently and at significantly lower cost than the Plan paid.

93.     Defendants squandered the Plan's enormous bargaining power and access to the institutional market by selecting investment options that charged retail fees and then added a completely unnecessary layer of their own fees for the benefit of CIGNA and its subsidiaries.

94.     In exchange for the payment of such fees, the Plan and its participants did not receive additional investment advice or other extra services.  To the contrary, in light of the wrap fee CIGNA imposed in addition to the fund's retail fees, the Plan and its participants paid *more* than retail investors *for the same services*.

95.      While imposing such retail fees, and an additional wrap fee, was a detriment to the Plan, it provided substantial financial benefits to CIGNA at the Plan's expense.

96.     Worse yet, Defendants selected TimesSquare, CIGNA's for profit subsidiary, as the sub-advisor managing Plan investment options, including the Fixed Income Fund, the S&P 500 Index Fund, the Small Cap Growth/TimesSquare Fund, and the High Yield Bond Fund.

97.     By installing TimesSquare as sub-advisor of these Plan investment options, Defendants insured that the Plan would pay, for the benefit of CIGNA, *both* TimesSquare's excessive expense ratio for each such fund *and* CF Life's additional wrap fee.

## The Imprudence of CIGNA's Fixed Income Fund

98.     Defendants' inclusion of CIGNA's Fixed Income Fund made their imprudence and self-dealing even worse. It imbued the Plan with imprudent and undiversified risk and an excessive 50 basis point fee costing the Plan and its participants millions of dollars in addition to the Fixed Income Fund's excessive costs.

99.     The Fixed Income Fund is a "group fixed annuity contract" issued by CIGNA's subsidiary, CG Life.  Under the contract, the Plan's assets are deposited into CG Life's General Account and CG Life agrees to pay an interest rate, which it sets, on the amounts deposited.

100.    This "guaranty" is false and fraudulent, and intended to trick participants into believing that their retirement savings are safe in all circumstances, when they are actually subject to the risks of CIGNA's business operations and solvency.

101.    Although CG Life "guarantees" an investment in the Fixed Income Fund against loss, that guaranty is backed only by the assets held in CG Life's General Account.

102.    CG Life's General Account is a pool of assets that CG Life holds in its general insurance operation, and is comprised of various investments including commercial mortgages, publically issued bonds, asset-backed securities, and privately-issued debt securities. CG Life uses the assets in its General Account to pay claims on its insurance policies and make payments on annuity contracts.

103.    Accordingly, the Fixed Income Fund was exposed to the risk that CG Life (and CIGNA) would become insolvent.  So was the CIGNA Stock Fund.

104.    The Fixed Income Fund and the CIGNA Stock Fund are the Plan's two largest investment options.  In 2004, through the combination of the Plan's Fixed Income Fund and the CIGNA Stock Fund, Defendants caused in excess of $1.4 billion, approximately 64% of the Plan's assets, to be invested in CIGNA, the Plan's Sponsor, and its subsidiaries.  The percentage was approximately the same in all other years relevant to this Complaint.

105.    Because the Plan already had taken this risk through its heavy investment in the CIGNA Company Stock Fund, a prudent investor would have analyzed whether the interests of the Plan were better served with a different Fixed Income option that did not increase the Plan's undiversified risk of CIGNA insolvency.

106.    Had Defendants undertaken this process, they would have discovered that other Fixed Income products in the market place had higher expected returns, lower costs and equivalent services.  Accordingly, a prudent investor would have avoided the Fixed Income Fund selected for the Plan, and considered such alternatives.

107.    Thus, although including the CG Life Fixed Income Fund and the CIGNA Stock Fund as investment options subjected the Plan and its participants to excessive and undiversified risk, it benefited CIGNA by providing: (1) billions of dollars of assets under management against which CG Life and TimesSquare, for the benefit of CIGNA, could assess fees; (2) CG Life with in excess of $1.1 billion dollars in working capital for its General Account from CIGNA employees' retirement savings; (3) CIGNA with hundreds of millions of dollars in equity through sales of its stock to its employees; and (4) billions of dollars of Plan assets as assets under management to CIGNA's Retirement Business.

108.    As set forth in more detail below, the billions of dollars in assets under management that CIGNA Retirement Business gained from the Plan were: (1) vital to the

Retirement Business' ability to profitably operate as a going concern for the benefit of CIGNA; and (2) a significant driver of the sale price CIGNA received for the Retirement Business.

109.     By the foregoing conduct; Defendants breached their fiduciary duties by, without limitation:

A.     Selecting and retaining investment options that imposed excessive and unreasonable fees, including fees for the benefit of CIGNA;

B.     Subjecting the Plan to such unreasonably expensive options when the Plan's enormous size and bargaining power enable Defendants to secure the same investments at a fraction of the cost;

C.     Imposing excessive and unreasonable wrap fees, *in addition to* these unreasonable management and extra fees, for the benefit of CIGNA;

D.     Failing to secure, for the excessive fees imposed upon the Plan, additional investment advice or other services for Plan participants;

E.     Selecting and retaining investment options for reasons other than furthering the economic interests of the Plan;

F.     Failing to properly prescreen investment options, selecting and retaining investment options that a responsible fiduciary would exclude, and imposing on participants the unreasonable burden of having to screen investment options when the lack the resources and expertise to do so;

G.     Selecting and retaining CIGNA's subsidiary TimesSquare as investment manager of three investment options so as to funnel additional and excessive fees to CIGNA in addition to CIGNA's wrap fee;

H.     Selecting and retaining CG Life's Fixed Income Fund so as to provide financial and other benefits to CIGNA and its subsidiaries while subjecting the Plan and its participants to excessive, undiversified and avoidable risk; and

I.     Subjecting the Plan to the control and discretion of fiduciaries laboring under conflicts of interest and self-dealing.

## COUNT III:

**Use of Plan Assets as Seed Money in the Establishment, Operation and Sale of TimesSquare**
(Breach of Duty of Prudence and Loyalty – 29 U.S.C. §1104(a))

110.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 109 as though fully set forth here.

111.     In approximately 2000, CIGNA established TimesSquare as a for-profit, wholly-owned subsidiary.  CIGNA established TimesSquare as an asset management business focused on institutional asset management, and particularly that of retirement plans.

112.    The Chief Investment Officer ("CIO") of the CIGNA Investment Group was installed as the President of TimesSquare while remaining in his position as CIO of the CIGNA Investment Group.

113.    TimesSquare was a spin-off of a portion of CIGNA's Investment Management Group.  Approximately one quarter of the CIGNA Investment Management Group's employees were transferred to TimesSquare.

114.    Through TimesSquare, Defendants charged the Plan as much as they desired, levying excessive and unnecessary fees that a prudent or loyal fiduciary would have avoided.

115.    In 2001, Defendants installed TimesSquare, without a request for proposal or competition, as the investment manager of the Plan's largest investment option, the Fixed Income Fund, which held $1,064,080,000.

116.    Also in 2001, Defendants terminated Charter as the sub-advisor / investment manager of three of the seven separate accounts which, until Defendants established TimesSquare, Charter had managed:

> A.    The S&P 500 Index Fund, the Plan's third largest investment option, which, held $219,380,000;
>
> B.    The Small Cap Growth Fund, the Plan's fifth largest investment option, which held $61,265,000;
>
> C.    The High Yield Bond Fund, the Plan's eleventh largest investment option, which held $7,982,000.

117.    Defendants installed TimesSquare as the investment manager of these investment options.

118.    As a result, by the end of 2001, TimesSquare – CIGNA's fledgling investment management subsidiary – managed $1.5 billion of the Plan's $2 billion in assets, or 75%.

119.    Department of Labor Advisory Opinions prohibit the use of Plan assets as seed money for plan sponsors' and/or plan fiduciaries business ventures.

120.    In direct violation of this prohibition, CIGNA used Plan assets as seed money for its for-profit fledging investment management business, the revenues and profits of which inured directly to CIGNA's benefit.

121.    TimesSquare continued to manage approximately two thirds of the Plan's assets – at all times more than $ 1.2 billion – until December 31, 2004.  On that date, as a result of

CIGNA's sale of two parts of its Retirement Business (CG Life and Global) to Prudential, PRIAC became the investment manager of the Fixed Income Fund and terminated TimesSquare as the sub-advisor / investment manager of the S&P 500 Index Fund.

122.    The fees of these investment options fell when TimesSquare was terminated.

123.    Thereafter, in November 2004, CIGNA sold the third part of its Retirement Business, TimesSquare, to its officers and employees – who, at the time, were also insiders, officers, directors and/or employees of CIGNA – and the Affiliated Managers Group.

124.    After this sale, TimesSquare continued to serve as sub-advisor of the Plan's Small Cap Growth Fund, which, at the time, held $65.2 million and currently holds in excess of $77.8 million in Plan assets.

125.    While operating TimesSquare, Plaintiffs are informed and believe that several of these officers and employees simultaneously were officers and employees of CIGNA.

126.    Thus, for its own benefit and in its own interest, Defendants used Plan assets as seed money to establish, build and operate TimesSquare so as to provide revenues and profits to CIGNA, and thereafter sold TimesSquare to generate further revenues and profits for CIGNA.

127.    By this conduct, Defendants breached their duties of loyalty and prudence in that they:

> A.    Failed to conduct themselves with the utmost good faith, loyalty and fidelity;
>
> B.    Used Plan  assets in their own interest and not for exclusive purpose of providing benefits to participants and beneficiaries and defraying the reasonable expenses of administering the Plan;

C.    Selected and retained TimesSquare as investment manager of three investment options so as to funnel additional and excessive retail fees to CIGNA, in addition to CIGNA's wrap fee;

D.    Selected and retained investment options operated by officers and employees of TimesSquare who were also officers and employees of CIGNA, and thus who had a direct financial interest in managing Plan assets for the benefit of CIGNA;

E.    Selected and retained investment options for reasons other than furthering the economic interests of the Plan;

F.    Selected and retained investment options that a responsible fiduciary would exclude;

G.    Failed to exercise the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

H.    Used their authority, discretion and control in connection with the Plan to advance their own interest;

I.    Subjected the Plan to the control and discretion of fiduciaries with conflicting loyalties;

J.    Subjected the Plan assets to control and discretion of investment managers with conflicting loyalties;

36

K.      Failed to compensate the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in their business and/or for their benefit;

L.      Failed account to the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit; and

M.      Failed, even in the absence of a breach of fiduciary duty, to account for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit.

128.    Defendants hid these fiduciary breaches through fraud or concealment.

129.    In participant communications, Defendants informed participants only of the total expense ratio of the investment options, so as to conceal: (1) the extent of the excessive wrap fees received by CIGNA affiliates; (2) to conceal the excessive investment management fees charged by the investment options in which CG Life invested on behalf of the Plan; and (3) the benefits to CIGNA and the self-dealing by which CIGNA obtained those benefits (*see, e.g.* Ct.Doc. 19-7, p. 5).

130.    Defendants told participants that certain options were "CG Life separate accounts" so as to create the impression that plan fiduciaries had met their fiduciary obligations and placed the Plan in institutionally priced separate accounts.  In fact, the "separate accounts" invested in expensive and imprudent options that could have and should have been obtained more cheaply through a true separate account structure. See, e.g., Doc. 19-10, p. 18 ("The High Yield Bond/Caywood-Scholl Fund is a CG Life separate account starting on November 1, 2002.")

see also, Doc. 19-10, p. 24 ("The Large Cap Growth/Goldman Sachs Fund is CG Life separate

account…. In August 1997 the Fund became a stand-alone separate account.");

131.    Defendants further concealed their fiduciary breaches in that Quarterly Statements

to individual participants were completely silent as to fees paid by the participants in any respect.

Doc. 19-16.

## <u>COUNT IV:</u>

### **Use of Plan Assets, without Compensation, in CIGNA's Business**
(Breach of Duty of Prudence and Loyalty – 29 U.S.C. §1104(a))

132.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 131 as

though fully set forth here.

133.     As set forth above, Defendants caused every investment option but the CIGNA

Stock Fund to be invested in CG Life and CIGNA's Retirement Business.

134.    As set forth above, in 1995 CIGNA and its Retirement Business received in

excess of $1.3 billion in assets under management from the Plan. By 2007, this had grown to

$2.6 billion.

135.    As set forth above, by selecting and retaining the Fixed Income Fund as a Plan

investment option, Defendants caused more than $1.1 billion of Plan assets to be invested

*directly* in CG Life's General Account, and thus caused the Plan to provide more than a billion

dollars of working capital for CG Life's operations.  At the same time, CIGNA's Retirement

Business, through TimesSquare, charged the Plan investment management fees on the working

capital that the Plan provided to CG Life through the Fixed Income Fund.

136.    By providing, approximately $2 billion for CIGNA's Retirement Business to use

as assets under management in its separate accounts and CG Life's General Account, Defendants:

(1) used Plan assets to support and Fund CG Life's general business and operations; (2) enabled

the Retirement Business to assess fees against those assets so as to generate revenues and profits for the benefit of CIGNA; (3) enhanced the Retirement Business' ability to market its services and investment products to unrelated retirement plans; and (4) increased the value of the Retirement Business and, ultimately, its sale price.

137.     In CIGNA's annual filings with the United States Securities Exchange Commission (the "SEC"), CIGNA states (emphasis added):

> Assets under management consist of invested and separate account assets, as well as third-party investment advisory account assets of the Retirement segment. **Assets under management are a key driver of earnings for this segment because a significant portion of this segment's revenue is based on asset values.**

138.     The approximately $2 billion of Plan assets that CIGNA and its Retirement Business have used in its operations are a substantial part of the Retirement Business' "asset under management" that was a "key driver" of the Retirement Business' earnings.

139.     In short, Defendants caused Plan assets to be used by CIGNA and the Retirement Business in its business and operations for its own benefit.

140.     On April 1, 2004, CIGNA sold its Retirement Business to the PRIAC as a going concern.  Through this sale, PRIAC became the Plan's primary investment manager, recordkeeper and service provider.

141.     As part of this sale, CIGNA's Retirement Business transferred approximately $18 billion of assets under management to PRIAC, including hundreds of millions of dollars of Plan assets.

142.     The Plan's assets exceeded 10% of the assets under management transferred to PRIAC in this sale.

143.    CG Life's assets under management were a key driver of the price CIGNA received from PRIAC.

144.    CIGNA reaped an *after tax gain of $809 million* from this sale, as well as other financial benefits including the release or reduction of various contract or guarantee obligations.

145.    Although Plan participants' retirement assets were used as seed money to generate this gain of $809 million, *Plan participants received nothing from the sale.*

146.    Defendants caused Plan assets, as a substantial portion of CG Life's assets under management and more than a billion dollars of CG Life's working capital in its General Account, to be used for the benefit of CIGNA in the profitable sale of its Retirement Business.

147.    Where a fiduciary uses plan assets for in its own business or for its own purposes, it is accountable for all revenues and profits received in connection with such use.

148.    Even in the absence of a breach of fiduciary duty, a fiduciary may not profit from a transaction involving plan assets and must account to the plan for all such profits.

149.    As set forth above, Defendants breached their fiduciary duties and used Plan assets in CIGNA's business and/or for their own purposes by:

> A.    For the benefit of CIGNA and to the detriment of the Plan, including the CG Life Fixed Income Fund as the Plan's largest investment option, and thereby causing well in excess of a billion dollars of Plan assets to be used as working capital in CG Life's General Account so as to support and fund CG Life's, and the Retirement Business', business and operations;

> B.    For the benefit of CIGNA and to the detriment of the Plan, including CG Life's Fixed Income Fund as the Plan's largest investment option and, by

doing so, effecting extending a loan of Plan assets to CG Life and the
Retirement Business to support and funds their business and operations;

C.     For the benefit of CIGNA and to the detriment of the Plan, including
virtually exclusively CG Life separate accounts and the CG Life Fixed
Income Fund as Plan investment options, and thereby providing, by 2004,
$2.5 billion in assets under management to CG Life and the Retirement
Business;

D.     For the benefit of CIGNA and to the detriment of the Plan, including
virtually exclusively CG Life separate accounts and the CG Life Fixed
Income Fund as investment options, and thereby causing Plan assets to be
used as CG Life assets under management which were the "key driver" of
the Retirement Business' earnings;

E.     For the benefit of CIGNA and to the detriment of the Plan, including
virtually exclusively CG Life separate accounts and the CG Life Fixed
Income Fund as investment options, and thereby using Plan asses to
enhance the value of, and increase the sale price of, the Retirement
business;

F.     Through the Fixed Income Fund and thus CG Life's General Account,
effectively providing a loan of well in excess of $1 billion to the
Retirement Business and CG Life to support and fund their general
operations;

G.      By all of the foregoing, through the use of Plan assets, enhancing the value and increasing the sale price of the Retirement Business as a going concern;

H.      By all of the foregoing, receiving revenues and profits from the use of Plan assets in their business;

I.      Failing to account to the Plan for the revenues and profits CIGNA received in connection with such uses of Plan assets; and

J.      Failing to compensate the Plan of such use of Plan assets.

## COUNT V:

**Failure to Capture Additional Compensation Streams For the Benefit of the Plan**
(Breach of Duty of Prudence and Loyalty – 29 U.S.C. §1104(a))

150.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 149 as though fully set forth here.

151.    The Plan's assets include an undivided interest in all of the underlying assets contained in the Plan's CG Life separate accounts and the Fixed Income Fund.  Any earnings, proceeds or accretions generated from, or in respect of, such Plan assets are also Plan assets.

152.    The Plan and its participants are entitled to all such earnings, proceeds or accretions generated from, or in respect of, such Plan assets.

153.    Beyond collecting excessive fees as set forth above, CIGNA, CG Life, TimesSquare and other service providers received additional, undisclosed compensation from their dealings with the Plan and Plan assets ("Additional Compensation Streams").  For example:

- consultants receive finders' fees from investment managers for the consultants' placement of Plan assets with a certain investment manager or mutual fund company;

- trustees or custodial banks perform cash sweeps of Plan accounts to capture cash before it is transferred to investment options, and earn interest on those cash holdings (float);

- investment managers, custodial banks, prime bankers, and/or mutual funds receive payments for lending securities, owned by the Plan, to third parties; and

- in connection with foreign investments, investment managers and mutual funds reap additional compensation from profiting on foreign currency exchange.

154.    In a multi-billion dollar plan, like the Plan here, such Additional Compensation Streams can result in millions of dollars of revenues generated by, or in respect of, Plan assets.

155.    Accordingly, prudent fiduciaries of multi-billion dollar 401(k) plans understand and account for these Additional Compensation Streams.

156.    Defendants were and are obligated to understand and consider these Additional Compensation Streams in fulfilling their fiduciary obligations to ensure that the proceeds of Plan assets are captured to defray Plan expenses, are applied solely for the benefit of the Plan and its participants and beneficiaries, and/or are returned to the Plan.

157.    Here, Defendants have failed to do so.  Instead, they have caused and/or allowed Plan service providers, including CG Life and TimesSquare, to retain such Additional Compensation Streams for the benefit of CIGNA.

158.    By such conduct, Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries in that they:

   A.    Failed to discharge their duties solely in the interest of the Plan and its participants;

B.      Failed to administer the Plan for the exclusive purpose of providing benefits to participants and beneficiaries and defraying the reasonable expenses of administering the Plan;

C.      Caused or allowed service providers to receive excess and unreasonable compensation by retaining Additional Compensation Streams in addition to other compensation;

D.      Deprived the Plan of the benefit of earnings, proceeds and other income generated from, or in respect of, Plan assets; and

E.      Caused or allowed CG Life and TimesSquare to receive additional and excess compensation for the benefit of CIGNA.

## COUNT VI:

### Prohibited Transactions - 29 U.S.C. §1106(a)

159.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 158 as though fully set forth here.

160.    As established above, CIGNA, John Arko, CG Life and the Committee are fiduciaries to the Plan.  As fiduciaries, they are parties in interest under ERISA §3(14). Alternatively, Defendants are parties in interest because: (1) they provide services to the Plan (under §3(14)(B)); and (2) they are the employer whose employees are covered by the Plan (under §3(14)(C)), among others.

161.    ERISA §406(a)(1), 29 U.S.C. §1106(a)(1), provides, in part:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--

**(C)** furnishing of goods, services, or facilities between the plan and a party in interest;

**(D)** transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

**Defendants' Violations of ERISA §406(a)(1)(C)**

162.   As set forth in detail above, CIGNA, John Arko, the Committee, and/or CG Life caused the Plan to engage in transactions, including, but not limited to:

A.   Entering into contracts with CG Life and TimesSquare;

B.   Amending those contracts with CG Life and TimesSquare;

C.   Evaluating the services provided by CG Life and TimesSquare to the Plan and deciding to retain and continue those services; and

D.   Paying invoices and/or authorizing fees to be removed from Plan accounts.

163.   CIGNA, John Arko, the Committee, and/or CG Life in engaging in the transactions above knew or should have known such transactions constituted the direct or indirect furnishing of services:

A.   Between the Plan and CG Life in that CG Life provided record keeping, administrative, and  investment management and advisory services to the Plan;

B.   Between the Plan and CG Life in that CG Life provided its own proprietary separate accounts as investment options within the Plan;

C.   Between the Plan and CG Life in that CG Life issued the variable group annuity contract;

D.   Between the Plan and CG Life in that CG Life issued the fixed group annuity contract for the Fixed Income Fund, which is a Plan investment option; and

E.      Between the Plan and TimesSquare in that TimesSquare provided

investment management services to the Plan's Fixed Income Fund, the

S&P 500 Index Fund, the Small Cap Growth/TimesSquare Fund, and the

High Yield Bond Fund.

164.    There is no prohibited transaction exemption with which Defendants complied

that applies to Plaintiffs' claims.

165.    The total fees paid to CG Life and TimesSquare for their services to the Plan were

unreasonable in light of the services provided.  Further, CIGNA, John Arko, and/or the

Committee failed to negotiate additional services or rebates from CG Life and TimesSquare on

behalf of the Plan.

166.    As set forth above, the Defendants did not compensate the Plan for the use of its

assets.

167.    As a result of these prohibited transactions, Defendants have received excessive

and improper revenues and profits.

**Defendants' Violations of ERISA §406(a)(1)(D)**

168.    As set forth in detail above, CIGNA, John Arko, the Committee, and/or CG Life,

in concert with one another, caused the Plan to engage in transactions, including, but not limited

to:

A.      Entering into contracts with CG Life and TimesSquare;

B.      Amending those contracts with CG Life and TimesSquare;

C.      Evaluating the services provided by CG Life and TimesSquare to the Plan

and deciding to retain and continue those services; and

     D.     Paying invoices and/or authorizing fees to be removed from Plan accounts.

169.    CIGNA, John Arko, the Committee, and/or CG Life in engaging in the transactions identified in ¶¶162-163, knew or should have known such transactions constituted the direct or indirect transfer to, or use by, or for the benefit of CG Life and TimesSquare, assets of the Plan in that, among other things:

     A.     Through CG Life's Fixed Income Fund, CG Life received and used well in excess of $1 billion of Plan assets;

     B.     Through CG Life's separate accounts and the Fixed Income Fund, CG Life received and used almost $2 billion from the Plan as assets under management, receiving the benefit of an enhanced value and sale price of CG Life and CIGNA's Retirement Business;

     C.     Plan assets were transferred to and used as assets under management of CG Life, from which CG Life generated revenues and profits for the benefit of CIGNA;

     D.     Plan assets, in excess of $1.2 billion, were used as seed money to establish TimesSquare;

     E.     Plan assets were transferred to and used as assets under management of TimesSquare, from which TimesSquare generated revenues and profits for the benefit of CIGNA;

     F.     For the benefit of TimesSquare and CIGNA insiders, CIGNA sold TimesSquare to its officers and directors, generating increased revenues and profits from the proceeds of that sale for CIGNA.

170.    There is no prohibited transaction exemption with which Defendants complied that applies to Plaintiffs' claims.

171.    The total fees paid to CG Life and TimesSquare for their services to the Plan were unreasonable in light of the services provided.  Further, CIGNA, John Arko, and/or the Committee failed to negotiate additional services or rebates from CG Life and TimesSquare on behalf of the Plan.

172.    As set forth above, the Defendants did not compensate the Plan for the use of its assets.

173.    As a result of these prohibited transactions, Defendants have received excessive and improper revenues and profits.

## COUNT VII:

### Prohibited Transactions  29 U.S.C. §1106(b)

174.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 173 as though fully set forth here.

175.    As established above, CIGNA, John Arko, CG Life and the Committee are fiduciaries to the Plan.

176.    ERISA §406(b), 29 U.S.C. §1106(b), provides, in part:

A fiduciary with respect to a plan shall not--

**(1)** deal with the assets of the plan in his own interest or for his own account,

**(2)** in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

**(3)** receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan

**Defendants' Violations of ERISA §406(b)(1)**

177.    As set forth above, CIGNA, John Arko, the Committee, CG Life, and

TimesSquare dealt with the assets of the Plan in their own interest and for their own account in

that, among other things:

A.    As set forth above, CIGNA, John Arko, the Committee, and/or CG Life

transferred to TimesSquare more than $1.2 billion of Plan assets, more

than two thirds of all the assets in the Plan, as seed money to establish a

wholly owned, for-profit investment management company so as to

generate additional revenues and profits for CIGNA and/or TimesSquare;

B.    As set forth above, CIGNA, John Arko, and/or the Committee included

and retained as Plan investment options virtually exclusively CG Life

separate accounts and/or direct investment in CG Life's General Account,

and thereby funneled revenues and profits received from managing the

investment of Plan assets to CIGNA;

C.    As set forth above, CIGNA, John Arko, and/or the Committee selected

and retained CG Life as the Plan's recordkeeper and primary

administrative service provider, charged excessive and unreasonable fees

for those services, and thereby funneled to CIGNA revenues and profits

generated from asset-based fees assessed against, and removed from, Plan

assets;

D.    As set forth above, CIGNA, John Arko, the Committee, and/or CG Life

selected and retained TimesSquare to manage Plan assets in the Fixed

Income Fund, the High Yield Bond Fund, the S&P 500 Index Fund, and

the Small Cap Growth/TimesSquare Fund and, by doing so, caused the

Plan to pay for the benefit of CIGNA, *both* TimesSquare's retail expense

ratio for each such fund *and* CG Life's additional fee; and

E.     As set forth above, CIGNA, John Arko, and/or the Committee caused or

allowed CG Life and TimesSquare to retain Additional Compensation

Streams produced by Plan assets so as to generate revenues and profits for

the benefit of CIGNA.

### Defendants' Violations of ERISA §406(b)(2)

178.     CIGNA, John Arko, the Committee, CG Life, and TimesSquare, in their

individual and corporate capacities as officers, directors, employees and/or agents of CIGNA,

acted in transactions involving the Plan on behalf of CIGNA, CG Life and TimesSquare (or

represented CIGNA, CG Life and TimesSquare) whose interests were adverse to the interests of

the Plan or the interests of its participants or beneficiaries in that:

A.     As set forth above, CIGNA, John Arko, and/or the Committee negotiated

and amended a Variable Group Annuity Contract with CG Life.  The

interests of CG Life and CIGNA (as its parent) were to impose as high

fees and rates as possible along with negotiating other terms of the

contract in their best business interests.  Conversely, CIGNA, John Arko,

and/or the Committee negotiated on behalf of the Plan;

B.     As set forth above, CIGNA, John Arko, and/or the Committee selected

and retained CG Life as the Plan's recordkeeper and primary

administrative service provider on behalf of CIGNA and CG Life.  The

interests of CG Life and CIGNA were to impose as high fees as possible

for such services and were directly adverse to the interests of the Plan to pay as low fees as possible; and

C.     Defendants selected, contracted with, amended contracts, and retained TimesSquare as investment manager of the Fixed Income Fund, S&P 500 Index Fund, and Small Cap Growth/TimesSquare Fund on behalf of TimesSquare and CIGNA. The interests of TimesSquare and CIGNA were to impose as high investment management fees as possible, and were directly adverse to the Plan's interest to pay as low management fees as possible.

**Defendants' Violations of ERISA §406(b)(3)**

179.     As set forth above, CIGNA received consideration for its own personal account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan in that it:

A.     As set forth above, CIGNA received revenues and profits from CG Life in connection with the selection and retention of CG Life separate accounts and the Fixed Income Account as Plan investment options;

B.     As set forth above, CIGNA received revenues and profits from TimesSquare in connection with the selection and retention of TimesSquare as in investment manager for the Plans; and

C.     As set forth above, CIGNA received hundreds of millions of dollars in profits in connection with the sale of its Retirement Business to PRIAC, while Plan assets constituted in excess of $2.4 billion, approximately 10%, of the assets under management on which the sale price depended.

180.     As set forth above, CG Life received consideration for its own personal account from a party dealing with the Plan in connection with transactions involving the assets of the Plan in that it:

    A.    Received excessive and unreasonable investment management fees, assessed against and collected from Plan assets pursuant to agreements between Defendants and CG Life and by reason of selection and retention of CG Life separate accounts and the CG Life Fixed Income Fund as investment options;

    B.    Received excessive and unreasonable record keeping and administrative fees, assessed against and collected from Plan assets,  pursuant to agreements between Defendants and CG Life;

    C.    Received revenue sharing payments from investment managers of the Plan's investment options pursuant to investment management agreements between investment option sub-advisors and CG Life; and

    D.    Received Additional Compensation Streams collected from Plan assets by reason of investment management and other agreements between CG Life, the Plan, Defendants, and other service providers.

181.     TimesSquare received consideration for its own personal account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan in that:

    A.    It received fees as investment manager of the Plan's Fixed Income Fund, S&P 500 Index Fund, Small Cap Growth/TimesSquare Fund, and High Yield Bond Fund pursuant to agreements between TimesSquare and CG Life;

    B.      The above described consideration was received by CIGNA, CG Life, and/or TimesSquare as a result of;

    C.      CIGNA, John Arko, the Committee and/or CG Life contracting with TimesSquare or amending such contract;

    D.      CIGNA, John Arko and/or the Committee contracting with CG Life or amending such contract;

    E.      Participants investing in CG Life separate accounts or the fixed income fund through the Plan; or

    F.      Participants directing previously deposited funds into a CG Life separate account or the fixed income fund through the Plan.

## CLAIMS RELEVANT TO ALL PROHIBITED TRANSACTION ALLEGATIONS

182.    There is no prohibited transaction exemption with which Defendants complied that applies to Plaintiffs' claims.

183.    The total fees paid to CG Life and TimesSquare for their services to the Plan were unreasonable in light of the services provided.  Further, CIGNA, John Arko, and/or the Committee failed to negotiate additional services or rebates from CG Life and TimesSquare on behalf of the Plan.

184.    As set forth above, the Defendants did not compensate the Plan for the use of its assets.

185.    As a result of these prohibited transactions, Defendants have received illicit and improper revenues and profits.

186.    As a result of these breaches, the Plan, Plaintiffs, the Class, and the Plan's participants and beneficiaries have suffered financial losses and damages.

187.    Pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 & 1132, Defendants are personally liable to make good to the Plan for the losses it experienced as a result of Defendants' breaches of fiduciary duty and to disgorge all revenues and profits CIGNA, CG Life, TimesSquare and/or any affiliated entities have received.

188.    Pursuant to ERISA §§409 and 502(a)(2), Defendants are personally liable for any other available and appropriate equitable relief, including disgorgement of all revenues and profits CIGNA, CG Life, TimesSquare and/or any affiliated entities have received; an accounting; prospective injunctive relief and declaratory relief; attorney's fees; and any other relief the court deems appropriate.

189.    Pursuant to ERISA §502(a)(3), the Court must order Defendants to disgorge all revenues and profits CIGNA, CG Life, TimesSquare and/or any affiliated entities have received; to render an accounting and enjoin any act which violates ERISA and/or to order that the Defendants are liable for other appropriate equitable relief to redress such violations and/or enforce the terms of ERISA.

190.    As a result of the foregoing breaches, Defendants received prohibited revenues and profits, and must disgorge such revenues and profits.

191.    In the alternative and in addition to the foregoing, to the extent that CG Life is deemed not to be a fiduciary of the Plans, as a non-fiduciary, CG Life unlawfully received plan assets as a party in interest and may be held liable because of its actual or constructive knowledge of the circumstances that created the unlawful transfer.

192.    Defendants failed to prudently pursue compensation or other remedies for the Plan as a result of breaches of fiduciary duties committed by other Plan fiduciaries including former Plan fiduciaries.

193.    Pursuant to ERISA §405, 29 U.S.C. §1105, Defendants are jointly and severally liable for all such breaches, as well as all those committed by other fiduciaries, in that they:

> A.    knowing that their conduct was a breach of fiduciary duty, knowingly participated in the breach and/or knowingly undertook to conceal it
>
> B.    by breaches of their duties of prudence, loyalty and other obligations under 29 U.S.C. §1104(a)(1) & (2), enabled other fiduciaries to commit a breach of fiduciary duty; and/or
>
> C.    with knowledge of a breach or breaches by other fiduciaries, including past fiduciaries, made no reasonable effort to remedy such breaches.

## DEFENDANTS ARE LIABLE UNDER ERISA FOR THE FOREGOING BREACHES

194.    As a result of the foregoing breaches and all causes of action asserted in the Second Amended Complaint, the Plan, Plaintiffs, the Class, and the Plan's participants and beneficiaries have suffered financial losses and damages.

195.    Pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 & 1132, Defendants are personally liable to make good to the Plan for the losses it experienced as a result of Defendants' breaches of fiduciary duty and to disgorge all revenues and profits CIGNA, CG Life, TimesSquare and/or any affiliated entities have received.

196.    Pursuant to ERISA §§409 and 502(a)(2), Defendants are personally liable for any other available and appropriate equitable relief, including disgorgement of all revenues and profits CIGNA, CG Life, TimesSquare and/or any affiliated entities have received; an accounting; prospective injunctive relief and declaratory relief; attorney's fees; and any other relief the court deems appropriate.

197.     Pursuant to ERISA §502(a)(3), the Court must order Defendants to disgorge all revenues and profits CIGNA, CG Life, TimesSquare and/or any affiliated entities have received; to render an accounting and enjoin any act which violates ERISA and/or to order that the Defendants are liable for other appropriate equitable relief to redress such violations and/or enforce the terms of ERISA.

198.     As a result of the foregoing breaches, Defendants received prohibited revenues and profits, and must disgorge such revenues and profits.

199.     In the alternative and in addition to the foregoing, to the extent that CG Life or TimesSquare are deemed not to be a fiduciaries of the Plan, CG Life and TimesSquare as non-fiduciaries, unlawfully received plan assets as a party in interest and may be held liable because of its actual or constructive knowledge of the circumstances that created the unlawful transfer.

200.     Defendants failed to prudently pursue compensation or other remedies for the Plan as a result of breaches of fiduciary duties committed by other Plan fiduciaries including former Plan fiduciaries.

201.     Pursuant to ERISA §405, 29 U.S.C. §1105, Defendants are jointly and severally liable for all such breaches, as well as all those committed by other fiduciaries, in that they:

      A.     knowing that their conduct was a breach of fiduciary duty, knowingly participated in the breach and/or knowingly undertook to conceal it;

      B.     by breaches of their duties of prudence, loyalty and other obligations under 29 U.S.C. §1104(a), enabled other fiduciaries to commit a breach of fiduciary duty; and/or

      C.     with knowledge of a breach or breaches by other fiduciaries, including past fiduciaries, made no reasonable effort to remedy such breaches.

## COUNT VIII:

### [Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]

202.   Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 201 as though fully set forth here.

203.   In addition to, and as an alternative to, the causes of action stated in Counts I - VII, Plaintiffs seek further relief pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3).

204.   Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

205.   Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

206.   Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

207.   By accepting possession and control over Plan participants' assets, Defendants necessarily have also accepted the obligation to explain and account for every transaction, expenditure, application, and distribution of such assets.

208.   Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

209.　　Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

210.　　As set forth in detail above, Defendants have caused and/or allowed the Plan to pay – directly and via hidden Revenue Sharing transfers and hidden Additional Compensation Streams – excess fees and expenses to Plan service providers – primarily CIGNA subsidiaries. Further, Defendants reaped prohibited profits in the sale of CIGNA's retirement business based upon substantial Plan assets under management.

211.　　Litigating and resolving these issues will involve identifying and reconciling multiple transfers, payments, and flows of Plan assets that occurred while such Plan assets were within Defendants' possession and control.

212.　　Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

213.　　An accounting is a particularly appropriate equitable remedy in circumstances where, as here, the underlying action and accounts are so complicated that a normal action for a fixed sum may not be practical.

214.　　In such an accounting, in light of their possession and control of Plan assets and information about how Plan assets have been applied and distributed, Defendants must bear the burden of proving all Plan transactions and their propriety.

215.　　Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of the Plan and its assets.

216.    Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to CIGNA and/or third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

217.    Plaintiffs respectfully request that the Court charge/surcharge against the Defendants and in favor of the Plan all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA.

218.    Plaintiffs respectfully request that the Court order Defendants to disgorge from CIGNA all profits it received, including profits received by subsidiaries and affiliated companies, in respect of the Plan and all amounts credited to CIGNA for administrative costs which CIGNA was obligated to pay and which Defendants assured Plan participants CIGNA did pay.

219.    Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease so that the Plan's participants and beneficiaries will receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and  declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- find and adjudge that Defendants must disgorge all revenues received from, or in respect of, the Plan;

- award actual monetary losses to the Plan;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies, including monies from the sale of their retirement business, and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA §502(g);

- order costs and attorneys' fees pursuant to ERISA §502(g) and the common fund doctrine and/or under ERISA's fee shifting provision;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R.Civ. P. 38 and the Constitution of the United states, Plaintiffs hereby

demand a trial by jury.

Respectfully submitted,

SCHLICHTER, BOGARD & DENTON

By:   /s/ Daniel V. Conlisk
  Jerome J. Schlichter, 02488116
  Nelson Wolff, 06211943
  Daniel V. Conlisk
  Heather Lea, 5276614
  100 S. Fourth St., Suite 900
  St. Louis, Missouri 63102
  (314) 621-6115
  (314) 621-7151 (Fax)
  jschlichter@uselaws.com
  nwolff@uselaws.com
  dconlisk@uselaws.com
  hlea@uselaws.com


  Belleville Illinois Office
  120 West Main Street, Ste. 208
  Belleville, IL  62220

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2009, I filed this document with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Sari M. Alamuddin
James E. Bayles, Jr.
MORGAN LEWIS & BOCKIUS, LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL  60601

Joseph J. Costello
Morgan Lewis & Bockius, LLP
1701 Market St.
Philadelphia, PA  19103


                              s/ Daniel V. Conlisk