## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| KIM NOLTE, SHERRY LEWIS, and THERESA MITCHELL, individually and as representatives of a class of similarly situated persons, and on behalf of the CIGNA 401(k) Plan, <br><br> Plaintiffs, <br><br> v. <br><br> CIGNA CORPORATION, JOHN ARKO, THE CORPORATE BENEFIT PLAN COMMITTEE OF CIGNA, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, TIMESSQUARE CAPITAL MANAGEMENT, INC., CIGNA INVESTMENTS, INC., AND PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY, <br><br> Defendants. | Case No. 2:07-cv-02046-HAB-DGB <br><br> Judge Harold A. Baker <br><br> Magistrate Judge David G. Bernthal |

## DEFENDANT PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY'S ANSWER TO PLAINTIFFS' THIRD AMENDED COMPLAINT

Defendant Prudential Retirement Insurance and Annuity Company ("PRIAC") herewith files the following Answer to Plaintiffs' Third Amended Complaint (the "Amended Complaint") pursuant to Rules 7 and 8 of the Federal Rules of Civil Procedure. Unless specifically admitted, PRIAC denies each and every allegation against it and denies liability to Plaintiffs. To the extent that Plaintiffs have included headings or impertinent material that are inappropriate under Rules 8 and 12(f) of the Federal Rules of Civil Procedure, no response is necessary and any such inappropriate material should be stricken. In any event, to the extent any headings or inappropriate material are deemed to require a response, PRIAC denies them.

Subject to the foregoing, PRIAC respectfully admits, denies and asserts as follows:

1.      In this action, Plaintiffs and Class Representatives Kim Nolte, Sherry Lewis, and Theresa Mitchell, on behalf of the CIGNA 401(k) Plan (the "Plan") and similarly situated participants and beneficiaries in the Plan, seek to recover the financial losses suffered by the Plan and to obtain injunctive and other equitable relief for the Plan from CIGNA Corporation ("CIGNA" the Plan Sponsor), John Arko, the Corporate Benefit Plan Committee of CIGNA (the "Committee", the Plan Administrator), Connecticut General Life Insurance Company, TimesSquare Capital Management, Inc. (currently known as CIGNA Investments, Inc. f/k/a CIGNA Investment Advisers, Inc.), and CIGNA Investments, Inc. (f/k/a/ CIGNA Investment Advisers, Inc. f/k/a TimesSquare Capital Management, Inc. f/k/a CIGNA Investments, Inc.)[1] (collectively "CIGNA Defendants"), and Prudential Retirement Insurance and Annuity Company ("PRIAC"), based upon breaches of their fiduciary duties.

**ANSWER:**

PRIAC admits that Plaintiffs purport to assert claims on behalf of the CIGNA 401(k)

Plan (the "Plan") and a class of participants and beneficiaries of the Plan, but denies that

Plaintiffs are entitled to any relief on their claims.

2.      As set forth in detail below, Defendants, among other things: (1) undertook a long campaign of self-interested and prohibited transactions by, among other things, retaining CIGNA subsidiaries ("CG Life" and "TimesSquare," indentified below), and PRIAC to serve as the Plan's investment manager and primary service provider, and thereby generating revenues and profits for the benefit of Defendants; (2) caused the Plan to include investment options with fees and expenses - paid by the Plan, and thus borne by Plan participants - that were and are unreasonable and excessive, and not incurred solely for the benefit of the Plan and its participants, but rather to serve Defendants' financial interests; (3) imprudently selected and retained Defendants' separate accounts and the Fixed Income Fund as Plan investment options, so as to serve Defendants' financial and profit interests; (4) invested more than $1 billion of Plan assets directly into Defendants' General Account, even though that investment imposed excessive and undiversified risk upon the Plan; and (5) used Plan assets in Defendants' business by placing more than $2.4 billion with Defendants as assets under management so as to increase the ongoing revenues and profits, including the eventual sale price, of CIGNA's Retirement Business to Prudential while not accounting to the Plan for such use.

**ANSWER:**

PRIAC denies the allegations in paragraph 2 of the Amended Complaint.

3.      Further, as set forth below, Defendants' selection of investment options for the Plan was imprudent and improper because equivalent investment products providing comparable services for dramatically lower fees were available to the Plan, and investment options were unsound and imprudent for this reason and other reasons discussed below. For the fees imposed,

---

[1]      TimesSquare Capital Management, Inc. and CIGNA Investments, Inc. will be collectively referred to as "TimesSquare."

the same as those available to small investors in the retail marketplace, Defendants did not secure for the Plan, and its participants, additional investment advice or other extra services.

**ANSWER:**

PRIAC denies the allegations in paragraph 3 of the Amended Complaint.

4.      By subjecting the Plan and its participants to these self-interested transactions, imprudent investment options, and the accompanying excessive fees and expenses, and by other conduct set forth below, Defendants violated their fiduciary obligations under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 et. seq., and caused damages to the Plan, including losses from the payment of excessive fees, underperformance net of fees, and lost opportunities to recover for the benefit of the Plan for the Plan's contribution to the success of CIGNA subsidiaries and lost opportunities to capture additional compensation streams.

**ANSWER:**

PRIAC denies the allegations in paragraph 4 of the Amended Complaint.

5.      Plaintiffs bring this action pursuant to ERISA §§502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3), which provide that participants may pursue civil actions on behalf of the Plan for damages to remedy breaches of fiduciary duty as set forth in ERISA §409, 29 U.S.C. § 1109, and/or to obtain other appropriate equitable relief.

**ANSWER:**

The allegations in paragraph 5 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC admits that Plaintiffs

purport to bring this action pursuant to ERISA §§ 502(a)(2) & (3), 29 U.S.C. §§ 1132(a)(2) &

(3).  The remaining allegations contained in paragraph 5 of the Amended Complaint purport to

characterize a statute, the terms of which speak for themselves, and, therefore, no further

response is required.

6.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1)(F).

**ANSWER:**

The allegations in paragraph 6 of the Amended Complaint assert legal conclusions to

which no response is required. To the extent a response is required, PRIAC admits that this Court

has jurisdiction over this matter.

      7.     All Defendants are subject to nationwide service of process issued from this Court pursuant to 29 U.S.C. §1132(e)(2).

**ANSWER:**

      The allegations in paragraph 7 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC admits that it is

subject to service of process issued from this Court.

      8.     Venue is proper in this Court pursuant to 29 U.S.C. § 1132(e)(2) because the breaches of fiduciary duty giving rise to this action occurred in this district and the Defendants may be found in this district.

**ANSWER:**

      The allegations in paragraph 8 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC admits that venue of

this action is proper.  PRIAC denies the remaining allegations in paragraph 8.

      9.     **INTRADISTRICT ASSIGNMENT:** Venue is proper in this Division of this Court pursuant to CDIL-LR 40.1(D) in that this case arises out of Kankakee County, Illinois; involves employment benefits provided to CIGNA employees in Kankakee County, Illinois; and a substantial part of Defendants' actions and omissions out of which this action arises occurred in Kankakee County, Illinois and/or were directed at, and had an effect upon, employees and Plan participants in this District and within this Division.

**ANSWER:**

      The allegations in paragraph 9 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC admits that venue of

this action in this division of this Court is proper.  PRIAC denies the remaining allegations in

paragraph 9 of the Amended Complaint.

      10.     Plaintiff and Class Representative Kim Nolte is a resident of Momence, Illinois, and of this District.

**<u>ANSWER:</u>**

Upon information and belief, PRIAC admits the allegations contained in paragraph 10 of

the Amended Complaint.

11.    Plaintiff and Class Representative Sherry Lewis is a resident of Kankakee, Illinois,
and of this District.

**<u>ANSWER:</u>**

Upon information and belief, PRIAC admits the allegations contained in paragraph 11 of

the Amended Complaint.

12.    Plaintiff and Class Representative Theresa Mitchell is a resident of Chebanse, Illinois,
and of this District.

**<u>ANSWER:</u>**

Upon information and belief, PRIAC admits the allegations contained in paragraph 12 of

the Amended Complaint.

13.    Each Plaintiffs and Class Representative is a participant in the Plan.

**<u>ANSWER:</u>**

PRIAC admits that plaintiffs Kim Nolte, Sherry Lewis, and Theresa Mitchell are

participants in the Plan but denies that they are adequate class representatives.

14.    Defendant CIGNA Corporation is based in Philadelphia, Pennsylvania. Pursuant
to ERISA §3(16)(B), CIGNA serves as Plan sponsor either directly or through its co-defendants,
agents or employees.

**<u>ANSWER:</u>**

PRIAC admits that Defendant CIGNA Corporation's headquarters is located in

Philadelphia, Pennsylvania and that Defendant CIGNA Corporation is the Plan's Sponsor within

the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(3(16)(B). Except as expressly admitted

herein, PRIAC denies the allegations contained in paragraph 14 of the Amended Complaint.

15.    CIGNA markets and sells employee-benefits insurance products and, until 2004,

sold employee retirement investment products in all fifty states. It maintains an extensive sales force throughout the United States and internationally.

**ANSWER:**

PRIAC denies the allegations in paragraph 15 of the Amended Complaint.

16.     CIGNA is primarily a holding company. Its operations and business consists of nothing more than its subsidiaries' activities, including those of CG Life and TimesSquare, identified in more detail below.

**ANSWER:**

PRIAC admits that CIGNA Corporation is a holding company.  Except as so admitted,

PRIAC lacks sufficient information to admit or deny the allegations in paragraph 16 and

therefore denies them.

17.     In its December 31, 2004 Form 10-K ("2004 Form 10-K"), CIGNA states that "CIGNA Corporation" is "a holding company and is not an insurance company. Its subsidiaries conduct various businesses ..."

**ANSWER:**

The allegations contained in paragraph 17 of the Amended Complaint purport to

characterize a written document, the terms of which speak for themselves, and, therefore, no

response is required. To the extent a response is required, PRIAC refers to the document cited

therein for the full contents and context thereof.

18.     According to its 2004 Form 10-K, CIGNA considers the segments a single operation: "CIGNA Corporation and its subsidiaries constitute one of the largest investor-owned employee benefits organizations in the United States."

**ANSWER:**

The allegations contained in paragraph 18 of the Amended Complaint purport to

characterize a written document, the terms of which speak for themselves, and, therefore, no

response is required. To the extent a response is required, PRIAC refers to the document cited

therein for the full contents and context thereof.

19.     Simply stated, CIGNA and its subsidiaries are a single, integrated organization. CIGNA's business is owning subsidiaries and collecting revenues and profits from them.

**ANSWER:**

PRIAC lacks sufficient information to admit or deny the allegations in paragraph 19 and

therefore denies them.

20.     Defendant John Arko is the Plan Administrator and a named fiduciary.

**ANSWER:**

PRIAC admits that at one time John Arko was the Plan Administrator and a "named

fiduciary" of the Plan.

21.     Defendant Corporate Benefit Plan Committee of CIGNA (the "Committee") is the named fiduciary of the Plan. CIGNA Corporation appoints the Committee. The Committee is comprised of CIGNA officers and employees.

**ANSWER:**

PRIAC admits that Defendant Corporate Benefit Plan Committee of CIGNA (the

"Committee") is a named fiduciary of the Plan.  PRIAC further admits that the Committee is

appointed by CIGNA Corporation and comprised of several CIGNA Corporation employees in

the corporate finance, operations and employee benefits units.  PRIAC denies the remaining

allegations contained in paragraph 21 of the Amended Complaint.

22.     Until 2004, Defendant Connecticut General Life Insurance Company ("CG Life") was a subsidiary of CIGNA. In 2004, CIGNA sold CG Life to Prudential, Inc and Defendant Prudential Retirement Insurance and Annuity Company ("PRIAC"), a subsidiary of Prudential Financial, Inc.

**ANSWER:**

PRIAC denies the allegations contained in paragraph 22 of the Amended Complaint.  By

way of further answer, PRIAC affirmatively states that on April 1, 2004, CIGNA Corporation

sold its retirement business to Prudential Financial, Inc., and PRIAC was created.

23.     Until 2004, CG Life, for a profit that inured to the benefit of CIGNA, served as the

Plan's investment manager, recordkeeper and primary administrative service provider.

**ANSWER:**

PRIAC lacks sufficient information to admit or deny the allegations in paragraph 23 of the Amended Complaint and therefore denies them.

24.     From 2004 to the present, Defendant PRIAC has served as the Plan's investment manager, recordkeeper and primary administrative service provider. Except for the CIGNA stock fund, all Plan assets are invested in either PRIAC's general account (the Fixed Income Fund) or one of 20 PRIAC-owned separate accounts.

**ANSWER:**

PRIAC admits that, subsequent to April 1, 2004, PRIAC has provided plan-level administrative and account record keeping services to the Plan.  PRIAC further admits that for certain of the separate accounts in the Plan's lineup it has been responsible for the selection, oversight, and de-selection of the registered investment advisor and for others it has been responsible only for selection and oversight.  In addition, PRIAC admits that certain of the Plan's assets are invested in the CIGNA stock fund, the Fixed Income Fund, and PRIAC separate accounts.  Except as expressly admitted herein, PRIAC denies the allegations in paragraph 24 of the Amended Complaint.

25.     Until 2004, Defendant TimesSquare was a subsidiary of CIGNA. TimesSquare was wholly owned by CIGNA and its employees participated in the Plan.

**ANSWER:**

PRIAC admits that prior to April 2004, employees of TimesSquare could participate in the Plan.  PRIAC denies the remaining allegations in paragraph 25 of the Amended Complaint.

26.     In 2004, CIGNA sold TimesSquare to certain of its officers and employees who, Plaintiffs are informed and believe, were CIGNA insiders and affiliated managers.

**ANSWER:**

PRIAC lacks sufficient information to admit or deny the allegations in paragraph 26 and

therefore denies them.

27.     Before 2004, TimesSquare, for profit which inured to the benefit of CIGNA, was the investment manager of the Plan's Fixed Income Fund, S&P 500 Index Fund, Small Cap Growth/TimesSquare Fund, and High Yield Bond Fund. This placed more than two-thirds of the Plans' assets under the management of TimesSquare.

**ANSWER:**

PRIAC admits that CG Life retained TimesSquare to provide fund management services

for the Small Cap Growth/TimesSquare Fund, S&P 500 Index Fund and, until at least October

31, 2002, the TimesSquare High Yield Bond Fund.  PRIAC denies the remaining allegations in

paragraph 27 of the Amended Complaint.

28.     CG Life, TimesSquare and another subsidiary, Global Portfolio Strategies, Inc. ("Global") comprised CIGNA's "Retirement Business."

**ANSWER:**

PRIAC admits that prior to April 1, 2004 CG Life and Global Portfolio Strategies, Inc.

("Global") were indirect subsidiaries of CIGNA Corporation, and were part of CIGNA

Corporations' retirement business.  PRIAC denies the remaining allegations in paragraph 28 of

the Amended Complaint.

29.     ERISA §2(21)(A) , 29 U.S.C. §1002(21)(A), provides, in part, that "a person is a fiduciary with respect to a plan to the extent

> (i)     he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
>
> (ii)    he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
>
> (iii)   he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105 (c)(1)(B) of this title."

**ANSWER:**

The allegations contained in paragraph 29 of the Amended Complaint purport to characterize a statute, the terms of which speak for themselves, and, therefore, no response is required. To the extent a response is required, PRIAC refers to the statute cited therein for the full contents and context thereof.

30.    Pursuant to 29 C.F.R. §2510.3-101(H)(1)(iii), the Plan's assets include an undivided interest in the underlying assets of CG Life's separate accounts.

**ANSWER:**

The allegations in paragraph 30 of the Amended Complaint assert legal conclusions to which no response is required. To the extent a response is required, PRIAC admits that prior to April 1, 2004, Plan assets (except those invested in the CIGNA Stock Fund) were, under the group annuity contract, invested in either CG Life's General Account (Fixed Income Fund) or in CG Life separate accounts. PRIAC denies the remaining allegations in paragraph 30 of the Amended Complaint.

31.    CG Life is a Plan fiduciary in that it was the investment manager of the Plan and of CG Life's separate accounts, the underlying assets of which are Plan assets. It thus exercises discretionary control respecting the Plan's assets and the disposition of those assets.

**ANSWER:**

The allegations in paragraph 31 of the Amended Complaint assert legal conclusions to which no response is required. To the extent a response is required, PRIAC denies the allegations in paragraph 31.

32.    TimesSquare is a Plan fiduciary in that it was the investment manager/advisor to the Plan's Fixed Income Fund, the S&P 500 Index Fund, High Yield Bond Fund and the Small Cap Growth/TimesSquare Fund, each of which are CG Life separate accounts. The underlying assets of these separate accounts are Plan assets. TimesSquare manages and invests those assets and thus exercises discretionary control respecting the Plan's assets and the disposition of those assets.

**ANSWER:**

The allegations in paragraph 32 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies the allegations in paragraph 32.

33.    PRIAC is a Plan fiduciary and has acknowledged that it is a Plan fiduciary with respect to the operation of the Plan's separate account investment options, including the institutionally managed funds, and the Plan's alliance mutual funds. As the Plan's overall investment manager, PRIAC was and continues to be responsible for the selection, monitoring, and removal of sub-advisors to manage the assets of the Plan, and has continuously exercised this discretionary authority and control since 2004. PRIAC was and continues to be responsible for the selection and monitoring of Plan investment options, and has continuously exercised this discretionary authority and control since 2004.

**ANSWER:**

The allegation in paragraph 33 of the Amended Complaint that "PRIAC is a Plan fiduciary" asserts legal conclusions to which no response is required.  PRIAC admits that, subsequent to April 1, 2004, PRIAC has provided plan-level administrative and account record keeping services to the Plan.  PRIAC further admits that for the institutional sub-advised accounts in the Plan's lineup, it has been responsible for the selection, oversight, and de-selection of the registered investment advisor and for other separate accounts it has been responsible only for selection and oversight.  In addition, PRIAC admits that it has acknowledged certain fiduciary responsibilities with respect to the Plan but denies that it has had fiduciary status relevant to the claims asserted in the Amended Complaint.  Except as expressly admitted herein, PRIAC denies the allegations in paragraph 33 of the Amended Complaint.

34.    PRIAC is also the Plan's recordkeeper and primary administrative service provider, and a substantial portion of the administrative fees it collects come from the Plan's investment options. Because PRIAC has the authority and responsibility to select, retain or replace the sub-advisors, PRIAC has been granted effective authority and control to set the level of its own compensation for providing administrative services.

**ANSWER:**

PRIAC admits that, subsequent to April 1, 2004, PRIAC has provided plan-level

administrative and account record keeping services to the Plan.  PRIAC further admits that for

the institutional sub-advised accounts in the Plan's lineup, it has been responsible for the

selection, oversight, and de-selection of the registered investment advisor and for other separate

accounts it has been responsible only for selection and oversight.  Except as expressly admitted

herein, PRIAC denies the allegations in paragraph 34 of the Amended Complaint.

35.     Pursuant to ERISA §502(a), actions for violations of the obligations defined in §409(a) may be brought my the Secretary of Labor, plan participants, beneficiaries, or fiduciaries, but must be brought on behalf of the Plan.

**ANSWER:**

The allegations contained in paragraph 35 of the Amended Complaint purport to

characterize a statute, the terms of which speak for themselves, and, therefore, no response is

required.  To the extent a response is required, PRIAC refers to the statute cited therein for the

full contents and context thereof.

36.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Plan, themselves and all similarly situated Plan participants and beneficiaries. The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant or beneficiary, has an interest. Plaintiffs seek to represent the following (the "Class"):

All persons, *excluding the Defendants, and/or other individuals who are or may be liable for the conduct described in this Complaint*, who were or are participants or beneficiaries of the Plan and who were, are or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

**ANSWER:**

PRIAC admits that Plaintiffs purport to assert their claims on behalf of a class consisting

of the individuals described in paragraph 36 of the Amended Complaint but denies that class

certification is appropriate.  PRIAC further admits that under the terms of the Plan, a Trust shall

be established for the purposes of holding, managing and administering all monies and other

properties held by the Trustee for the exclusive benefit of the Participants and their Beneficiaries,

and all contributions under the Plan and all assets of the Plan shall be held in this Trust.  PRIAC

denies the remaining allegations in paragraph 36 of the Amended Complaint.

37.    Certification of this Class is proper under Rule 23 (a) in that:

A.    **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the Plan's public documents state that, at the end of the 2007 Plan year, there were 40,825 participants with account balances in the Plan.

B.    **Commonality**. Common issues of fact and law predominate over any issues unique to individual Class members. As set forth in detail below, issues that are common to all Class Members include, but are not limited to, that Defendants:

i.    Failed to discharge their duties solely in the interest of the Plan and its participants;

ii.    Failed to exercise the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

iii.    Used Plan assets in their own interest and not for the exclusive purpose of providing benefits to participants and beneficiaries and defraying the reasonable expenses of administering the Plan;

iv.    Failed to conduct themselves with the utmost good faith, loyalty and fidelity;

v.    Failed to prudently monitor recordkeeping fees for reasonableness;

vi.    Fraudulently concealed excessive recordkeeping and administrative fees in their communication with Plan participants;

vii.    Selected and retained investment options that imposed excessive and unreasonable fees, including fees for the benefit of Defendants;

viii.    Subjected the Plan to such unreasonably expensive options when the Plan's enormous size and bargaining power enable Defendants

to secure the same investments at a fraction of the cost;

ix.  Imposed excessive and unreasonable additional fees, *in addition to* these unreasonable management and extra fees, for the benefit of Defendants;

x.  Failed to secure, for the excessive fees imposed upon the Plan, additional investment advice or other services for Plan participants;

xi.  Selected and retained investment options for reasons other than furthering the economic interests of the Plan;

xii.  Failed to properly prescreen investment options; selected and retained investment options that a responsible fiduciary would exclude; and imposed on participants the unreasonable burden of having to screen investment options when they lack the resources and expertise to do so;

xiii.  Selected and retained Defendants' subsidiaries as investment managers of investment options so as to funnel additional and excessive fees to Defendants in addition to Defendants' wrap fee;

xiv.  Selected and retained Defendants' Fixed Income Fund so as to provide financial and other benefits to Defendants and their subsidiaries while subjecting the Plan and its participants to excessive, undiversified and avoidable risk;

xv.  Subjected the Plan to the control and discretion of fiduciaries laboring under conflicts of interest;

xvi.  Selected and retained investment options operated by officers and employees of Defendants' affiliates who were also officers and employees of Defendants, and thus who had a direct financial interest in managing Plan assets for the benefit of Defendants;

xvii.  Used their authority, discretion and control in connection with the Plan to advance their own interest;

xviii.  Subjected the Plan assets to control and discretion of investment managers with conflicting loyalties;

xix.  Failed to compensate the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in their business and/or for their benefit;

xx.  Failed to account to the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

xxi.      Failed, even in the absence of a breach of fiduciary duty, to account for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

xxii.     For the benefit of Defendants and to the detriment of the Plan, included the Fixed Income Fund as the Plan's largest investment option, and thereby caused well in excess of a billion dollars of Plan assets to be used as working capital in Defendants' General Accounts so as to support and fund Defendants' (and the Retirement Business') business and operations;

xxiii.    For the benefit of Defendants and to the detriment of the Plan, included CG Life's Fixed Income Fund as the Plan's largest investment option and, by doing so, effectively extended a loan of Plan assets to Defendants and the Retirement Business to support and funds their business and operations;

xxiv.     For the benefit of Defendants and to the detriment of the Plan, included virtually exclusively Defendants' separate accounts and Defendants' Fixed Income Fund as Plan investment options, and thereby provided more than $2.4 billion in assets under management to Defendants and the Retirement Business;

xxv.      For the benefit of Defendants and to the detriment of the Plan, included virtually exclusively Defendants' separate accounts and Defendants' Fixed Income Fund as investment options, and thereby caused Plan assets to be used as Defendants' assets under management which were the "key driver" of the Retirement Business' earnings;

xxvi.     For the benefit of Defendants and to the detriment of the Plan, included virtually exclusively Defendants' separate accounts and Defendants' Fixed Income Fund as investment options, and thereby used Plan assets to enhance the value of, and increase the sale price of, the Retirement Business;

xxvii.    Through the Fixed Income Fund and thus Defendants' General Accounts, effectively provided a loan in excess of $1 billion to the Retirement Business and Defendants to support and fund their general operations;

xxviii.   Through the use of Plan assets, enhanced the value and increased the sale price of the Retirement Business as a going concern;

xxix.     Received revenues and profits from the use of Plan assets in their business;

xxx.    Failed to account to the Plan for the revenues and profits
Defendants received in connection with such uses of Plan assets;

xxxi.    Failed to compensate the Plan for such use of Plan assets;

xxxii.    Caused or allowed service providers to receive excess and
unreasonable compensation by retaining Additional Compensation
Streams in addition to other compensation;

xxxiii.    Deprived the Plan of the benefit of earnings, proceeds and other
income generated from, or in respect of, Plan assets; and caused or
allowed Defendants to receive additional and excess compensation
for the benefit of Defendants;

xxxiv.    Failed to properly monitor the fees and expenses paid by the Plan;

xxxv.    Manipulated, misrepresented and/or disguised the nature of fees
and expenses incurred by the Plan and that they were imposed for
Defendants' benefit to the detriment of the Plan;

xxxvi.    Failed to disclose that hidden and excessive fees were and are
being assessed against Plan assets and paid to Defendants', and by
failing to stop such fees;

xxxvii.    In charging, causing to be charged or paid, and failing to monitor
the fees and expenses of the Plan, failed to exercise the care, skill,
prudence, and diligence that a prudent person would when acting
in like capacity and familiar with such matters;

xxxviii.    Imprudently invested in separately managed accounts which in
turn invested in mutual funds and other investment products, thus
imposing an additional layer of management fees without
providing any additional services of value;

xxxix.    Engaged in prohibited transactions that they knew, or should have
known, constituted direct, or indirect, furnishing of services
between the Plan and Defendants;

xl.    Engaged in prohibited transactions that they knew, or should have
known, constituted direct, or indirect, transfer to, or use by, or for
the benefit of Defendants, assets of the Plan;

xli.    Engaged in prohibited transactions when they dealt with the assets
of the Plan in their own interest and for their own accounts;

xlii.    Engaged in prohibited transactions when in their individual and
corporate capacities as officers, directors, employees and/or agents
of Defendants, acted in transactions involving the Plan on behalf of

Defendants whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries;

xliii.   Engaged in prohibited transactions when they received consideration for their own personal account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan;

xliv.   By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xlv.   Are liable to the Plan and the Class for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations;

xlvi.   Must disgorge all fees and other revenues paid to them by, or derived from, the Plan; and

xlvii.   Are responsible to account for the assets and transactions of the Plan and should be charged/surcharged for any transactions and payments for which they cannot account or which were not proper uses of Plan assets.

C.   **Typicality**. The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant, has an interest. The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

i.   The Defendants owed the exact same fiduciary and other ERISA¬based obligations to each Plan participant and beneficiary, and each member of the Class;

ii.   The Defendants' breach of those obligations constitutes a breach to each participant and beneficiary, and each member of the Class; and

iii.   Any recovery or other remedy secured in this action will inure to the benefit of the Plan.

D.   **Adequacy of Representation**. The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class' claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

**ANSWER:**

The allegations in paragraph 37 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies the allegations in paragraph 37.

38.     Class certification is also appropriate under Rule 23(b) and each subpart in that:

A.     Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B.     Pursuant to Rule 23(b)(1)(B), in the absence of certification, there is a risk that adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications;

C.     Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

D.     Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

**ANSWER:**

The allegations in paragraph 38 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies the allegations in paragraph 38.

39.     The Plan is a "defined contribution plan," as defined in ERISA §3(34), 29 U.S.C. § 1002(34), and contains or is part of an "eligible individual account plan" under ERISA §407(d)(3)(A), 29 U.S.C. § 1 107(d)(3)(A). It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

**ANSWER:**

PRIAC admits the allegations in paragraph 39 of the Amended Complaint.

40.     CG Life, TimesSquare, PRIAC, and their affiliates were and are the Plan's investment managers.

**ANSWER:**

PRIAC admits that, subsequent to April 1, 2004, for certain of the separate accounts in the Plan's lineup it has been responsible for the selection, oversight, and de-selection of the registered investment advisor and for others it has been responsible only for selection and oversight.  Except as expressly admitted herein, PRIAC denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendants charged fees to each investment option in addition to the management fees charged by the managers (the "sub-advisors") of the underlying investments.

**ANSWER:**

PRIAC admits that for certain funds CG Life charged annual fees of varying percentages of fund assets to cover its own administrative expenses as well as the fees it paid to fund managers.  PRIAC further admits that until January 1, 2005, CG Life was paid annual fees under a group annuity contract and that for the Barclays Equity Market Index Fund an annual fee was charged to manage the fund.  In addition, PRIAC admits that for certain funds it charges annual fees of varying percentages of fund assets to cover the fees it pays to sub-advisors and for the provision of services to the Plan, including PRIAC's (a) establishment and operation of the Plan's separate accounts, (b) monitoring and reporting on the performance of the institutional sub-advised accounts as part of its Manager-of-Managers Program and DDA Program, and (c) maintaining records of investments for the Plan.  PRIAC also admits that, subsequent to January 1, 2005, it has been paid annual fees under a group annuity contract.  PRIAC denies the remaining allegations in paragraph 41 of the Amended Complaint.

42.     CG Life, TimesSquare, and PRIAC did not actually provide necessary or valuable investment management services. Instead, the sub-advisors provided investment management services and received a portion of the fund's expense ratio, the balance of which was paid to Defendants.

**ANSWER:**

PRIAC admits that CG Life, TimesSquare and PRIAC were compensated for Plan-level

services they provided to the Plan.  PRIAC denies the remaining allegations in paragraph 42 of

the Amended Complaint.

43.     As a result, the Plan and its participants were forced to pay both: (1) excessive and imprudent fees to the underlying managers (as discussed below); and (2) an additional fee imposed for the benefit of Defendants (a "wrap fee" discussed below).

**ANSWER:**

PRIAC denies the allegations in paragraph 43 of the Amended Complaint.

44.     Contrary to the duty of plan fiduciaries to operate the Plan for the exclusive benefit of plan participants, these additional fees directly benefitted Defendants.

**ANSWER:**

PRIAC denies the allegations in paragraph 44 of the Amended Complaint

45.     These fees were unnecessary and imprudent in that the Plan could have invested directly with the sub-advisor and, in doing so, received the same or superior services while avoiding Defendants' additional fees.

**ANSWER:**

PRIAC denies the allegations in paragraph 45 of the Amended Complaint.

46.     The only reason for structuring the investments was to allow Defendants to charge additional, needless fees so as to provide revenue and profit to Defendants.

**ANSWER:**

PRIAC denies the allegations in paragraph 46 of the Amended Complaint.

47.     The fees received by the sub-advisors were also imprudent and excessive in that Defendants could have, and should have, secured lower fees by investing in the sub-advisor's institutional investment products or similar institutional investment products with equivalent services and dramatically lower fees.

**ANSWER:**

PRIAC denies the allegations in paragraph 47 of the Amended Complaint.

48.     Until approximately December 2000, Plan participants could contribute up to 25% of their eligible earnings to the Plan and invest in eleven investment options that Defendants selected for inclusion in the Plan. Of these, nine were CG Life "separate accounts" that CG Life operated, for a profit, to benefit CIGNA rather than for the exclusive benefit of plan participants. The other two investment options were the CG Life Fixed Income Fund, which invested directly in CG Life's General Account, and the CIGNA Stock Fund.

**ANSWER:**

PRIAC admits that two investment options in the Plan were the Fixed Income Fund and the CIGNA Stock Fund and that until January 1, 2005, the Fixed Income Fund was a group annuity contract with CG Life.  PRIAC denies the remaining allegations contained in paragraph 48 of the Amended Complaint.

49.     From 2001 and thereafter, upon enrollment Plan participants could contribute 25% of their eligible earnings to the Plan and invest in twenty-two investment options that Defendants had selected for inclusion in the Plan. Of these, twenty were Defendants' separate accounts. The other two were Defendants' Fixed Income Fund, which invested directly in Defendants' General Account, and the CIGNA Stock Fund.

**ANSWER:**

PRIAC admits that starting on September 15, 2001 the Plan had 22 investment options. PRIAC further admits that 15 of the options were CG Life separate accounts, five were Custom Funds which contained a mixture of the Fixed Income Fund and six CG Life separate accounts, and the remaining two investment options in the Plan were the Fixed Income Fund and the CIGNA Stock Fund.  PRIAC also admits that, until January 1, 2005, the guarantees provided by the Plan's Fixed Income Fund investment option were provided through a group annuity contract with CG Life.  PRIAC admits that, subsequent to April 1, 2004, the Plan had 22 investment options.  PRIAC denies the remaining allegations in paragraph 49 of the Amended Complaint.

50.     Each investment option in the Plan imposed excessive fees for the investment management services provided and, in addition, paid fees on top of these investment management fees, directly or indirectly, to Defendants.

**ANSWER:**

PRIAC denies the allegations in paragraph 50 of the Amended Complaint.

51.     Each expense ratio was excessive and included extra assessments, collected for the benefit of Defendants, which were wholly unnecessary and bore no relation to the services provided.

**ANSWER:**

PRIAC denies the allegations in paragraph 51 of the Amended Complaint.

52.     As set forth below, in 2004, after having placed Plan participants in its own products using their retirement assets as seed capital, CIGNA sold its Retirement Business to PRIAC.

**ANSWER:**

PRIAC denies the allegations in paragraph 52 of the Amended Complaint.  By way of

further answer, PRIAC affirmatively states that on April 1, 2004, CIGNA Corporation sold its

retirement business to Prudential Financial, Inc.

53.     As a result of that sale, PRIAC replaced CG Life, became a fiduciary to the Plan, and provided the same services to the Plan as CG Life had provided before the sale.

**ANSWER:**

The allegation in paragraph 53 of the Amended Complaint that PRIAC "became a

fiduciary to the Plan" asserts legal conclusions to which no response is required.  To the extent a

response is required, PRIAC admits that it has acknowledged certain fiduciary responsibilities

with respect to the Plan but denies that it has had fiduciary status relevant to the claims asserted

in the Amended Complaint.  PRIAC further admits that immediately after the April 1, 2004 sale

discussed in paragraph 52 above, PRIAC began providing the Plan with the record keeping and

administrative services that CG Life had previously provided, although CG Life remained the

issuer of the group annuity contract under which the Plan's assets were accumulated and

managed until January 1, 2005.  Except as expressly admitted herein, PRIAC denies the

allegations contained in paragraph 53 of the Amended Complaint.

54.     As a result of this sale, the Plan's investment options nominally changed. They remained in the same funds with the same investment managers, with very few exceptions. After the sale, they were renamed PRIAC separate accounts.

**ANSWER:**

PRIAC admits that with the exception of the Small Cap Growth/TimesSquare Fund and the S&P 500 Fund, the fund managers of the Plan's investments options were the same immediately before and after the April 1, 2004 sale of CIGNA's retirement business to Prudential Financial, Inc.  By way of further response, PRIAC affirmatively states that Quantitative Management Associates became the fund manager for the S&P 500 Fund on April 1, 2004 and that since that date Prudential Investment Management, Inc. has managed the investments that support the guarantees offered by the Plan's Fixed Income Fund.  PRIAC also admits that effective January 1, 2005, the PRIAC separate accounts replaced the CG Life separate accounts.  Except as expressly admitted herein, PRIAC denies the allegations in paragraph 54 of the Amended Complaint.

55.     Since CIGNA sold its Retirement Business, the Plan's investment options have had lower fees because CIGNA's self-interest in adding excessive fees has been reduced:

| Name of Fund | Cigna Expense Ratio | PRIAC Expense Ratio | Excess reduced |
|---|---|---|---|
| Dryden S&P 500 Index Fund | 20 bps | 17 bps | 3 bps |
| Small Cap Value / Perkins, Wolf, McDonnell Fund | 95 bps | 90 bps | 5 bps |
| Large Cap Growth / Goldman Sachs Fund | 70 bps | 61 bps | 9 bps |
| Small Cap Growth / TimesSquare Fund | 95 bps | 91 bps | 4 bps |
| Barclays Equity Market Index Fund | 35 bps | 25 bps | 10 bps |
| Mid Cap Value / Wellington Mgmt Fund | 90 bps | 80 bps | 10 bps |
| Mid Cap Blend / New | 90 bps | 80 bps | 10 bps |

| Name of Fund | Cigna Expense Ratio | PRIAC Expense Ratio | Excess reduced |
|---|---|---|---|
| Amsterdam Partners Fund | | | |
| State Street Global Advisors EAFE Index Fund | 35 bps | 30 bps | 5 bps |
| Large Cap Value / Wellington Mgmt Fund | 70 bps | 60 bps | 10 bps |
| Mid Cap Growth / Artisan Partners Fund | 90 bps | 80 bps | 10 bps |
| High Yield Bond / Caywood-Scholl Fund | 95 bps | 57 bps | 38 bps |
| International Blend / Boston Co. Fund | 100 bps | 96 bps | 4 bps |
| Large Cap Value / John A. Levin & Co. Fund | 70 bps | 60 bps | 10 bps |
| CIGNA Custom 40 Fund | 91 bps | 76 bps | 15 bps |
| International Growth / Artisan Partners Fund | 100 bps | 95 bps | 5 bps |
| CIGNA Custom 50 Fund | 92 bps | 76 bps | 16 bps |
| CIGNA Custom 30 Fund | 90 bps | 76 bps | 14 bps |
| Large Cap Growth / RCM Fund | 70 bps | 60 bps | 10 bps |
| CIGNA Custom 20 Fund | 89 bps | 76 bps | 13 bps |
| CIGNA Custom 60 Fund | 95 bps | 75 bps | 20 bps |

**ANSWER:**

PRIAC admits that subsequent to the sale of CIGNA's retirement business to Prudential

Financial, Inc. on April 1, 2004, fees for the Plan's investment options decreased.  PRIAC denies

all other allegations in paragraph 55 of the Amended Complaint.

56.    Although PRIAC, a company not formally affiliated with CIGNA, charged lower
fees than those CIGNA charged to its own employees, PRIAC's expense ratios and fees derived
from the Plan were and are still unreasonably excessive as set forth below, causing millions of
dollars of excessive fees.

**ANSWER:**

PRIAC admits that it is not affiliated with CIGNA and that subsequent to the sale of

CIGNA's retirement business to Prudential Financial, Inc. on April 1, 2004, fees for the Plan's

investment options decreased.  PRIAC denies all other allegations in paragraph 56 of the

24

Amended Complaint.

57.     Defendants are bound by ERISA's imposition of a fiduciary duty that has been characterized as "the highest known to law." Defendants' fiduciary obligations require that, at all times, they must:

A.     conduct themselves with the utmost good faith, loyalty and fidelity;

B.     act with the sole purpose of advancing the interests of the Plan, its participants and beneficiaries;

C.     without request, fully disclose to, and inform participants of, all material information and all information participants need to know to understand and protect their interests in the Plan;

D.     discharge their duties with the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying the reasonable cost of administering the Plan;

E.     ensure, at all times, that Plan assets are never used for the benefit of the plan sponsor or other fiduciaries;

F.     scrupulously avoid conflicts of interests, self-dealing and prohibited transactions;

G.     never use their authority, discretion and control in connection with the Plan to advance their own interest;

H.     account to the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

I.     compensate the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

J.     disgorge any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

K.     even in the absence of a breach of fiduciary duty, account for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit;

L.     consider only the economic interests of the Plan in selecting Plan investment options;

M.     exercise the care, skill, prudence and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

N.     diversify the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so;

O.     properly prescreen investment options so as not to include investment options that a responsible fiduciary would exclude;

P.     properly prescreen investment options and avoid placing on participants the unreasonable burden of having to screen investment options when they lack the resources and expertise to do so; and

Q.     use the enormous bargaining and purchasing power of a multi-billion dollar 401(k) plan to secure investment options in the wholesale, institutional investment marketplace and/or to secure additional investment advice or other extra services for participants so as to lower participants' cost of participation to wholesale levels if non-institutional investment vehicles are included.

**ANSWER:**

The allegations in paragraph 57 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC references the fiduciary provisions of ERISA and denies all allegations in paragraph 57 of the Amended Complaint to the extent they are inconsistent with those provisions.

58.     Defendants have not disclosed, and/or have affirmatively concealed, a litany of material information including:

A.     That Defendants had engaged in a long campaign of self-interested transactions designed to reap prohibited profits from the Plan and its assets for Defendants and/or related entities;

B.     That the Plan's size and asset value enabled Defendants to provide lower-priced investment options;

C.     That the fees charged and funneled to Defendants were depriving participants of the opportunity to receive market returns;

D.     That the excessive fees and expenses assessed against their accounts, and paid to Defendants, substantially would undermine the value of participants' retirement savings over time;

E.      That Plan service providers - primarily CIGNA subsidiary CG Life and PRIAC - collected "soft dollars" from participants' accounts which included asset-based charged for recordkeeping services which became increasingly excessive as assets in the Plan grew;

F.      That wrap fees were, and are, being assessed against the Plan but not being used to benefit the Plan, but rather to benefit Defendants;

G.      That Plan service providers were and/or are receiving excess payments via Additional Compensation Streams, and that such monies were available for the benefit of the Plan but not captured;

H.      That the expense ratios charged in Plan investment options were and are inflated to collect soft dollars and wrap fees and are not used for the investment management and operation of the investment option/Fund, (i.e. the ostensible purpose for the imposition of such fees);

I.      That the expense ratios of Plan investment options/Funds were and are inflated to collect soft dollars for the purpose of providing wrap fees so that the stated expense ratio is not the true and accurate cost of investing in the investment option/Fund;

J.      How much each service provider is paid with Plan assets, derived from participants' accounts, when wrap fees and Additional Compensation Streams are considered;

K.      That the total amount paid to services providers is not reasonable in light of the services provided and incurred solely for participants' benefit;

L.      That plan fiduciaries have forgone Additional Compensation Streams available in connection with Plan investment options, and thereby unnecessarily increased the expenses which Plan participants otherwise must bear;

M.      The true and accurate amount of recordkeeping and administrative fees that are assessed against participants' accounts in the Plan; in that Plan record-keepers and administrators receive are paid only in soft dollars collected;

N.      The true and accurate price of Plan investment options/Funds;

O.      The true and accurate amount of fees paid to investment managers *for actual investment management services* (*i.e.* the actual amount of investment management being purchased) in any Plan investment option/Fund;

P.      In actively-managed investment options/Funds, the actual amount of active management services that Plan participants are purchasing, in that

the inclusion of undisclosed soft dollar assessments in actively-managed investment options/Funds renders participants incapable of knowing whether the higher fees charged are actually used for active investment management rather than to funnel additional revenue to Defendants;

Q.    The fact that soft dollar payments of Plan assets, derived from participants' accounts, are masking prohibited transactions and/or conflicts of interests between or among Plan fiduciaries and service provider; and

R.    That Defendants based investment decisions on factors other than the economic interest of the Plan.

**ANSWER:**

The allegations contained in paragraph 58 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required. To the extent a response is required, PRIAC refers to the documents referenced therein for the full contents and context thereof.  PRIAC denies all other allegations in paragraph 58 of the Amended Complaint.

59.    Because the Defendants failed and refused to provide them with this information, and concealed this information from them, Plan participants have lacked the information necessary for them: (a) to understand and protect their interests in the Plan; (b) to have knowledge regarding the Defendants' breaches of fiduciary duty; and (c) to have reason to believe they should make inquiry about those breaches and the facts underlying them.

**ANSWER:**

PRIAC denies the allegations in paragraph 59 of the Amended Complaint.

60.    Defendants know that Plan participants lack such information and knowledge.

**ANSWER:**

PRIAC denies the allegations in paragraph 60 of the Amended Complaint.

61.    In their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated. As ERISA fiduciaries, Defendants have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

**ANSWER:**

The allegations in paragraph 61 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies the allegations in paragraph 61.

62.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 61 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 61 as its answer to paragraph 62 of the Amended Complaint.

63.     The Plan's recordkeeper, CG Life, was an affiliate of CIGNA.

**ANSWER:**

PRIAC admits that CG Life was an indirect subsidiary of CIGNA Corporation and at one time provided record keeping services to the Plan.  Except as expressly admitted herein, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 63 and therefore denies them.

64.     CG Life's compensation for recordkeeping was "wrapped" into a variable group annuity contract.

**ANSWER:**

PRIAC admits that until January 1, 2005, CG Life was paid annual fees under a group annuity contract.  Except as expressly admitted herein, PRIAC denies the remaining allegations in paragraph 64 of the Amended Complaint.

65.     In these variable annuity contracts, Defendants selected investment vehicles and/or managers - either retail mutual funds or investments that mirror retail mutual funds in their features and services - and imposed an additional fee on top of the funds' expense ratio. This process is known as "wrapping" the mutual fund. The extra fees imposed are called "wrap fees."

**ANSWER:**

PRIAC denies the allegations in paragraph 65 of the Amended Complaint.

66.     As investments, therefore, annuities are inherently inferior to straight investment in the underlying investment vehicles, because they are more expensive.

**ANSWER:**

PRIAC denies the allegations in paragraph 66 of the Amended Complaint.

67.     The fees for these contracts in the Plan were asset-based and, accordingly, increased as the amount of assets grew over time.

**ANSWER:**

PRIAC admits that for certain funds it charges annual fees of varying percentages of fund assets to cover the fees it pays to sub-advisors and for the provision of services to the Plan, including PRIAC's (a) establishment and operation of the Plan's separate accounts, (b) monitoring and reporting on the performance of the institutional sub-advised accounts as part of its Manager-of-Managers Program and DDA Program, and (c) maintaining records of investments for the Plan.  PRIAC also admits that, subsequent to January 1, 2005, it has been paid annual fees under a group annuity contract.  PRIAC denies all other allegations in paragraph 67 of the Amended Complaint.

68.     Defendants failed to prudently monitor these fees for reasonableness.

**ANSWER:**

PRIAC denies the allegations in paragraph 68 of the Amended Complaint and specifically denies that PRIAC had any responsibility under ERISA with respect to the monitoring of its own fees.

69.     In 2002, CG Life was paid $14 million for providing these services.

**ANSWER:**

Paragraph 69 of the Amended Complaint relates solely to the CIGNA Defendants and

30

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 69 and therefore denies

them.

70.    Of that amount, $10 million came from fees on the fixed income fund alone.

**ANSWER:**

Paragraph 70 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 70 of the Amended

Complaint and therefore denies them.

71.    CG Life's compensation was excessive for the services the Plan received from CG
Life.

**ANSWER:**

Paragraph 71 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC denies

the allegations in paragraph 71 of the Amended Complaint.

72.    CG Life's asset-based compensation for recordkeeping services was excessive.
The costs of recordkeeping services do not increase commensurately with the amount of assets
in the Plan. Ongoing increases in Plan assets caused recordkeeping fees to be excessive, and to
consistently become more so.

**ANSWER:**

Paragraph 72 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond. To the extent a response is required, PRIAC denies

the allegations in paragraph 72 of the Amended Complaint.

73.    After PRIAC replaced CG Life as the Plan's recordkeeper in 2004, the Plan's
recordkeeping and administrative fees continued to be unreasonable and excessive for the
services the Plan received from PRIAC. A large portion of the fees that PRIAC collected come
from the Plan's investment options. This compensation was not for any actual services that
PRIAC provided to the Plan. The CIGNA Defendants failed to adequately monitor PRIAC's

compensation to ensure that it was no more than reasonable for the services PRIAC provided to the Plan, and allowed PRIAC to collect payments even though the payments were not compensation for any actual services PRIAC provided to the Plan.

**ANSWER:**

PRIAC denies the allegations in paragraph 73 of the Amended Complaint.

74.     Not until 2010, after the filing of this action, did Defendants change the manner in which the administrative fees are charged to the Plan, converting to a flat fee based on the number of participants in the Plan, rather than as a percentage of all the assets in the Plan.

**ANSWER:**

PRIAC admits that, on April 1, 2010, a new fee structure went into effect which (1)

Separates the administrative and investment management fees; (2) Charges administrative fees

regardless of a participant's selection of investment options; (3) Charges administrative fees to

accounts each quarter; and (4) Includes a per-participant asset-based fee that will not exceed

$210 per year.  PRIAC denies the remaining allegations in paragraph 74 of the Amended

Complaint.

75.     Further, CIGNA Defendants breached their duty of loyalty by applying different standards in managing the CIGNA defined contribution Plan compared to the standards it applied in managing the CIGNA defined benefit (DB) and non-qualified plans. PRIAC provided CIGNA free or discounted investment management services in the DB and non-qualified plans, in exchange for imposing higher, unreasonable, and excessive fees for the administrative services that PRIAC provided to the defined contribution Plan. The DB and non-qualified plans discounts came at the expense of the defined contribution Plan and its participants.

**ANSWER:**

PRIAC denies the allegations in paragraph 75 of the Amended Complaint.

76.     Defendants fraudulently concealed these excessive recordkeeping and administrative fees in their communications with plan participants.

**ANSWER:**

PRIAC denies the allegations in paragraph 76 of the Amended Complaint.

77.     By way of example, Defendants informed participants only of the total expense ratio of the Plan's investment options, which concealed the amount of fees paid to CG Life and

other CIGNA affiliates for recordkeeping and administrative services. See, e.g., Ct.Doc. 19-10, p. 5).

**ANSWER:**

The allegations contained in paragraph 77 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required. To the extent a response is required, PRIAC denies the allegations in paragraph 77 of the Amended Complaint.

78.     Defendants further concealed the excessive recordkeeping compensation in quarterly account statements to participants, which were completely silent as to fees paid by the participants in any respect. See, e.g., Doc. 19-16.

**ANSWER:**

The allegations contained in paragraph 78 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required. To the extent a response is required, PRIAC denies the allegations in paragraph 78 of the Amended Complaint.

79.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 78 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 78 as its answer to paragraph 79 of the Amended Complaint.

80.     As set forth above, Defendants caused the Plan's investment options to include - with the exception of the CIGNA Stock Fund - exclusively Defendants' separate accounts and Fixed Income Fund managed by Defendants.

**ANSWER:**

PRIAC denies the allegations in paragraph 80 of the Amended Complaint.

81.     As set forth above, each such separate account was comprised of a mutual fund or similar investment product "wrapped" in Defendants' additional layer of fees.

**ANSWER:**

PRIAC denies the allegations in paragraph 81 of the Amended Complaint.

82.     As set forth above, these additional fees were excessive and a prudent fiduciary could have easily avoided them by purchasing equivalent investment management directly from the sub-advisor.

**ANSWER:**

PRIAC denies the allegations in paragraph 82 of the Amended Complaint.

83.     For each investment option, the sub-advisor who actually managed the Plan's investment option offered equivalent investment management services for less than was ultimately paid by the Plan.

**ANSWER:**

PRIAC denies the allegations in paragraph 83 of the Amended Complaint.

84.     As set forth above, for each investment option, the difference between the reasonable investment management rates available from the sub-advisor and the fees actually assessed against the Plan represent revenue and self-dealing profits to Defendants.

**ANSWER:**

PRIAC denies the allegations in paragraph 84 of the Amended Complaint.

85.     Even when compared to mutual funds and similar investment products, the fees Defendants charged in the Plan's separate accounts, and the Fixed Income Fund, were excessive in every category.

**ANSWER:**

PRIAC denies the allegations in paragraph 85 of the Amended Complaint.

86.     The fees available in the mutual fund marketplace to an investor *with only $3,000 to invest were*, and are, substantially lower than those Defendants imposed on the Plan in every investment category.

**ANSWER:**

PRIAC denies the allegations in paragraph 86 of the Amended Complaint.

87.     Defendants did not even consider these sorts of alternatives, or any alternatives that did not allow Defendants to profit.

**ANSWER:**

PRIAC denies the allegations in paragraph 87 of the Amended Complaint.

88.     Further evidencing the unreasonable and excessive fees that Defendants imposed on the Plan is the fact the fees assessed against each investment option fell by millions of dollars when, in 2004, CIGNA sold its Retirement Business to PRIAC.

**ANSWER:**

PRIAC admits that subsequent to the sale of CIGNA's retirement business to Prudential Financial, Inc. on April 1, 2004, fees for the Plan's investment options decreased.  PRIAC denies all other allegations in paragraph 88 of the Amended Complaint.

89.     Simply stated, when CIGNA and its Retirement Business were eliminated from the Plan, and CIGNA's profit motive no longer affected the Plan's fees, the expense ratios of the Plan's investment options fell in every category. Defendants for years had imposed on CIGNA's own employees higher fees than would, and did, PRIAC, a company not formally affiliated with CIGNA.

**ANSWER:**

PRIAC admits that it is not affiliated with CIGNA and that subsequent to the sale of CIGNA's retirement business to Prudential Financial, Inc. on April 1, 2004, fees for the Plan's investment options decreased.  PRIAC denies all other allegations in paragraph 89 of the Amended Complaint.

90.     Despite the fact that PRIAC imposed lower fees than did CG Life, after CIGNA's sale of the retirement business to PRIAC in 2004, the Plan's fees remained unreasonable and excessive.

**ANSWER:**

PRIAC admits that subsequent to the sale of CIGNA's retirement business to Prudential Financial, Inc. on April 1, 2004, fees for the Plan's investment options decreased.  PRIAC denies all other allegations in paragraph 90 of the Amended Complaint.

91.     The Plan contained assets ranging from more than $1.3 billion in 1995 to more than $2.6 billion in 2007.

**ANSWER:**

PRIAC states that the Plan's asset balances during the period from 1995 to 2007 are reflected on Forms 5500, which are publicly available documents, the contents of which speak for themselves, and it refers to those Forms 5500 for their contents.  PRIAC admits the Plan's assets have varied over time and the value of the assets at times in 2005 exceeded $1.3 billion and at times in 2007 exceeded $2.6 billion.

92.     The size and purchasing power of multi-billion dollar 401(k) plans, like the Plan here, enables plan fiduciaries to contract directly with investment managers and secure investment management services at a fraction of the fees - potentially 25% - charged to smaller plans and individual investors in the retail marketplace. More than a decade ago, the Department of Labor emphasized this to 401(k) plan fiduciaries.

**ANSWER:**

PRIAC denies the allegations in paragraph 92 of the Amended Complaint.

93.     Moreover, while paying a fraction of retail fees, by selecting such institutional investment vehicles, plan fiduciaries can establish and control the funds' investment objectives, control and reduce trading costs, and escape the conflicts of interest and scandals that have plagued the retail investment/mutual fund industry for years.

**ANSWER:**

PRIAC denies the allegations in paragraph 93 of the Amended Complaint.

94.     Simply stated, the investment marketplace available to multi-billion dollar 401(k) plans, like the Plan here, allowed Defendants the opportunity to invest Plan assets prudently and at significantly lower cost than the Plan paid.

**ANSWER:**

PRIAC denies the allegations in paragraph 94 of the Amended Complaint.

95.     Defendants squandered the Plan's enormous bargaining power and access to the institutional market by selecting investment options that charged retail fees and then added a completely unnecessary layer of their own fees for the benefit of Defendants and their subsidiaries.

**ANSWER:**

PRIAC denies the allegations in paragraph 95 of the Amended Complaint.

96.     In exchange for the payment of such fees, the Plan and its participants did not receive additional investment advice or other extra services. To the contrary, in light of the wrap fee Defendants imposed in addition to the fund's retail fees, the Plan and its participants paid *more* than retail investors *for the same services*.

**ANSWER:**

PRIAC denies the allegations in paragraph 96 of the Amended Complaint.

97.     While imposing such retail fees, and an additional wrap fee, was a detriment to the Plan, it provided substantial financial benefits to Defendants at the Plan's expense.

**ANSWER:**

PRIAC denies the allegations in paragraph 97 of the Amended Complaint.

98.     Worse yet, Defendants selected their own affiliates as sub-advisors managing Plan investment options, including the Fixed Income Fund, the S&P 500 Index Fund, the Small Cap Growth/TimesSquare Fund, the High Yield Bond Fund, among others.

**ANSWER:**

Paragraph 98 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 98 that relate solely to the CIGNA Defendants and therefore denies them.  PRIAC admits that since April 1, 2004, the Plan sponsor has maintained the Dryden S&P 500 Index Fund as an investment option, which is managed by Quantitative Management Associates, a Prudential Financial Company, and that Prudential Investment Management, Inc. has managed the investments that support the guarantees offered by the Plan's Fixed Income Fund during that time.  PRIAC denies the remaining allegations in paragraph 98 of the Amended Complaint.

99.     By installing their own sub-advisors of these Plan investment options, Defendants insured that the Plan would pay, for the benefit of Defendants, an excessive expense ratio for each such fund *and* Defendants' additional wrap fees.

**ANSWER:**

PRIAC denies the allegations in paragraph 99 of the Amended Complaint.

100.     Further, CIGNA Defendants breached their duty of loyalty by applying different standards in managing the CIGNA defined contribution Plan compared to the standards it applied in managing the CIGNA defined benefit (DB) and non-qualified plans. PRIAC provided CIGNA free or discounted investment management services in the DB and non-qualified plans, in exchange for imposing higher, unreasonable, and excessive fees for the investment management services that PRIAC provided to the defined contribution Plan. The DB and non-qualified plans discounts came at the expense of the defined contribution Plan and its participants.

**ANSWER:**

PRIAC denies the allegations in paragraph 100 of the Amended Complaint.

101.     Defendants' inclusion of the Fixed Income Fund made their imprudence and self-dealing even worse. It imbued the Plan with imprudent and undiversified risk and an excessive 50 basis point fee costing the Plan and its participants millions of dollars in addition to the Fixed Income Fund's excessive costs.

**ANSWER:**

PRIAC denies the allegations in paragraph 101 of the Amended Complaint.

102.     The Fixed Income Fund is a "group fixed annuity contract" issued by Defendants' subsidiaries. Under the contract, the Plan's assets are deposited into Defendants' General Accounts and Defendants agree to pay an interest rate, which it sets, on the amounts deposited.

**ANSWER:**

PRIAC admits that the Fixed Income Fund has been a group annuity contract issued either by CG Life or by PRIAC depending on the time period involved.  PRIAC further admits that under that contract, CG Life or PRIAC paid interest on amounts deposited into the Fixed Income Fund, and guaranteed payment of the amounts deposited and the accumulated interest. PRIAC also admits that CG Life and PRIAC set the interest rate based on the expected investment performance of assets owned by CG Life or PRIAC and held in their respective General Accounts.  Except as expressly admitted herein, PRIAC denies the allegations in paragraph 102 of the Amended Complaint.

103.     This "guaranty" is false and fraudulent, and intended to trick participants into believing that their retirement savings are safe in all circumstances, when they are actually subject to the risks of Defendants' business operations and solvency.

**ANSWER:**

PRIAC denies the allegations in paragraph 103 of the Amended Complaint.

104.    Although Defendants "guarantee" an investment in the Fixed Income Fund against loss, that guaranty is backed only by the assets held in Defendants' General Accounts.

**ANSWER:**

PRIAC admits that, until January 1, 2005, CG Life guaranteed investments in the Fixed

Income Fund against loss and that the guarantee was backed by the general assets of CG Life –

called CG Life's "General Account."  PRIAC further admits that beginning on January 1, 2005,

PRIAC guaranteed investments in the Fixed Income Fund against loss and that the guarantee was

backed by the general assets of PRIAC – called PRIAC's "General Account."  Except as

expressly admitted herein, PRIAC denies the allegations in paragraph 104 of the Amended

Complaint.

105.    Defendants' General Accounts are pools of assets that Defendants hold in its general insurance operation, and is comprised of various investments including commercial mortgages, publically issued bonds, asset-backed securities, and privately-issued debt securities. Defendants use the assets in their General Account to pay claims on their insurance policies and make payments on annuity contracts.

**ANSWER:**

PRIAC denies the allegations contained in paragraph 105 that there are "pools of assets"

in PRIAC's "general insurance operation."  PRIAC admits the allegations describing the

contents and use of the General Accounts solely with respect to the Fixed Income Fund.  PRIAC

denies all other allegations in paragraph 105.

106.    Accordingly, the Fixed Income Fund was exposed to the risk that Defendants would become insolvent. So was the CIGNA Stock Fund.

**ANSWER:**

PRIAC denies the allegations in paragraph 106 of the Amended Complaint.

107.    The Fixed Income Fund and the CIGNA Stock Fund are the Plan's two largest

investment options. For example, in 2004, through the combination of the Plan's Fixed Income Fund and the CIGNA Stock Fund, Defendants caused in excess of $1.4 billion, approximately 64% of the Plan's assets, to be invested in CIGNA, the Plan's Sponsor, and its subsidiaries. The percentage was approximately the same in all other years relevant to this Complaint.

**ANSWER:**

PRIAC denies the allegations in paragraph 107 of the Amended Complaint.

108.    Because the Plan already had taken this risk through its heavy investment in the CIGNA Company Stock Fund, a prudent investor would have analyzed whether the interests of the Plan were better served with a different Fixed Income option that did not increase the Plan's undiversified risk of Defendants' insolvency.

**ANSWER:**

PRIAC denies the allegations in paragraph 108 of the Amended Complaint.

109.    Had Defendants undertaken this process, they would have discovered that other Fixed Income products in the market place had higher expected returns, lower costs and equivalent services. Accordingly, a prudent investor would have avoided the Fixed Income Fund selected for the Plan, and considered such alternatives.

**ANSWER:**

PRIAC denies the allegations in paragraph 109 of the Amended Complaint.

110.    Thus, although including the Fixed Income Fund and the CIGNA Stock Fund as investment options subjected the Plan and its participants to excessive and undiversified risk, it benefited CIGNA by providing: (1) billions of dollars of assets under management against which Defendants could assess fees; (2) Defendants with in excess of $1.1 billion dollars in working capital for their General Accounts from CIGNA employees' retirement savings; (3) CIGNA with hundreds of millions of dollars in equity through sales of its stock to its employees; and (4) billions of dollars of Plan assets as assets under management to Defendants' Retirement Business.

**ANSWER:**

PRIAC denies the allegations in paragraph 110 of the Amended Complaint.

111.    As set forth in more detail below, the billions of dollars in assets under management that Defendants' Retirement Business gained from the Plan were: (1) vital to the Retirement Business' ability to profitably operate as a going concern for the benefit of Defendants; and (2) a significant driver of the sale price CIGNA received for the Retirement Business.

**ANSWER:**

PRIAC denies the allegations in paragraph 111 of the Amended Complaint.

112.    By the foregoing conduct, CIGNA Defendants breached their fiduciary duties by, without limitation:

    A.    Selecting and retaining investment options that imposed excessive and unreasonable fees, including fees for the benefit of CIGNA;

    B.    Subjecting the Plan to such unreasonably expensive options when the Plan's enormous size and bargaining power enable Defendants to secure the same investments at a fraction of the cost;

    C.    Imposing excessive and unreasonable wrap fees, in addition to these unreasonable management and extra fees, for the benefit of CIGNA;

    D.    Failing to secure, for the excessive fees imposed upon the Plan, additional investment advice or other services for Plan participants;

    E.    Selecting and retaining investment options for reasons other than furthering the economic interests of the Plan;

    F.    Failing to properly prescreen investment options, selecting and retaining investment options that a responsible fiduciary would exclude, and imposing on participants the unreasonable burden of having to screen investment options when they lack the resources and expertise to do so;

    G.    Selecting and retaining CIGNA's subsidiary TimesSquare as investment manager of three investment options so as to funnel additional and excessive fees to CIGNA in addition to CIGNA's wrap fee;

    H.    Selecting and retaining CG Life's Fixed Income Fund so as to provide financial and other benefits to CIGNA and its subsidiaries while subjecting the Plan and its participants to excessive, undiversified and avoidable risk; and

    I.    Subjecting the Plan to the control and discretion of fiduciaries laboring under conflicts of interest and self-dealing.

**ANSWER:**

PRIAC denies the allegations in paragraph 112 of the Amended Complaint.

113.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 112 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to Paragraphs 1 through 112 as its answer to paragraph 113 of the Amended Complaint.

114.    In approximately 2000, CIGNA established TimesSquare as a for-profit, wholly-owned subsidiary. CIGNA established TimesSquare as an asset management business focused on institutional asset management, and particularly that of retirement plans.

**ANSWER:**

Paragraph 114 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 114 of the Amended Complaint and thus denies them.

115.    The Chief Investment Officer ("CIO") of the CIGNA Investment Group was installed as the President of TimesSquare while remaining in his position as CIO of the CIGNA Investment Group.

**ANSWER:**

Paragraph 115 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 115 of the Amended Complaint and thus denies them.

116.    TimesSquare was a spin-off of a portion of CIGNA's Investment Management Group. Approximately one quarter of the CIGNA Investment Management Group's employees were transferred to TimesSquare.

**ANSWER:**

Paragraph 116 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 116 of the Amended Complaint and thus denies them.

117.     Through TimesSquare, Defendants charged the Plan as much as they desired, levying excessive and unnecessary fees that a prudent or loyal fiduciary would have avoided.

**ANSWER:**

Paragraph 117 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 117 of the Amended

Complaint and thus denies them.

118.     In 2001, Defendants installed TimesSquare, without a request for proposal or competition, as the investment manager of the Plan's largest investment option, the Fixed Income Fund, which held $1,064,080,000.

**ANSWER:**

Paragraph 118 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 118 of the Amended

Complaint and thus denies them.

119.     Also in 2001, Defendants terminated Charter as the sub-advisor / investment manager of three of the seven separate accounts which, until Defendants established TimesSquare, Charter had managed:

> A.     The S&P 500 Index Fund, the Plan's third largest investment option, which, held $219,380,000;
>
> B.     The Small Cap Growth Fund, the Plan's fifth largest investment option, which held $61,265,000;
>
> C.     The High Yield Bond Fund, the Plan's eleventh largest investment option, which held $7,982,000.

**ANSWER:**

Paragraph 119 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 119 of the Amended

Complaint and thus denies them.

120.    Defendants installed TimesSquare as the investment manager of these investment options.

**ANSWER:**

Paragraph 120 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 120 of the Amended Complaint and thus denies them.

121.    As a result, by the end of 2001, TimesSquare - CIGNA's fledgling investment management subsidiary - managed $1.5 billion of the Plan's $2 billion in assets, or 75%.

**ANSWER:**

Paragraph 121 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 121 of the Amended Complaint and thus denies them.

122.    Department of Labor Advisory Opinions prohibit the use of Plan assets as seed money for plan sponsors' and/or plan fiduciaries business ventures.

**ANSWER:**

The allegations contained in paragraph 122 of the Amended Complaint purport to characterize unspecified regulations, the terms of which speak for themselves, and, therefore, no response is required.  To the extent a response is required, PRIAC denies the allegations in paragraph 122 of the Amended Complaint.

123.    In direct violation of this prohibition, CIGNA used Plan assets as seed money for its for-profit fledging investment management business, the revenues and profits of which inured directly to CIGNA's benefit.

**ANSWER:**

Paragraph 123 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 123 of the Amended

Complaint and thus denies them.

124.    TimesSquare continued to manage approximately two thirds of the Plan's assets -
at all times more than $ 1.2 billion - until December 31, 2004. On that date, as a result of
CIGNA's sale of two parts of its Retirement Business (CG Life and Global) to Prudential,
PRIAC became the investment manager of the Fixed Income Fund and terminated TimesSquare
as the sub-advisor / investment manager of the S&P 500 Index Fund.

**ANSWER:**

PRIAC denies the allegations in paragraph 124 of the Amended Complaint and

affirmatively states that Quantitative Management Associates became the fund manager for the

S&P 500 Fund on April 1, 2004.

125.    The fees of these investment options fell when TimesSquare was terminated.

**ANSWER:**

PRIAC denies the allegations in paragraph 125 of the Amended Complaint.

126.    Thereafter, in November 2004, CIGNA sold the third part of its Retirement Business,
TimesSquare, to its officers and employees - who, at the time, were also insiders, officers, directors
and/or employees of CIGNA - and the Affiliated Managers Group.

**ANSWER:**

Paragraph 126 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 126 of the Amended

Complaint and thus denies them.

127.    After this sale, TimesSquare continued to serve as sub-advisor of the Plan's Small
Cap Growth Fund, which, at the time, held $65.2 million and currently holds in excess of $77.8
million in Plan assets.

**ANSWER:**

PRIAC denies the allegations in paragraph 127 of the Amended Complaint and

affirmatively states that the Plan's Small Cap Growth Fund held $68.2 million in assets on April

1, 2004 and $66.9 million in assets as of June 30, 2010.

128.    While operating TimesSquare, Plaintiffs are informed and believe that several of
these officers and employees simultaneously were officers and employees of CIGNA.

**ANSWER:**

Paragraph 128 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 128 of the Amended

Complaint and thus denies them.

129.    Thus, for its own benefit and in its own interest, Defendants used Plan assets as
seed money to establish, build and operate TimesSquare so as to provide revenues and profits to
CIGNA, and thereafter sold TimesSquare to generate further revenues and profits for CIGNA.

**ANSWER:**

Paragraph 129 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 129 of the Amended

Complaint and thus denies them.

130.    By this conduct, Defendants breached their duties of loyalty and prudence in
that they:

A.    Failed to conduct themselves with the utmost good faith, loyalty and
fidelity;

B.    Used Plan assets in their own interest and not for exclusive purpose of
providing benefits to participants and beneficiaries and defraying the
reasonable expenses of administering the Plan;

C.    Selected and retained TimesSquare as investment manager of three
investment options so as to funnel additional and excessive retail fees to

CIGNA, in addition to CIGNA's wrap fee;

D.    Selected and retained investment options operated by officers and employees of TimesSquare who were also officers and employees of CIGNA, and thus who had a direct financial interest in managing Plan assets for the benefit of CIGNA;

E.    Selected and retained investment options for reasons other than furthering the economic interests of the Plan;

F.    Selected and retained investment options that a responsible fiduciary would exclude;

G.    Failed to exercise the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

H.    Used their authority, discretion and control in connection with the Plan to advance their own interest;

I.    Subjected the Plan to the control and discretion of fiduciaries with conflicting loyalties;

J.    Subjected the Plan assets to control and discretion of investment managers with conflicting loyalties;

K.    Failed to compensate the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in their business and/or for their benefit;

L.    Failed account to the Plan for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit; and

M.    Failed, even in the absence of a breach of fiduciary duty, to account for any benefits, revenues and/or profits received from, or in respect of, any use of Plan assets in the fiduciaries' business and/or for the fiduciary's benefit.

## ANSWER:

PRIAC denies the allegations in paragraph 130 of the Amended Complaint.

131.    Defendants hid these fiduciary breaches through fraud or concealment.

**ANSWER:**

PRIAC denies the allegations in paragraph 131 of the Amended Complaint.

132.    In participant communications, Defendants informed participants only of the total expense ratio of the investment options, so as to conceal: (1) the extent of the excessive wrap fees received by CIGNA affiliates; (2) to conceal the excessive investment management fees charged by the investment options in which CG Life invested on behalf of the Plan; and (3) the benefits to CIGNA and the self-dealing by which CIGNA obtained those benefits (*see, e.g.* Ct.Doc. 19-7, p. 5).

**ANSWER:**

The allegations contained in paragraph 132 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required.  To the extent a response is required, PRIAC refers to the documents cited therein for the full contents and context thereof.  PRIAC denies all other allegations in paragraph 132.

133.    Defendants told participants that certain options were "CG Life separate accounts" so as to create the impression that plan fiduciaries had met their fiduciary obligations and placed the Plan in institutionally priced separate accounts. In fact, the "separate accounts" invested in expensive and imprudent options that could have and should have been obtained more cheaply through a true separate account structure. See, e.g., Doc. 19-10, p. 18 ("The High Yield Bond/Caywood-Scholl Fund is a CG Life separate account starting on November 1, 2002.") see also, Doc. 19-10, p. 24 ("The Large Cap Growth/Goldman Sachs Fund is CG Life separate account.... In August 1997 the Fund became a stand-alone separate account.");

**ANSWER:**

The allegations contained in paragraph 133 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required.  To the extent a response is required, PRIAC refers to the documents cited therein for the full contents and context thereof.  PRIAC denies all other allegations in paragraph 133.

134.    Defendants further concealed their fiduciary breaches in that Quarterly Statements to individual participants were completely silent as to fees paid by the participants in any respect. Doc. 19-16.

**ANSWER:**

The allegations contained in paragraph 134 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required.  To the extent a response is required, PRIAC refers to the documents cited therein for the full contents and context thereof.  PRIAC denies all other allegations in paragraph 134.

135.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 134 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 134 as their answer to paragraph 135 of the Amended Complaint.

136.    As set forth above, Defendants caused every investment option but the CIGNA Stock Fund to be invested in CG Life and CIGNA's Retirement Business.

**ANSWER:**

Paragraph 136 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 136 of the Amended Complaint and thus denies them.

137.    As set forth above, in 1995 CIGNA and its Retirement Business received in excess of $1.3 billion in assets under management from the Plan. By 2007, this had grown to $2.6 billion.

**ANSWER:**

To the extent paragraph 137 of the Amended Complaint relates solely to the CIGNA Defendants, PRIAC is not required to respond.  PRIAC states that the Plan's asset balances during the period from 1995 to 2007 are reflected on Forms 5500, which are publicly available documents, the contents of which speak for themselves, and it refers to those Forms 5500 for

their contents.  PRIAC admits the Plan's assets have varied over time and the value of the assets

at times in 2005 exceeded $1.3 billion and at times in 2007 exceeded $2.6 billion.  PRIAC denies

the remaining allegations in paragraph 137.

138.    As set forth above, by selecting and retaining the Fixed Income Fund as a Plan
investment option, Defendants caused more than $1.1 billion of Plan assets to be invested
*directly* in CG Life's General Account, and thus caused the Plan to provide more than a billion
dollars of working capital for CG Life's operations. At the same time, CIGNA's Retirement
Business, through TimesSquare, charged the Plan investment management fees on the working
capital that the Plan provided to CG Life through the Fixed Income Fund.

**ANSWER:**

Paragraph 138 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 138 of the Amended

Complaint and thus denies them.

139.    By providing, approximately $2 billion for CIGNA's Retirement Business to
use as assets under management in its separate accounts and CG Life's General Account,
Defendants: (1) used Plan assets to support and Fund CG Life's general business and operations;
(2) enabled the Retirement Business to assess fees against those assets so as to generate revenues
and profits for the benefit of CIGNA; (3) enhanced the Retirement Business' ability to market its
services and investment products to unrelated retirement plans; and (4) increased the value of the
Retirement Business and, ultimately, its sale price.

**ANSWER:**

Paragraph 139 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 139 of the Amended

Complaint and thus denies them.

140.    In CIGNA's annual filings with the United States Securities Exchange Commission
(the "SEC"), CIGNA states (emphasis added):

> Assets under management consist of invested and separate account
> assets, as well as third-party investment advisory account assets of the
> Retirement segment**.** Assets under management are a key driver of

earnings for this segment because a significant portion of this segment's revenue is based on asset values.

**ANSWER:**

The allegations contained in paragraph 140 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required. To the extent a response is required, PRIAC refers to the documents cited therein for the full contents and context thereof. PRIAC denies all other allegations in paragraph 140.

141.    The approximately $2 billion of Plan assets that CIGNA and its Retirement Business have used in its operations are a substantial part of the Retirement Business' "asset under management" that was a "key driver" of the Retirement Business' earnings.

**ANSWER:**

To the extent paragraph 141 of the Amended Complaint relates solely to the CIGNA Defendants, PRIAC is not required to respond. To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 141 of the Amended Complaint and therefore denies them.

142.    In short, Defendants caused Plan assets to be used by CIGNA and the Retirement Business in its business and operations for its own benefit.

**ANSWER:**

To the extent paragraph 142 of the Amended Complaint relates solely to the CIGNA Defendants, PRIAC is not required to respond. To the extent a response is required, PRIAC lacks sufficient information to admit or deny the allegations in paragraph 142 and therefore denies them.

143.    In 2004, CIGNA sold its Retirement Business to the PRIAC as a going concern. Through this sale, PRIAC became the Plan's primary investment manager, recordkeeper and service provider.

**ANSWER:**

PRIAC admits that on April 1, 2004, CIGNA Corporation sold its retirement business to Prudential Financial, Inc., that PRIAC was created and that, thereafter, PRIAC began providing plan-level administrative and account record keeping services.  PRIAC further admits that for certain of the separate accounts in the Plan's lineup it has been responsible for the selection, oversight, and de-selection of the registered investment advisor and for others it has been responsible only for selection and oversight.  Except as expressly admitted herein, PRIAC denies the allegations in paragraph 143 of the Amended Complaint.

144.    As part of this sale, CIGNA's Retirement Business transferred approximately $18 billion of assets under management to PRIAC, including hundreds of millions of dollars of Plan assets.

**ANSWER:**

PRIAC admits that the retirement business managed total assets worth approximately $18 billion, including $2.1 billion in Plan assets, when it was sold on April 1, 2004.  Except as expressly admitted herein, PRIAC denies the allegations in paragraph 144 of the Amended Complaint.

145.    The Plan's assets exceeded 10% of the assets under management transferred to PRIAC in this sale.

**ANSWER:**

PRIAC admits the allegations contained in paragraph 145 of the Amended Complaint.

146.    CG Life's assets under management were a key driver of the price CIGNA received from PRIAC.

**ANSWER:**

PRIAC denies the allegations in paragraph 146 of the Amended Complaint.

147.    CIGNA reaped an *after tax gain of $809 million* from this sale, as well as other financial benefits including the release or reduction of various contract or guarantee obligations.

**ANSWER:**

To the extent paragraph 147 of the Amended Complaint relates solely to the CIGNA

Defendants, PRIAC is not required to respond.  To the extent a response is required, PRIAC

lacks sufficient information to admit or deny the allegations in paragraph 147 of the Amended

Complaint and therefore denies them.

148.    Although Plan participants' retirement assets were used as seed money to generate this gain of $809 million, *Plan participants received nothing from the sale*.

**ANSWER:**

PRIAC denies the allegations in paragraph 148 of the Amended Complaint.

149.    Defendants caused Plan assets, as a substantial portion of CG Life's assets under management and more than a billion dollars of CG Life's working capital in its General Account, to be used for the benefit of CIGNA in the profitable sale of its Retirement Business.

**ANSWER:**

PRIAC denies the allegations in paragraph 149 of the Amended Complaint.

150.    Where a fiduciary uses plan assets for in its own business or for its own purposes, it is accountable for all revenues and profits received in connection with such use.

**ANSWER:**

The allegations in paragraph 150 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 150.

151.    Even in the absence of a breach of fiduciary duty, a fiduciary may not profit from a transaction involving plan assets and must account to the plan for all such profits.

**ANSWER:**

The allegations in paragraph 151 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 151.

152.    As set forth above, Defendants breached their fiduciary duties and used Plan assets in CIGNA's business and/or for their own purposes by:

A.    For the benefit of CIGNA and to the detriment of the Plan, including the CG Life Fixed Income Fund as the Plan's largest investment option, and thereby causing well in excess of a billion dollars of Plan assets to be used as working capital in CG Life's General Account so as to support and fund CG Life's, and the Retirement Business', business and operations;

B.    For the benefit of CIGNA and to the detriment of the Plan, including CG Life's Fixed Income Fund as the Plan's largest investment option and, by doing so, effectively extending a loan of Plan assets to CG Life and the Retirement Business to support and fund their business and operations;

C.    For the benefit of CIGNA and to the detriment of the Plan, including virtually exclusively CG Life separate accounts and the CG Life Fixed Income Fund as Plan investment options, and thereby providing, by 2004, $2.5 billion in assets under management to CG Life and the Retirement Business;

D.    For the benefit of CIGNA and to the detriment of the Plan, including virtually exclusively CG Life separate accounts and the CG Life Fixed Income Fund as investment options, and thereby causing Plan assets to be used as CG Life assets under management which were the "key driver" of the Retirement Business' earnings;

E.    For the benefit of CIGNA and to the detriment of the Plan, including virtually exclusively CG Life separate accounts and the CG Life Fixed Income Fund as investment options, and thereby using Plan assets to enhance the value of, and increase the sale price of, the Retirement business;

F.    Through the Fixed Income Fund and thus CG Life's General Account, effectively providing a loan of well in excess of $1 billion to the Retirement Business and CG Life to support and fund their general operations;

G.    By all of the foregoing, through the use of Plan assets, enhancing the value and increasing the sale price of the Retirement Business as a going concern;

H.    By all of the foregoing, receiving revenues and profits from the use of Plan assets in their business;

I.    Failing to account to the Plan for the revenues and profits CIGNA received in connection with such uses of Plan assets; and

J.    Failing to compensate the Plan of such use of Plan assets.

**ANSWER:**

PRIAC denies the allegations in paragraph 152 of the Amended Complaint.

153.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 152 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 152 as its answer

to paragraph 153 of the Amended Complaint.

154.     The Plan's assets include an undivided interest in all of the underlying assets contained in the Plan's CG Life separate accounts and the Fixed Income Fund. Any earnings, proceeds or accretions generated from, or in respect of, such Plan assets are also Plan assets.

**ANSWER:**

The allegations in paragraph 154 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 154.

155.     The Plan and its participants are entitled to all such earnings, proceeds or accretions generated from, or in respect of, such Plan assets.

**ANSWER:**

The allegations in paragraph 155 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 155 of the Amended Complaint.

156.     Beyond collecting excessive fees as set forth above, CIGNA, CG Life, TimesSquare and other service providers received additional, undisclosed compensation from their dealings with the Plan and Plan assets ("Additional Compensation Streams"). For example:

- consultants receive finders' fees from investment managers for the consultants' placement of Plan assets with a certain investment manager or mutual fund company;

- trustees or custodial banks perform cash sweeps of Plan accounts to capture cash before it is transferred to investment options, and earn interest on those cash holdings (float);

- investment managers, custodial banks, prime bankers, and/or mutual funds receive payments for lending securities, owned by the Plan, to third parties; and

- in connection with foreign investments, investment managers and mutual funds reap additional compensation from profiting on foreign currency exchange.

**ANSWER:**

Paragraph 156 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC lacks

sufficient information to admit or deny the allegations in paragraph 156 and thus denies them.

157.    In a multi-billion dollar plan, like the Plan here, such Additional Compensation Streams can result in millions of dollars of revenues generated by, or in respect of, Plan assets.

**ANSWER:**

PRIAC denies the allegations in paragraph 157 of the Amended Complaint.

158.    Accordingly, prudent fiduciaries of multi-billion dollar 401(k) plans understand and account for these Additional Compensation Streams.

**ANSWER:**

The allegations in paragraph 158 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 158.

159.    Defendants were and are obligated to understand and consider these Additional Compensation Streams in fulfilling their fiduciary obligations to ensure that the proceeds of Plan assets are captured to defray Plan expenses, are applied solely for the benefit of the Plan and its participants and beneficiaries, and/or are returned to the Plan.

**ANSWER:**

The allegations in paragraph 159 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 159.

160.    Here, Defendants have failed to do so. Instead, they have caused and/or allowed Plan service providers, including CG Life and TimesSquare, to retain such Additional Compensation Streams for the benefit of CIGNA.

**ANSWER:**

Paragraph 160 of the Amended Complaint relates solely to the CIGNA Defendants and

PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC denies

the allegations in paragraph 160 of the Amended Complaint.

161.    By such conduct, Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries in that they:

A.    Failed to discharge their duties solely in the interest of the Plan and its participants;

B.    Failed to administer the Plan for the exclusive purpose of providing benefits to participants and beneficiaries and defraying the reasonable expenses of administering the Plan;

C.    Caused or allowed service providers to receive excess and unreasonable compensation by retaining Additional Compensation Streams in addition to other compensation;

D.    Deprived the Plan of the benefit of earnings, proceeds and other income generated from, or in respect of, Plan assets; and

E.    Caused or allowed CG Life and TimesSquare to receive additional and excess compensation for the benefit of CIGNA.

**ANSWER:**

PRIAC denies the allegations in paragraph 161 of the Amended Complaint.

162.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 161 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 161 as its answer

to paragraph 162 of the Amended Complaint.

163.    Since 2004, PRIAC has performed recordkeeping and administrative services for the Plan, a role that previously belonged to CG Life.

**ANSWER:**

PRIAC admits that subsequent to April 1, 2004, PRIAC has provided Plan-level

administrative and account record keeping services that CG Life previously provided.  PRIAC

denies the remaining allegations in paragraph 163 of the Amended Complaint.

164.    PRIAC's compensation for recordkeeping was "wrapped" into a variable group
annuity contract and derived from the investment options in the Plan.

**ANSWER:**

PRIAC admits that beginning January 1, 2005, PRIAC was paid annual fees under a

group annuity contract.  Except as expressly admitted herein, PRIAC denies the remaining

allegations in paragraph 164 of the Amended Complaint.

165.    In these variable annuity contracts, Defendants selected investment vehicles
and/or managers - either retail mutual funds or investments that mirror retail mutual funds in
their features and services - and imposed an additional fee on top of the funds' expense ratio.
This process is known as "wrapping" the mutual fund. The extra fees imposed are called "wrap
fees."

**ANSWER:**

PRIAC denies the allegations in paragraph 165 of the Amended Complaint.

166.    The fees for these contracts in the Plan were asset based and, accordingly, increased
as the amount of assets grew over time.

**ANSWER:**

PRIAC admits that for certain funds it charges annual fees of varying percentages of fund

assets to cover the fees it pays to sub-advisors and for the provision of services to the Plan,

including PRIAC's (a) establishment and operation of the Plan's separate accounts, (b)

monitoring and reporting on the performance of the institutional sub-advised accounts as part of

its Manager-of-Managers Program and DDA Program, and (c) maintaining records of

investments for the Plan.  PRIAC also admits that, subsequent to January 1, 2005, it has been

paid annual fees under a group annuity contract.  PRIAC denies the remaining allegations in

paragraph 166 of the Amended Complaint.

167.    Defendants failed to prudently monitor these fees for reasonableness.

**ANSWER:**

PRIAC denies the allegations in paragraph 167 of the Amended Complaint and

specifically denies that PRIAC had any responsibility under ERISA with respect to the

monitoring of its own fees.

168.    A significant portion of the fees that PRIAC collects comes from the investment
managers and sub-advisors of the 20 PRIAC separate accounts in the Plan. These payments were
not reasonable compensation for the actual services provided to the Plan.

**ANSWER:**

PRIAC denies the allegations in paragraph 168 of the Amended Complaint.

169.    As set forth above, PRIAC was and continues to be responsible for the selection,
monitoring, and removal of the investment managers/sub-advisers who manage Plan assets held
in the PRIAC separate accounts.

**ANSWER:**

PRIAC admits that, subsequent to April 1, 2004, for the institutional sub-advised

accounts in the Plan's lineup, it has been responsible for the selection, oversight, and de-

selection of the registered investment advisor and for other separate accounts it has been

responsible only for selection and oversight.  Except as expressly admitted, PRIAC denies all

other allegations in paragraph 169 of the Amended Complaint.

170.    PRIAC selected and retained managers and investment funds based in part on
which funds provided additional compensation to PRIAC, rather than selecting and retaining
managers and investment funds based on merit. In so doing, PRIAC failed to discharge its duties
with respect to the Plan prudently and solely in the interest of the Plan and its participants, and
for the exclusive purpose of providing benefits to the participants and their beneficiaries and
defraying the reasonable expenses of administering the Plan.

**ANSWER:**

PRIAC denies the allegations in paragraph 170 of the Amended Complaint.

171.    PRIAC's asset-based compensation was and continues to be excessive for the services the Plan received from PRIAC. The costs of recordkeeping services do not increase commensurately with the amount of assets in the Plan. Ongoing increases in Plan assets caused recordkeeping fees to be excessive, and to consistently become more so.

**ANSWER:**

PRIAC denies the allegations in paragraph 171 of the Amended Complaint.

172.    Further, PRIAC breached its duty of loyalty by applying different standards in selecting and retaining investment managers in CIGNA's defined contribution Plan compared to the standards it applied in the CIGNA defined benefit (DB) and non-qualified plans. While PRIAC selected and retained managers in the defined contribution Plan based in part on which funds provided additional compensation to PRIAC, it provided free or discounted services to CIGNA for the services PRIAC performed in the DB and non-qualified plans. These discounts were provided in exchange for imposing higher, unreasonable, and excessive fees on the defined contribution Plan and came at the expense of the Plan and its participants.

**ANSWER:**

PRIAC denies the allegations in paragraph 172 of the Amended Complaint.

173.    Defendants fraudulently concealed these excessive recordkeeping and administrative fees in their communications with plan participants.

**ANSWER:**

PRIAC denies the allegations in paragraph 173 of the Amended Complaint.

174.    By way of example, Defendants informed participants only of the total expense ratio of the Plan's investment options, which concealed the amount of fees paid to PRIAC for recordkeeping and administrative services. See, e.g., Doc. 19-7, p. 5.

**ANSWER:**

The allegations contained in paragraph 174 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required. To the extent a response is required, PRIAC denies the allegations in paragraph 174.

175.    Defendants further concealed the excessive recordkeeping compensation in quarterly account statements to participants, which were completely silent as to fees paid by the participants in any respect. See, e.g., Doc. 19-16.

**ANSWER:**

The allegations contained in paragraph 175 of the Amended Complaint purport to characterize written documents, the terms of which speak for themselves, and, therefore, no response is required. To the extent a response is required, PRIAC denies the allegations in paragraph 175.

176.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 175 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 175 as its answer to paragraph 176 of the Amended Complaint.

177.    As set forth above, PRIAC was and continues to be responsible for the selection, monitoring, and removal of investment managers/sub-advisers to manage the assets of the Plan.

**ANSWER:**

PRIAC admits that, subsequent to April 1, 2004, for the institutional sub-advised accounts in the Plan's lineup, it has been responsible for the selection, oversight, and de-selection of the registered investment advisor and for other separate accounts it has been responsible only for selection and oversight. Except as expressly admitted, PRIAC denies all other allegations in paragraph 177 of the Amended Complaint.

178.    PRIAC selected and retained managers and investment funds which charged excessive fees, and those that provided additional compensation to PRIAC, rather than selecting and retaining managers based on merit.

**ANSWER:**

PRIAC denies the allegations in paragraph 178 of the Amended Complaint.

179.    As set forth above, Defendants caused the Plan's investment options to include - with the exception of the CIGNA Stock Fund - exclusively PRIAC separate accounts and the PRIAC Fixed Income Fund (which invested directly in PRIAC's General Account).

**ANSWER:**

PRIAC denies the allegations in paragraph 179 of the Amended Complaint.

180.    As set forth above, each such separate account was comprised of a mutual fund or similar investment product "wrapped" in PRIAC's additional layer of fees.

**ANSWER:**

PRIAC denies the allegations in paragraph 180 of the Amended Complaint.

181.    As set forth above, these additional fees were excessive and a prudent fiduciary could have easily avoided them by purchasing equivalent investment management directly from the sub-advisor.

**ANSWER:**

PRIAC denies the allegations in paragraph 181 of the Amended Complaint.

182.    For each investment option, the sub-advisor who actually managed the Plan's investment option offered equivalent investment management services for less than was ultimately paid by the Plan.

**ANSWER:**

PRIAC denies the allegations in paragraph 182 of the Amended Complaint.

183.    As set forth above, for each investment option, the difference between the reasonable investment management rates available from the sub-advisor and the fees actually assessed against the Plan represent excessive compensation to Plan service providers.

**ANSWER:**

PRIAC denies the allegations in paragraph 183 of the Amended Complaint.

184.    Even when compared to mutual funds and similar investment products, the fees PRIAC charged in the Plan's separate accounts, and the Fixed Income Fund, were excessive in every category.

**ANSWER:**

PRIAC denies the allegations in paragraph 184 of the Amended Complaint.

185.    The fees available in the mutual fund marketplace to an investor *with only $3,000 to invest* were, and are, substantially lower than those Defendants imposed on the Plan in every investment category.

**ANSWER:**

PRIAC denies the allegations in paragraph 185 of the Amended Complaint.

186.    The Plan contained assets ranging from more than $1.3 billion in 1995 to more than $2.6 billion in 2007.

**ANSWER:**

PRIAC states that the Plan's asset balances during the period from 1995 to 2007 are

reflected on Forms 5500, which are publicly available documents, the contents of which speak

for themselves, and it refers to those Forms 5500 for their contents.  PRIAC admits the Plan's

assets have varied over time and the value of the assets at times in 2005 exceeded $1.3 billion

and at times in 2007 exceeded $2.6 billion.

187.    The size and purchasing power of multi-billion dollar 401(k) plans, like the Plan here, enables plan fiduciaries to contract directly with investment managers and secure investment management services at a fraction of the fees - potentially as low as one-fourth the cost - charged to smaller plans and individual investors in the retail marketplace. More than a decade ago, the Department of Labor emphasized this to 401(k) plan fiduciaries.

**ANSWER:**

PRIAC denies the allegations in paragraph 187 of the Amended Complaint.

188.    Moreover, while paying a fraction of retail fees, by selecting such institutional investment vehicles, plan fiduciaries can establish and control the funds' investment objectives, control and reduce trading costs, and escape the conflicts of interest and scandals that have plagued the retail investment/mutual fund industry for years.

**ANSWER:**

PRIAC denies the allegations in paragraph 188 of the Amended Complaint.

189.    PRIAC did not even consider these sorts of alternatives, or any alternatives that did not impose such unreasonable and excessive fees.

**ANSWER:**

PRIAC denies the allegations in paragraph 189 of the Amended Complaint.

190.    PRIAC squandered the Plan's enormous bargaining power and access to the institutional market by selecting and retaining investment options and sub-advisors that charged

retail fees or their equivalent and then added an additional layer of unnecessary fees.

**ANSWER:**

PRIAC denies the allegations in paragraph 190 of the Amended Complaint.

191.   In exchange for the payment of such fees, the Plan and its participants did not receive additional investment advice or other extra services. To the contrary, in light of the wrap fee PRIAC imposed in addition to the fund's retail fees, the Plan and its participants paid *more* than retail investors *for the same services*, all to the detriment of the Plan and its participants.

**ANSWER:**

PRIAC denies the allegations in paragraph 191 of the Amended Complaint.

192.   Further, PRIAC breached its duty of loyalty by applying different standards in setting the fees it collected for administering CIGNA's defined contribution Plan, compared to the fees PRIAC imposed for administering the CIGNA defined benefit (DB) and non-qualified plans. PRIAC provided free or discounted services to CIGNA for the services that PRIAC provided for the DB and non-qualified plans, in exchange for imposing higher, unreasonable, and excessive fees for the services that PRIAC provided to the defined contribution Plan. These discounts came at the expense of the defined contribution Plan and its participants.

**ANSWER:**

PRIAC denies the allegations in paragraph 192 of the Amended Complaint.

193.   Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 192 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 192 as its answer

to paragraph 193 of the Amended Complaint.

194.   As established above, CIGNA, John Arko, CG Life, the Committee, and PRIAC are fiduciaries to the Plan. As fiduciaries, they are parties in interest under ERISA §3(14). Alternatively, Defendants are parties in interest because: (1) they provide services to the Plan (under §3(14)(B)); and (2) they are the employer whose employees are covered by the Plan (under §3(14)(C)), among others.

**ANSWER:**

The allegations in paragraph 194 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC admits that at one

time John Arko, was a "named fiduciary" of the Plan and that the Committee is a "named

fiduciary" of the Plan.  PRIAC further admits that it has acknowledged certain fiduciary

responsibilities with respect to the Plan but denies that it has had fiduciary status relevant to the

claims asserted in the Amended Complaint.  Except as expressly admitted herein, PRIAC denies

the allegations in paragraph 194 of the Amended Complaint.

195.    ERISA §406(a)(1), 29 U.S.C. §1106(a)(1), provides, in part:

A fiduciary with respect to a plan shall not cause the plan to engage in a
transaction, if he knows or should know that such transaction constitutes a
direct or indirect--

**(C)**    furnishing of goods, services, or facilities between the plan and a
party in interest;

**(D)**    transfer to, or use by or for the benefit of a party in interest, of any
assets of the plan; or

**ANSWER:**

The allegations contained in paragraph 195 of the Amended Complaint purport to

characterize a statute, the terms of which speak for themselves, and, therefore, no response is

required.  To the extent a response is required, PRIAC refers to the statute cited therein for the

full contents and context thereof.

196.    As set forth in detail above, CIGNA, John Arko, the Committee, CG Life, and/or
PRIAC caused the Plan to engage in transactions, including, but not limited to:

A.    Entering into contracts with CG Life, TimesSquare, and PRIAC;

B.    Amending those contracts with CG Life, TimesSquare, and PRIAC;

C.    Evaluating the services provided by CG Life, TimesSquare, and PRIAC to
the Plan and deciding to retain and continue those services; and

D.    Paying invoices and/or authorizing fees to be removed from Plan
accounts.

**ANSWER:**

PRIAC denies the allegations in paragraph 196 of the Amended Complaint.

197.    CIGNA, John Arko, the Committee, CG Life and/or PRIAC in engaging in the transactions above knew or should have known such transactions constituted the direct or indirect furnishing of services:

A.    Between the Plan and CG Life in that CG Life provided record keeping, administrative, and investment management and advisory services to the Plan;

B.    Between the Plan and PRIAC in that PRIAC provided record keeping, administrative, and investment management and advisory services to the Plan;

C.    Between the Plan and CG Life in that CG Life provided its own proprietary separate accounts as investment options within the Plan;

D.    Between the Plan and PRIAC in that PRIAC provided its own proprietary separate accounts as investment options within the Plan;

E.    Between the Plan and CG Life in that CG Life issued the variable group annuity contract;

F.    Between the Plan and PRIAC in that PRIAC issued the variable group annuity contract;

G.    Between the Plan and CG Life in that CG Life issued the fixed group annuity contract for the Fixed Income Fund, which is a Plan investment option;

H.    Between the Plan and PRIAC in that PRIAC issued the fixed group annuity contract for the Fixed Income Fund, which is a Plan investment option; and

I.    Between the Plan and TimesSquare in that TimesSquare provided investment management services to the Plan's Fixed Income Fund, the S&P 500 Index Fund, the Small Cap Growth/TimesSquare Fund, and the High Yield Bond Fund.

**ANSWER:**

PRIAC denies the allegations in paragraph 197 of the Amended Complaint.

198.    There is no prohibited transaction exemption with which Defendants complied that applies to Plaintiffs' claims.

**ANSWER:**

The allegations in paragraph 198 of the Amended Complaint assert legal conclusions to

66

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 198.

198.    The total fees paid to CG Life, TimesSquare and PRIAC for their services to the Plan were unreasonable in light of the services provided. Further, CIGNA, John Arko, and/or the Committee failed to negotiate additional services or rebates from CG Life, TimesSquare and PRIAC on behalf of the Plan.

**ANSWER:**

PRIAC denies the allegations in paragraph 199 of the Amended Complaint.

200.    As set forth above, the Defendants did not compensate the Plan for the use of its assets.

**ANSWER:**

PRIAC denies the allegations in paragraph 200 of the Amended Complaint.

201.    As a result of these prohibited transactions, Defendants have received excessive and improper revenues and profits.

**ANSWER:**

PRIAC denies the allegations in paragraph 201 of the Amended Complaint.

202.    As set forth in detail above, CIGNA, John Arko, the Committee, CG Life, and/or PRIAC, in concert with one another, caused the Plan to engage in transactions, including, but not limited to:

> A.    Entering into contracts with CG Life, TimesSquare, and PRIAC;
>
> B.    Amending those contracts with CG Life, TimesSquare, and PRIAC;
>
> C.    Evaluating the services provided by CG Life, TimesSquare, and PRIAC to the Plan and deciding to retain and continue those services; and
>
> D.    Paying invoices and/or authorizing fees to be removed from Plan accounts.

**ANSWER:**

PRIAC denies the allegations in paragraph 202 of the Amended Complaint.

203.    CIGNA, John Arko, the Committee, CG Life and/or PRIAC in engaging in the transactions identified in ¶¶196-197, knew or should have known such transactions constituted the direct or indirect transfer to, or use by, or for the benefit of CG Life, TimesSquare, and

PRIAC assets of the Plan in that, among other things:

A.    Through CG Life's Fixed Income Fund, CG Life received and used well in excess of $1 billion of Plan assets;

B.    Through PRIAC's Fixed Income Fund, PRIAC received and used well in excess of $1 billion of Plan assets;

C.    Through CG Life's separate accounts and the Fixed Income Fund, CG Life received and used almost $2 billion from the Plan as assets under management, receiving the benefit of an enhanced value and sale price of CG Life and CIGNA's Retirement Business;

D.    Through PRIAC's separate accounts and the Fixed Income Fund, PRIAC received and used almost $2 billion from the Plan as assets under management, receiving millions of dollars in fees for the benefit of PRIAC;

E.    Plan assets were transferred to and used as assets under management of CG Life, from which CG Life generated revenues and profits for the benefit of CIGNA;

F.    Plan assets, in excess of $1.2 billion, were used as seed money to establish TimesSquare;

G.    Plan assets were transferred to and used as assets under management of TimesSquare, from which TimesSquare generated revenues and profits for the benefit of CIGNA;

H.    For the benefit of TimesSquare and CIGNA insiders, CIGNA sold TimesSquare to its officers and directors, generating increased revenues and profits from the proceeds of that sale for CIGNA.

**ANSWER:**

PRIAC denies the allegations in paragraph 203 of the Amended Complaint.

204.    There is no prohibited transaction exemption with which Defendants complied that applies to Plaintiffs' claims.

**ANSWER:**

The allegations in paragraph 204 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 204.

205.    The total fees paid to CG Life, TimesSquare, and PRIAC for their services to the Plan were unreasonable in light of the services provided. Further, CIGNA, John Arko, and/or the Committee failed to negotiate additional services or rebates from CG Life, TimesSquare, and PRIAC on behalf of the Plan.

**ANSWER:**

PRIAC denies the allegations in paragraph 205 of the Amended Complaint.

206.    As set forth above, the Defendants did not compensate the Plan for the use of its assets.

**ANSWER:**

PRIAC denies the allegations in paragraph 206 of the Amended Complaint.

207.    As a result of these prohibited transactions, Defendants have received excessive and improper revenues and profits.

**ANSWER:**

PRIAC denies the allegations in paragraph 207 of the Amended Complaint.

208.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 207 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 207 as their

answer to paragraph 208 of the Amended Complaint.

209.    As established above, CIGNA, John Arko, CG Life, the Committee, and PRIAC are fiduciaries to the Plan.

**ANSWER:**

The allegations in paragraph 209 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC admits that at one

time John Arko, was a "named fiduciary" of the Plan and that the Committee is a "named

fiduciary" of the Plan.  PRIAC further admits that it has acknowledged certain fiduciary

responsibilities with respect to the Plan but denies that it has had fiduciary status relevant to the

claims asserted in the Amended Complaint.  Except as expressly admitted herein, PRIAC denies

the allegations in paragraph 209 of the Amended Complaint.

210.    ERISA §406(b), 29 U.S.C. § 1106(b), provides, in part:

A fiduciary with respect to a plan shall not--

(1)    deal with the assets of the plan in his own interest or for his own account,

(2)    in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan

**ANSWER:**

The allegations contained in paragraph 210 of the Amended Complaint purport to

characterize a statute, the terms of which speak for themselves, and, therefore, no response is

required.  To the extent a response is required, PRIAC refers to the statute cited therein for the

full contents and context thereof.

211.    As set forth above, Defendants dealt with the assets of the Plan in their own interest and for their own account in that, among other things:

A.    As set forth above, CIGNA, John Arko, the Committee, and/or CG Life transferred to TimesSquare more than $1.2 billion of Plan assets, more than two thirds of all the assets in the Plan, as seed money to establish a wholly owned, for-profit investment management company so as to generate additional revenues and profits for CIGNA and/or TimesSquare;

B.    As set forth above, CIGNA, John Arko, and/or the Committee included and retained as Plan investment options virtually exclusively CG Life separate accounts and/or direct investment in CG Life's General Account, and thereby funneled revenues and profits received from managing the investment of Plan assets to CIGNA;

C.    As set forth above, CIGNA, John Arko, and/or the Committee selected and retained CG Life as the Plan's recordkeeper and primary administrative service provider, charged excessive and unreasonable fees for those services, and thereby funneled to CIGNA revenues and profits

generated from asset-based fees assessed against, and removed from, Plan assets;

D.      As set forth above, CIGNA, John Arko, the Committee, and/or CG Life selected and retained TimesSquare to manage Plan assets in the Fixed Income Fund, the High Yield Bond Fund, the S&P 500 Index Fund, and the Small Cap Growth/TimesSquare Fund and, by doing so, caused the Plan to pay for the benefit of CIGNA, *both* Times Square's retail expense ratio for each such fund *and* CG Life's additional fee;

E.      As set forth above, PRIAC selected and retained Quantitative Asset Management (a Prudential entity) to manage Plan assets in the S&P 500 Index Fund and, by doing so, caused the Plan to pay for the benefit of PRIAC, *both* Quantitative Asset Management's retail-level expense ratio *and* PRIAC's additional fee; and

F.      As set forth above, CIGNA, John Arko, and/or the Committee caused or allowed CG Life and TimesSquare to retain Additional Compensation Streams produced by Plan assets so as to generate revenues and profits for the benefit of CIGNA.

**ANSWER:**

    PRIAC denies the allegations in paragraph 211 of the Amended Complaint.

    212.    Defendants, in their individual and corporate capacities, acted in transactions involving the Plan on behalf of CIGNA, CG Life, TimesSquare, and PRIAC, whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries in that:

A.      As set forth above, CIGNA, John Arko, and/or the Committee negotiated and amended a Variable Group Annuity Contract with CG Life. The interests of CG Life and CIGNA (as its parent) were to impose as high fees and rates as possible along with negotiating other terms of the contract in their best business interests. Conversely, CIGNA, John Arko, and/or the Committee negotiated on behalf of the Plan;

B.      As set forth above, CIGNA, John Arko, and/or the Committee selected and retained CG Life as the Plan's recordkeeper and primary administrative service provider on behalf of CIGNA and CG Life. The interests of CG Life and CIGNA were to impose as high fees as possible for such services and were directly adverse to the interests of the Plan to pay as low fees as possible;

C.      Defendants selected, contracted with, amended contracts, and retained TimesSquare as investment manager of the Fixed Income Fund, S&P 500 Index Fund, and Small Cap Growth/TimesSquare Fund on behalf of TimesSquare and CIGNA. The interests of TimesSquare and CIGNA

were to impose as high investment management fees as possible, and were directly adverse to the Plan's interest to pay as low management fees as possible; and

D.  Defendants selected, contracted with, amended contracts, and retained Quantitative Asset Management as investment manager of the S&P 500 on behalf of PRIAC. The interests of PRIAC were to impose as high investment management fees as possible, and were directly adverse to the Plan's interest to pay as low management fees as possible.

**ANSWER:**

To the extent the allegations in paragraph 212 of the Amended Complaint relate solely to the CIGNA Defendants, PRIAC is not required to respond.  To the extent a response is required, PRIAC denies the allegations in paragraph 212.

213.    As set forth above, CIGNA received consideration for its own personal account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan in that it:

A.  As set forth above, CIGNA received revenues and profits from CG Life in connection with the selection and retention of CG Life separate accounts and the Fixed Income Account as Plan investment options;

B.  As set forth above, CIGNA received revenues and profits from TimesSquare in connection with the selection and retention of TimesSquare as an investment manager for the Plans;

C.  As set forth above, CIGNA received hundreds of millions of dollars in profits in connection with the sale of its Retirement Business to PRIAC, while Plan assets constituted in excess of $2.4 billion, approximately 10%, of the assets under management on which the sale price depended; and

D.  CIGNA set its own compensation by selecting its own affiliates as service providers to the Plan, for which those affiliates collected revenues and profits for the benefit of CIGNA.

**ANSWER:**

Paragraph 213 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC denies the allegations in paragraph 213.

214.    Further, CIGNA received consideration for its own personal account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan in that it received free or discounted services from PRIAC for services that PRIAC provided for other corporate plans - specifically the CIGNA defined benefit (DB) and non-qualified plans. Those discounts were provided in exchange for imposing higher, unreasonable, and excessive fees for the services that PRIAC provided to the defined contribution Plan. Because CIGNA otherwise would have had to pay the non-discounted rates out of its corporate accounts, the discounts inured to the benefit of CIGNA, and came at the expense of the defined contribution Plan and its participants.

**ANSWER:**

PRIAC denies the allegations in paragraph 214 of the Amended Complaint.

215.    As set forth above, CG Life received consideration for its own personal account from a party dealing with the Plan in connection with transactions involving the assets of the Plan in that it:

> A.    Received excessive and unreasonable investment management fees, assessed against and collected from Plan assets pursuant to agreements between Defendants and CG Life and by reason of selection and retention of CG Life separate accounts and the CG Life Fixed Income Fund as investment options;

> B.    Received excessive and unreasonable record keeping and administrative fees, assessed against and collected from Plan assets, pursuant to agreements between Defendants and CG Life;

> C.    Received revenue sharing payments from investment managers of the Plan's investment options pursuant to investment management agreements between investment option sub-advisors and CG Life; and

> D.    Received Additional Compensation Streams collected from Plan assets by reason of investment management and other agreements between CG Life, the Plan, Defendants, and other service providers.

**ANSWER:**

Paragraph 215 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC denies the allegations in paragraph 215.

216.    TimesSquare received consideration for its own personal account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan in that:

> A.    It received fees as investment manager of the Plan's Fixed Income Fund,

S&P 500 Index Fund, Small Cap Growth/TimesSquare Fund, and High Yield Bond Fund pursuant to agreements between TimesSquare and CG Life;

B.     The above described consideration was received by CIGNA, CG Life, and/or TimesSquare as a result of;

C.     CIGNA, John Arko, the Committee and/or CG Life contracting with TimesSquare or amending such contract;

D.     CIGNA, John Arko and/or the Committee contracting with CG Life or amending such contract;

E.     Participants investing in CG Life separate accounts or the fixed income fund through the Plan; or

F.     Participants directing previously deposited funds into a CG Life separate account or the fixed income fund through the Plan.

**ANSWER:**

Paragraph 216 of the Amended Complaint relates solely to the CIGNA Defendants and PRIAC is therefore not required to respond.  To the extent a response is required, PRIAC denies the allegations in paragraph 216.

217.    As set forth above, PRIAC received consideration for its own personal account from a party dealing with the Plan in connection with transactions involving the assets of the Plan in that it:

A.     Received excessive and unreasonable investment management fees, assessed against and collected from Plan assets pursuant to agreements between Defendants and PRIAC and by reason of selection and retention of PRIAC separate accounts and the PRIAC Fixed Income Fund as investment options;

B.     Received excessive and unreasonable record keeping and administrative fees, assessed against and collected from Plan assets, pursuant to agreements between Defendants and PRIAC;

C.     Received revenue sharing payments from investment managers of the Plan's investment options pursuant to investment management agreements between investment option sub-advisors and PRIAC;

D.     Received Additional Compensation Streams collected from Plan assets by reason of investment management and other agreements between PRIAC,

the Plan, Defendants, and other service providers; and

    E.    Received revenues and profits from Quantitative Asset Management in connection with the selection and retention of Quantitative Asset Management as an investment manager for the Plans; and

    F.    PRIAC set its own compensation in that it had authority to select and retain investment managers based on the amount of revenue sharing the investment manager agreed to provide to PRIAC.

**ANSWER:**

PRIAC denies the allegations in paragraph 217 of the Amended Complaint.

218.    There is no prohibited transaction exemption with which Defendants complied that applies to Plaintiffs' claims.

**ANSWER:**

The allegations in paragraph 218 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 218.

219.    The total fees paid to CG Life, TimesSquare, and PRIAC for their services to the Plan were unreasonable in light of the services provided. Further, CIGNA, John Arko, and/or the Committee failed to negotiate additional services or rebates from CG Life, TimesSquare and PRIAC on behalf of the Plan.

**ANSWER:**

PRIAC denies the allegations in paragraph 219 of the Amended Complaint.

220.    As set forth above, the Defendants did not compensate the Plan for the use of its assets.

**ANSWER:**

PRIAC denies the allegations in paragraph 220 of the Amended Complaint.

221.    As a result of these prohibited transactions, Defendants have received illicit and improper revenues and profits.

**ANSWER:**

PRIAC denies the allegations in paragraph 221 of the Amended Complaint.

222.    As a result of these breaches, the Plan, Plaintiffs, the Class, and the Plan's participants and beneficiaries have suffered financial losses and damages.

**ANSWER:**

PRIAC denies the allegations in paragraph 222 of the Amended Complaint.

223.    Pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 & 1132, Defendants are personally liable to make good to the Plan for the losses it experienced as a result of Defendants' breaches of fiduciary duty and to disgorge all revenues and profits CIGNA, CG Life, TimesSquare, PRIAC, and/or any affiliated entities have received.

**ANSWER:**

PRIAC denies the allegations in paragraph 223 of the Amended Complaint.

224.    Pursuant to ERISA §§409 and 502(a)(2), Defendants are personally liable for any other available and appropriate equitable relief, including disgorgement of all revenues and profits CIGNA, CG Life, TimesSquare, PRIAC and/or any affiliated entities have received; an accounting; prospective injunctive relief and declaratory relief; attorney's fees; and any other relief the court deems appropriate.

**ANSWER:**

The allegations in paragraph 224 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs

are entitled to the relief requested in paragraph 224 of the Amended Complaint.

225.    Pursuant to ERISA §502(a)(3), the Court must order Defendants to disgorge all revenues and profits CIGNA, CG Life, TimesSquare, PRIAC and/or any affiliated entities have received; to render an accounting and enjoin any act which violates ERISA and/or to order that the Defendants are liable for other appropriate equitable relief to redress such violations and/or enforce the terms of ERISA.

**ANSWER:**

The allegations in paragraph 225 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs

are entitled to the relief requested in paragraph 225.

226.    As a result of the foregoing breaches, Defendants received prohibited revenues and profits, and must disgorge such revenues and profits.

**ANSWER:**

The allegations in paragraph 226 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs are entitled to the relief requested in paragraph 226.

227.    In the alternative and in addition to the foregoing, to the extent that CG Life is deemed not to be a fiduciary of the Plans, as a non-fiduciary, CG Life unlawfully received plan assets as a party in interest and may be held liable because of its actual or constructive knowledge of the circumstances that created the unlawful transfer.

**ANSWER:**

The allegations in paragraph 227 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies the allegations in paragraph 227.

228.    In the alternative and in addition to the foregoing, to the extent that PRIAC is deemed not to be a fiduciary of the Plans for all purposes, as a non-fiduciary, PRIAC unlawfully received plan assets as a party in interest and may be held liable because of its actual or constructive knowledge of the circumstances that created the unlawful transfer.

**ANSWER:**

The allegations in paragraph 228 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies the allegations in paragraph 228.

229.    Defendants failed to prudently pursue compensation or other remedies for the Plan as a result of breaches of fiduciary duties committed by other Plan fiduciaries including former Plan fiduciaries.

**ANSWER:**

PRIAC denies the allegations in paragraph 229 of the Amended Complaint.

230.    Pursuant to ERISA §405, 29 U.S.C. § 1105, Defendants are jointly and severally liable for all such breaches, as well as all those committed by other fiduciaries, in that they:

A.    knowing that their conduct was a breach of fiduciary duty, knowingly participated in the breach and/or knowingly undertook to conceal it

      B.     by breaches of their duties of prudence, loyalty and other obligations under 29 U.S.C. §1104(a)(1) & (2), enabled other fiduciaries to commit a breach of fiduciary duty; and/or

      C.     with knowledge of a breach or breaches by other fiduciaries, including past fiduciaries, made no reasonable effort to remedy such breaches.

**ANSWER:**

The allegations in paragraph 230 of the Amended Complaint assert legal conclusions to which no response is required. To the extent a response is required, PRIAC denies the allegations in paragraph 230.

231.    As a result of the foregoing breaches and all causes of action asserted in the Third Amended Complaint, the Plan, Plaintiffs, the Class, and the Plan's participants and beneficiaries have suffered financial losses and damages.

**ANSWER:**

PRIAC denies the allegations in paragraph 231 of the Amended Complaint.

232.    Pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 & 1132, Defendants are personally liable to make good to the Plan for the losses it experienced as a result of Defendants' breaches of fiduciary duty and to disgorge all revenues and profits CIGNA, CG Life, TimesSquare, PRIAC and/or any affiliated entities have received.

**ANSWER:**

The allegations in paragraph 232 of the Amended Complaint assert legal conclusions to which no response is required. To the extent a response is required, PRIAC denies that plaintiffs are entitled to the relief requested in paragraph 232.

233.    Pursuant to ERISA §§409 and 502(a)(2), Defendants are personally liable for any other available and appropriate equitable relief, including disgorgement of all revenues and profits CIGNA, CG Life, TimesSquare, PRIAC and/or any affiliated entities have received; an accounting; prospective injunctive relief and declaratory relief; attorney's fees; and any other relief the court deems appropriate.

**ANSWER:**

The allegations in paragraph 233 of the Amended Complaint assert legal conclusions to which no response is required. To the extent a response is required, PRIAC denies that plaintiffs

are entitled to the relief requested in paragraph 233.

234.    Pursuant to ERISA §502(a)(3), the Court must order Defendants to disgorge all revenues and profits CIGNA, CG Life, TimesSquare, PRIAC and/or any affiliated entities have received; to render an accounting and enjoin any act which violates ERISA and/or to order that the Defendants are liable for other appropriate equitable relief to redress such violations and/or enforce the terms of ERISA.

**ANSWER:**

The allegations in paragraph 234 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs

are entitled to the relief requested in paragraph 234.

235.    As a result of the foregoing breaches, Defendants received prohibited revenues and profits, and must disgorge such revenues and profits.

**ANSWER:**

The allegations in paragraph 235 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs

are entitled to the relief requested in paragraph 235.

236.    In the alternative and in addition to the foregoing, to the extent that CG Life, PRIAC or TimesSquare are deemed not to be fiduciaries of the Plan for all purposes, CG Life PRIAC, and TimesSquare as non-fiduciaries, unlawfully received plan assets as a party in interest and may be held liable because of their actual or constructive knowledge of the circumstances that created the unlawful transfer.

**ANSWER:**

The allegations in paragraph 236 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs

are entitled to the relief requested in paragraph 236.

237.    Defendants failed to prudently pursue compensation or other remedies for the Plan as a result of breaches of fiduciary duties committed by other Plan fiduciaries including former Plan fiduciaries.

**ANSWER:**

PRIAC denies the allegations in paragraph 237 of the complaint.

238.    Pursuant to ERISA §405, 29 U.S.C. § 1105, Defendants are jointly and severally liable for all such breaches, as well as all those committed by other fiduciaries, in that they:

> A.    knowing that their conduct was a breach of fiduciary duty, knowingly participated in the breach and/or knowingly undertook to conceal it;
>
> B.    by breaches of their duties of prudence, loyalty and other obligations under 29 U.S.C. § 1104(a), enabled other fiduciaries to commit a breach of fiduciary duty; and/or
>
> C.    with knowledge of a breach or breaches by other fiduciaries, including past fiduciaries, made no reasonable effort to remedy such breaches.

**ANSWER:**

The allegations in paragraph 238 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 238.

239.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 238 as though fully set forth here.

**ANSWER:**

PRIAC restates and incorporates its responses to paragraphs 1 through 238 as their

answer to paragraph 239 of the Amended Complaint.

240.    In addition to, and as an alternative to, the causes of action stated in Counts I - IX, Plaintiffs seek further relief pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3).

**ANSWER:**

PRIAC admits that Plaintiffs purport to seek relief pursuant to ERISA § 502(a)(3), 29

U.S.C. § 1132(a)(3), but denies that Plaintiffs are entitled to the relief requested.

241.    Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

**ANSWER:**

The allegations contained in paragraph 241 of the Amended Complaint purport to

characterize a statute, the terms of which speak for themselves, and, therefore, no response is

required.  To the extent a response is required, PRIAC refers to the statute cited therein for the

full contents and context thereof.

242.    Defendants are the primary fiduciaries of the Plan and occupy a position of trust
and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and
beneficiaries.

**ANSWER:**

The allegations in paragraph 242 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC admits that it has

acknowledged certain fiduciary responsibilities with respect to the Plan but denies that it has had

fiduciary status relevant to the claims asserted in the Amended Complaint.  Except as expressly

admitted herein, PRIAC denies the allegations in paragraph 242 of the Amended Complaint.

243.    Defendants have exclusive discretion and control over the Plan's assets and are
strictly obligated to exercise that control "for the exclusive purposes of providing benefits to
participants in the Plan and their beneficiaries and defraying reasonable expenses of
administering the Plan."

**ANSWER:**

The allegations in paragraph 243 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC admits that it has

acknowledged certain fiduciary responsibilities with respect to the Plan, and that to the extent it

is a fiduciary it owes obligations to the Plan as set forth in ERISA, but denies that it has had

fiduciary status relevant to the claims asserted in the Amended Complaint.  Except as expressly

admitted herein, PRIAC denies the allegations in paragraph 243 of the Amended Complaint.

244.    By accepting possession and control over Plan participants' assets, Defendants
necessarily have also accepted the obligation to explain and account for every transaction,

expenditure, application, and distribution of such assets.

**ANSWER:**

PRIAC denies the allegations in paragraph 244 of the Amended Complaint.

245.    Although only Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

**ANSWER:**

PRIAC denies the allegations in paragraph 245 of the Amended Complaint.

246.    Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

**ANSWER:**

The allegations in paragraph 246 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations in paragraph 246.

247.    As set forth in detail above, Defendants have caused and/or allowed the Plan to pay - directly and via hidden revenue sharing transfers and hidden Additional Compensation Streams - excess fees and expenses to Plan service providers. Further, Defendants reaped prohibited profits in the sale of CIGNA's retirement business based upon substantial Plan assets under management.

**ANSWER:**

PRIAC denies the allegations in paragraph 247 of the Amended Complaint.

248.    Litigating and resolving these issues will involve identifying and reconciling multiple transfers, payments, and flows of Plan assets that occurred while such Plan assets were within Defendants' possession and control.

**ANSWER:**

PRIAC denies the allegations in paragraph 248 of the Amended Complaint.

249.    Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

**ANSWER:**

PRIAC denies the allegations in paragraph 249 of the Amended Complaint.

250.    An accounting is a particularly appropriate equitable remedy in circumstances where, as here, the underlying action and accounts are so complicated that a normal action for a fixed sum may not be practical.

**ANSWER:**

The allegations in paragraph 250 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs

are entitled to the relief requested in paragraph 250.

251.    In such an accounting, in light of their possession and control of Plan assets and information about how Plan assets have been applied and distributed, Defendants must bear the burden of proving all Plan transactions and their propriety.

**ANSWER:**

The allegations in paragraph 251 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies the

allegations contained in paragraph 251.

252.    Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of the Plan and its assets.

**ANSWER:**

The allegations in paragraph 252 of the Amended Complaint assert legal conclusions to

which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs

are entitled to the relief requested in paragraph 252.

253.    Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to CIGNA and/or third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

**ANSWER:**

The allegations in paragraph 253 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs are entitled to the relief requested in paragraph 253.

254.    Plaintiffs respectfully request that the Court charge/surcharge against the Defendants and in favor of the Plan all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA.

**ANSWER:**

The allegations in paragraph 254 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies that plaintiffs are entitled to the relief requested in paragraph 254.

255.    Plaintiffs respectfully request that the Court order Defendants to disgorge all profits they received, including profits received by subsidiaries and affiliated companies, in respect of the Plan and all amounts credited to Defendants for administrative costs which Defendants were obligated to pay and which Defendants assured Plan participants Defendants did pay.

**ANSWER:**

The allegations in paragraph 255 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies the allegations and denies that plaintiffs are entitled to the relief requested in paragraph 255.

256.    Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease so that the Plan's participants and beneficiaries will receive the full benefit of their retirement savings in the future.

**ANSWER:**

The allegations in paragraph 256 of the Amended Complaint assert legal conclusions to which no response is required.  To the extent a response is required, PRIAC denies the allegations and denies that plaintiffs are entitled to the relief requested in paragraph 256.

**FIRST DEFENSE**

The Amended Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

Insofar as the Amended Complaint purports to allege claims of breach of fiduciary duty as a result of misrepresentations, the averments of the circumstances constituting the alleged fraud or mistake have not been alleged with the requisite particularity required by Federal Rule of Civil Procedure 9(b).

## THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations and/or the doctrine of laches.

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

## FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

## SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by their lack of standing.

## SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs exercised independent control over their Plan accounts.

## EIGHTH DEFENSE

The Plans at issue satisfy the relevant requirements of ERISA §404(c), 29 U.S.C. §1104(c).

## NINTH DEFENSE

To the extent that Plaintiffs assert claims under ERISA § 406, 29 U.S.C. § 1106, the claims are barred, in whole or in part, pursuant to ERISA § 408, 29 U.S.C. § 1108 because PRIAC received no more than reasonable compensation.

## TENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the Amended Complaint seeks relief that cannot be obtained under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), and it seeks relief that is not appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## ELEVENTH DEFENSE

Plaintiffs are not entitled to a jury trial.

## RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES

PRIAC reserves the right to assert, and hereby gives notice that it intends to rely upon, any other defense that may become available or appear during discovery proceedings or otherwise in this case and hereby reserves the right to amend its Answer to assert any such defense.

## DEMAND FOR JUDGMENT

WHEREFORE, PRIAC respectfully requests that the Court:

a)      dismiss the Amended Complaint with prejudice;

b)      award PRIAC its attorneys' fees and costs; and

c)      grant such other and further relief as the Court deems just and proper.

Dated:  August 6, 2010                    Respectfully submitted,

                                          /s/ Robert N. Eccles
                                          *Lead Counsel for Defendant*
                                          *Prudential Retirement Insurance and*
                                          *Annuity Company*

                                          Robert N. Eccles
                                          Brian D. Boyle
                                          O'MELVENY & MYERS LLP
                                          1625 Eye Street, N.W.
                                          Washington, D.C. 20006
                                          (202) 383-5300

                                          John Grossbart
                                          Geoffrey J. Repo
                                          SONNENSCHEIN NATH & ROSENTHAL LLP
                                          233 S. Wacker Drive
                                          Suite 7800
                                          Chicago, IL  60606
                                          (312) 876-8000

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2010, I filed this document with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Troy A. Doles
SCHLICHTER BOGARD & DENTON
Suite 900
100 S. 4th Street
St. Louis, MO  63102

Sari M. Alamuddin
James E. Bayles, Jr.
LEWIS & BOCKIUS, LLP
77 West Wacker Drive
Fifth Floor
Chicago, IL  60601

Azeez Hayne
Joseph J. Costello
MORGAN LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103


/s/ Robert N. Eccles