## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| KIM NOLTE, SHERRY LEWIS, and THERESA MITCHELL, individually and as representatives of a class of similarly situated persons, and on behalf of the CIGNA 401(k) Plan, <br><br> Plaintiffs, <br><br> v. <br><br> CIGNA CORPORATION, JOHN ARKO, THE CORPORATE BENEFIT PLAN COMMITTEE OF CIGNA, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, TIMESSQUARE CAPITAL MANAGEMENT, INC., CIGNA INVESTMENTS, INC., AND PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY, <br><br> Defendants. | Case No. 2:07-cv-02046-HAB-DGB <br><br> Judge Harold A. Baker <br><br> Magistrate Judge David G. Bernthal |

## MEMORANDUM IN SUPPORT OF DEFENDANT PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS

The central contention in plaintiffs' Third Amended Complaint for Breach of Fiduciary Duty (the "Complaint") is that the fiduciaries of the CIGNA 401(k) Plan (the "Plan")[1] breached duties under ERISA[2] by causing the Plan to incur excessive expenses through the Plan's investment options.  Originally making claims solely against CIGNA entities and personnel, earlier this summer—more than three years after they commenced the action—plaintiffs amended their pleadings to level the same theories against the Plan's current external service

---

[1]  Attached to the Declaration of John Arko ("Arko Decl.") [Dkt. # 19-1] as Exhibit 1 [Dkt. ## 19-2, 19-3].

[2]  Employee Retirement Income Security Act of 1974.

provider, Prudential Retirement Insurance and Annuity Company ("PRIAC").

Plaintiffs' eleventh-hour expansion of the Complaint has needlessly delayed resolution of the litigation, however, as the applicable law makes clear that PRIAC has no fiduciary responsibility for the Plan's incurred costs.  While PRIAC has contractually assumed certain well-defined fiduciary responsibilities to the Plan (including the responsibility for selecting sub-advisors for certain of the Plan's investment options), it does not have fiduciary control over the *expenses* charged to the Plan for its services.  PRIAC has an obvious proprietary role in negotiating the asset-based fees it charges for each of the investment options it offers its 401(k) clients, but that role does not make PRIAC a fiduciary in respect of the Plan's costs.  Instead, the relevant *fiduciary* decision that determines the Plan's expenses is the choice of the investment options to be offered to participants from among those offered by PRIAC.  Here, the governing Plan documents make clear that that the selection of investment products is controlled by CIGNA entities, not PRIAC.

The Seventh Circuit has already spoken to this very issue in *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), a substantially similar case brought by the same plaintiffs' counsel.  In that case, plaintiffs likewise sued the relevant plans' external recordkeeper and manager of the plans' investment options for allegedly causing the plans to incur excessive, investment-based fees.  The Seventh Circuit affirmed the dismissal of plaintiffs' claims against those service providers, recognizing that, as here, the governing documents gave the plans' sponsor control over the selection of the plans' investments.  *Id.* at 583-84.  Under the Seventh Circuit's reasoning, plaintiffs' fiduciary duty claims against PRIAC deserve a similar fate.

In addition to their primary claims for fiduciary liability, plaintiffs also purport to seek "appropriate equitable relief" from PRIAC under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

That claim too should be dismissed because the relief they seek is neither "appropriate" nor "equitable" within the well-settled meaning of § 502(a)(3).

I.     **BACKGROUND**

Plaintiffs Kim Nolte, Sherry Lewis, and Theresa Mitchell purport to bring this suit as a class action on behalf of current, former and future participants and beneficiaries in the Plan.

A.     **The Plan**

The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). (Compl. ¶ 39.) CIGNA Corporation ("CIGNA") is the Plan's sponsor; the Corporate Benefit Plan Committee of CIGNA (the "CIGNA Committee") is the Plan's "named fiduciary"; and John Arko is the Plan's Administrator. (Compl. ¶¶ 1, 14, 20-21.) Eligible employees of CIGNA or its affiliates may—as permitted by § 401(k) of the Internal Revenue Code, 26 U.S.C. § 401(k)—contribute a portion of their pre-tax earnings to the Plan. (Plan,[3] §§ 1.26, 1.58, 1.59, 4.1.) CIGNA matches those employee contributions pursuant to a formula set forth in the Plan. (*Id.* § 4.3.) Since 2001, participating employees have been able to direct that their Plan accounts be invested in any of 22 available investment options. (Compl. ¶ 49.)

As of 2002, those investment options consisted of the following:

a. The "Fixed Income Fund," a group annuity contract issued by Connecticut General Life Insurance Company ("CG Life"). Through the Fixed Income Fund, CG Life offered participants a stated interest rate of return paid out of CG Life's general account and guaranteed principal and accumulated interest against loss. (CIGNA 401(k) Plan Summary Plan Description and Prospectus: Investment Choices, September 23, 2002

---

[3] The Plan is referenced throughout the Complaint. (*See, e.g.*, Compl. ¶¶ 20-21, 37(c), 39, 48-49.)

("2002 IC"), at 16-18 (Arko Decl., Ex. 6 [Dkt. #19-9]));[4]

b.  The CIGNA Stock Fund, trusteed by Mellon Bank (2002 IC at 44);

c.  Fifteen separate accounts offered by CG Life.[5]  For each separate account, CG Life

retained a sub-advisor, or investment manager, to invest the account's assets in stocks or

bonds according to defined investment strategies and goals.  (2002 IC at 18-20, 23-44);

and

d.  Five CIGNA Custom Funds.  Each CIGNA Custom Fund consisted of a pre-set mix of

the Fixed Income Fund and nine CG Life separate accounts intended to provide a diverse

mix of investments appropriate for participants of a particular age group.  (2002 IC at 20-

22.)

CG Life also provided recordkeeping and administrative services to the Plan.  (Compl. ¶ 23.)

In 2004, CIGNA sold its retirement business to Prudential Financial, Inc., and PRIAC

assumed responsibility for providing administrative services to the Plan.  (Compl. ¶ 22.)  On

January 1, 2005, PRIAC replaced CG Life as issuer of the Fixed Income Fund's group annuity

contract.  (Compl. ¶ 24; CIGNA 401(k) Plan Summary Plan Description and Prospectus:

Investment Choices, October 15, 2005 ("2005 IC") at 14 (Arko Decl., Ex. 4 [Dkt. ##19-6, 19-

7]).)  Assets in the CG Life separate accounts offered under the Plan—either directly or through

the CIGNA Custom Funds—were likewise transferred to corresponding PRIAC separate

---

[4]  The SPDs and amendments and supplements to them are referenced in, and thus incorporated
into, the Complaint.  (*See* Compl. ¶ 77 (citing the CIGNA 401(k) Plan Summary Plan
Description and Prospectus Update, July 11, 2003); ¶ 78 (referencing the CIGNA 401(k) Plan
Summary Plan Description and Prospectus: Investment Choices, October 15, 2005); ¶ 74 (citing
the CIGNA 401(k) Plan Summary Plan Description and Prospectus Update, April 1, 2010).)
[5]  A "separate account" is defined under ERISA § 3(17), 29 U.S.C. § 1002(17) as "an account
established or maintained by an insurance company under which income, gains, and losses,
whether or not realized, from assets allocated to such account, are, in accordance with the
applicable contract, credited to or charged against such account without regard to other income,
gains, or losses of the insurance company."

accounts.  (2005 IC at 16-42.)  PRIAC has acknowledged fiduciary responsibility for the selection, monitoring, and removal of sub-advisors for several of those PRIAC separate accounts.  (Compl. ¶ 33.)

Since becoming the Plan's service provider, PRIAC has received compensation for these products and services through asset-based fees charged in connection with the investment options selected by CIGNA entities.  These asset-based charges have been negotiated with CIGNA and have been disclosed in the Plan's summary plan descriptions ("SPDs").  (Compl. ¶¶ 55, 164, 166; 2005 IC at 3.)  As the SPDs have also disclosed, PRIAC is responsible for compensating sub-advisors for the separate accounts out of its own asset-based fees for the respective accounts.  (*See, e.g.*, 2005 IC at 18 ("PRIAC charges an annual fee 0.57% of Fund assets to cover its own administrative expenses as well as the fees it pays to the Fund manager."; *id*. at 21, 23, 25 (same disclosures as to other accounts).)

**B.     Plaintiffs' Claims**

Plaintiffs allege that PRIAC and the "CIGNA Defendants"[6] breached fiduciary duties by causing the Plan to incur unreasonable administrative and investment costs through fees charged in connection with the Plan's investment options.  Plaintiffs bring a total of ten claims based on this allegation, but only five are asserted against PRIAC.  Count VI asserts that PRIAC breached general fiduciary duties under ERISA § 404(a), 29 U.S.C. § 1104(a), by imposing and receiving unreasonable compensation for recordkeeping and administrative services provided to the Plan.  (Compl. ¶¶ 162-75.)  Plaintiffs contend that PRIAC received such compensation (1) in the form of "wrap fees" charged by PRIAC in connection with the separate accounts that are in addition to the fees imposed by the sub-advisors to those accounts; and (2) through payments received by

---

[6]  The "CIGNA Defendants" are defined in the Complaint to include CIGNA, Arko, CG Life, TimesSquare Capital Management, Inc., and CIGNA Investments, Inc.

PRIAC from those sub-advisors.  (*Id*. ¶¶ 164-68.)  Count VII alleges that PRIAC breached duties

under ERISA § 404(a) by selecting overly expensive sub-advisors rather than using the Plan's

size to obtain lower cost alternatives.  (*Id*. ¶¶ 178, 187-89.)  According to plaintiffs, the sub-

advisors' rates, when combined with PRIAC's so-called "wrap fee," resulted in excessive

investment management expenses.  (*Id*. ¶ 190.)  Significantly, however, plaintiffs make no

allegation that PRIAC's selection of sub-advisors was imprudent—*e.g.*, that the chosen sub-

advisors were incompetent or unqualified, and for that reason destined to underperform other

investment managers with similar investment mandates.

Counts VIII and IX recast plaintiffs' theories against PRIAC and the CIGNA Defendants

as claims that defendants engaged in prohibited transactions in violation of ERISA § 406, 29

U.S.C. § 1106.  (*Id*. ¶¶ 193-217.)  Count VIII asserts violations of ERISA § 406(a)—which

prohibits fiduciaries from causing plans to enter into certain transactions involving statutorily-

defined "parties in interest."  Count IX alleges violations of ERISA § 406(b)—which prohibits

certain plan-related transactions involving fiduciaries themselves.  Finally, Count X asserts that

defendants are liable for equitable remedies including an "accounting" and "surcharge" under

ERISA § 502(a)(3).  (*Id*. ¶¶ 239-56.)

## II.    ARGUMENT

### A.    Standard of Review

A motion for judgment on the pleadings is evaluated "under the same standard as a

motion to dismiss under Fed. R. Civ. P. 12(b)."  *GATX Leasing Corp. v. Nat'l Union Fire Ins.

Co*., 64 F.3d 1112, 1114 (7th Cir. 1995).  Dismissal is thus required if the complaint does not

"contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)).  A claim is facially plausible only if the factual allegations are

"enough to raise a right to relief above the speculative level." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quotation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Rather, a complaint that tenders only "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" warrants dismissal. *Id.* (quotation omitted). If the well-pleaded facts raise only a possibility of misconduct, the complaint must be dismissed. *Id.* at 1950.

Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the complaint and are central to the asserted claims. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). As the Seventh Circuit recognized in *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009), this circuit has "been relatively liberal in its approach" to this rule. In *Hecker*—which was brought by the same plaintiffs' counsel as here and involved a substantially similar attempt to pin fiduciary liability on service providers for the fully disclosed fees they charged on investment products selected by 401(k) plan sponsors—the Seventh Circuit held that the district court, in deciding a Rule 12 motion, acted appropriately in considering plan materials, such as summary plan descriptions, that were referenced in the complaint. *Id.* at 582-83. The appellate court further held that the district court could properly consider supplements to the summary plan descriptions that were not themselves referenced in the complaint but "serve[d] much the same purpose as" documents that were. *Id.* at 583.

### B. Counts VI and VII Should Be Dismissed Because PRIAC Has No Fiduciary Status Relevant to Plaintiffs' Claims.

Counts VI and VII assert that PRIAC breached fiduciary duties under ERISA § 404(a) by causing the Plan to incur excessive costs for, respectively, administrative and investment management services. These counts lack merit because, although PRIAC has certain fiduciary

responsibilities with respect to the Plan, it does not act as a fiduciary in collecting its stated

charges for services rendered.

ERISA provides that a person is a plan fiduciary:

> *to the extent* (i) he exercises any discretionary authority or discretionary control
> respecting management of such plan or exercises any authority or control
> respecting management . . .  or disposition of its assets, (ii) he renders investment
> advice for a fee or other compensation, direct or indirect, with respect to any
> moneys or property of such plan, or has any authority or responsibility to do so, or
> (iii) he has any discretionary authority or discretionary responsibility in the
> administration of such plan.

ERISA § 3(21)(A) (emphasis added).

Because ERISA makes a person a fiduciary only "to the extent" that the person performs

fiduciary functions, *see Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000), a plan fiduciary as to

one function is not necessarily a fiduciary with respect to other plan functions. *Chi. District*

*Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 472 (7th Cir. 2007).

("Caremark may be an ERISA fiduciary for some purposes and not for others.").  Accordingly,

"[i]n every case charging breach of ERISA fiduciary duty . . . the threshold question is …

whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function)

when taking the action subject to complaint."  *Pegram*, 530 U.S. at 226.  Because the core

contention in Counts VI and VII is that the Plan incurred unreasonable expenses for plan services,

this means PRIAC can only be liable under those counts if it has had fiduciary authority over

those expenses.  It has not.

Plaintiffs' principal argument that PRIAC controlled the Plan's expenses, including its

own compensation, is premised on the fact the PRIAC had fiduciary authority over the selection

of the sub-advisors to the specific PRIAC separate accounts that CIGNA entities selected as

investment options under the Plans.  (Compl. ¶¶ 33-34, 169-70, 177-78.)  Plaintiffs theorize that

PRIAC used its authority to select more expensive sub-advisors that, in exchange, paid

compensation back to PRIAC.  (*Id.* ¶¶ 34, 170, 178.)  In fact, PRIAC's selection of sub-advisors

had no effect on the costs incurred by the Plan, since PRIAC agreed to bear responsibility for

compensating all sub-advisors out of its own disclosed asset-based fees for each separate account.

Instead, the Plan's incurred costs were controlled by the CIGNA fiduciaries in selecting and

maintaining the investment account offerings for the Plan.

As the SPDs and supplements to the SPDs indicate, PRIAC received a disclosed asset-

based fee for each of the PRIAC separate accounts offered under the Plan and compensated the

sub-advisor out of that fee.  (*See*, *e.g.*, 2005 IC at 18 ("PRIAC charges an annual fee of 0.57% of

Fund assets to cover its own administrative expenses as well as the fees it pays to the Fund

manager.").)  As a result, any alleged selection by PRIAC of overly expensive sub-advisors

(Compl. ¶ 178) would only have decreased the portion of the disclosed asset-based fees retained

by PRIAC and would not have affected the costs incurred by the Plan.  Likewise, any alleged

payments by the sub-advisors back to PRIAC would merely have altered the contractual

arrangement between PRIAC and those sub-advisors—again, with no effect on Plan costs.[7]  The

Plan's costs were thus driven not by any of PRIAC's compensation arrangements with the sub-

---

[7]  This dynamic is addressed in the CIGNA 401(k) Plan Summary Plan Description and
Prospectus: Investment Choices, June 3, 2008 ("2008 IC") (Attached as Ex. E to the Declaration
of Amy Hatfield In Support Of Defendant Prudential Retirement Insurance And Annuity
Company's Motion For Judgment On The Pleadings (Attached at Ex. 1 to Mem. in Support of
Defendant PRIAC's Mot. for J. on the Pleadings)).  That document identifies a single expense
ratio for each investment option and provides "estimates" of the amount of that fee that are
"available to offset . . . the Fund's investment management expenses and to offset [PRIAC's]
expenses for the administrative and recordkeeping services it provides the Plan."  (*Id.* at 6.)  The
SPD then explains, "If [PRIAC's] costs to provide these services are less than its fee, it earns a
profit.  Otherwise, it incurs a loss."  (*Id.*)  As the document further explains, those "costs" that
cut into PRIAC's profitability include the amounts paid to the separate accounts' sub-
advisors/investment managers.  (*See id.* at 7 ("Investment Management Expenses – include the
charge by the Fund's investment manager against the Fund's assets for managing the Fund's
investment portfolio . . . ").)

advisors, but rather by the CIGNA fiduciaries' decisions to include PRIAC separate accounts as

Plan investment options at PRIAC's disclosed rates, and the decisions of Plan participants to

invest their individual accounts in those options.

Plaintiffs do not allege, nor could they plausibly do so, that PRIAC controlled the manner

in which Plan participants allocated their accounts among the available investment options. And,

while plaintiffs assert in conclusory fashion that "PRIAC was and continues to be responsible for

the selection and monitoring of Plan investment options" (Compl. ¶ 33), this assertion is

contradicted by the governing Plan document and summary plan descriptions.[8] The Plan

document instead expressly assigns responsibility for the selection of the Plan's investment

options to the CIGNA Committee—a committee comprised solely of CIGNA officers and

employees—unless that committee delegates that responsibility to another fiduciary. (Plan §

7.1(b).) And the "Investment Choices" component of the 2008 SPD confirms that CIGNA

employees retained final authority over the selection of the Plan's investment options:

> CIGNA Corporation's senior financial and human resources officers have
> appointed several CIGNA Corporation employees to an Investment Review
> Group to review and recommend investment funds for the Plan . . . CIGNA
> Corporation's Corporate Benefit Plan Committee, the plan's named fiduciary,
> adopted the Investment Policy Statement, reviews the recommendations of the
> Investment Review Group and makes final decisions.

(2008 IC at 51; *see also* 2005 IC at 48.)

As the Seventh Circuit recently held in *Hecker*, 556 F.3d 577, it is that "final authority"

over investment selection that matters in determining fiduciary responsibility for the resulting

---

[8]  *See Northern Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."); *Hudson v. Ace Cash Express, Inc.*, 2002 WL 1205060, at *3 & n.1 (S.D. Ind. May 30, 2002) ("Although the court must draw all reasonable inferences in plaintiff's favor, it is not required to accept allegations that are directly contradicted by documents incorporated by reference into plaintiff's complaint.").

costs.  In *Hecker*, as here, plaintiffs asserted breach of fiduciary duty claims against service providers to two 401(k) plans based on allegations that the plans had been made to incur excessive administrative and investment management fees through the plan's investment options. *Id.* at 578.  The Seventh Circuit affirmed dismissal of the claims against the service providers, reasoning that—although plaintiffs had alleged that one service provider "played a role in the selection of investment options"—the plan materials gave the plan's sponsor, not the service providers, "final say on which investment options will be included."  *Id.* at 583-84.  The same logic applies to warrant dismissal of PRIAC here.

To be sure, PRIAC had some influence over the Plan's costs because it determined (subject to negotiations with CIGNA fiduciaries) the asset-based fee it would charge for each of the investment products the CIGNA fiduciaries selected from among the larger group of products PRIAC offered to 401(k) plans.  But PRIAC's role in pricing its investment account offerings cannot be equated with fiduciary control over the Plan's costs.  While PRIAC, like any other business, obviously has a say in the rates at which it is willing to make its products and services available to the Plan and other clients, the Seventh Circuit has repeatedly held that a party does not act as an ERISA fiduciary in negotiating the terms of its own retention—even if it is being retained to serve in a fiduciary capacity.  *See id.* at 583 (discussing Seventh Circuit cases "holding that a service provider does not act as a fiduciary with respect to the terms in the service agreement *if it does not control the named fiduciary's negotiation and approval of those terms.*" (emphasis added)).[9]  Here, PRIAC had to determine what fees to seek in connection with its

_____

[9]  *See also Schulist v. Blue Cross of Iowa,* 717 F.2d 1127, 1131-32 (7th Cir. 1983) (holding that defendant insurer was not liable as a fiduciary for causing the plan to pay it "unreasonable compensation" where compensation was paid according to contracted rates); *Caremark,* 474 F.3d at 473 (holding that pharmaceutical benefits manager did not act as a fiduciary in

investment products, but the CIGNA Committee had final say over whether to choose to select

PRIAC's products for the Plan at those fees, or to negotiate lower fees.  Indeed, the Complaint

underscores this point—emphasizing that the CIGNA Defendants negotiated *lower* fees for the

Plan's investment options after the options became the products of PRIAC.  (Compl. ¶¶ 55-56.)

        In sum, PRIAC has had no fiduciary authority or control over the costs incurred by the

Plan for administrative and investment management services and so cannot be held liable as a

fiduciary for those costs.  Counts VI and VII should be dismissed accordingly.

### C.   Count VIII Should Be Dismissed As Against PRIAC Because PRIAC Did Not Cause the Plan to Enter Into the Challenged Transactions.

        Count VIII alleges that "CIGNA, John Arko, the Committtee, CG Life, and/or PRIAC"

caused the Plan to engage in transactions prohibited under ERISA §§ 406(a)(1)(C) and (D).

(Compl. ¶¶ 196-207.)  Those provisions state that, absent an exemption under ERISA § 408,[10] a

plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know

that such transaction constitutes a direct or indirect— . . . C) furnishing of goods, services, or

facilities between the plan and a party in interest; (D) transfer to, or use by or for the benefit of a

party in interest, of any assets of the plan . . . ."  (*Id.* ¶ 195)  Count VIII thus fails against PRIAC

because PRIAC did not "cause" the Plan to engage in any of the described transactions.

        Plaintiffs identify four sets of "transactions" that they contend violated ERISA §§

406(a)(1)(C) and (D):

> (A) Entering into contracts with CG Life, TimesSquare, and PRIAC;
> (B) Amending those contracts with CG Life, TimesSquare, and PRIAC;
> (C) Evaluating the services provided by CG Life, TimesSquare, and PRIAC to the Plan and deciding to retain and continue those services; and
> (D) Paying invoices and/or authorizing fees to be removed from Plan accounts.

---

negotiating and adhering to an arrangement under which it received payments from the plan that
exceeded its actual costs).

[10]  29 U.S.C. § 1108.

(Compl. ¶¶ 196, 202.)

As a threshold matter, the third of these categories cannot give rise to a violation of ERISA § 406(a), because the mere evaluation or continuance of a service relationship does not constitute a "transaction" within the meaning of the statute.  Rather, as the Ninth Circuit recognized in *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004), a "transaction" involves a "commercial bargain" such as a "sale, exchange, or leasing of property, . . . [or] the lending of money or extension of credit," and does not encompass the mere decision to maintain an existing arrangement.  *Id.* at 1101 (quotation omitted); *see also Tibble v. Edison Int'l*, 639 F. Supp. 2d 1122, 1126 (C.D. Cal. 2009) ("[Defendant's] alleged failure to act, however, cannot constitute a 'transaction' for the purposes of § 1106(a)(1)(D).").

Moreover, there is no basis to conclude that PRIAC caused the Plan to engage in any of the first three categories of "transactions."  PRIAC cannot be responsible for causing the Plan to contract with CG Life or TimesSquare because, according to the Complaint itself, those entities ended their relationships with the Plan at the same time PRIAC assumed its Plan-related roles.[11]  Nor can plaintiffs plausibly assert that PRIAC caused the Plan to contract with PRIAC for services.  As previously discussed, the CIGNA Committee, not PRIAC, was responsible for selecting PRIAC separate accounts as Plan investment options.  And CIGNA entities were likewise responsible for causing the Plan to retain PRIAC for the other services described in Count VIII, as the Complaint itself reflects.  (*See, e.g.,* Compl. ¶¶ 217A-B.)

Finally, as to the remaining category ("Paying invoices and/or authorizing fees to be

---

[11]  Compl. ¶ 53 ("As a result of that sale, PRIAC replaced CG Life, became a fiduciary to the Plan, and provided the same services to the Plan as CG Life had provided before the sale"); ¶ 124 (TimesSquare continued to manage approximately two thirds of the Plan's assets . . . until December 31, 2004.  On that date . . . PRIAC became the investment manager of the Fixed Income Fund and terminated TimesSquare as the sub-advisor/investment manager of the S&P 500 Index Fund.").

removed from Plan accounts"), plaintiffs fail to identify any invoices that PRIAC supposedly paid or fees that PRIAC purportedly authorized—much less allege facts sufficient to show that such payments or authorizations gave rise to prohibited transactions.  Indeed, plaintiffs do not specifically allege that PRIAC itself paid or authorized *any* improper payment of fees from Plan accounts, but rather allege only that PRIAC "and/or" one or more of the other defendants did so. (*Id.* ¶¶ 196, 202.)  Vague and equivocal allegations that *some* defendant paid or authorized *some* unspecified invoices to *some* other unknown party are wholly insufficient to state a claim against any particular defendant.[12]  This is particularly so given the Supreme Court's recent admonition to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 129 S. Ct. at 1949.

Accordingly, Count VIII should be dismissed against PRIAC.

**D.    Count IX Should Be Dismissed As Against PRIAC Because Plaintiffs Have Failed to Sufficiently Allege That PRIAC Was Responsible for Any Prohibited Transactions.**

Count IX alleges that defendants caused the Plan to engage in a variety of transactions prohibited under ERISA § 406(b).  But each of plaintiffs' claims against PRIAC fails either: (1) because PRIAC was not responsible for the transaction at issue; or (2) because plaintiffs simply fail to state a plausible theory of violation.

**1.    ERISA §§ 406(b)(1) & (b)(2)**

---

[12]  *See, e.g., In re Providian Fin. Corp. ERISA Litig.*, No. C 01-05027, 2002 U.S. Dist. LEXIS 25676, at *3-4 (N.D. Cal. Nov. 14, 2002) (finding that ERISA complaint that "lumped the various classes of defendants into an undifferentiated mass and alleged that all of them violated all of the asserted fiduciary duties . . . . fails to put the various defendants on notice of the allegations against them"); *In re McKesson HBOC, Inc. ERISA Litig.*, No. C00-20030, 2002 U.S. Dist. LEXIS 19473, at *10 (N.D. Cal. Sept. 30, 2002) (dismissing ERISA complaint that was "replete with overly general allegations pursuant to which nearly all defendants are generally alleged to be liable for all breaches of fiduciary duty, all the while failing to identify specific defendants who are liable for specific breaches of specific fiduciary duties").

Section 406(b) provides that, absent an exemption under ERISA § 408, a fiduciary shall

not:

    (1) deal with the assets of the plan in his own interest or for his own account;

    (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

    (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving assets of the plan.

Although plaintiffs allege that "defendants" committed numerous violations of ERISA §§

406(b)(1) and (b)(2), they offer only a single theory involving PRIAC.  That theory centers on

PRIAC's use of another Prudential entity, "Quantitative Asset Management" (QMA), as sub-

advisor to the S&P 500 Index Fund separate account used by the Plan.[13]  With respect to §

406(b)(1), plaintiffs allege that, "PRIAC selected and retained Quantitative Asset Management . .

. to manage Plan assets in the S&P 500 Index Fund and, by doing so, caused the Plan to pay for

the benefit of PRIAC, *both* Quantitative Asset Management's retail-level expense ratio *and*

PRIAC's additional fee . . . ."  (Compl. ¶ 211E.)  As to § 406(b)(2), plaintiffs allege that,

"Defendants selected, contracted with, amended contracts, and retained Quantitative Asset

Management as investment manager of the S&P 500 on behalf of PRIAC.  The interests of

PRIAC were to impose as high investment management fees as possible, and were directly

adverse to the Plan's interest to pay as low management fees as possible."  (*Id.* ¶ 212D.)

    Neither theory makes any logical sense, however, because PRIAC's decision to use

QMA's services has not affected the amount of costs borne by the Plan.  As the SPDs show,

PRIAC charges a single asset-based fee for the S&P 500 Index Fund and pays QMA out of that

unitary fee.  (*See, e.g.,* 2005 IC at 28-29; 2008 IC at 6-7.)  Once that fee is set, any payment by

---

[13]  The entity's actual name is Quantitative Management Associates.  (2005 IC at 28.)

PRIAC to QMA merely reallocates PRIAC's disclosed fee among the two Prudential entities.  It

does not cause the Plan incur an "additional fee," and it does not adversely affect the Plan's

interest in maintaining low fees.  PRIAC's setting of the unitary fee, in turn, does not give rise to

a prohibited transaction because, as discussed above (*supra* at 11-12), PRIAC does not act as a

fiduciary in negotiating its charges for its separate account products.  *See Schulist*, 717 F.2d at

1131 (obligations under § 406 "are all premised upon the assumption that the party whose duty is

asserted is a fiduciary under ERISA with respect to the conduct alleged").

### 2.    ERISA § 406(b)(3)

Plaintiffs' theories against PRIAC under ERISA § 406(b)(3) fare no better.  First,

plaintiffs incredibly contend that by simply receiving its negotiated fees for Plan services,

PRIAC violated § 406(b)(3).  (Compl. ¶ 217A-B.)  This grossly misinterprets the statute.  As the

Department of Labor ("DOL")—the administrative agency chiefly responsible for interpreting

and enforcing ERISA's provisions—has opined, "a fiduciary does not engage in an act described

in section 406(b)(3) of ERISA if the fiduciary does not use any of its authority, control, or

responsibility to cause a third party to pay to the fiduciary any compensation in connection with

a transaction involving the assets of the plan."  DOL Adv. Op. 99-03A (Jan. 25, 1999); *RLJCS*

*Enters., Inc. v. Prof. Benefit Trust, Inc.*, 438 F. Supp. 2d 903, 910 (N.D. Ill., 2006) ("An agency's

advisory opinions are not binding authority, but they are entitled to deference if reasonable.").

As explained above, it was the CIGNA Defendants, not PRIAC, who committed the Plan to

retain PRIAC's products and services at PRIAC's rates.  (*See supra* 9-12.)  PRIAC's receipt of

its negotiated compensation therefore does not violate § 406(b)(3).[14]

---

[14]  The DOL's interpretation of § 406(b)(3) is consistent with the purpose of ERISA's prohibited
transaction provisions in § 406.  As the Supreme Court noted in *National Labor Relations Board*
*v. Amax Coal Co.*, 453 U.S. 322 (1981), "[t]he legislative history of ERISA confirms that
Congress intended in particular to prevent trustees 'from engaging in actions where there would

Next, plaintiffs allege that PRIAC violates § 406(b)(3) by receiving "revenues and profits from Quantitative Asset Management" and "revenue sharing payments" from other investment managers in connection with the selection of them as sub-advisors to PRIAC's separate accounts. (Compl. ¶¶ 217C, E-F.)  These theories find no support in the text or purpose of § 406(b)(3) either.

By its terms, § 406(b)(3) only prohibits a fiduciary from receiving consideration "in connection with a transaction *involving the assets of the plan*."  (Emphasis added.)  PRIAC's retention of sub-advisors for its separate accounts does not involve the Plan's assets.  This is because, as specified in the SPDs, the sub-advisors' fees are not charged to the Plan itself but are instead paid by PRIAC out of its own disclosed fees.  (*See, e.g.,* 2005 IC, at 28 ("PRIAC charges an annual fee of 0.60% of Fund assets to cover its administrative expenses as well as the fees it pays to the Fund manager.").)  And, as a matter of law, the fees that PRIAC receives are its *own* assets, not the Plan's.  *See Hecker*,  556 F.3d at 584 ("Once the fees are collected from the mutual fund's assets and transferred to one of the Fidelity entities, they become Fidelity's assets-again, not the assets of the Plans."); *Caremark*, 474 F.3d at 476 n.6 (rebates paid by manufacturers to plan service provider based on sales to ERISA plans were "its own assets," not "plan assets").  Thus, under a plain reading of the statute, PRIAC's retention of the sub-advisors did not violate § 406(b)(3).

Nor does plaintiffs' theory further the statutory provision's purpose: "to prevent a trustee 'from being put into a position where he has dual loyalties, and, therefore, he cannot act

---

be a conflict of interest with the fund, such as representing any party dealing with the fund.'"  *Id*. at 333-34 (quoting S. Rep. No. 93-383, at 31-32 (1973)).  Where, as here, the fiduciary responsible for causing a plan to enter into a transaction involving plan assets is independent from the party who allegedly received payment from the transaction, no such conflict exists. Simply put, there is no risk of self-dealing where the party allegedly receiving payment is not responsible for the decision that results in payment.

exclusively for the benefit of a plan's participants and beneficiaries.'" *National Labor Relations Board*, 453 U.S. at 333-34 (quoting H. R. Conf. Rep. No. 93-1280, at 5089 (1974).)  Plaintiffs contend that PRIAC retained the sub-advisors at inflated rates in exchange for the sub-advisors providing compensation back to PRIAC.  (*See, e.g.,* Compl. ¶¶ 170, 178.)  But PRIAC has no incentive to overpay the sub-advisors because anything it pays comes out of its own disclosed fee.  And, even if PRIAC had such an incentive, any resulting overpayment would have no adverse consequence for the Plan or its participants; they would simply continue to incur PRIAC's explicit asset-based fee, and no more.  In short, PRIAC's alleged arrangements with the sub-advisors do not in any way place PRIAC's interests at odds with those of the Plan or Plan participants.  Lacking both a textual basis and a practical purpose, plaintiffs' "revenue sharing" theories should be rejected.

Finally, plaintiffs allege that PRIAC violated § 406(b)(3) by receiving "Additional Compensation Streams collected from Plan assets by reason of investment management and other agreements between PRIAC, the Plan, Defendants, and other service providers . . . ." (Compl. ¶ 217D.)  But plaintiffs do not identify what "Additional Compensation Streams" (an amorphous term explained only as to other defendants (Compl. ¶ 156)) PRIAC supposedly received.  Nor do they allege any *facts* from which this Court could reasonably infer that PRIAC's alleged receipt of such "Additional Compensation Streams" qualified as prohibited transactions.  Plaintiffs' inscrutable assertions that PRIAC received "Additional Compensation Streams" and that those unidentified "Additional Compensation Streams" violated § 406(b)(3) fail to state a plausible claim for relief under the *Twombly/Iqbal* standard.

Accordingly, Count IX should be dismissed against PRIAC.[15]

### E.      Count X Should Be Dismissed for Multiple Reasons.

Count X purports to seek equitable relief—including injunctive relief, an accounting, surcharge and disgorgement—under ERISA § 502(a)(3).  The count should be dismissed as against PRIAC for multiple reasons.

First, as is the case with respect to Counts VI through IX, plaintiffs' claims against PRIAC under Count X are expressly premised on the assertion that PRIAC is a fiduciary to the Plan.  (*See, e.g.,* Compl. ¶ 242 ("Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.").)  But, as discussed in Section III.B above, PRIAC does not act as an ERISA fiduciary with respect to the conduct challenged in the Complaint.  Thus, like the claims in Count VI through IX, the Count X claims against PRIAC should be dismissed.

Second, even if Count X could be read to encompass claims for non-fiduciary liability, the count would still be subject to dismissal for the independent reason it does not seek relief available under § 502(a)(3).  By it terms, § 502(a)(3) only authorizes a court to remedy violations of statutory or plan provisions by granting an injunction or "other appropriate equitable relief."  As the Supreme Court has recognized, such relief means "*something* less than *all* relief."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 259 n.8 (1993).  In particular, the Supreme Court has recognized that, "almost invariably," suits "seeking (whether by judgment, injunction, or

---

[15]      In addition to plaintiffs' delineated counts, the Complaint contains two sections after Count IX titled, "CLAIMS RELEVANT TO ALL PROHIBITED TRANSACTION ALLEGATIONS," and "DEFENDANTS ARE LIABLE UNDER ERISA FOR THE FOREGOING BREACHES."  Those sections seek in part to hold defendants liable for each other's alleged breaches through theories of non-fiduciary liability under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and co-fiduciary liability under ERISA § 405, 29 U.S.C. § 1105.  To the extent Count IX is intended to encompass those sections, it should still be dismissed for the additional reasons set forth in Sections III.E and III.F below.

declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money

damages,' [which] are, of course, the classic form of *legal* relief.'" *Great-West Life & Annuity*

*Ins. Co. v. Knudson,* 534 U.S. 204, 210 (2002) (citations omitted).

Plaintiffs may cast their requested remedies in equitable terms—"surcharge" and

"disgorgement"—but it is clear they are seeking money damages unavailable under § 502(a)(3).

Equity allows the recovery of money or property only "where money or property identified as

belonging in good conscience to the plaintiff could clearly be traced to particular funds or

property in the defendant's possession." *Id*.  But the Complaint discloses that plaintiffs are not

seeking recovery of specific funds in PRIAC's possession that properly belong to the Plan.  They

are instead seeking broad recovery of "all amounts . . . . which [an] accounting reveals were or

are improper, excessive and/or in violation of ERISA."  (Compl. ¶ 254.)  Recovery of such

amounts falls well outside the realm of equitable relief and thus outside the scope of § 502(a)(3).

Plaintiffs' request for an accounting, in turn, becomes pointless—and thus inappropriate—once

their improper request for a "surcharge" is disallowed, since the object of the accounting is to

identify the "fees and expenses incurred by the Plan" in order to surcharge allegedly excess

amounts against PRIAC.  (Compl. ¶¶ 253-54.)

Finally, although plaintiffs also purport to seek injunctive relief under Count X, they fail

to show an entitlement to such relief.  They do not identify any particular injunction that they

believe would be appropriate.  Nor do they allege any facts to demonstrate irreparable harm or

the inadequacy of legal remedies—a notable omission given the Complaint's acknowledgement

that the compensation practices challenged by plaintiffs have already changed (Compl. ¶ 74.)

*See Bugher v. Feightner,* 722 F.2d 1356, 1360 (7th Cir. 1983) (stating, with respect to §

502(a)(3) claim that the "necessary prerequisite to the right to maintain an equitable action is the

unavailability of an adequate remedy at law . . . ."); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2nd Cir. 2005) (explaining, in dismissing claim for injunctive relief under § 502(a)(3), that "[t]he basic requirements to obtain injunctive relief have always been a showing of irreparable harm and the inadequacy of legal remedies.").  Absent such allegations, plaintiffs' bare assertion that they want an injunction fails to state a viable claim for relief.

      **F.**      <u>**Plaintiffs Have Failed to State a Plausible Claim Against PRIAC for Co-Fiduciary Liability.**</u>

Finally, in addition to their direct breach of fiduciary duty claims, plaintiffs generally seek to hold defendants liable as co-fiduciaries for each other's alleged breaches pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a).  Section 405, however, does not circumvent the rule that a person who performs limited fiduciary functions does not become a fiduciary for all purposes. *See, Pegram*, 530 U.S. at 226.  Consistent with this rule, courts have refused to impose § 405 liability absent a meaningful connection between a defendant's fiduciary role and the alleged breach of a co-fiduciary.  *See, e.g.*, *DiFelice v. US Airways, Inc*., 397 F. Supp. 2d 735, 757 (E.D.Va. 2005) ("[C]o-fiduciary liability, like the general fiduciary liability from which it derives, is not an all or nothing proposition."); *Pension Fund-Mid Jersey Trucking Indus. Local 701 v. Omni Funding Group*, 731 F. Supp. 161, 176 (D.N.J. 1990) ("ERISA does not contemplate that every plan fiduciary become an insurer of the entire plan.").  As explained above, the Complaint fails to establish any significant nexus between PRIAC's fiduciary roles and the challenged conduct, including the alleged breaches of the other defendants.  Indeed, many of the alleged breaches by the other defendants—including all of the alleged misconduct involving defendants CG Life and TimesSquare—occurred before PRIAC assumed any fiduciary responsibilities to the Plan.  *Supra* at 13; *Keach v. U.S. Trust Co*., 240 F. Supp. 840, 844 (C.D. Ill. 2002) ("ERISA makes it clear that no fiduciary can be held liable for any breach of fiduciary

duty that occurred either before he became a fiduciary or after he ceased to be a fiduciary.")
(citing ERISA § 409(b), 29 U.S.C. § 1109(b).)  As such, plaintiffs have failed to state a claim
against PRIAC under § 405.

## CONCLUSION

For the foregoing reasons, PRIAC respectfully requests that the Court dismiss plaintiffs'
claims against PRIAC with prejudice.

Dated:  August 9, 2010                     Respectfully submitted,

                                        /s/ Robert N. Eccles

                                        Robert N. Eccles
Brian D. Boyle
Shannon M. Barrett
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

John Grossbart
Geoffrey J. Repo
SONNENSCHEIN NATH & ROSENTHAL LLP
233 S. Wacker Drive
Suite 7800
Chicago, IL  60606
(312) 876-8000

*Attorneys for defendant*
*Prudential Retirement Insurance and*
*Annuity Company*

22

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with CDIL-LR 7.1(B)(4)(c), I hereby certify that the Memorandum in

Support of Defendant Prudential Retirement Insurance and Annuity Company's Motion For

Judgment On The Pleadings complies with the type-volume limitation of Rule 7.1(B)(4)(b)(1).

The Memorandum contains 6,961 words and 37,110 characters and was prepared in a

proportionally spaced typeface (12-point Times New Roman).


Dated:  August 9, 2010                    Respectfully submitted,

                                          /s/ Robert N. Eccles

                                          Robert N. Eccles
                                          Brian D. Boyle
                                          Shannon M. Barrett
                                          O'MELVENY & MYERS LLP
                                          1625 Eye Street, N.W.
                                          Washington, D.C. 20006
                                          (202) 383-5300


                                          John Grossbart
                                          Geoffrey J. Repo
                                          SONNENSCHEIN NATH & ROSENTHAL LLP
                                          233 S. Wacker Drive
                                          Suite 7800
                                          Chicago, IL  60606
                                          (312) 876-8000

                                          *Attorneys for defendant*
                                          *Prudential Retirement Insurance and*
                                          *Annuity Company*

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2010, I filed this document with the Clerk of the Court

using the CM/ECF system which will send notification of such filing(s) to the following:

Troy A. Doles
SCHLICHTER BOGARD & DENTON
Suite 900
100 S. 4th Street
St. Louis, MO  63102

Sari M. Alamuddin
James E. Bayles, Jr.
MORGAN LEWIS & BOCKIUS, LLP
77 West Wacker Drive
Fifth Floor
Chicago, IL  60601

Azeez Hayne
Joseph J. Costello
MORGAN LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103


/s/ Robert N. Eccles